## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**RUTH SHALIT BARRETT**,

████████████

Plaintiff,

v.

**THE ATLANTIC MONTHLY GROUP LLC**,
600 New Hampshire Avenue, NW FL 4
Washington, D.C. 20037

and

**DONALD CHRISTOPHER PECK**,
600 New Hampshire Avenue, NW FL 4
Washington, D.C. 20037

Defendants.

Case No.: 1:22-cv-49

**COMPLAINT**

JURY TRIAL DEMANDED

## COMPLAINT FOR MONETARY AND INJUNCTIVE RELIEF

1.     Plaintiff Ruth Shalit Barrett brings this Complaint against Defendants The Atlantic Monthly Group LLC ("*The Atlantic*" or "*Atlantic*") and Donald Christopher Peck (collectively, "Defendants").

2.     *The Atlantic* is an internationally prominent media organization that hired Ms. Barrett, an experienced investigative and feature writer, to write an article for its magazine. Although Ms. Barrett's piece was favorably received, *The Atlantic* unlawfully smeared Ms. Barrett for acting in accordance with the law and ethical precepts of the profession of journalism. She alleges causes of action for defamation,

1

defamation per se, invasion of privacy-false light, and tortious interference against *The Atlantic* and Mr. Peck. She also brings separate causes of action against *The Atlantic* for breach of covenant of good faith and fair dealing, breach of contract, breach of implied contract, and rescission.

## I.   INTRODUCTION

3.     In 2020, Ms. Barrett wrote a long-form investigative article for *The Atlantic*, "The Mad, Mad World of Niche Sports Among Ivy League-Obsessed Parents" (hereinafter, "Article").[1] The Article exposed efforts of the affluent residents of the Gold Coast of Connecticut to use niche sports to give their already-privileged children further advantages in the competitive admissions process at elite colleges and universities.  The story drew praise from established journalists, collegiate sports officials, and NCAA athletes. *New York Times* columnist Ginia Bellafante called it "an excellent article" that "outlines the shifting fortunes of wealthy and maniacal parents who immerse their children in boutique sports—squash, fencing—purely as a means of lubricating the path to the Ivy League."

4.     *The Washington Post,* an outlet that has displayed unrelenting hostility toward Ms. Barrett ever since she wrote a highly critical cover story about them for *The New Republic*, was a notable exception. In a series of articles, tweets and video links, Erik Wemple, the *Post'*s chief media critic, targeted Ms. Barrett with a sustained campaign of mudslinging and vilification. He dredged up early-career mistakes that she had made in the mid-1990s, as a young reporter fresh out of college,

---

[1] A copy of the Article is attached as **Exhibit 1**.

and suggested that these missteps should have disqualified her for a writing assignment for *The Atlantic* twenty-seven years later. He proclaimed that her article was full of "distortions and nonsense and contended it depicted rich sports parents unfairly, making them "appear more unreasonable and tyrannical and status-conscious than they are." Mr. Wemple also slammed *The Atlantic* for running Ms. Barrett's piece under her married name, Ruth S. Barrett, arguing that her byline should have included her maiden name, as this was the byline she used when she was accused of journalistic malfeasance in her early 20s.

5.     Under unrelenting pressure from the *Post* and Mr. Wemple, *The Atlantic* decided to retract Ms. Barrett's article. To justify this punishment—an extremely rare occurrence in journalism, generally reserved for instances of grievous error or fraud—*The Atlantic* published an Editor's Note to its website on November 1, 2020, attached hereto as **Exhibit 2**, claiming that "new information" had come to light that revealed Ms. Barrett, a contributor under contract, was actually a disreputable journalist whose facts could not be trusted. Specifically, *The Atlantic* claimed that it had to retract Ms. Barrett's deeply reported piece not because of any meaningful deficiencies in the piece, but because it "cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the article." In order to support its character assassination of Ms. Barrett, which was the foundation for its false contention that *The Atlantic* could not "vouch for the accuracy of the article," Defendants claimed that Ms. Barrett (1) was forced out of her job at *The New Republic* in 1999 following the "discovery" of "plagiarism and inaccurate

3

reporting" in her work, (2) deliberately hid her history from readers by insisting on a misleading byline she had not used "in the past," (3) induced a confidential sources to lie to *The Atlantic*'s fact checkers, and (4) made "several other errors" in her depiction of that confidential source.[2] Each of these claims is demonstrably false.

6.     Although the Editor's Note accuses Ms. Barrett of engaging in the cardinal journalistic sin of "fabrication," the only falsehood that *The Atlantic* ever uncovered in the Article (even after it conducted a *post hoc* investigation) was the inclusion of a minor masking detail intended to shield the identity of a confidential source, identified in the Article and herein as Sloane. Ms. Barrett had added a single reference to a fourth child ("and son") at the request of Sloane and her husband, who were concerned that *The Atlantic*'s vivid depiction of her as a Fairfield County mom with advanced public-health degrees, a trampoline in her backyard, and three daughters who play squash and fence on a national level was tantamount to identifying her by name. Documents and screenshots in Ms. Barrett's possession conclusively establish that this two-word reference was included in the piece at the express request of Sloane and her husband—not at the urging of Ms. Barrett, as *The Atlantic* falsely claimed.

7.     This trivially erroneous detail had no material bearing on the substance of the Article, and such masking is not unusual when necessary to protect

---

[2] In a separate memorandum that Mr. Peck, Editor at Large of *The Atlantic*, emailed to all editorial staff on October 30, 2020 (the "Peck Memorandum"), he repeated these false and defamatory attacks on Ms. Barrett. The Peck Memorandum is attached hereto as **Exhibit 3**.

individuals—especially minor children—from being identifiable in an article. In fact, *The Atlantic*'s editors had already employed this same masking technique in editing the Article, proposing to alter a lacrosse coach's quote so that it referenced "multiple" students rather than a single student. On September 14, 2020, Ms. Barrett noticed that a quote from Darien High School lacrosse coach Jeff Braemeier had been updated from, "My own captain is one of my best defensive kids ever. 4.2 GPA. I couldn't get him into an Ivy. I tried" to "I've had multiple high-end players with worthy grades. I couldn't get them into an Ivy. I tried." When Ms. Barrett asked her editor and fact-checker why the quote had been altered—for the worse, in her opinion—and why Coach Braemeier, who had been describing one particular student, was now referencing "multiple" students—she was told that the change was at the instigation of the magazine's legal department. "Saw that," the fact-checker texted Ms. Barrett, in response to her inquiry. "Was a legal request to make him less identifiable."

8.     *The Atlantic* demonstrated no similar concern about Sloane or her family—even though *The Atlantic*'s use of quotes and background material provided by Sloane was governed by an agreement stipulating that she would not be identifiable in the Article. Promises of confidentiality to sources in exchange for information are enforceable legal rights under the law of contracts and promissory estoppel. Ms. Barrett's editors had full knowledge of this agreement: Mr. Peck himself had described Sloane as "a source we agreed to shield."

9.     Despite this agreement, Sloane and her husband felt the need to ask Ms. Barrett for additional veiling because they were concerned that the Article included

5

too many specific details about their family. Ms. Barrett believed Sloane's concerns were valid and tried to enlist her editors in her efforts to protect Sloane. She was surprised to learn that The Atlantic would not include a brief disclaimer stating that several minor identifying details about Sloane had been changed to preserve her confidentiality and protect her children's privacy. She was told it was the policy of *The Atlantic* not to run such disclaimers.

10.    Ms. Barrett then endeavored to find alternate ways to preserve the anonymity of her confidential source, asking her editors to make alterations to the Article to ensure that Sloane was not identifiable. Among other changes, Ms. Barrett wanted to modify her description of Sloane's educational credentials, delete a reference to the model of her car, and blur the names and dates of Sloane's daughters' athletic tournaments, referencing "a tournament in northern California" rather than "in Redwood City . . . at the California Summer Gold tournament." Her editors acceded to some but denied other requests, on the grounds that greater specificity would enhance the Article's credibility. As the Article went into first-pass galleys, Ms. Barrett was concerned that the draft did not sufficiently veil Sloane.

11.    Ms. Barrett reminded her editors of her confidentiality agreement with Sloane but found that she could not get traction. "[I] don't want to change anything else!" her editor emailed her on September 8, 2020. Although Ms. Barrett's editors at *The Atlantic* had been informed that Sloane's participation in the Article was based on a promise that she would not be identifiable, their commitment to honoring this promise was tepid at best.

6

12.    The casual attitute exhibited by *The Atlantic* in regard to this fundamental obligation of journalistic practice was reflected in its editors' public statements after the magazine cut ties with Ms. Barrett. In his October 30, 2020 memorandum sent to the magazine's editorial staff, Mr. Peck either forgot or deliberately omitted the fact that Sloane was a protected confidential source granted anonymity by *The Atlantic* in exchange for providing information of value. "The article originally included a reference to a son of Sloane's," Mr. Peck wrote, "but this was a fabrication to make Sloane less identifiable, because she was concerned about maintaining anonymity." In relegating the magazine's legally enforceable confidentiality agreement with Sloane to a passing "concern" voiced by Sloane, Mr. Peck revealed his indifference toward this legally binding agreement.

13.    Separately, on January 30, 2021, the Washington *Post* published a story in which anonymous "sources" at *The Atlantic* stepped forward to impugn Ms. Barrett further, purporting to explain the primary reason the magazine felt compelled to retract her truthful, meticulously documented article. *The Atlantic* abandoned the Article after having established that Ms. Barrett had been "'complicit' in disguising the identity of the story's central character." These anonymous *Atlantic* editors, along with their colleague Mr. Peck, appear to have forgotten that the story's central character—otherwise known as the story's central source—cooperated with *The Atlantic* on the condition that her identity be disguised, just as these editors insisted on not being named themselves as they smeared Ms. Barrett in the pages of *The Washington Post*.

7

14.     Ms. Barrett took her responsibilities to her source seriously and believed that she needed to act to safeguard the privacy of Sloane and her children. Following a series of emotional pleas from Sloane and her husband, Ms. Barrett agreed to insert the "son" reference into the piece to blur the Article's portrait of Sloane as the mother of three daughters—a personal detail that Sloane believed would lead other squash and fencing parents to recognize her as the source for the *Atlantic* article. When Ms. Barrett asked if she could leave in certain background facts about Sloane, Sloane texted her on August 28, 2020, "No to all – it's way to identifying/it's like using my name," and insisted, "No 3 kids."

15.     In the end, as Ms. Barrett and Sloane had feared and predicted, *The Atlantic's* excessive specificity about Sloane and her family rendered them vulnerable to being identified and outed. Mr. Wemple zeroed in on Sloane after he located the California Summer Gold tournament roster and identified her daughter as the only competitor who withdrew.

16.     Mr. Wemple then learned that Sloane does not have a son. He took this information to *The Atlantic*, asking for public confirmation. "Wemple is continuing to dispute the story," the Article's fact-checker and Senior Associate Editor at *The Atlantic*, Michelle Ciarrocca, texted Ms. Barrett on October 26, 2020. "[A] whole new list of items, but responding to some would compromise Sloane's identity. He's claiming she doesn't have a son?!"

17.     Rather than thanking Mr. Wemple for his interest in the piece and explaining that *The Atlantic* does not discuss its confidential sources—which is

standard journalistic practice in this circumstance—*The Atlantic* appeared to go into panic mode. Editors at the magazine confronted Ms. Barrett and demanded to know whether Mr. Wemple was correct in his surmise about the composition of Sloane's family. Ms. Barrett asked the editors if this information was for the magazine's internal use or if they intended to share it with Mr. Wemple. The editors informed Ms. Barrett that if they learned that Sloane did not have a son, they intended to disclose this personal detail not only to Mr. Wemple of *The Washington Post*, but also to the public directly, in the form of a stand-alone correction.

18.    Ms. Barrett expressed her opposition to this plan. She believed the public disclosure of this information was improper and would risk compromising her source, as the fact-checker feared. The editors disagreed and said that the priority now had to be "accuracy." Ms. Barrett was essentially ordered to put her obligation to her superiors at *The Atlantic* above her contractual and ethical obligations to her source. Ms. Barrett did not cooperate. At the time, Sloane had gone dark and had stopped responding to *The Atlantic*'s inquiries and requests for additional information about her family. Ms. Barrett did not feel it was her place to unilaterally reveal personal details about her source that went against her source's expressed wishes, and that would be published in *The Washington Post* and *The Atlantic*.

19.    Although *The Atlantic* later told the *Post* that it was Ms. Barrett's "complicit[y] in disguising the identity" of her source that caused the magazine to retract the Article, *The Atlantic* and Mr. Peck initially made bolder claims, falsely indicating that the Article as a whole was unreliable and fraudulent. On October 30,

2020 Mr. Peck sent an email to the entire editorial staff of *The Atlantic*, requesting the patience of his staff as editors commenced an investigation to "understand fully the scope of deceptions and errors in the article." Mr. Peck's false and defamatory memorandum was leaked to the *Post*'s Erik Wemple, who tweeted it out in full the next day. *The Atlantic* then published its Editor's Note, which reiterated the central claim of the Peck Memorandum: "We cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the article."

20.     In fact, *The Atlantic* was well-positioned to attest to the veracity of Ms. Barrett's article in its totality. An in-depth investigation conducted by the magazine's Director of Research in the expectation of finding extensive "deceptions and errors" in Ms. Barrett's article uncovered only one trivial factual inaccuracy: an anonymous lacrosse-mom source described by Ms. Barrett as being from Greenwich was actually from a neighboring town. At this point, *The Atlantic* had already acknowledged and corrected another minor factual error flagged by Erik Wemple: Ms. Barrett had referred to the fabled backyard hockey rinks of Darien, Connecticut as "Olympic-sized" when they could be more accurately described as commercially sized or NHL-sized. Notably, *The Atlantic*'s fact-checker, who was also a senior associate editor at the magazine, took responsibility for this second error: "Olympic sized rinks are even bigger than NHL. I should have flagged this[.]" The fact-checker reassured Ms. Barrett that articles often contain small, unintended errors that do not erode their veracity.  "Every piece has mistakes," she emailed Ms. Barrett on October 22, 2020. "It's just a matter of who actually notices!"

21.     Apart from the son, the town of the lacrosse mom and the precise size of a hockey rink are the only errors that *The Atlantic* has acknowledged and corrected in the Article.  They are also the only errors Ms. Barrett is aware of in the Article. Both are so trivial and insignificant as to hardly warrant correction—let alone the full retraction of a serious and meaningful piece of journalism.

22.     At one point, *The Atlantic* also purported to dispute Ms. Barrett's description of two saber-fencing injuries. In the Article, Ms. Barrett had written that one of Sloane's daughter's had been "gashed so deeply in the thigh that blood seeped through her pants"; *The Atlantic* subsequently changed this description to "a skin rupture that bled through a fencing uniform." This modification does not materially alter the meaning of the sentence and does not constitute a factual error. Separately, with regard to a neck injury sustained by the same fencer, *The Atlantic*'s online Editor's Note claimed that the editors had "identified the need to clarify a detail about a neck injury . . . to be more precise about its severity." This "need," which had seemed so urgent when *The Atlantic* first defamed Ms. Barrett, appeared to lessen after the initial round of media coverage of what Erik Wemple giddily dubbed "The Ruth Shalit Barrett fiasco"; the neck-injury "clarification" was quietly excised from the updated version of the Editor's Note that was published in the January/February 2021 print edition, attached hereto as **Exhibit 4**.

23.     No previous lapses by *Atlantic* writers—some of which involved minor errors and some of which involved serious factual inaccuracies and

misrepresentatios—merited public repudiation of the writer or retraction of their work.

24.     To provide one pertinent example: in April of 2020, when *Atlantic* writer Timothy McLaughlin profiled a Filipino nurse named Daisy Donarila, he inaccurately described his central subject as having two siblings instead of four.  Here is the straightforward correction that The Atlantic ran in response:

> *An earlier version of this article misstated how many siblings Daisy Donorila had. She was the youngest of five, not the youngest of three.*

25.     On December 6, 2020, one month after Ms. Barrett's piece had been de-published and her reputation destroyed by *The Atlantic,* she received a gracious text from a senior staffer at the magazine. "[F]rom my perspective, the son was the only thing," this staffer wrote. "But, sadly, seems that was enough… it tainted everything else."

26.     This is what came of the investigation Peck claimed was necessary to uncover the "scope of deceptions and errors in the article." The son was the only thing. And yet, instead of publishing a brief correction and updating the head count of Sloane's family, as *The Atlantic* had done for writer Timothy McLaughlin just months earlier, the magazine retracted Ms. Barrett's article in full and maligned her with false allegations in an Editor's Note that has been read by a global audience on the website of an internationally known journal. In this Note, *The Atlantic* informed readers that while the editors had initially believed that it was safe to commission a feature piece from Ms. Barrett, as "in recent years her work has appeared in reputable magazines," they now claimed that the assignment was a "mistake" and

reflective of "poor judgment" on their part. In retrospect, they continued, her early-career mistakes at *The New Republic* should have ruled out such an assignment.

27.     In its Editor's Note, *The Atlantic* libelously stated that Ms. Barrett left *The New Republic* in 1999 (when she was 29), "after plagiarism and inaccurate reporting were discovered in her work." In fact, Ms. Barrett's journalistic lapses at *The New Republic* did not occur in 1999. These infractions occurred over a twelve-month time span, between 1994-1995. The plagiarism episodes amounted to two separate incidents involving a total of six unattributed sentences. The first incident occurred in July of 1994, when Ms. Barrett was 23 years old. The second occurred in July of 1995, when Ms. Barrett was 24 years old. Counter to *The Atlantic*'s false claims, no plagiarism or inaccurate reporting was "discovered" in her work in 1999; nor was she found to have committed professional infractions of any sort after this 1994-95 time period.

28.     The false and misleading timeline propounded by *The Atlantic* is of critical importance, according to articles the magazine has published in its own pages regarding brain development in emerging adults (18-25 year olds).[3] Under these principles, the alleged infractions of a 23 or 24-year-old individual should be treated with greater humanity and mercy than if he or she had committed the same acts when five or six years older. *The Atlantic*'s punitive condemnation of Ms. Barrett on

---

[3] *See, e.g.*, Yana Kunichoff, *Should Communities Have a Say in How Residents Are Punished for Crime?*, THE ATLANTIC, https://www.theatlantic.com/politics/archive/2017/05/chicago-restorative-justicecourt/ 524238/ (May 2, 2017).

the basis of her conduct as an emergent adult runs counter to the defendants' own professed moral standards and editorial advocacy of forgiveness for errors made by individuals 25 and under. Perhaps this is why *The Atlantic* opted to falsify its timeline of transgression and insinuate that these professional lapses occurred in 1999, when Ms. Barrett would have been almost 30 years old, instead of in 1994 and 1995, when she was a 23-year-old reporter fresh out of the *The New Republic* intern pit.

29.     Readers of the Editor's Note, which alludes repeatedly to "plagiarism" along with other misdeeds from Ms. Barrett's past, would reasonably conclude that Ms. Barrett had committed grave, legally actionable plagiarism while a writer at *The New Republic*. In itself, the fact that *The Atlantic* has deemed it necessary to exhume and aggressively publicize conduct that occurred almost 30 years ago would suggest that the misconduct must have been especially egregious. In fact, Ms. Barrett's improper use of unattributed material in her political profile-writing of the 1990s, while admittedly sloppy and reckless, was considered gray-zone plagiarism at the time. It kicked off a passionate debate about what does and does not constitute plagiarism.  In a 1997 *New Yorker* piece entitled "Purloined Letters: Are We Too Quick to Denounce Plagiarism?" writer James Kincaid described the sentences Ms. Barrett had taken as "boilerplate." Comparing her transgressions to those of serial plagiarist David Sumner, who stole dozens of poems by acclaimed authors and presented them to poetry journals as his own original work, Kincaid wrote, "What's curious is that anyone should have professed similar indignation over what Shalit did. Can we not distinguish Shalit from Sumner? Is 'budding interest in developing a

14

white-collar criminal defense practice' a phrase, even without the buds, worthy of being declared 'original'? Should we be marshaling our legal forces to protect it?"

30.     In an article published in *The Hartford Courant* on April 29, 1999, reporter David Daley called Ms. Barrett, "the smoothest sentence stylist of her generation," and called the pile-on against her "profoundly unfair."  He posited that, "[i]f every Washington reporter who borrowed background from National Journal or Legal Times were run out of town, the National Press Club would be an even lonelier place." Daley concluded: "Her epitaph does not deserve to be "Ruth Shalit, plagiarist."

31.     *The Atlantic* could conceivably have a strict zero-tolerance policy regarding plagiarism and believe that any individual who has ever committed it should be unemployable in journalism forever. But this is not the case. *The Atlantic* has knowingly and enthusiastically published the work of Doris Kearns Goodwin, Nina Totenberg, and other writers who have acknowledged a far more egregious past history of plagiarism. Ms. Goodwin's 2002 book, *The Fitzgeralds and The Kennedys*, contained more than 50 sentences plagiarized from a biography of Kathleen Kennedy written by Lynne McTaggart. As a result, Ms. Goodman's publisher Simon & Schuster was compelled to recall and pulp all copies of the book and to pay a sizable monetary settlement to Ms. McTaggart. Seven years later, it happened again; Ms. Goodwin's bestseller No *Ordinary Time* was found to contain multiple passages pulled from Joseph Lash's *Eleanor and Franklin*, Hugh Gallagher's *FDR's Splendid Deception*. And yet in 2018, only nine years later, *The Atlantic* published a lengthy article by Ms. Goodwin on the legacy of Lyndon Johnson. *The Atlantic* did not

subsequent retract Ms. Goodwin's piece and inform its readers that it could not "attest to her trustworthiness" due to her past transgressions.

32.    *The Atlantic*'s Editor's Note additionally defames Ms. Barrett by claiming that she left *The New Republic* in 1999 after ". . . inaccurate reporting w[as] discovered in her work." This is false. Not a single error or factual inaccuracy was "discovered" in her work in 1999. Furthermore, a review of *The New Republic* corrections archive shows that no errors were found in any of Ms. Barrett's articles in 1998, 1997, or 1996. Ms. Barrett was not pushed out of *The New Republic* due to a "discovery" of errors and mistakes in her journalistic work. Ms. Barrett does not have an unusual and concerning history of "inaccurate reporting." During her six years at *The New Republic*, only one of her articles, her 1995 *Washington Post* piece, was found to contain a factual error that was significant enough to warrant a correction. This error was acknowledged, dealt with, and corrected back in 1995. It has no relevance to her professional work for *The Atlantic* 27 years later.

33.    The Peck Memorandum and the Editor's Notes also smear Ms. Barrett with the false claim that in preparing the Article, she requested a new byline in an attempt to deceive readers about her identity and professional history. In fact, contemporaneous correspondence shows that Ms. Barrett did not choose her own byline for the Article; rather, a byline ("Ruth Barrett") was chosen for her. Ms. Barrett first saw this byline on September 10, 2020, when she received galley proofs of the Article. Ms. Barrett had never previously published under the byline "Ruth Barrett" and felt uneasy about it. She emailed her editor the next day to request that her

byline be changed to "Ruth S. Barrett"—a byline she has used in the past in writing for reputable national publications, without controversy and without allegations of misuse.

34.    The Article was ultimately published with the byline "Ruth S. Barrett," but at any point pre-publication *The Atlantic* could have updated it to "Ruth Shalit Barrett." The assignment was approved by *The Atlantic* on October 31, 2019, after Ms. Barrett's written pitch was distributed and presented at a full editorial staff meeting attended by all masthead editors. When a few editors requested to see recent clips, editor Laurie Abraham, who had worked with Ms. Barrett on previous stories for other publications, circulated a lengthy feature piece Ms. Barrett had published in *New York Magazine* the previous year. That piece was published under the byline Ruth Shalit Barrett. All editors at that meeting should have had full knowledge of Ms. Barrett's name, reputation, and career as an investigative and feature writer. The notion that Ms. Abraham or Ms. Barrett engaged in any misrepresentation or chicanery in connection with her byline is a malicious lie.

35.    Evidencing this malice, Defendants neither verified their accusations independently nor gave Ms. Barrett an opportunity to respond ahead of publishing these statements—a violation of a common journalistic practice that *The Atlantic* and its fact-checkers routinely engage in with subjects of its publications.

36.    *The Atlantic* was well-aware of this obligation. Several weeks before her *Atlantic* piece shipped off to print, Ms. Barrett and her editor, Laurie Abraham, received an email from the fact-checker regarding a section of the Article that

17

portrayed an ultra-high-net-worth squash dad in a negative light. The fact-checker emailed Ms. Barrett and Ms. Abraham that she wanted to pass along "the latest from legal" concerning this parent, a hedge-fund manager who had recently relocated from Connecticut to Palm Beach Gardens. "More concerned that we give father a chance to comment on specifics," the note read. "I don't think anything we're writing is defamatory -- but I can also imagine a billionaire asset manager getting aggressive that we were in the wrong if we don't give him a chance to comment, so let's make sure we do so." Apparently *The Atlantic* believes that billionaire asset managers ought to be given a "chance to comment" on allegations against them, but considers this step optional in the case of freelance contract writers who may not be in a position to get aggressive when they are abruptly smeared and defamed.

37.    Moreover, *The Atlantic* and Mr. Peck even ratcheted up their assault on Ms. Barrett through media outside *The Atlantic* itself. They informed *The Washington Post* that the magazine had "conducted a four-week investigation of how the mishap unfolded." "After a further review, we believe the gravest errors occurred in the author-selection and vetting process," *The Atlantic* asserted to the *Post*. This purported "investigation" into a writer for *The Atlantic*—and the public announcement of its conclusions harshly condemning the writer—is unprecedented for Defendants, as they themselves admitted to the *Post*. "We do not comment on specific employment or personnel matters." Defendants deliberately chose to publicly besmirch Ms. Barrett's character and reputation to an outside critic and media organization with a history of animosity towards her. The effect, if not the purpose,

of Defendants' further publication of their defamatory charges through *The Washington Post* has been to exacerbate the damages to Ms. Barrett they have caused her through their wrongful conduct.

38.    Not content with destroying her journalistic reputation and career through false and defamatory publications, *The Atlantic* also breached its contract with her.[4] These breaches all flow from the same course of conduct—*The Atlantic* abandoning its own writer and its obligations to her at the first sign of criticism by a powerful, vindictive media critic with a megaphone and a mean streak. For instance, the Contract expressly required *The Atlantic* to hire an agent and "make such intellectual property rights available to interested parties and to market such rights." Instead of adhering to these contractual obligations, *The Atlantic* interfered with efforts to create derivative dramatic works. In November of 2020, Ms. Barrett received an inquiry from an executive at a Hollywood production company who had read her *Atlantic* piece on niche-sports bedlam and was interested in developing it for television. Ms. Barrett retained an entertainment lawyer who reached out to *The Atlantic* to request a "chat" about "dramatic or similar rights." *The Atlantic* went off the deep end, telling this attorney that *The Atlantic* intended to "vigorously oppose" any effort by Ms. Barrett to dramatize her work, as such an effort would only "breath life back into this retracted Article." As a result, that project, and all other efforts to create derivative works, have been thwarted.

---

[4] The November 7, 2019 Author's Agreement ("Contract") is attached hereto as **Exhibit 5**.

39.     *The Atlantic* also breached its contractual duty of good faith and fair dealing to Ms. Barrett. An author who contracts with a reputable publishing company to provide an important investigative work that is the product of painstaking research and craftsmanship at a minimum expects that the company will not sacrifice that work and the personal and professional reputation of the author at the first sign of criticism from a competitor outlet, and that the company will not endeavor to withhold the Article from public view and deprive individuals or entities intellectual rights to the Article, contrary to its express contractual duty. At its core, *The Atlantic*'s conduct was suffused with bad faith. Instead of standing up for its own writer and defending her when she found herself in the crosshairs of a powerful enemy, *The Atlantic* immediately liquidated all its values and sided with the bully.

40.     In January 2021, *The Atlantic* confirmed to the *Post* the primary reason for their retraction of the Article. *The Atlantic* "bailed on the article," because it determined that Ms. Barrett "was 'complicit' in disguising the identity of the story's central character." In other words, *The Atlantic* retracted the Article after learning that its writer was complicit in preserving the anonymity Sloane had been guaranteed as a condition of her participation. This admission reveals the central problem Ms. Barrett faced: *The Atlantic* did not appear to respect, or perhaps even fully understand, its obligation to protect the anonymity of her confidential source. Ms. Barrett was not "disguising" a "central character." She was shielding the identity of the primary confidential source in a piece of investigative journalism—protection that both she and *The Atlantic* were ethically and contractually required to provide.

41.     After learning about the son, *The Atlantic* could have taken a number of lawful actions, some of which would have been displeasing to Ms. Barrett. It could have published a correction, noting that Sloane did not have a son. It could have stealth-edited the piece and updated this detail without publishing a formal correction. It could have published an Editor's Note admonishing Ms. Barrett for using this masking detail. It could have even retracted the entire article solely on the basis of this detail, on the grounds that Ms. Barrett should have relayed any problems with her source to her editors and not acted unilaterally. What *The Atlantic* could not lawfully do is engage in character assassination by publishing falsehoods about Ms. Barrett that have destroyed her reputation and career.

## II.    JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because complete diversity exists between Mr. Peck, *The Atlantic*, and Ms. Barrett and the matter in controversy exceeds $75,000. Because of Mr. Peck's and *The Atlantic*'s defamatory publications about Ms. Barrett that Mr. Peck circulated to all *The Atlantic* editorial staff and that *The Atlantic* disseminated online to a global audience, respectively, Ms. Barrett incurred alleged damages of at least $1,000,000.

43.     This Court has personal jurisdiction because Mr. Peck and *The Atlantic* transact business in the District of Columbia and commit torts in the District of Columbia, as described in this Complaint.

44.    Venue is proper in this Court pursuant to pursuant to 28 U.S.C. § 1391(b) because a substantial part of Ms. Barrett's claims occurred in the District of Columbia.

### III.    PARTIES

45.    Ruth Shalit Barrett is a natural person residing in Connecticut. In December 2019 Ms. Barrett contracted with *The Atlantic* to author and submit an article for its magazine. While creating this article, Ms. Barrett was a citizen and resident of Connecticut and was based in Connecticut. As a result of Mr. Peck's and *The Atlantic*'s defamatory and other wrongful actions, she continues to suffer economic and reputational harm in Connecticut.

46.    *The Atlantic* is a District of Columbia corporation with its principal place of business in the District of Columbia. In December 2019, *The Atlantic* contracted with Ms. Barrett to author and submit an article for its magazine. It published Ms. Barrett's article "The Mad, Mad World of Niche Sports Among Ivy League-Obsessed Parents" online in October 2020. Shortly afterwards, however, *The Atlantic* retracted the Article alongside a defamatory Editor's Note online and in print.

47.    Donald Christopher Peck is a natural person residing in the District of Columbia. He became Editor at Large for *The Atlantic* in March 2021, but during all relevant events described herein he was editor at *The Atlantic* magazine. On October 30, 2020, Mr. Peck emailed a memorandum to *The Atlantic*'s entire editorial staff about Ms. Barrett and her article, "The Mad, Mad World of Niche Sports Among Ivy League-Obsessed Parents."

## IV.    FACTS

**A.    Ms. Barrett's was a successful young writer and associate editor for *The New Republic* in the 1990s.**

48.    In January 1993, six months after graduating from Princeton University, Ms. Barrett, then known as Ruth Shalit, was hired as a reporter-researcher at *The New Republic*. She was assigned a desk in the intern pit and instructed to provide research assistance and administrative support for the magazine's senior editors. Within a year, she had published 14 feature-length pieces, including an acclaimed cover story, and was negotiating contracts with several national magazines.

49.    By the summer of 1994, Ms. Barrett had been promoted from *The New Republic* reporter-researcher to associate editor. She had also been hired to write long-form political stories for *The New York Times Magazine* and was under contract to write a monthly politics column for *GQ.* She was 23 years old.

50.    As her responsibilities increased, Ms. Barrett became increasingly scattered and overwhelmed. She began to pull all-nighters at the magazine's 19th Street offices. During this time, she was also dealing with a significant undiagnosed medical issue. Profiles of her written in the mid-1990s mockingly catalogued her erratic behavior. She was described as a "total klutz" who habitually spilled coffee on herself, lost items, and walked into filing cabinets.

51.    During a one-year period from July of 1994 to July of 1995, The New Republic twice apologized after unattributed material from other articles appeared in her work. The first occurrence was in a cover story she wrote for *The New Republic*

23

that was published on July 3, 1994. In this piece, three sentences of biographical information and a quote from a *Legal Times* article by Daniel Klaidman appeared in Ms. Barrett's article, virtually unchanged. Ms. Barrett had herself interviewed—at length—the same Washington attorney whom Mr. Klaidman quoted in his article, yet she did not use any quotes from her own interview. Instead, she published the quote the attorney had given Mr. Klaidman. Neither this quote nor the three sentences were attributed to Mr. Klaidman or to *Legal Times*.

52.    In the second instance, three phrases from a *National Journal* article by Paul Starobin, totaling 29 words, appeared virtually unaltered in Ms. Barrett's profile of Steve Forbes that ran on July 3, 1995. Once again, *The New Republic* was forced to apologize to its readers and Ms. Barrett acknowledged her debt.

53.    After this second infraction, reporters at other publications began to comb through Ms. Barrett's previous work, looking for similar incidents. Two additional occurrences were quickly uncovered, involving pieces she had written in the same time frame. Her October 2, 1994 *New York Times Magazine* profile of attorney Bob Bennett was found to contain a sentence from a *National Journal* profile of Bennett. Also, her March 5, 1995 *New York Times Magazine* cover story on Bob Dole featured a sentence that was nearly identical to a sentence that had appeared in an earlier *New Republic* profile of Dole.

54.    *The New Republic* published two separate apologies in its Notebook section as a result of these transgressions, and Ms. Barrett apologized to the writers

whose quotes and sentences she had taken. *The New York Times Magazine* did not publish any apologies or corrections regarding her articles.

55.    These journalistic lapses, amounting to four separate incidents comprising a total of eight sentences, all occurred within the same 12-month time frame. The first occurred in July of 1994, when Ms. Barrett was 23 years old. The last occurred July of 1995, when Ms. Barrett was 24 years old. Notwithstanding *The Atlantic*'s false and libelous statements about Ms. Barrett, no plagiarism or use of unattributed material was "discovered" in her work in 1999. Nor was she found to have committed any journalistic malfeasance after this 1994-95 time period.

56.    On October 2, 1995, *The New Republic* published a cover story by Ms. Barrett that was highly critical of *The Washington Post*. At the time it was published, Ms. Barrett's almost 13,000-word article, entitled "Race in the Newsroom: The Washington Post in Black and White," was considered an influential and impactful piece of journalism. *Washington Post* columnist Juan Williams, among others, praised it as a catalyst for necessary discussion about a sensitive topic. In an all-hands internal memo, Geneva Overholser, then the ombudswoman of *The Washington Post*, wrote: "The New Republic piece has hit the newsroom hard.... The struggles and questions and views it brings to light are representative of the U.S in 1995 and certainly are present at the *Post*." She added it was her "hope" that *The New Republic* article would "engender more of the sort of examination and discussion that, however painful, holds greater promise than either silence or rigid prescriptions for

change." Ms. Barrett's editors at *The New Republic* described her *Post* article as "a model of nuance, balance and fair-mindedness."

57.     *Washington Post* publisher Donald Graham and his executive editor, Leonard Downie Jr., disagreed, denouncing the article as "maliciously hurtful" and "spiteful." As one writer observed in 1996, "Her epic sent the Post powers-that-be off the deep end, causing them to convene some 400 staff members for a group therapy session that, by most accounts, dissolved into more of what Shalit had written about. In the process, they launched a full-throttle counterattack on Shalit."

58.     The *Post*'s attack on Ms. Barrett, described by *George* magazine as "overheated and somewhat hysterical," took many forms. In an attempt to discredit piece, the *Post* publicly denounced her as a plagiarist and discredited journalist—despite the fact that multiple editors at the paper, including Mr. Downie, had cooperated fully with her article and had agreed to all of her interview requests. The *Post* also found a handful of minor factual inaccuracies in the nearly 13,000-word article. In addition, *The New Republic* apologized for and corrected a serious error in the piece. A reference to a Washington, D.C. businessman and city contractor noted that he had been "jailed for corruption." In fact, he had been investigated several times but neither convicted nor jailed.

59.     Inadvertent factual errors in a piece, however serious and regrettable, do not amount to cognizable wrongdoing. Ms. Barrett's article was never retracted or de-published by *The New Republic*, nor was any other article she wrote for *The New Republic* or for any other publication.

60.    As a Washington, D.C. journalist, Ms. Barrett paid a heavy price for her early mistakes—mistakes that were amplified and magnified by her decision, in 1995, to publish a critical article on *The Washington Post*, earning her the enmity of that major, powerful journalistic institution. She was relentlessly skewered in gossipy profiles that focused on her "exotic-looking pug features," her "do-me heels," her "little-girl voice." When news leaked that *George*, a glossy monthly magazine bankrolled by John F. Kennedy, Jr., was preparing a negative article about Ms. Barrett, the tabloids had a field day. "Embattled Scribe at Hunk's Mercy," proclaimed the *Page Six* headline.

61.    In March of 1996, Ms. Barrett took a leave of absence from *The New Republic*. She returned in December of that year and went on to work at the magazine for two more years. She wrote multiple investigative pieces, editorials, and cover stories that were well-received, anthologized, and cited in scholarly journals and major newspapers. She also published television criticism and book reviews. On March 3, 1998, she was invited on *NPR*'s "On the Media" to discuss one of her literary essays.

62.    None of this work presented any issues or necessitated corrections or clarifications. By mid-1998, Ms. Barrett felt relieved and grateful that her period of opprobrium appeared to be behind her and she was able to return to work in a field that she loved.

63.    In 1998, *The New Republic* learned that associate editor Stephen Glass had fully or partially fabricated 27 out of 41 articles he had written for the magazine.

*The New Republic* apologized to its readers and officially retracted all 41 of Mr. Glass's stories. The magnitude of his fabrications and the number of institutions and individuals maligned by his inventions made this episode one of the biggest scandals in the history of journalism. Mr. Glass's short-lived journalism career became the subject of a *Vanity Fair* feature and a big-budget movie starring Hayden Christiansen, *Shattered Glass*.

64.   The coverage of Mr. Glass put a renewed spotlight on Ms. Barrett. She was referenced in many of the stories about him and her transgressions of the mid-90s rehashed. Although she had written over sixty factual, legitimate news stories and cultural essays for *The New Republic*—two of which were contaminated by six lines of unattributed material—her infractions were conflated with his major malpractice.

65.   In December of 1998, Ms. Barrett learned that her continued employment at the magazine was exacerbating the negative publicity *The New Republic* continued to receive over Mr. Glass. In early 1999, she elected to leave the magazine.

66.   After leaving *The New Republic*, Ms. Barrett moved to New York and took a job working at an ad agency. She also wrote a popular advertising column for Salon.com called *Brand X*. One of her columns was picked up by *The Wall Street Journal* and another was selected for inclusion in a 2017 anthology, "The Best of Salon." The success of Ms. Barrett's *Salon* column opened additional doors for her.

67. Over the next several years, Ms. Barrett published feature pieces, cultural essays and book reviews in *New York Magazine*, *The Wall Street Journal*, *ELLE*, *Details*, Nerve.com, *Surface*, and *Lingua Franca*. She had contracts with national magazines, was hired as contributing editor, and was put on mastheads. She did this all under her own name. Nothing was concealed. Her ability to get work was not impaired by her name or reputation. None of these outlets were deceived by her. Their reputations were not damaged by publishing her.

68. Prior to *The Atlantic*'s decision to retract her piece and destroy her reputation, Ms. Barrett was busy, thriving, and fulfilled in all aspects of her life.  She was an active volunteer in her community and in her children's schools. She enjoyed the respect of her friends, family and peers. She wrote culturally relevant and lively journalism that sparked debate. She had a full and happy life, did not consider herself damaged goods, and she had no need to turn to *The Atlantic* in desperation for a career-salvaging "second chance."

**B.** **Ms. Barrett wrote a compelling, thoroughly researched article for *The Atlantic*.**

69. Counter to the insinuation of *The Atlantic*'s Editor's Note, Ms. Barrett did not approach *The Atlantic* and ask them to consider her as a contributor. *The Atlantic* solicited this pitch from her. In the summer of 2019, in the course of a conversation with *Atlantic* senior editor Laurie Abraham, Ms. Barrett mentioned a trend she had noticed in her preppy Connecticut town: parents were spending deranged amounts of money in the hope of turning their physically unremarkable children into elite competitive athletes so that they could qualify for preferential

admission as Ivy League sports recruits. Additionally, Ms. Barrett had noted that there were certain niche sports or micro-sports—squash, fencing, water polo, sailing—that seemed particularly susceptible to this sort of optimizing and gamesmanship, resulting in an overheated stampede into these sports among families with disposable income. Ms. Abraham loved the idea and encouraged Ms. Barrett to write it up as a story pitch. On October 31, 2019, she distributed Ms. Barrett's two-page pitch to her colleagues at *The Atlantic*, who responded enthusiastically.

70.     Even though the Article risked upsetting some families who treat niche athletics as their children's key to elite college admissions, it served a superseding positive purpose—exposing the inequality inherent in such a system, and the harms to children's health and happiness. As Vice President of Lacrosse Operations Ann Kitt Carpenetti informed Ms. Barrett via email, "If this piece you are working on can serve as a cautionary tale, by talking to families in our sport and others who are sacrificing everything for their kids to play sports – only to see them drop out as freshman due to burnout or injury . . . we would be so grateful to assist you in any way we can."

71.     In March of 2020, as the COVID-19 pandemic closed schools and shredded sports schedules, Ms. Barrett reached out to Ms. Abraham and asked if the magazine would prefer that she not proceed with the piece. After checking with Mr. Peck, Ms. Abraham wrote to Ms. Barrett and told her to keep going. Ms. Abraham forwarded an email she had received from Mr. Peck, encouraging her to persevere:

"This thing will end," Mr. Peck wrote to Ms. Abraham on March 22, 2020. "Kids are still going to play sports." After Ms. Barrett turned in a draft, Mr. Peck expressed enthusiasm about the article and actively participated in its editing.

## C. *The Atlantic* failed to support Ms. Barrett in her efforts to shield her confidential source.

72.     During the Article's editorial process, Ms. Barrett repeatedly expressed her concern that the piece included too many specific, identifying details about Sloane's family. In addition to its vivid depiction of Sloane as a Fairfield County stay-at-home mom with an advanced health degree and three girls who play squash and fence, the piece listed the specific tournaments and events in which her children competed. It also recounted in detail a harrowing injury sustained by her middle daughter that resulted in her withdrawal from a national fencing tournament.

73.     In late August, in accordance with *Atlantic* editorial policy, a fact-checker from *The Atlantic* contacted Sloane and read to her, word for word, every single quote that would be attributed to her in the story. At this point, Ms. Barrett had already briefed Sloane on the gist of her quotes and had reviewed with her the narrative about her family that would be recounted in the Article. When Sloane heard the full quotes that Ms. Barrett intended to use, she expressed anxiety and reiterated her concern that she and her daughters were not adequately shielded. Sloane and her husband were particularly concerned about a quote in which she fretted about her daughter's prospects for admission to a top-tier college and expressed worry that she would instead end up at Ohio State University. Following Sloane's conversation with the fact-checker, Ms. Barrett received an angry phone call from Sloane's husband.

During this call, Sloane's husband expressed his consternation that Sloane had been inadequately protected in the Article and declared that she could not be associated with the Ohio State quote. He told Ms. Barrett he feared his wife was currently too exposed in the Article and stated he did want a group of "angry Buckeyes" at his front door.

74.     Ms. Barrett continued to work with her editor and with the fact-checker on the story to find ways to protect Sloane. While Ms. Barrett's editor at *The Atlantic* did agree to some deletions and alterations, an impasse was soon reached. The editor felt she had done enough for Sloane. "I don't want to change anything else!" she wrote on September 1, 2020. "She can't keep re-negotiating the details. This is a magazine!" And yet Sloane continued to insist—correctly, as it turned out—that *The Atlantic* was including too many specific facts about her family and that she would be identifiable. Sloane's husband began to call Ms. Barrett on a daily basis, requesting that she delete or change particular facts that, in his view, would expose his family as the family depicted in the Article.

75.     Ms. Barrett's editors believed that Sloane and her husband were creating needless drama and that their concerns were invalid. One of her editors declared repeatedly that Sloane, on some level, *had* to know that her sports-mom friends were going to figure it out—and that she should just accept this and move on. Ms. Barrett pushed back strongly, explaining that Sloane and her family had not accepted this in the slightest, and that Sloane would deny that she was Ms. Barrett's source if asked.

76.     As the editing and fact-checking process progressed, Sloane's concerns escalated. She continued to reach out to Ms. Barrett, imploring her to take additional steps to mask her identity in a way that was consistent with their agreement. "The spirit of our agreement is that I am not identifiable," Sloane wrote Ms. Barrett in a text message.

77.     Her husband called Ms. Barrett and told her that Sloane was no longer sleeping at night. He also mentioned that his daughters were distraught and feared adverse consequences if their identities were to become known. On September 7, 2020 he sent her a text message. "**She is identifiable**," he wrote. "Fencers/Squash plus [an educational credential] means identifiable." Sloane also texted Ms. Barrett. "Ruth I am just way too exposed," she wrote. "We would be shunned by so many people."

78.     At this point, perceiving (correctly) that Sloane was not been adequately shielded by *The Atlantic*, Sloane and her husband called Ms. Barrett and asked that *The Atlantic* remove several quotes from the Article. The quotes that they wanted to remove happened to be Ms. Barrett's editors' favorites. Ms. Barrett's editor conveyed her anger and displeasure but would not assent to any additional veiling measures aside from several small changes to Sloane's bio.   She felt she had already done enough.

79.     Exhausted, Ms. Barrett gave in. She agreed to insert into the piece a reference to a fourth child in order to give her source and her agitated teenage children some additional veiling and a modicum of deniability. This change seemed

to satisfy Sloane and her husband and they thanked Ms. Barrett for protecting their family.

80.     Ms. Barrett's insertion of this trivially erroneous detail was not due to lack of professionalism, shoddy journalism, or dishonesty. On the contrary, it was a result of Ms. Barrett's commitment to protecting her confidential source—a paramount ethical duty of any reputable journalist. And it had no material bearing on the substance of the Article. Indeed, such masking is not unusual when necessary to protect confidential sources who have been promised anonymity. In fact, *The Atlantic*'s editors had already employed this masking tactic in editing Ms. Barrett's Article, proposing to alter a lacrosse coach's quote so that it referenced "multiple" students rather than a single student, based on a warning from the magazine's legal department that the coach's original quote could render the student identifiable.

**D.     Ms. Barrett's Article was positively received until *The Washington Post* ruthlessly attacked the Article and its author, and *The Atlantic* followed suit.**

81.     On October 17, 2020, *The Atlantic* published Ms. Barrett's article to its online website, with the plan to include the Article in its November 2020 print edition. Ms. Barrett received positive reactions to her Article's caution against churning teenagers through expensive regimens for the slim chance of winning a recruitment slot at prestigious colleges.

82.     On October 20, 2020, one individual wrote Ms. Barrett to let her know that "as a former NCAA athlete, a trustee of the Women's Sports Foundation, a recent board member of the Stanford Athletic Department and the parent of three teenagers,

34

I agree whole-heartedly with your assessment." ."   The founder of a Massachusetts squash academy emailed Ms. Barrett on October 28  to let her know that her Atlantic article was "excellent and 100% accurate... if not understated.  I know many of the names mentioned in the article, personally and have witnessed behavior on par and at times worse than what you chronicled." On October 24, 2020, a collegiate squash player from a NESCAC conference school emailed Ms. Barrett. "I recently just read your article 'The Mad, Mad World of Niche Sports' and genuinely want to say thank you. I don't think anyone could've painted a clearer image of what the squash world is like."

83.    The Article also encouraged healthier parenting: A private college admissions advisor emailed Ms. Barrett on October 30, 2020 to let her know she had distributed her piece to the parents of her high school clients: "One parent told me she's going to dial down the soccer and dial up the reading! Keep up the great reporting." And the Article prompted US Squash to reaffirm its commitment to inclusion, as the organization circulated an email on October 23, 2020 stating that "US Squash's mission is to increase access, support lifelong engagement, encourage sportsmanship and achieve excellence. Articles such as this make us that much more determined in the ongoing pursuit of our mission . . . ."

84.    Amidst this positive reception, on October 19, 2020 *The Washington Post*'s Erik Wemple called Ms. Barrett and also contacted her via email, asking if she would speak with him about her Article. Ms. Barrett strongly believed *The Washington Post* had a conflict of interest and would never cover her with any

semblance of fairness or objectivity. Additionally, she had an antagonistic relationship with Mr. Wemple, dating back to his days as a writer and editor at *City Paper*, a weekly Washington tabloid that had mocked and attacked her repeatedly in the 1990s.

85.   Ms. Barrett's editor, Laurie Abraham, tried to reassure her that *The Atlantic* might be able to make the matter go away. She advised Ms. Barrett not to speak to Erik Wemple and to allow the magazine to handle it.

86.   Several days later, Ms. Abraham called Ms. Barrett to fill her in on a conversation that Anna Bross, the magazine's Vice President of Communications, had had with Mr. Wemple. According to Ms. Abraham, Ms. Bross had reached out to the *Washington Post* media critic to ask why the *Post* was now choosing to pursue Ms. Barrett, after a period of years in which it had allowed her to resume her journalistic career free from special censure and harassment. "All these years, you've allowed her to write," Ms. Bross told Mr. Wemple, in Ms. Abraham's telling. "Why aren't you allowing her now?"

87.   According to Ms. Abraham, Mr. Wemple informed Ms. Bross that *The Atlantic*, unlike *New York* Magazine or *ELLE*, was a Washington-based publication. Ms. Barrett's article for *The Atlantic*, he continued, could be therefore be seen as her "Washington comeback." Ms. Bross protested that Ms. Barrett's article for *The Atlantic* was a culture story, not a work of political journalism and did not augur her comeback as a Washington political reporter. Mr. Wemple disagreed, reiterating his claim that *The Atlantic* had its headquarters in Washington.

88.     Ms. Barrett was confused and shaken to hear of this exchange. She did not understand why it was up to *The Washington Post*, a powerful and notoriously vindictive corporate media entity with a documented conflict of interest in covering her, to decide whether she would be "allowed" to write feature pieces for other publications. She did not understand why a 49-year-old woman with a decades-long track record of unblemished work could not, at this point, be a writer on her own terms, and instead had to be gatekept through *The Washington Post*'s lens and power.

89.     On October 24, 2020, the *Post* published a column written by Erik Wemple criticizing the piece, titled: "Opinion: Ruth Shalit just wrote for the Atlantic. Would readers know it from the byline?"[5] In it, Mr. Wemple mocked and maligned Ms. Barrett, highlighting the decades-old journalistic errors she had made in her early 20s. He assailed her for misstating the dimensions of backyard hockey rinks in Darien and suggested that she had used hyperbole in her description of a fencing injury. He dug up photos and video clips of Ms. Barrett from 1993 and ridiculed *The Atlantic* for publishing her.

90.     Mr. Wemple himself conceded that he was subjecting Ms. Barrett to a double standard: He wrote, "We know that we're nitpicking. But when the former Ruth Shalit is writing for your publication, you nail down all Olympic-size claims." *The Atlantic*, in response, contended that the piece was nailed down. "'This feature

---

[5] Erik Wemple, *Opinion: Ruth Shalit just wrote for the Atlantic. Would readers know it from the byline?*, THE WASHINGTON POST (Oct. 24, 2020) https://www.washingtonpost.com/opinions/2020/10/24/ruth-shalit-just-wrote-atlantic-would-readers-know-it-byline/.

went through our usual rigorous editing and fact-checking process,'" a spokesperson for the magazine told him. "'We fact-check every magazine piece extremely thoroughly.'"

91.    Although *The Atlantic*, at this point, was publicly defending its decision to publish the Article, the magazine was clearly rattled by the intensity of the grudge harbored by the *Post* against Ms. Barrett. Ms. Abraham, Ms. Barrett's editor, admitted to her that the magazine felt caught off guard and deflated.

92.    Following the publication of his October 24, 2020 story, Mr. Wemple immediately began work on a follow-up. He continued to home in on Sloane and appeared determined to learn her identity and unmask her.

93.    At this point, *The Atlantic* had already engaged in outrageous mistreatment of Sloane to appease Mr. Wemple. In preparing his initial, October 24, 2020 story, Mr. Wemple had reached out to The *Atlantic* to question whether Sloane's 12-year-old daughter had indeed sustained a neck injury at a saber fencing tournament in July of 2019. Instead of giving him the brush-off, *The Atlantic* appeared to react with hysteria. Employees from *The Atlantic* began to hound Sloane with phone and email requests for photographs and medical records that would corroborate the injury—despite the fact that this incident had already been confirmed by *The Atlantic'*s fact-checker, and despite its corroboration by several parents who had witnessed the bout. (Mr. Wemple eventually conceded that the neck injury did occur, but maintained that Ms. Barrett had used hyperbole in describing it).

94.     Ms. Barrett was stunned that a media critic from *The Washington Post* would request the confidential medical records of a 12-year-old girl and even more surprised that *The Atlantic* would seriously consider this request. She considered *The Atlantic*'s communications with Sloane, the young fencer's mother, to be intrusive, unwarranted, and bordering on harassment.

95.     Further, unmasking Sloane served no valid journalistic purpose. Sloane was a stay-at-home mom who had invested significant time and money into her daughters' high-end sports, only to see them struggle and suffer painful injuries. Sloane did not appear to have a self-serving motive for participating in Ms. Barrett's Article. She was not suing USA Fencing or the sports' corporate sponsor. By her own telling, the only person she blames in the Article is herself.

96.     Ms. Barrett was taken aback by Mr. Wemple's prolonged focus on her confidential source and by the ferocity of his efforts to uncloak Sloane and expose her identity. She was surprised that *The Atlantic* complied with his relentless and increasingly intrusive demands for information about Sloane. The Article's fact-checker had spoken with Sloane at length and found her to be poised and credible.

97.     Following Mr. Wemple's discovery about the "son," *The Atlantic*'s improper and aberrant harassment of Sloane escalated. Editors at the magazine bombarded her and her husband with repeated texts, phone calls, and emails, demanding that she answer Mr. Wemple's personal questions about the exact makeup of her family and threatening adverse action in the form of an admonitory correction if she refused.

98.    From October 24 to 26, 2020, Mr. Wemple called Ms. Barrett every day, and emailed her repeatedly. He now had a list of specific questions about the piece and wanted answers. Ms. Barrett believed she had the necessary information to defend her piece and to rebut each of his claims, but she once again complied with *The Atlantic*'s directive not to communicate with him: "For the record: I would like to defend my piece. I worked hard on it and am able to rebut everything that Wemple is disputing." But she followed *The Atlantic*'s instructions, trusting it to do the right thing: "If you and the magazine prefer that I not speak to him directly, I will respect that. But I don't think it makes sense to leave his claims unchallenged." At that time, she thought *The Atlantic* would appropriately handle the matter on her behalf, as it had promised; but that did not happen. Instead, *The Atlantic* began to exclude Ms. Barrett from its correspondence with Mr. Wemple.

99.    On October 29, 2020, Mr. Peck and Adrienne LaFrance, executive editor of *The Atlantic*, confronted Ms. Barrett over Zoom while purporting to read aloud from a letter supposedly written by Sloane's attorney. In the letter, Sloane's attorney purportedly stated that Sloane now deeply regretted participating in the Article and believed that the Article contained inaccuracies. Furthermore, Sloane confirmed in the letter that she only had three children and claimed (falsely) that the decision to add a fourth had been all Ms. Barrett's idea. Even worse, the letter continued, Ms. Barrett had forced the son on her, over her objections.

100.   Ms. Barrett, stunned, refuted these allegations. She explained that the request to add a fourth child came from Sloane and her husband, and that it was

likely motivated by a fear that the Article contained too many identifying facts about Sloane. Ms. Barrett subsequently found correspondence that confirmed her recollection that the mention of a son came from Sloane and her husband; and that they had urged her to put it in the story—not the other way around.

101.   Ms. Barrett told Mr. Peck and Ms. LaFrance that she was uncomfortable with the fact that Sloane now had an attorney, *The Atlantic* was represented by counsel, and that she was now the only party without representation. She asked if they could resume the Zoom meeting at a later date, after she had hired her own attorney. Mr. Peck and Ms. LaFrance called this unnecessary and reassured her that they only wanted to return attention to her Article.

102.   This reassurance was false. The next day, on October 30, 2020, Mr. Wemple published another column excoriating Ms. Barrett and her Article.[6] By this point, *The Atlantic* had decided to cut its losses and throw Ms. Barrett overboard. Mr. Peck sent a defamatory memo to the magazine's editorial staff, apologizing for having published Ms. Barrett and promising a full and complete investigation: "It is crucial for us to understand fully the scope of deceptions and errors in the article." He told his colleagues he had learned that Ms. Barrett "was complicit with a source in the story . . . in an effort to deceive *The Atlantic* and its readers." He framed Ms. Barrett as capable of such deception by falsely alleging that "she left *The New*

---

[6] Erik Wemple, *Opinion: The Atlantic's troubled niche-sports story*, THE WASHINGTON POST (Oct. 30, 2020),
https://www.washingtonpost.com/opinions/2020/10/30/atlantics-troubled-niche-sports-story/.

*Republic* . . . after plagiarism and inaccurate reporting were discovered in her work" and that she had requested the byline "Ruth S. Barrett" to prevent readers from associating her with those incidents. The next day, *The Washington Post*'s Erik Wemple posted this email on Twitter, calling the situation "the Ruth Shalit Barrett fiasco."

103.    *The Atlantic* next cut all ties with her. On October 30, 2020 the magazine published the first version of its Editor's Note.  In this note, *The Atlantic* claimed that "new information emerged that has raised serious concerns about [the Article's] accuracy, and about the credibility of the author, Ruth Shalit Barrett." Mr. Wemple covered this Editor's Note in his October 31, 2020 column. "[A]n admirable exercise in accountability," Mr. Wemple praised. Yet, he advised, "a better approach might be an outright retraction."[7]

104.    The next day, on November 1, 2020, *The Atlantic* obliged Mr. Wemple and retracted the Article in its entirety. It also published an updated Editor's Note.[8] This pleased Mr. Wemple, who tweeted that day: ". . . . I gotta say: The Atlantic has

---

[7] Erik Wemple, *Opinion: Editor's note in the Atlantic claims deception by Ruth Shalit Barrett in niche-sports story*, THE WASHINGTON POST (Oct. 31, 2020), https://www.washingtonpost.com/opinions/2020/10/31/editors-note-atlantic-claims-deception-by-ruth-shalit-barrett-niche-sports-story/.

[8] On November 2, 2020 Mr. Wemple covered the retraction (https://www.washingtonpost.com/opinions/2020/11/02/atlantic-retracts-niche-sports-story-by-ruth-shalit-barrett/), and on January 30, 2021 he covered Ms. Abraham's related departure from *The Atlantic* (https://www.washingtonpost.com/opinions/2021/01/30/editor-who-worked-ruth-shalit-barretts-retracted-atlantic-story-is-no-longer-with-magazine/).

acted admirably following the publication of this story." This updated note attacked the Article's veracity in order to justify the retraction, even though by this point *The Atlantic*'s research chief, Yvonne Rolzhausen, had completed her investigation and found that the Article was accurate aside from two trivial details—the exact dimensions of Darien hockey rinks and the hometown of an unnamed lacrosse parent.

105.    Finally, in its January/February 2021 print edition (also digitally accessible to *The Atlantic* subscribers), *The Atlantic* published an adaptation of this November 1, 2020 note. Therein, *The Atlantic* repeated many of the online note's falsehoods and false implications but walked back some of its most incendiary charges—establishing that *The Atlantic* knew or should have known that these charges were false:

a.    The online note "identified a need to clarify a detail about a neck injury . . . to be more precise about its severity," but the print edition omits this supposedly necessary clarification.

b.    The online note claims Ms. Barrett "is accused of inducing at least one source to lie to our fact-checking department," but the print edition confines this accusation to just "a source."

c.    The online note states "we cannot attest to the veracity of the article," but the print edition says "we cannot attest to the veracity of the piece **in its entirety**." (emphasis added)

d.     The online note states that Ms. Barrett "encouraged Sloane to deceive *The Atlantic*," but the print edition omits this false accusation, and merely

states that Sloane's attorney claimed Ms. Barrett "proposed the invention of a son as way to protect her anonymity."

e.     The online Note states that, "When writing recently for other magazines, Barrett was identified by her full name, Ruth Shalit Barrett," but the print edition walks that back, stating, "When writing recently for other magazines, Barrett was *typically* identified by her full name, Ruth Shalit Barrett." (emphasis added) Despite this and other alterations, *The Atlantic* has not corrected its online note. Instead, *The Atlantic* leaves damaging assertions about Ms. Barrett online that it has elsewhere altered and thus knows are false and misleading.

106.   *The Atlantic*'s online and print Editor's Notes and the Peck Memorandum are the fulcrum of this complaint, and they are defamatory on their face and by implication. Their import is amplified by the fact that *The Atlantic*'s treatment of Ms. Barrett is singular: the magazine had never before retracted an article or decimated an author's character for similar errors. Without exception, *The Atlantic* has published factual corrections in the past by simply correcting the mistakes without an attack on its own journalists. For example: "This article originally mischaracterized the size of WNYC's newsroom. We regret the error." [9]

---

[9] Gillian B. White, *Why Public Media Has a Sexual-Harassment Problem*, THE ATLANTIC (Feb. 2, 2018), https://www.theatlantic.com/business/archive/2018/02/sexual-harassment-public-media/551780/.

107.   *The Atlantic* has also not retracted or damaged an author's character for far more egregious, substantive errors but instead tends to ambiguously attribute errors to the article itself, not to an individual or entity. For example, a past correction stated, "An earlier version of this essay mischaracterized what Bolton said about Trump's involvement in investigations."[10]

108.   Another correction read as follows: "This section **previously and erroneously grouped the views** of William and Benjamin Hurlbut together. It **mischaracterized the nature of the conversation** between He and Benjamin Hurlbut. It has also been revised to clarify William Hurlbut's stance on the ethics of embryo use, which do not, as previously stated, arise from conservative religious beliefs."[11]

109.   Other previous corrections simply explain, in neutral, non-judgmental terms, that an important part of an article is inaccurate: "This article previously mischaracterized parts of the IVF process";[12] or, "This article previously

---

[10] Thomas Wright, *What Matters Most Is That Bolton Publishes the Book Before the Election*, THE ATLANTIC, https://www.theatlantic.com/ideas/archive/2020/06/i-am-not-a-bolton-fan-but-he-deserves-credit/613183/ (June 18, 2020, 4:26 PM ET).

[11] Ed Yong, The CRISPR Baby Scandal Gets Worse by the Day, THE ATLANTIC, https://www.theatlantic.com/science/archive/2018/12/15-worrying-things-about-crispr-babies-scandal/577234/ (Dec. 4, 2018, 10:55 AM ET) (emphasis added).
[12] Sarah Zhang, *IVF Mix-Ups Have Broken the Definition of Parenthood*, THE ATLANTIC, https://www.theatlantic.com/science/archive/2019/07/ivf-embryo-mix-up-parenthood/593725/#Correction1 (July 11, 2019, 2:23 PM ET).

mischaracterized why Brad Birkenfeld was charged with conspiracy."[13] Or: "This story originally stated that Chu's study was of affluent families"; "[i]t also incorrectly reported that Chu was a parent at the time of her study"; and "[i]t also incorrectly reported that the boys would play with Chu's hair. We regret the errors."[14] All of these "mischaracteriz[ations]"—including describing someone as a parent when she is not—are more material than the number and gender of a confidential source's children.

110.    The malicious cruelty of the online and print Editor's Notes—and of *The Atlantic*'s decision to not only retract Ms. Barrett's Article but to describe her as a repellant and immoral person—has caused her and her entire family significant distress. These publications robbed Ms. Barrett of her good standing and reputation in her community as an honest, respectable, and ethical individual, and she has and continues to endure intense humiliation in her day-to-day personal life.

111.    *The Atlantic*'s conduct has also practically foreclosed Ms. Barrett's continued work in journalism. Its Editor's Notes are thus defamatory *per se* because they have negatively impacted, if not ended, Ms. Barrett's career. *The Atlantic*'s conduct also obliterated the likelihood that the Article would continue inspiring

---

[13] Peter Stone, *A Million-Dollar Pardon Offer at the Trump Hotel*, THE ATLANTIC, https://www.theatlantic.com/politics/archive/2021/02/corey-lewandowski-allegedly-pitched-more-1-million-trump-pardon/617980/#Correction1 (Feb. 10, 2021, 6:16 PM ET).

[14] Michael Reichert, *Male Violence Is Everywhere*, THE ATLANTIC, https://www.theatlantic.com/education/archive/2018/02/male-violence-is-everywhere/554261/ (Feb. 28, 2018).

important conversations around equity in sports and college admissions or child and adolescent health. *The Atlantic* now claims that it did all of this because of a mischaracterization of the main source's family. But this excuse does not hold water in light of the fact that similar and more egregious errors by other writers had triggered nothing more than brief, non-accusatory corrections by *The Atlantic* in the past. The truth is that *The Atlantic* was reacting to criticism from *The Washington Post*, and lacked the wisdom, fortitude and integrity to stand up to a bullying and vindictive media columnist with the ability to whip up outrage on Twitter.

E.   **Mr. Peck and *The Atlantic* smeared Ms. Barrett to support their contention that they made a mistake in publishing an article written by her.**

112.   The Peck Memorandum and the Editor's Notes communicated damaging falsehoods about Ms. Barrett and her Article. Although *The Atlantic* later admitted that the only real factual issue in the article that could be blamed on Ms. Barrett was the use of two words ("and son") to mask the identity of a confidential source, Defendants made numerous false and disparaging statements to create the false impression that it was retracting the Article because of numerous deceptions by an author who could not be trusted to tell the truth.

113.   The Peck Memorandum and Editor's Notes conveyed that in 1999 Ms. Barrett departed *The New Republic* following findings of plagiarism and inaccuracies in her work.[15]

---

[15] Mr. Peck wrote: "In 1999, when Barrett (her married name) was known by Ruth Shalit, she left *The New Republic*, where she was an associate editor, after

114.   This is false. In 1994-95, Ms. Barrett was accused of plagiarism and errors in her journalism but left *The New Republic* years later, in 1999. By contrast, Mr. Peck's and *The Atlantic*'s published statements falsely suggest that Ms. Barrett left *The New Republic* in 1999 immediately following and as a direct result of those incidents.

115.   In addition, Mr. Peck and *The Atlantic* both knew that this statement implied false information, or they should have known this and were therefore reckless toward its truth or falsity. *The Atlantic* and then-editor of *The Atlantic* magazine, Mr. Peck, either did or should have researched Ms. Barrett's professional past before publishing their false accounts of her departure. This misrepresentation was designed to exaggerate the gravity of Ms. Barrett's early-career mistakes, so as to devise a character capable of committing the deceptions that Mr. Peck and *The Atlantic* falsely purport she committed.

116.   Mr. Peck and *The Atlantic* also falsely indicated that Ms. Barrett had asked *The Atlantic* to publish her Article under the byline "Ruth S. Barrett" to prevent readers from associating her with her decades-old journalistic mistakes.[16]

---

plagiarism and inaccurate reporting were discovered in her work." *The Atlantic* then wrote online: "In 1999, when she was known by Ruth Shalit, she left The New Republic, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work." Later, *The Atlantic* published in print: "In 1999, when she was known by Ruth Shalit, she left *The New Republic* after plagiarism and inaccurate reporting were discovered in her work."

[16] From the Peck Memorandum: "The assignment was a mistake. So was the initial byline under which the piece ran. We typically defer to authors on how their byline appears, and originally we referred to Barrett as Ruth S. Barrett at her request. In

117.    This is false and misleading. It omits that *The Atlantic* first presented Ms. Barrett with a less transparent byline, "Ruth Barrett," and that Ms. Barrett proposed "Ruth S. Barrett" in response. Hence, Ms. Barrett actually proposed a more transparent byline than the one *The Atlantic* originally proposed. The only individual/entity liable for trying to mask Ms. Barrett's past from readers is *The Atlantic*, not Ms. Barrett.

118.    It also omits that Ms. Barrett displayed zero concern that readers would discover her full name. In fact, on October 17, 2020 Ms. Barrett asked Ms. Abraham if her author biography could link to www.ruthsbarrett.com, wherein Ms. Barrett shared articles that she had published under the bylines "Ruth Shalit," "Ruth Shalit Barrett" and "Ruth S. Barrett." There was no attempt to deceive by Ms. Barrett—*The Atlantic* knew who she was and could have used her maiden name if wanted to do so.

119.    Through this false accusation, Mr. Peck and *The Atlantic* intended to paint a portrait of a disgraced journalist trying to hide her identity to support its false

---

the interest of transparency to our readers, we should have included the name that she used in her byline in the 1990s." From the Online Editor's Note: "Originally, we referred to her as Ruth S. Barrett. When writing recently for other magazines, Barrett was identified by her full name, Ruth Shalit Barrett. . . . We typically defer to authors on how their byline appears . . . . We referred to Barrett as Ruth S. Barrett at her request, but in the interest of transparency, we should have included the name that she used as her byline in the 1990s, when the plagiarism incidents occurred." From the print version of the Editor's Note: "Originally, we referred to the author of the article as Ruth S. Barrett. When writing recently for other magazines, Barrett was typically identified by her full name, Ruth Shalit Barrett. . . . We typically defer to authors on how their byline appears. We referred to Barrett as Ruth S. Barrett at her request, but in the interest of transparency, we should have included the name that she used as her byline in the 1990s."

narrative that the Article was full of deceptions and could not be trusted, when in fact, it was retracting the Article to satisfy a media critic from a rival publication.

120.    To add insult to injury, unnamed "magazine sources" from *The Atlantic* spoke to Mr. Wemple and "raised concerns about the racial implications" of one line in the Article (which was truncated and taken out of context) and suggested that this was consistent with a supposed "imbroglio" over her story about the *Washington Post* that she wrote decades earlier. Like so many of the other claims about Ms. Barrett, this one—which is perhaps the most pernicious—falls apart upon even cursory inspection.

121.    As an initial matter, the entire article was written to expose the inequitable advantage of "overwhelmingly white, often wealthy players" who play niche sports. Indeed, the line about Compton that supposedly "raised concerns," was preceded by three paragraphs of discussion of the checkered history of athletic recruiting and the ways in which unscrupulous recruiters have traditionally preyed upon communities of color. The Article also discussed the ways in which wealthy families exploit urban communities to present a false veneer of equity in niche sports. While her decades-earlier article about *The Washington Post* confronted thorny racial issues, it was praised by *Washington Post* writers at the time. And, indeed, the *Post*'s own ombudsman had acknowledged that "the struggles and questions and views it brings to light are representative of the U.S. in 1995 and are certainly present at the *Post*."

**F.    Mr. Peck and *The Atlantic* falsified facts surrounding Ms. Barrett's conduct regarding her primary source and exploited those lies to cast the entire piece as unreliable.**

122.    Mr. Peck and *The Atlantic* published false statements surrounding Ms. Barrett's conduct in connection with her primary source, Sloane.[17]

123.    Instead of making clear that they had a contractual and ethical duty to protect Sloane's identity, Defendants falsely depicted the addition of the son as a conspiracy to deceive *The Atlantic* and its readers. In his October 30, 2020 memorandum to staff, Mr. Peck denounced the reference to the son as "a fabrication to make Sloane less identifiable, because she was concerned about maintaining anonymity." By relegating Sloane's contractual right to anonymity to a vague,

---

[17] The Peck Memorandum reads: "New information establishes that Barrett was complicit with a source in the story, referred to as 'Sloane,' in an effort to deceive *The Atlantic* and its readers about the makeup of Sloane's family. The article originally included a reference to a son of Sloane's, but this was a fabrication to make Sloane less identifiable, because she was concerned about maintaining anonymity." The online Editor's Note reads: "We have established that Barrett deceived *The Atlantic* and its readers about a section of the story that concerns a person referred to as 'Sloane.' . . . . Her [Sloane's] attorney also said that according to Sloane, Barrett had first proposed the invention of a son, and encouraged Sloane to deceive *The Atlantic* as a way to protect her anonymity. . . . we now know that the author misled our fact-checkers, lied to our editors, and is accused of inducing at least one source to lie to our fact-checking department." The print edition of the Editor's Note reads: "We have established that Barrett deceived *The Atlantic* and its readers about a section of the story that concerns a person referred to as 'Sloane.' . . . . Sloane's attorney told The Atlantic that Sloane had misled the magazine because she had wanted to make herself less readily identifiable—and that Barrett had proposed the invention of a son as a way to protect her anonymity. . . . we now know that the author misled our fact-checkers, lied to our editors, and is accused of inducing a source to lie to our fact-checking department."

halfhearted "concern," Mr. Peck and *The Atlantic* created the false impression that Ms. Barrett recruited an important source and quoted her extensively in an article without first establishing clear ground rules for this source's participation. Mr. Peck and *The Atlantic* misled readers when they omitted the crucial context that Sloane had a confidentiality agreement with *The Atlantic* and had every expectation of robust protection. Mr. Peck should have truthfully described Sloane to *The Atlantic*'s readers the way he had, several days earlier, described her to Ms. Abraham: as "a source we agreed to shield." *The Atlantic* smeared Ms. Barrett when it falsely implied that Ms. Barrett's arrangement with Sloane was haphazard and ungoverned by ground rules—when in fact it was governed by a formal agreement that *The Atlantic* flouted and disregarded at every turn.

124.   Sloane and her husband first approached Ms. Barrett with the concept for the Article in or around July 2019. Sloane is a coastal Connecticut sports mom who, in the eyes of *The Atlantic,* did not fit the mold of a heroic source deserving of protection. But Sloane had worked hard to provide *The Atlantic* with valuable information on a topic of public importance. She had connected Ms. Barrett with coaches, sent her documents, and suggested other sources to interview. After the Article had been filed, she spent three additional weeks cooperating with quote-checkers and fact-checkers. Sloane was not an *Atlantic* employee. She did not receive payment in exchange for her assistance with the Article. All she asked for in return was the protection guaranteed as a condition of her contributions.

125.  Indeed, Sloane agreed to speak with Ms. Barrett and provide information for the article only on the condition that she would neither be identified nor identifiable, from which arose Ms. Barrett's and *The Atlantic*'s obligations to protect Sloane's anonymity.

126.  Mr. Peck and *The Atlantic* nonetheless imply in their respective publications that adding the son was a fabrication intended to serve a nefarious purpose, such as making the Article more salacious.

127.  Mr. Peck and *The Atlantic* knew or should have known that Ms. Barrett could not have possibly had a self-serving motive here. Nothing about the decision to add the son had the effect of making Ms. Barrett's story more or less believable. If Ms. Barrett had invented a detail that functioned as a signifier—for instance, had she falsely claimed that Sloane has a reclaimed-wood private squash court on her front lawn, and then later claimed that she included this embellishment to protect Sloane's identity—it would be easy to doubt Ms. Barrett's motives. A private court could well be a masking detail, but it also feeds a narrative of entitlement that enhances Ms. Barrett's thesis. By contrast, the fourth child was content-neutral and is clearly in the piece for one purpose—to enable Ms. Barrett to fulfill her ethical and legal obligation to protect Sloane. *The Atlantic* knew this and should have communicated it to readers.

128.    *The Atlantic* also stated that Ms. Barrett originated the concept of the son to mask Sloane's identity (untrue) and that Ms. Barrett pressured Sloane to lie to *The Atlantic* about that detail (also untrue).[18]

129.    In fact, Sloane's desire to avoid being described as the mother of three daughters first surfaced in a text message she sent to Ms. Barrett on August 28, 2020. "No 3 kids," she wrote. "It's way too identifying."

130.    Sloane and her husband then encouraged Ms. Barrett to incorporate this detail into the Article to reduce Sloane's identifiability. Sloane and her husband wanted and spearheaded any misrepresentations about their family makeup to *The Atlantic*, without pressure from Ms. Barrett. Sloane's understandable and defensible fear of being identified exclusively drove any such misrepresentations.

131.    *The Atlantic* knew or was reckless toward the truth or falsity of its online publication of Sloane's claim that Ms. Barrett had "encouraged Sloane to deceive *The Atlantic*" in addition to its assertions (online) that Ms. Barrett "is accused of inducing at least one source to lie to our fact-checking department" and (in print) that she "is accused of inducing a source to lie to our fact-checking department." At a minimum, publishing these allegations—without proof or adequate investigation—was reckless because they originated from a distressed, partial source.

132.    In addition, in asserting that Ms. Barrett deceived *The Atlantic* and readers by adding the son, Mr. Peck and *The Atlantic* created the false impression that adding the son was in direct contravention of company policy such that *The*

---

[18] *See id.*

*Atlantic* would never employ such means, and relatedly that this edit ran afoul of unambiguous journalistic ethics. Both implications are false and misleading.

133.    *The Atlantic* neither adopted nor communicated any policy to Ms. Barrett around source masking; specifically, acceptable versus prohibited tools that *The Atlantic* authors can implement in their writing to protect confidential sources.

134.    Other major outlets have publicized such policies, including *The New York Times*[19] and *NPR*,[20] making *The Atlantic*'s absence of such a policy meaningful because *The Atlantic* did not have an internal benchmark through which it could evaluate the propriety of Ms. Barrett's conduct.

135.    Instead, throughout the editing and fact-checking process for the Article, *Atlantic* employees gave the impression that quotes and facts should be considered fungible under some circumstances and can be altered if there is a moral and legal justification, such as the need to protect the privacy of minor children.

136.    For example, Ms. Barrett noticed that a quote from Darien High School lacrosse coach Jeff Braemeier had been altered and made less truthful, based on a "concern from legal" that a student-athlete referenced in Braemeier's quote could be identifiable.

---

[19] *How The Times Uses Anonymous Sources*, Philip B. Corbett, N.Y. TIMES *(June 14, 2018),* https://www.nytimes.com/2018/06/14/reader-center/how-the-times-uses-anonymous-sources.html.

[20] *Special Section: Anonymous sourcing*, NPR, https://www.npr.org/about-npr/688745813/special-section-anonymous-sourcing.

137.   Without its own policy on ethical means of source protection and given its modification of minor facts to that end, *The Atlantic* did not have a definite stance against inclusion of the son to mask Sloane's identity.

138.   Meanwhile, journalistic ethics also fails to unambiguously answer whether a journalist can alter a negligible detail about a confidential source to protect the source's anonymity.

139.   Esteemed journalists appear to have fudged small details in their works, presumably in the interest of confidential source protection. For example, Claudia Dreifus, now a writer for *The New York Times* and adjunct professor at Columbia University, published an article for *Glamour* that described an anonymous source as living in Boston when it turned out she did not, with no preface stating that the article changed details to protect source anonymity.[21] When asked if the fact that the source did not actually live in Boston might "harm the story," then-executive editor for *Glamour* Magazine (and previous reporter for *Wall Street Journal* and *The New York Times* and editor at *Newsweek*, and then Vice President/New Magazine Development at *The New York Times* post-*Glamour*) Rona Cherry testified: "No, because it was what she went through that was important."[22] In an example where the identity of the source is actually an issue of great national concern—as opposed to here where the protection is being made to protect a mother and her family from

---

[21] Claudia Dreifus, *Patient-Therapist Sex*, GLAMOUR MAG., Sept. 1988.

[22] Rona Cherry Dep. at 69-70 in *Ruzicka v. Conde Nast Publ'ns, Inc.*, 999 F.2d 1319 (8th Cir. 1993).

embarrassment—Bob Woodward and Carl Bernstein described Deep Throat as a "White House source," even though Deep Throat was actually Mark W. Felt, an FBI employee.

140.    Nonetheless, Mr. Peck and *The Atlantic* insinuated to readers that *The Atlantic*'s express policy and/or journalistic ethics categorically prohibits falsification of any and all information, no matter how immaterial, even in the interest of confidential source protection. For one thing: it is false and misleading for *The Atlantic* to imply existence of conclusive standards around such a complex ethical issue. For another: we now know that this is pure moralistic grandstanding that bears no relation to *The Atlantic*'s real-life policies, as evidenced from the fact that "[m]y own captain" can become "multiple . . . players," in the event of legal concerns about potential identifiability. Why *The Atlantic*'s legal department had a blind spot when it came to the potential identifiability of the minor children of Ms. Barrett's anchor source remains a mystery.[23]

141.    Lastly, Mr. Peck and *The Atlantic* exploited these falsehoods to create the impression that adding the son undercut the Article's reliability, despite knowing that the son's addition was not grounds to condemn its veracity. Mr. Peck wrote in his memorandum, "It is crucial for us to understand fully the scope of deceptions and errors in the article." *The Atlantic* then falsely claimed, "It is impossible for us to

---

[23] JOURNALISM ETHICS: A REFERENCE HANDBOOK 120 (Elliot D. Cohen & Deni Elliot eds., 1997) ("There are significant ethical justifications for using anonymous sources . . . . [including] preventing either physical or emotional harm to a source; **protecting the privacy of a source, particularly children**" (emphasis added)).

vouch for the accuracy of this article." In toto, each publication falsely depicted the son as a symptom of more extensive fraud in Ms. Barrett's the Article.

142. This depiction was false and misleading. The son's addition is not indicative of more extensive fraud in the Article. It was a single measure pushed by Sloane and her husband in reaction to *The Atlantic*'s indifference to its legal obligation to protect her anonymity. *The Atlantic* clearly saw Sloane's expectation of anonymity as an obstacle to circumvent, not a legal right.

143. Ultimately, *The Atlantic*'s conduct did render Sloane identifiable. Mr. Wemple wrote in his October 30, 2020 article for *The Washington Post* that "[i]nsiders had no difficulty identifying the family of 'Sloane.'" Upon information and belief, Mr. Wemple identified Sloane by locating the California Summer Gold tournament roster and identifying Sloane's daughter as the only competitor who withdrew (*The Atlantic* had pushed to include the tournament's name in Ms. Barrett's Article). Sloane thus had legitimate reason to fear that *The Atlantic* would breach its promise of anonymity. The son's addition only evidences her desperation to avoid that outcome. It does not evidence material falsehoods in Ms. Barrett's Article and is not itself a material falsehood.

144. Mr. Peck and *The Atlantic* also could not realistically infer the Article's fraudulence from the son's addition because *The Atlantic* neither possessed nor communicated to Ms. Barrett any policy around source masking, such as accepted versus unaccepted editing measures to protect confidential sources. Without such guidance from *The Atlantic* and clear ethical guidelines on this topic from the

industry, Mr. Peck and *The Atlantic* could not reasonably extrapolate from Ms. Barrett's acquiescence to fudging a negligible detail (*i.e.*, "and son") that she is an unethical, rule-breaking journalist who might have also altered material components of her Article.

145.   The Article's reliability was also substantiated through *The Atlantic*'s comprehensive fact-checking procedure. Ms. Ciarrocca, *The Atlantic*'s own Senior Editor, fact-checked Ms. Barrett's Article. She initiated the process on or around August 11, 2020, asking Ms. Barrett for her "backup and notes/research along with contact info for all of the sources quoted in the piece."

146.   The fact-checker proceeded to closely examine Ms. Barrett's Article for accuracy. The Article was not a stew of unnamed sources and other untraceable minutiae, but was based on multiple on-the-record interviews, dozens of pages of NCAA participation data, and a profusion of empirical, verifiable facts. Numerous text exchanges between Ms. Barrett and the fact-checker, attempting to clarify the color of a squash player's ponytail, or whether lacrosse has topped the list of most-added high-school sports for the past six years or the past seven years, are a testament to the fact that the Article was meticulously fact-checked and subjected to rigorous editorial scrutiny.

147.   Ms. Barrett was a conscientious and engaged participant in the fact-checking process. For example, she emailed the fact-checker on September 16, 2020, "are we overstating / engaging in hyperbole when we say '**prevent** regular kids from

cracking the system?'" and "maybe we say '**make it difficult** for regular kids to crack the system.'"

148.   But the fact-checker led review and confirmation of facts in Ms. Barrett's Article and was ultimately responsible for confirming their accuracy. The fact-checker conceded that fact-checking and outstanding errors in Ms. Barrett's Article, if any, were her responsibility. On October 22, 2020 she emailed Ms. Barrett that "Olympic sized rinks are even bigger than NHL. I should have flagged this," and separately that "these are things I should have caught and discussed on my call with Sloane."

149.   Mr. Peck and *The Atlantic* nonetheless represented to readers that Ms. Barrett's Article might be materially false, even though *The Atlantic* has a robust fact-checking system and Ms. Barrett engaged earnestly in that process, and even though the fact-checker assumed responsibility for any minor errors that ended up in the Article.

150.   *The Atlantic* has previously attributed errors to its editing process.[24] Honest reporting about Ms. Barrett's Article would have done the same.

---

[24] "*Due to an editing error, this article originally misidentified several quotes given to German news sources as quotes given directly to the author.*" *The Tree With Matchmaking Powers*, THE ATLANTIC, https://www.theatlantic.com/health/archive/2019/06/the-postman-at-the-bridegrooms-oak/591892/ (Sept. 15, 2020, 12:01pm ET). "*Due to an editing error, this article originally stated that Tristan Harris's quotation came from an interview with the authors. In fact, Harris wrote it in a recent essay.*" *How To Put Out Democracy's Dumpster Fire*, THE ATLANTIC,

151.    The Article's reliability was further substantiated through a *second* fact-checking *The Atlantic* undertook in response to Mr. Wemple's criticisms post-publication. Ms. Barrett conveyed what she had been told about this second fact-check in an October 29, 2020 email to Ms. Abraham, informing her she had learned that Yvonne Rolzhausen, research chief for *The Atlantic*, had reviewed the Article "a second time, in detail" and found that "everything else holds up."

152.    Given that *The Atlantic* fact-checked Ms. Barrett's Article twice and found no substantive errors, Mr. Peck's and *The Atlantic*'s accusations of unreliability were based only on Ms. Barrett's reasonable decision to not disclose that Sloane did not have a son and from a letter submitted by Sloane's attorney—a letter which Ms. Barrett was neither allowed to read in full nor to respond to.

153.    Second, following publication of Mr. Wemple's first criticism of Ms. Barrett's Article in *The Washington Post* that discussed Sloane, among other things, Sloane's attorney sent a letter on Sloane's behalf to *The Atlantic*. The letter contested the accuracy of some of the Article's contents and claimed that Ms. Barrett originated the idea to add the son. Perplexed, Ms. Barrett emailed Sloane and her husband that the letter from their attorney "dispute[d] . . . claims that were read back to you twice, by both me and Michelle, and that you approved."

---

https://www.theatlantic.com/magazine/archive/2021/04/the-internet-doesnt-have-to-be-awful/618079/ (Mar. 11, 2021, 8:41am ET).

154.    Sloane had a conflict of interest and cannot be considered a credible source for accusations against Ms. Barrett and her Article. In the first two weeks after the Article's publication, Sloane did not inform Ms. Barrett or anyone at *The Atlantic* of any issues with Ms. Barrett's story, nor did she protest that it contained inaccuracies. Further, unlike many aggrieved sources, she had ample opportunities to do so: during this time period, *Atlantic* editors and fact-checkers were calling and emailing Sloane on an almost-daily basis to re-check facts and request additional information and photographs. On the receiving end of these multiple communications from *The Atlantic*, Sloane responded politely. She also informed the Article's fact-checker via email that "[t]he information that I provided was accurate."

155.    Sloane only reversed course, hired an attorney, and lodged accusations against Ms. Barrett after Erik Wemple identified her as the central source for the Article and after *The Atlantic*—rather than contacting Sloane to apologize for its dereliction in rendering her identifiable—doubled down and told her that it intended to publish an admonitory "correction" revealing further details about her family.

156.    Upon information and belief, Sloane lodged these accusations against Ms. Barrett and her Article in a state of mounting concern regarding the confidentiality she had been promised. On October 30, 2020, Ms. Barrett wrote to Mr. Peck that she strongly suspected that Sloane hired an attorney to "remind The Atlantic of the urgency of guarding her anonymity. Unfortunately she seems to have convinced herself -- or someone has convinced her -- that the best way to guarantee

that anonymity is to attack the very foundations of the piece and to discredit me as the writer."

157.    Sloane was not an exile from the "Mad, Mad World" of niche sports. Her children still actively competed in squash and fencing, but in the Article Sloane expressed her strong disillusionment with these sports—urging other families to get out while they still could, before they wasted all their resources and emotional bandwidth on "a fool's folly," as she put it in the Article. Even before the Article was published, Sloane started having second thoughts about participating and had briefed Ms. Barrett on the consequences if she were to be exposed. Sloane feared that her daughters would lose their coaches, their program, and their studio, that their family would be shunned by the governing bodies of squash and fencing, and that her children's college admissions prospects would be damaged.

158.    Once the Article went live, and Erik Wemple of the *Post*—perturbed by what he perceived as the "Washington comeback" of Ruth Shalit Barrett—began to pick it apart in an attempt to discredit it, the prolonged fallout and spotlight on Sloane's family must have been harrowing. Far from being a neutral arbiter of Ms. Barrett's journalistic practices, Sloane was now powerfully incentivized to discredit Ms. Barrett and her Article and to cast herself as a victim of fraudulent reporting.

159.    Mr. Peck is a seasoned journalism professional, and *The Atlantic*'s leadership is also comprised of such professionals. Both should have known better

than to defer to allegations of a disgruntled source with ample motive to undermine an Article that risks damaging her and her family's reputations.[25]

160.   *The Atlantic* knew Sloane and her husband had grown increasingly anxious about the Article. A text from Ms. Barrett to the Article's fact-checker states that "[m]y consternation over this has to do with the fact that my relationship with [Sloane's husband] has now become very tense." In addition, a September 10, 2020 email from Ms. Barrett to Ms. Abraham and to the Article's fact-checker states that "[t]he big sticking point was her [Sloane's] bio, which they say is too specific and will identify her." Given his leadership role, Mr. Peck also knew or should have known about Sloane's anxiety. Both Mr. Peck and *The Atlantic* therefore knew or should have known that Sloane, once identified, had become an untrustworthy source of information about Ms. Barrett and her Article.

161.   On October 29, 2020, Mr. Peck and Adrienne LaFrance confronted Ms. Barrett with Sloane's allegations, including the allegation Sloane had not, in fact, "reconfigured the basement so that her younger two could fence," as the Article describes. However, Ms. Barrett provided strong evidence that this was untrue. She emailed Mr. Peck an audio recording wherein Sloane relates to Ms. Barrett the

---

[25] *See* HOLDING THE MEDIA ACCOUNTABLE 27-28 (David Pritchard ed., 2000) ("Subjects of a news story may define a news story as deficient for a number of reasons even if a story contains no errors of unambiguous fact. . . . subjects of news coverage also tend to define an error as any deviation from their conception of what the story should be."); *see also id.* at 27-41 (noting that about half of journalistic sources become disgruntled).

various elements of her pandemic fencing setup. At :48 seconds in, she says, "I'll show them to you, in the basement."

162.   Mr. Peck and Ms. LaFrance also raised Sloane's allegation that Sloane did not have a beach house as the Article purports ("Her husband dusted off the beach-house blender . . . ."). Ms. Barrett responded that it was her understanding that Sloane and her family had spent a week there in July, although she did not know if the home was owned, or a rental.

163.   *The Atlantic* nonetheless published in its online Editor's Note that "*Sloane's attorney claimed that there are several other errors about Sloane in the article but declined to provide* The Atlantic *with examples*" and published an analogous allegation in print. This is false. Upon information and belief, the letter offered unsound examples of errors in Ms. Barrett's Article—one of which Ms. Barrett disproved with evidence and others that she denied but is capable of disproving through documentary evidence. *The Atlantic* misled readers into assuming existence of other errors based on this unreliable letter.

164.   *The Atlantic*'s online Editor's Note purported to identify four small errors in  Ms. Barrett's Article besides the son: "We identified the need to clarify a detail about a neck injury sustained . . . to be more precise about its severity."; "We also identified the need to correct the characterization of a thigh injury . . . ."; "And we identified the need to correct the location of a lacrosse family . . . ."; "The article originally referenced Olympic-size backyard hockey rinks, but . . . they are not Olympic-size." (The print edition enumerated the latter three. Without explanation,

it omitted the allegation that Ms. Barrett's Article misrepresented a neck injury; however, as with other alterations reflected in the print edition, *The Atlantic* did not amend the online note.)

165.   Only two of these can truly be considered "errors." Ms. Barrett's description of the thigh injury that *The Atlantic* contested ("gashed so deeply in the thigh that blood seeped through her pants") is accurate. The Article's fact-checker emailed Ms. Barrett on September 1, 2020 that "she said when she took off her uniform there were multiple red spots/striations all over both legs, one deep enough that it was bleeding." Degree and/or description of injury is highly subjective.

166.   The hockey-rink description is more hyperbole than error, mirroring *The Atlantic*'s own hyperbolic style of writing. Many Atlantic feature pieces employ playful hyperbole, notably Caitlin Flanagan's lacerating article on private school culture that appeared in the April 2021 issue. In this piece, Ms. Flanagan describes "fundraising events dedicated to financing a major school project: paving the locker rooms with gold coins, annexing Slovakia, putting out a hit on a rival headmaster."[26] The magazine did not run a correction apologizing for Ms. Flanagan's "errors" regarding gold coins and Slovakia.

167.   More importantly, the online Editor's Note explained that "we noted and corrected these errors in the online version of the article on October 30," and the print edition likewise indicated that *The Atlantic* had corrected three of these pre-

---

[26] Caitlin Flanagan, *Private Schools Have Become Truly Obscene*, THE ATLANTIC, https://www.theatlantic.com/magazine/archive/2021/04/private-schools-are-indefensible/618078/ (Mar. 26, 2021, 7:42pm ET).

retractions. None of these purported errors were grounds for retraction, so none were grounds for alleging the Article's unreliability. The Article's fact-checker even emailed Ms. Barrett on October 22, 2020 that "every piece has mistakes, it's just a matter of who actually notices!" *The Atlantic* knew that articles often contain small, unintended errors that do not erode their veracity.

168.   Mr. Peck and *The Atlantic* did not have reason to question the Article's reliability, and they had ample evidence of its reliability. Therefore, both knew or were reckless toward the truth or falsity of their implications that Ms. Barrett's Article was subject to pervasive error but published such nonsense regardless.

169.   *The Atlantic* further knew or was reckless toward the falsity of its claim that the Article was altogether unreliable because, in justifying its rejection of Ms. Barrett's request for dramatic rights to the Article, a December 4, 2020 letter from *The Atlantic*'s Assistant General Counsel contained no adverse allegations about the Article other than those pertaining to Sloane's family makeup. Unlike *The Atlantic*'s Editor's Notes, this letter did not purport the Article's broad unreliability.

170.   Also indicating that *The Atlantic* knew or was reckless toward the truth or falsity of its depiction of Ms. Barrett's Article as wholly unreliable, *The Atlantic* first published online that Ms. Barrett "is accused of inducing at least one source to lie to our fact-checking department" but, in the January/February 2021 print edition, amended this accusation to just "a source." *The Atlantic* nonetheless preserves online the false implication that *The Atlantic* has nonspeculative reason to think Ms. Barrett might have "induc[ed]" multiple sources "to lie" to its fact-checking department.

171.   *The Atlantic* never intended to publish an accurate assessment of Ms. Barrett or her Article's veracity. *The Atlantic* cared solely for its reputation, which overshadowed its interest in justly treating an author it deemed damaged goods. After publication of *The Atlantic*'s original (online) Editor's Note, Ms. Barrett emailed Mr. Peck: "What happens if the piece continues to be rechecked and it holds up?" He did not reply.

172.   These depictions would be highly offensive to any reasonable person who labored over an intensive piece of journalism, not to mention years of reputation-rebuilding. They are also defamatory *per se* because no respectable outlet would want to hire the journalist that Mr. Peck and *The Atlantic* invented in their respective publications and called Ruth Shalit Barrett.

**G.   *The Atlantic*'s conduct is inconsistent with its obligations pursuant to its contract with Ms. Barrett.**

173.   *The Atlantic* engaged in the above conduct despite its Author's Agreement with Ms. Barrett (dated November 7, 2019 and signed December 30, 2019 by Ms. Barrett and November 7, 2019 by Ms. Amy Weiss-Meyer) that indicates intent on behalf of both signatories to protect writer and publisher. *See* Ex. 5.

174.   The Author's Agreement obligated Ms. Barrett to warrant that "the Work does not infringe the copyright, or invade the proprietary rights, or any other right, of any person or entity; **the Work does not** libel or **invade the privacy or publicity rights of anyone**; and the Work will not cause tortious harm to anyone." Ex. 5 at 2 (emphasis added). This language encompasses Ms. Barrett's duty to avoid

invading Sloane's privacy and publicity rights, which required Ms. Barrett to avoid authoring an Article that leaves Sloane identifiable.

175.   In addition, the Author's Agreement gave *The Atlantic* "exclusive worldwide rights to dramatize the Work by radio, television, motion picture, or the Internet, and/or to publish, broadcast, or assign or sublicense the right to create derivative works to be displayed in such media." Ex. 5 at 1. "In return, Publisher [*The Atlantic*] agrees to make commercially reasonable efforts, including through a contractual relationship with an agent selected by Publisher, to make such intellectual property rights available to interested parties and to market such rights." *Id.* at 1. Also, "[p]ublisher agrees to pay Author fifty percent (50%) of all net revenues (after agent and attorney's fees) from the sale of such rights." *Id.* at 1-2.

176.   *The Atlantic* materially breached the Author's Agreement in not only failing to "make commercially reasonable efforts" to market the Article for dramatization and other commercial opportunities, such as hiring an agent to that end, but also actively obstructing Ms. Barrett from pursuing the same. In a December 4, 2020 letter rejecting Ms. Barrett's request for the dramatic rights to her Article, legal counsel for *The Atlantic* disclosed *The Atlantic*'s goal—counter to its obligation under the Author's Agreement—that the Article garner no public attention.

177.   The letter also evidenced how *The Atlantic* was accomplishing this goal and, as a result, inhibiting Ms. Barrett from profiting from her Article. The letter reiterated the false claim that Ms. Barrett had coerced a source to lie to *The Atlantic*. It also alleged that dramatization of the Article would "compound" the reputational

injury that Ms. Barrett's "extraordinary admission of journalistic malpractice" had already inflicted on *The Atlantic*. This false narrative was first introduced by Mr. Peck's October 30, 2020 internal email, then published globally by *The Atlantic*, and now recycled by *The Atlantic* to justify scrubbing Ms. Barrett's findings from all platforms.

178.    By retracting Ms. Barrett's Article in full and publishing defamatory Editor's Notes that denounced its reliability and vilified its author, *The Atlantic* made it impracticable for the Article to glean profit for *The Atlantic* or Ms. Barrett through commercial dramatization. Few, if any, companies would want to dramatize a concept that was so seriously sullied by a reputable institution like *The Atlantic*. *The Atlantic* thus breached its express promise to "make commercially reasonable efforts" to market intellectual property rights to the Article.

179.    *The Atlantic* further materially breached its Author's Agreement with Ms. Barrett by sacrificing her Article and reputation for an illegitimate reason. *The Atlantic* trampled on Ms. Barrett's rights created by that agreement (as indicated, its express promise to exercise "commercially reasonable efforts . . . to make such intellectual property rights available to interested parties"; its implied promise to protect Ms. Barrett's sources' anonymity; and its implied covenant of good faith and fair dealing) all while the agreement purports to confer highly valuable rights on *The Atlantic*, such as "exclusive worldwide rights to dramatize the Work," that *The Atlantic* presumably intends to preserve. This is grounds for rescission.

180.   By retracting the Article based on false smears of the Article and its author, *The Atlantic* also did not deal with Ms. Barrett in good faith or fairly.

181.   Moreover, *The Atlantic*'s Editor's Notes interfered with the professional opportunities that Ms. Barrett expected to arise from her *The Atlantic* debut. *The Atlantic* must have known that Ms. Barrett had valid business expectancies at time of publication, and it must have been substantially certain that its ruthless descriptions of Ms. Barrett would put an end to most, if not all, of those prospective opportunities. *The Atlantic* also must have known that Ms. Barrett had one or more valid business expectancies when she sought dramatic rights to the Article post-publication, but *The Atlantic* nonetheless left its defamatory Editor's Note (uncorrected) online.

182.   *The Atlantic*'s conduct not only robbed society of the public good that would otherwise flow from Ms. Barrett's Article but also robbed Ms. Barrett of personal and financial gains that would flow from dramatizing the concept through other creative modes. Since the Article's retraction, the entertainment industry has expressed some interest in dramatizing it. The Author's Agreement unjustly cuts off this single opportunity to restore Ms. Barrett's work in another form and extract some positive impact from it. Dramatizing the Article would revive a work that *The Atlantic* disclaimed for its own benefit, unrelated to its validity, and through unlawful, defamatory censure.

## CLAIMS FOR RELIEF

## <u>FIRST CLAIM FOR RELIEF</u>

## Defamation

## (As to *The Atlantic* and Mr. Peck)

183.   Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through  182 of this complaint.

184.   Mr. Peck circulated an email on October 30, 2020 to third parties, all staff members of *The Atlantic*, that contains the following damaging and false factual assertions about Ms. Barrett:

a.      "New information establishes that Barrett was complicit with a source in the story, referred to as 'Sloane,' in an effort to deceive *The Atlantic* and its readers about the makeup of Sloane's family. The article originally included a reference to a son of Sloane's, but this was a fabrication to make Sloane less identifiable, because she was concerned about maintaining anonymity." These statements are false and misleading. They indicate that Ms. Barrett's illegitimate interests motivated the son's addition rather than her and *The Atlantic*'s ethical and legal obligation to protect her anonymity. They also falsely indicate that this edit breached clear company policy and/or journalistic ethics, and that it perpetrated a material fraud. Both claims are provably false. Mr. Peck knew these assertions to be false or was reckless toward their truth or falsity because he is a veteran journalist and media

professional and was then-editor at *The Atlantic* magazine who monitored the Article's creation and editing.

b.     "It is crucial for us to understand fully the scope of deceptions and errors in the article . . . . In addition to the lie about the son, we have so far identified and corrected a number of smaller errors." This assertion is false in framing trivial errors as grounds for questioning the Article's veracity when Mr. Peck's main concern (the son) served only to protect Sloane's anonymity and does not evidence material fraud. Mr. Peck knew these assertions to be false or was reckless toward their truth or falsity because he is a veteran journalist and media professional, was then-editor at *The Atlantic* magazine who monitored the Article's creation and editing, and in a letter dated December 4, 2020 to Ms. Barrett's counsel *The Atlantic*'s Assistant General Counsel had solely complained about issues surrounding Sloane's family composition (as opposed to claiming the Article is altogether untrustworthy).

c.     "In 1999, when Barrett (her married name) was known by Ruth Shalit, she left *The New Republic*, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work." This statement is false and misleading because "plagiarism and inaccurate reporting" were not "discovered" in Ms. Barrett's work in 1999. Ms. Barrett did not engage in journalistic lapses at *The New Republic* in 1999. These infractions occurred over a twelve-month time span, between 1994-1995. It is further false and misleading because Ms. Barrett did not exit *The New*

*Republic* as a direct result of these incidents. Finally, it is false and misleading because Ms. Barrett was neither accused of nor responsible for "inaccurate reporting" rising to the level of journalistic malfeasance that could precipitate a forced exit from *The New Republic* (rather, just one of her articles for *The New Republic* contained a serious error). Mr. Peck knew this assertion to be false or was reckless toward its truth or falsity because he was in regular contact with the Article's main editor, Ms. Abraham, who was Ms. Barrett's longtime friend and colleague, and because he was then-editor at *The Atlantic* magazine who monitored the Article's creation and editing.

      d.    "The assignment was a mistake. So was the initial byline under which the piece ran. We typically defer to authors on how their byline appears, and originally we referred to Barrett as Ruth S. Barrett at her request. In the interest of transparency to our readers, we should have included the name that she used in her byline in the 1990s." This statement is false in indicating that Ms. Barrett proposed the byline "Ruth S. Barrett" to conceal her identity. After *The Atlantic* proposed "Ruth Barrett," Ms. Barrett recommended the more transparent byline, "Ruth S. Barrett." Mr. Peck knew this assertion to be false or was reckless toward its truth or falsity because he was in regular contact with the Article's main editor, Ms. Abraham, and was then-editor at *The Atlantic* magazine who monitored the Article's creation and editing.

185.   *The Atlantic* published an Editor's Note online on November 1, 2020 that contains the following damaging and false factual assertions about Ms. Barrett:

74

a.      "In 1999, when she was known by Ruth Shalit, she left The New Republic, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work." This statement is false and misleading because "plagiarism and inaccurate reporting" were not "discovered" in Ms. Barrett's work in 1999. Ms. Barrett did not engage in journalistic lapses at *The New Republic* in 1999. These infractions occurred over a twelve-month time span, between 1994-1995. It is further false and misleading because Ms. Barrett did not exit *The New Republic* as a direct result of these incidents. Finally, it is false and misleading because Ms. Barrett was neither accused of nor responsible for "inaccurate reporting" rising to the level of journalistic malfeasance that could precipitate a forced exit from *The New Republic* (rather, just one of her articles for *The New Republic* contained a serious error). *The Atlantic* knew or was reckless toward its falsity because Ms. Abraham (the Article's main editor) was Ms. Barrett's longtime friend and colleague.

b.      "Originally, we referred to her as Ruth S. Barrett. When writing recently for other magazines, Barrett was identified by her full name, Ruth Shalit Barrett. . . . We typically defer to authors on how their byline appears . . . . We referred to Barrett as Ruth S. Barrett at her request, but in the interest of transparency, we should have included the name that she used as her byline in the 1990s, when the plagiarism incidents occurred." This statement is false in indicating that Ms. Barrett proposed the byline "Ruth S. Barrett" to conceal her identity. After *The Atlantic* proposed "Ruth Barrett,"

Ms. Barrett recommended the more transparent byline, "Ruth S. Barrett." In addition, *The Atlantic* knew or was reckless toward the truth or falsity of this description, as Ms. Abraham was the Article's main editor and would have seen and approved the first-pass proof of Ms. Barrett's Article that contained the initial byline, "Ruth Barrett." *The Atlantic* further knew or was reckless toward the truth or falsity of this description because later, in its January/February 2021 print Editor's Note, *The Atlantic* clarified that "[w]hen writing recently for other magazines, Barrett was typically identified by her full name, Ruth Shalit Barrett" (as opposed to "was identified by her full name"). *The Atlantic* thus knew or was reckless toward the truth that Ms. Barrett had not consistently used her full name in recent writings and, accordingly, that using the byline "Ruth S. Barrett" was not an irregularity that could corroborate its false implication that Ms. Barrett wanted to mask her identity.

      c.     "We have established that Barrett deceived *The Atlantic* and its readers about a section of the story that concerns a person referred to as 'Sloane.' . . . . Her [Sloane's] attorney also said that according to Sloane, Barrett had first proposed the invention of a son, and encouraged Sloane to deceive *The Atlantic* as a way to protect her anonymity. . . . we now know that the author misled our fact-checkers, lied to our editors, and is accused of inducing at least one source to lie to our fact-checking department." These statements are false and misleading. They suggest that Ms. Barrett's

illegitimate interests motivated the son's addition rather than her and *The Atlantic*'s ethical and legal obligation to protect her anonymity. They also falsely suggest that this edit breached clear company policy and/or journalistic ethics, and that it perpetrated a material fraud. Lastly, they suggest Ms. Barrett might have been accused of causing multiple sources to misstate facts to *The Atlantic*. These claims are provably false. *The Atlantic* knew this depiction was false or was reckless toward its truth or falsity, as Ms. Abraham oversaw the formation and editing of the Article knew that Sloane had become a disgruntled source, and *The Atlantic* knew that solely Sloane had accused Ms. Barrett of "inducing" a "source to lie."

     d.    "Sloane's attorney claimed that there are several other errors about Sloane in the article but declined to provide *The Atlantic* with examples." This statement is false. Mr. Peck and Adrienne LaFrance, executive editor of *The Atlantic*, confronted Ms. Barrett with specific examples supposedly provided by Sloane during a video conference call. Ms. Barrett addressed and refuted each of these accusations during that call and, later, by email.

     e.    "We cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the article. . . . It is impossible for us to vouch for the accuracy of this article." This statement is false because *The Atlantic* comprehensively fact-checked the piece and then re-checked items criticized by Mr. Wemple and admitted that the minor mistakes

77

should have been caught by the fact-checker and that there were no additional errors in the piece. In addition, *The Atlantic* admitted that explicitly: "It really comes down to the lie about the son and then not being forthright about it when questions were raised. I don't know of any other lies/deception. It's all just so unfortunate. They (higher ups) all know, from my perspective, the son was the only thing. But sadly, seems like that was enough…it tainted everything else."

180.   *The Atlantic* also published an Editor's Note in its January/February 2021 print edition (also digitally accessible to *The Atlantic* subscribers) that contains the following damaging and false factual assertions about Ms. Barrett:

a.   "In 1999, when she was known by Ruth Shalit, she left *The New Republic* after plagiarism and inaccurate reporting were discovered in her work." This statement is false and misleading because "plagiarism and inaccurate reporting" were not "discovered" in Ms. Barrett's work in 1999. Ms. Barrett did not engage in journalistic lapses at *The New Republic* in 1999. These infractions occurred over a twelve-month time span, between 1994-1995. It is further false and misleading because Ms. Barrett did not exit *The New Republic* as a direct result of these incidents. Finally, it is false and misleading because Ms. Barrett was neither accused of nor responsible for "inaccurate reporting" rising to the level of journalistic malfeasance that could precipitate a forced exit from *The New Republic* (rather, just one of her articles for *The New Republic* contained a serious error). *The Atlantic* knew or was reckless

toward its falsity because Ms. Abraham (the Article's main editor) was Ms. Barrett's longtime friend and colleague.

b.  "Originally, we referred to the author of the article as Ruth S. Barrett. When writing recently for other magazines, Barrett was typically identified by her full name, Ruth Shalit Barrett. . . . We typically defer to authors on how their byline appears. We referred to Barrett as Ruth S. Barrett at her request, but in the interest of transparency, we should have included the name that she used as her byline in the 1990s." This statement is false in indicating that Ms. Barrett proposed the byline "Ruth S. Barrett" to conceal her identity. After *The Atlantic* proposed "Ruth Barrett," Ms. Barrett recommended the more transparent byline, "Ruth S. Barrett." In addition, *The Atlantic* knew or was reckless toward the truth or falsity of this description, as Ms. Abraham was the Article's main editor and would have seen and approved the first-pass proof of Ms. Barrett's Article that contained the initial byline, "Ruth Barrett."

c.  "We have established that Barrett deceived *The Atlantic* and its readers about a section of the story that concerns a person referred to as 'Sloane.' . . . . Sloane's attorney told *The Atlantic* that Sloane had misled the magazine because she had wanted to make herself less readily identifiable— and that Barrett had proposed the invention of a son as a way to protect her anonymity. . . . we now know that the author misled our fact-checkers, lied to our editors, and is accused of inducing a source to lie to our fact-checking

department." These statements are false and misleading. They suggest that Ms. Barrett's illegitimate interests motivated the son's addition rather than her and *The Atlantic*'s ethical and legal obligation to protect her anonymity. They also falsely suggest that this edit breached clear company policy and/or journalistic ethics, and that it perpetrated a material fraud. Both claims are provably false. *The Atlantic* knew this depiction was false or was reckless toward its truth or falsity, as Ms. Abraham oversaw the formation and editing of the Article and knew that Sloane had become a disgruntled source.

d. "Sloane's attorney claimed that there are several other errors about Sloane in the article but declined to provide examples." This statement is false. Sloane's attorney provided *The Atlantic* with a letter that contained additional alleged errors that Ms. Barrett either refuted or disproved. *The Atlantic* knew this statement was false or was reckless toward its falsity, as Mr. Peck and Adrienne LaFrance, executive editor of *The Atlantic*, confronted Ms. Barrett with these and other allegations from this same letter at a private Zoom meeting. Ms. Barrett addressed these allegations then and, later, by email.

e. "We cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the piece in its entirety. . . . It is impossible for us to vouch for the accuracy of this article." This statement is false because it suggests Ms. Barrett's Article suffers from unspecified substantive inaccuracies. *The Atlantic* knew this implication to be

false or was reckless toward its falsity as, among the other reasons stated herein, *The Atlantic* comprehensively fact-checked the piece and then re-checked items criticized by Mr. Wemple. Afterwards, it admitted that there were no other errors.

186.   Mr. Peck's memorandum and *The Atlantic*'s online and print Editor's Notes impaired Ms. Barrett's ability to practice journalism, her profession of much of the past twenty-plus years.

187.   Ms. Barrett is not a public official. She is not a politician. She is not a public figure under any remotely reasonable definition of the phrase. She is just a private individual, no more and no less. The First Amendment does not give Defendants a license to lie about her.

188.   These violations are compensable pursuant to common law defamation in the District of Columbia. As a direct and proximate cause of this conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.

## SECOND CLAIM FOR RELIEF

### Defamation *Per Se*

### (As to *The Atlantic* and Mr. Peck)

189.   Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 188 of this complaint.

190.   Mr. Peck circulated an email on October 30, 2020 to third parties, all staff members of *The Atlantic*, that contains the following damaging and false factual assertions about Ms. Barrett:

a.   "New information establishes that Barrett was complicit with a source in the story, referred to as 'Sloane,' in an effort to deceive *The Atlantic* and its readers about the makeup of Sloane's family. The article originally included a reference to a son of Sloane's, but this was a fabrication to make Sloane less identifiable, because she was concerned about maintaining anonymity." These statements are false and misleading. They suggest that Sloane's illegitimate interests motivated the son's addition rather than Ms. Barrett's and *The Atlantic*'s ethical and legal obligation to protect her anonymity. They also falsely suggest that this edit breached clear company policy and/or journalistic ethics, and that it perpetrated a material fraud. Both claims are provably false. Mr. Peck knew these assertions to be false or was reckless toward their truth or falsity because he is a veteran journalist and media professional and was then-editor at *The Atlantic* magazine who monitored the Article's creation and editing.

b.   "It is crucial for us to understand fully the scope of deceptions and errors in the article . . . . In addition to the lie about the son, we have so far identified and corrected a number of smaller errors." This assertion is false in framing trivial errors as grounds for questioning the Article's veracity when Mr. Peck's main concern (the son) served only to protect Sloane's anonymity

and does not evidence material fraud. Mr. Peck knew these assertions to be false or was reckless toward their truth or falsity because he is a veteran journalist and media professional, was then-editor at *The Atlantic* magazine who monitored the Article's creation and editing, and in a letter dated December 4, 2020 to Ms. Barrett's counsel *The Atlantic*'s Assistant General Counsel had solely complained about issues surrounding Sloane's family composition (as opposed to claiming the Article is altogether untrustworthy).

c.      "In 1999, when Barrett (her married name) was known by Ruth Shalit, she left *The New Republic*, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work." This statement is false and misleading because "plagiarism and inaccurate reporting" were not "discovered" in Ms. Barrett's work in 1999. Ms. Barrett did not engage in journalistic lapses at *The New Republic* in 1999. These infractions occurred over a twelve-month time span, between 1994-1995. It is further false and misleading because Ms. Barrett did not exit *The New Republic* as a direct result of these incidents. Finally, it is false and misleading because Ms. Barrett was neither accused of nor responsible for "inaccurate reporting" rising to the level of journalistic malfeasance that could precipitate a forced exit from *The New Republic* (rather, just one of her articles for *The New Republic* contained a serious error). Mr. Peck knew this assertion to be false or was reckless toward its truth or falsity because he was in regular contact with the Article's main editor, Ms. Abraham, who was Ms. Barrett's

longtime friend and colleague, and because he was then-editor at *The Atlantic* magazine who monitored the Article's creation and editing.

      d.    "The assignment was a mistake. So was the initial byline under which the piece ran. We typically defer to authors on how their byline appears, and originally we referred to Barrett as Ruth S. Barrett at her request. In the interest of transparency to our readers, we should have included the name that she used in her byline in the 1990s." This statement is false in indicating that Ms. Barrett proposed the byline "Ruth S. Barrett" to conceal her identity. After *The Atlantic* proposed "Ruth Barrett," Ms. Barrett recommended the more transparent byline, "Ruth S. Barrett." Mr. Peck knew this assertion to be false or was reckless toward its truth or falsity because he was in regular contact with the Article's main editor, Ms. Abraham, and was then-editor at *The Atlantic* magazine who monitored the Article's creation and editing.

191.   *The Atlantic* published an Editor's Note on November 1, 2020 that contains the following damaging and false factual assertions about Ms. Barrett:

      a.    "In 1999, when she was known by Ruth Shalit, she left The New Republic, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work." This statement is false and misleading because "plagiarism and inaccurate reporting" were not "discovered" in Ms. Barrett's work in 1999. Ms. Barrett did not engage in journalistic lapses at *The New Republic* in 1999. These infractions occurred over a twelve-month time span, between 1994-1995. It is further false and misleading because Ms.

Barrett did not exit *The New Republic* as a direct result of these incidents. Finally, it is false and misleading because Ms. Barrett was neither accused of nor responsible for "inaccurate reporting" rising to the level of journalistic malfeasance that could precipitate a forced exit from *The New Republic* (rather, just one of her articles for *The New Republic* contained a serious error). *The Atlantic* knew or was reckless toward its falsity because Ms. Abraham (the Article's main editor) was Ms. Barrett's longtime friend and colleague.

b.      "Originally, we referred to her as Ruth S. Barrett. When writing recently for other magazines, Barrett was identified by her full name, Ruth Shalit Barrett. . . . We typically defer to authors on how their byline appears . . . . We referred to Barrett as Ruth S. Barrett at her request, but in the interest of transparency, we should have included the name that she used as her byline in the 1990s, when the plagiarism incidents occurred." This statement is false in indicating that Ms. Barrett proposed the byline "Ruth S. Barrett" to conceal her identity. After *The Atlantic* proposed "Ruth Barrett," Ms. Barrett recommended the more transparent byline, "Ruth S. Barrett." In addition, *The Atlantic* knew or was reckless toward the truth or falsity of this description, as Ms. Abraham was the Article's main editor and would have seen and approved the first-pass proof of Ms. Barrett's Article that contained the initial byline, "Ruth Barrett." *The Atlantic* further knew or was reckless toward the truth or falsity of this description because later, in its January/February 2021 print Editor's Note, *The Atlantic* clarified that "[w]hen

writing recently for other magazines, Barrett was typically identified by her full name, Ruth Shalit Barrett" (as opposed to "was identified by her full name"). *The Atlantic* thus knew or was reckless toward the truth that Ms. Barrett had not consistently used her full name in recent writings and, accordingly, that using the byline "Ruth S. Barrett" was not an irregularity that could corroborate its false implication that Ms. Barrett wanted to mask her identity.

c.    "We have established that Barrett deceived *The Atlantic* and its readers about a section of the story that concerns a person referred to as 'Sloane.' . . . . Her [Sloane's] attorney also said that according to Sloane, Barrett had first proposed the invention of a son, and encouraged Sloane to deceive *The Atlantic* as a way to protect her anonymity. . . . we now know that the author misled our fact-checkers, lied to our editors, and is accused of inducing at least one source to lie to our fact-checking department." These statements are false and misleading. They suggest that Ms. Barrett's illegitimate interests motivated the son's addition rather than her and *The Atlantic*'s ethical and legal obligation to protect her anonymity. They also falsely suggest that this edit breached clear company policy and/or journalistic ethics, and that it perpetrated a material fraud. Lastly, they suggest Ms. Barrett might have been accused of causing multiple sources to misstate facts to *The Atlantic*. These claims are provably false. *The Atlantic* knew this depiction was false or was reckless toward its truth or falsity, as Ms. Abraham

oversaw the formation and editing of the Article knew that Sloane had become a disgruntled source, and *The Atlantic* knew that only Sloane had accused Ms. Barrett of "inducing" a "source to lie."

d.      "Sloane's attorney claimed that there are several other errors about Sloane in the article but declined to provide *The Atlantic* with examples." This statement is false. Sloane's attorney provided *The Atlantic* with a letter that contained additional alleged errors that Ms. Barrett either refuted or disproved. *The Atlantic* knew this statement was false or was reckless toward its falsity, as Mr. Peck and Adrienne LaFrance, executive editor of *The Atlantic*, confronted Ms. Barrett with these and other allegations from this same letter at a private Zoom meeting. Ms. Barrett addressed these allegations then and, later, by email.

e.      "We cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the article. . . . It is impossible for us to vouch for the accuracy of this article." This statement is false because it suggests Ms. Barrett's Article suffers from unspecified substantive inaccuracies. *The Atlantic* knew this to be false or was reckless toward its falsity as, among the other reasons stated herein, *The Atlantic* comprehensively fact-checked the piece and then re-checked items criticized by Mr. Wemple. Afterwards, it admitted that there were no other errors.

192.    *The Atlantic* also published an Editor's Note in its January/February 2021 print edition (also digitally accessible to *The Atlantic* subscribers) that contains the following damaging and false factual assertions about Ms. Barrett:

    a.    "In 1999, when she was known by Ruth Shalit, she left *The New Republic* after plagiarism and inaccurate reporting were discovered in her work." This statement is false and misleading because "plagiarism and inaccurate reporting" were not "discovered" in Ms. Barrett's work in 1999. Ms. Barrett did not engage in journalistic lapses at *The New Republic* in 1999. These infractions occurred over a twelve-month time span, between 1994-1995. It is further false and misleading because Ms. Barrett did not exit *The New Republic* as a direct result of these incidents. Finally, it is false and misleading because Ms. Barrett was neither accused of nor responsible for "inaccurate reporting" rising to the level of journalistic malfeasance that could precipitate a forced exit from *The New Republic* (rather, just one of her articles for *The New Republic* contained a serious error). *The Atlantic* knew or was reckless toward its falsity because Ms. Abraham (the Article's main editor) was Ms. Barrett's longtime friend and colleague.

    b.    "Originally, we referred to the author of the article as Ruth S. Barrett. When writing recently for other magazines, Barrett was typically identified by her full name, Ruth Shalit Barrett. . . . We typically defer to authors on how their byline appears. We referred to Barrett as Ruth S. Barrett at her request, but in the interest of transparency, we should have included

the name that she used as her byline in the 1990s." This statement is false in indicating that Ms. Barrett proposed the byline "Ruth S. Barrett" to conceal her identity. After *The Atlantic* proposed "Ruth Barrett," Ms. Barrett recommended the more transparent byline, "Ruth S. Barrett." In addition, *The Atlantic* knew or was reckless toward the truth or falsity of this description, as Ms. Abraham was the Article's main editor and would have seen and approved the first-pass proof of Ms. Barrett's Article that contained the initial byline, "Ruth Barrett."

c.      "We have established that Barrett deceived *The Atlantic* and its readers about a section of the story that concerns a person referred to as 'Sloane.' . . . . Sloane's attorney told *The Atlantic* that Sloane had misled the magazine because she had wanted to make herself less readily identifiable— and that Barrett had proposed the invention of a son as a way to protect her anonymity. . . . we now know that the author misled our fact-checkers, lied to our editors, and is accused of inducing a source to lie to our fact-checking department." These statements are false and misleading. They suggest that Ms. Barrett's illegitimate interests motivated the son's addition rather than her and *The Atlantic*'s ethical and legal obligation to protect her anonymity. They also falsely suggest that this edit breached clear company policy and/or journalistic ethics, and that it perpetrated a material fraud. Both claims are provably false. *The Atlantic* knew this depiction was false or was reckless

toward its truth or falsity, as Ms. Abraham oversaw the formation and editing of the Article and knew that Sloane had become a disgruntled source.

d.    "Sloane's attorney claimed that there are several other errors about Sloane in the article but declined to provide examples." This statement is false. Mr. Peck and Adrienne LaFrance, executive editor of *The Atlantic*, confronted Ms. Barrett with these and other allegations from this same letter at a private Zoom meeting. Ms. Barrett addressed these allegations then and, later, by email.

e.    "We cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the piece in its entirety. . . . It is impossible for us to vouch for the accuracy of this article." This statement is false because it suggests Ms. Barrett's Article suffers from unspecified substantive inaccuracies. *The Atlantic* knew this implication to be false or was reckless toward its falsity as, among the other reasons stated herein, *The Atlantic* comprehensively fact-checked the piece and then re-checked items criticized by Mr. Wemple. Afterwards, it admitted that there were no other errors.

193.   The false statements in Mr. Peck's memorandum and *The Atlantic*'s online and print Editor's Notes attributed to Ms. Barrett a matter negatively affecting her fitness for journalism, her profession of much of the past twenty-plus years, and therefore damaged Ms. Barrett's ability to practice journalism. These statements are so likely to degrade and damage Ms. Barrett's reputation that proof of harm is not

required to recover compensation, as this injury constitutes legal harm in the District of Columbia (defamation *per se*).

194.    Ms. Barrett is not a public official. She is not a politician. She is not a public figure under any remotely reasonable definition of the phrase. She is just a private individual, no more and no less. The First Amendment does not give Defendants a license to lie about her. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974).

195.    These violations are compensable pursuant to common law defamation in the District of Columbia. As a direct and proximate cause of this conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.

## THIRD CLAIM FOR RELIEF

### Invasion of Privacy-False Light

### (As to *The Atlantic* and Mr. Peck)

196.    Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 195 of this complaint.

197.    Mr. Peck circulated an email memorandum to all *The Atlantic* staff on October 30, 2020 about Ms. Barrett and her Article for *The Atlantic*. This memorandum constituted a publicity in that it was communicated across a company and had the significant probability of being circulated externally as well (as confirmed by its appearance on Erik Wemple's Twitter page the next day).

198. Furthermore, Mr. Peck's memorandum contains damaging and false factual assertions about Ms. Barrett. For example, the memorandum states that Ms. Barrett "left *The New Republic* . . . after plagiarism and inaccurate reporting were discovered in her work," even though she left *The New Republic* years after. Mr. Peck circulated this memorandum knowing this assertion, other assertions described herein, and the memorandum's overarching message that Ms. Barrett's article was unreliable to be false or with reckless disregard for their truth or falsity and, thus, with knowledge or reckless disregard for the truth that his publication would place Ms. Barrett in a false light.

199. *The Atlantic* published an online Editor's Note on November 1, 2020 about Ms. Barrett and her Article for *The Atlantic*. This constituted a publicity in that it was posted online to *The Atlantic*'s global audience and had significant probability of republication and/or coverage by other media outlets.

200. *The Atlantic* also published an adaptation of this Editor's Note in its January/February 2021 print edition. This also constituted a publicity in that it was circulated to *The Atlantic*'s print subscribers and remains digitally accessible to *The Atlantic* subscribers. For these reasons, it also bore a substantial probability of republication and/or coverage by other media outlets.

201. These online and print Editor's Notes contains damaging and false factual assertions about Ms. Barrett. For example, in addition to the other defamatory statements mentioned herein, *The Atlantic* falsely claimed that Ms. Barrett coerced Sloane to lie to its fact-checkers and proposed the byline "Ruth S.

Barrett" to mask her identity. *The Atlantic* published this and the other falsehoods in its Editor's Notes about Ms. Barrett knowing their falsity or with reckless disregard toward their truth or falsity and, therefore, with knowledge or reckless disregard for the truth that its Editor's Notes would place Ms. Barrett in a false light.

202.   Through its Editor's Notes, *The Atlantic* suggested to readers that Ms. Barrett's Article is substantively unreliable, even though *The Atlantic* did not provide readers with facts to substantiate such an accusation and has no such facts. *The Atlantic* thus published its Editor's Notes with the overarching message that Ms. Barrett is an unreliable journalist who published a fraudulent article even though it knew or was reckless toward the truth or falsity of that message.

203.   The above-described publications from Mr. Peck and *The Atlantic* were offensive to Ms. Barrett and would be offensive to any reasonable person in her position because they publicly condemned Ms. Barrett's professional and personal integrity through publication of false assertions about her professional past and conduct in connection with *The Atlantic* and her article. As a result, these publications impeded, if not destroyed, Ms. Barrett's career in journalism after she spent years successfully rehabilitating her reputation in the field.

204.   Ms. Barrett is not a public official. She is not a politician. She is not a public figure under any remotely reasonable definition of the phrase. She is just a private individual, no more and no less. The First Amendment does not give Defendants a license to lie about her. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974).

205.    These violations are compensable pursuant to common law invasion of privacy-false light in the District of Columbia. As a direct and proximate cause of this conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.

## FOURTH CLAIM FOR RELIEF

### Tortious Interference with Business Expectancy

### (As to *The Atlantic* and Mr. Peck)

206.    Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 182.

207.    November 1, 2020 and then adapted for publication in *The Atlantic*'s January/February 2021 print edition, which is also available online to *The Atlantic* subscribers) that contain damaging and false factual assertions about Ms. Barrett and the false allegation that her Article is materially and extensively deceptive.

208.    Mr. Peck and *The Atlantic* published these falsehoods with the knowledge that Ms. Barrett, as a journalist, was or would soon pursue contracts with other media companies for the purpose of authoring additional articles.

209.    Mr. Peck and *The Atlantic* also published these falsehoods with knowledge that Ms. Barrett—as a professional journalist and signatory to an Author's Agreement wherein *The Atlantic* promised to "make commercially reasonably efforts" to market intellectual property rights to the Article—would aspire to sell dramatic or other rights to her Article for profit. *The Atlantic* could also infer

from Ms. Barrett's request for dramatic rights to the Article that Ms. Barrett had or was seeking commercial opportunities related to the Article.

210.   Mr. Peck and *The Atlantic* also published these falsehoods with substantial certainty that they would disrupt, if not preclude, Ms. Barrett's ability to acquire such contracts. In fact, a December 4, 2020 letter from *The Atlantic*'s Assistant General Counsel to Ms. Barrett's counsel expressed *The Atlantic*'s aim that the Article garner no public attention. As such, *The Atlantic* published falsehoods in its Editor's Notes, not just substantially certain these falsehoods would impede Ms. Barrett's ability to acquire contracts in relation to her Article, but also *hoping* that she would never acquire such contracts.

211.   These interferences will cost Ms. Barrett all of the prospective income she might have otherwise gained by continuing her career in journalism, which *The Atlantic* effectively terminated.

212.   These violations are compensable pursuant to common law tortious interference with business expectancy in the District of Columbia. As a direct and proximate cause of this conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.

**FIFTH CLAIM FOR RELIEF**

**Breach of Covenant of Good Faith and Fair Dealing**

**(As to *The Atlantic*)**

213.  Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 182 of this complaint.

214.  Ms. Barrett signed an Author's Agreement with *The Atlantic* on December 30, 2019 to author and submit an article for its magazine. From this contract arises an implied covenant of good faith and fair dealing. The covenant of good faith and fair dealing is implied in every contract, and it prohibited *The Atlantic* from engaging in bad faith and/or arbitrary and capricious conduct that would preclude Ms. Barrett from benefitting from deal.

215.  After Ms. Barrett submitted and *The Atlantic* published her piece created pursuant to that contract in 2020, *The Atlantic* published an Editor's Note on November 1, 2020 and an adaptation of this note in its January/February 2021 print edition (also digitally accessible to *The Atlantic* subscribers) that contain false factual assertions and messages about Ms. Barrett.

216.  *The Atlantic*'s Editor's Notes were unreasonable, *i.e.* arbitrary and capricious, in that they disseminated accusations about Ms. Barrett that are refuted by evidence within *The Atlantic*'s custody, control, and/or possession. For example, *The Atlantic* falsely accused Ms. Barrett of coercing Sloane to lie to its fact-checkers and described Ms. Barrett as the engineer of a covert byline intended to deceive readers, among the other defamatory claims described herein.

217.  *The Atlantic*'s Editor's Notes were also published in bad faith in that they were calculated to defend *The Atlantic*'s reputation against external criticism, at the cost of accurate representation of Ms. Barrett and her Article.

218.   *The Atlantic*'s Editor's Notes also breached the spirit of the contract and Ms. Barrett's justified expectations by inducing her to create an article for *The Atlantic* but retracting it and undermining its integrity by publishing falsehoods about its author.

219.   *The Atlantic* further breached the spirit of the contract in maintain retraction of the Article and leaving the November 1, 2020 Editor's Note online and uncorrected. These decisions are especially egregious given corrections embodied in the note's January/February 2021 print version, but these decisions cohere with *The Atlantic*'s objective—communicated in its Assistant General Counsel's December 4, 2020 letter to Ms. Barrett's counsel—that the Article attract zero public attention.

220.   This violation is compensable pursuant to the implied covenant of good faith and fair dealing in the District of Columbia. As a direct and proximate cause of *The Atlantic*'s conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.

## SIXTH CLAIM FOR RELIEF

### Breach of Contract

### (As to *The Atlantic*)

221.   Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 182 of this complaint.

222.   *The Atlantic* and Ms. Barrett entered into a contract—written by *The Atlantic* itself—that in section 6(b) required Ms. Barrett, *inter alia*, to represent and

warrant that her work "does not infringe . . . any other right, of any person or entity, nor "invade the privacy … rights of anyone."

223.   Promises of confidentiality to sources in exchange for information are enforceable legal rights under the law of contracts and promissory estoppel. *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991).

224.   Ms. Barrett agreed with her source that she would be treated as confidential, *i.e.* that she would not be identified or described in a way that would make her identifiable in the Article that Ms. Barrett was writing.

225.   In exchange for and in reliance upon this agreement, the source provided information that *The Atlantic* published for a profit.

226.   At the behest of the source, Ms. Barrett agreed to alter a family descriptor so that the source would not be identifiable. The altered description was solely for the purpose of protecting the confidentiality of the source. It was not material to the narrative and did not alter the thrust of Ms. Barrett's Article.

227.   Ms. Barrett did not intend to deceive readers of her Article, and the alteration could not be reasonably interpreted as deceptive under any colloquial and/or professional journalism definition of the term "deceit."

228.   *The Atlantic* wrote its contract with Ms. Barrett, and any ambiguity in interpretation of the contract should be resolved in favor of the party who did not write it: Ms. Barrett rather than *The Atlantic*.

229.   Section 6(b) should be interpreted as imposing reciprocal obligations on *The Atlantic* not to infringe any rights of any person, including rights under an agreement of confidentiality.

230.   At the very least, the contract should be interpreted as barring *The Atlantic* from thwarting Ms. Barrett's efforts to fulfill the requirements of the very contract that *The Atlantic* wrote.

231.   Instead, after its publication of Ms. Barrett's Article, *The Atlantic* chose to dishonor its contractual and ethical obligations. Editors of *The Atlantic* pressured the source to reveal identifying details, deliberately and voluntarily disclosed facts about the source to a third-party media organization, and libelously assaulted Ms. Barrett in print for her good faith efforts to abide by the contract between her and *The Atlantic*. *The Atlantic*'s treatment of its confidential source was especially reprehensible and unjustifiable. In the days following publication of Ms. Barrett's Article, *The Atlantic* staffers repeatedly contacted the source and her spouse attempting to have the source disclose personal information—including sensitive family details—that would have in toto unmasked the source's identity in violation of the confidentiality agreement between the source and Ms. Barrett.

232.   *The Atlantic* also materially breached its contract with Ms. Barrett in failing to "make commercially reasonable efforts" to market the Article for dramatization and other commercial opportunities, such as hiring an agent for that purpose. *See* Ex. 5 at 1 ("In return, Publisher agrees to make commercially reasonable efforts, including through a contractual relationship with an agent selected by

Publisher, to make such intellectual property rights available to interested parties and to market such rights. Publisher agrees to pay Author fifty percent (50%) of all net revenues (after agent and attorney's fees) from the sale of such rights.").

233.   *The Atlantic* further violated this provision by actively preventing Ms. Barrett from pursuing such opportunities. Namely, *The Atlantic* published its defamatory Editor's Notes, thereafter maintained and continues to maintain the online Editor's Note (absent correction, and despite retreating from some falsehoods in that note in its January/February 2021 print version), and rejected Ms. Barrett's request for dramatic rights to her Article while communicating—through its counsel—its aspiration that the Article obtain no opportunities for public dissemination through any medium.

234.   All this took and continues to take place as *The Atlantic* profited and continues to profit from the Article Ms. Barrett wrote and the information the source provided.

### SEVENTH CLAIM FOR RELIEF

### Breach of Implied Contract

### (As to *The Atlantic*)

235.   Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 182 of this complaint.

236.   *The Atlantic* also assumed an implied contractual obligation to protect the anonymity of Ms. Barrett's sources when it hired her to create and submit an article for its magazine and, in that agreement, obligated her to warrant that the

work would not invade anyone's privacy. *See* Ex. 5 ("Author represents and warrants that . . . the Work does not infringe the copyright, or invade the proprietary rights, or any other right, of any person or entity; the Work does not libel or invade the privacy or publicity rights of anyone; and the Work will not cause tortious harm to anyone . . . ."). As such, Ms. Barrett relied on the expectation that *The Atlantic* would not take action that threatens Sloane's anonymity and make decisions solely in its own interest.

237.    *The Atlantic* breached that implied contractual obligation when it insisted on including too many personal details about Sloane and her family that made Sloane identifiable.

238.    By demanding that Ms. Barrett's Article contain elaborate detail about Sloane and her family, *The Atlantic* harmed Sloane's interests by leaving her more susceptible to identification. *The Atlantic* was unconcerned about this risk.

239.    At the same time, insisting that Ms. Barrett's Article retain excessive detail about Sloane benefitted *The Atlantic*'s interests because a more elaborate Article is more interesting to readers, and because describing Sloane in detailed fashion rendered *The Atlantic* less vulnerable to the accusation that *The Atlantic* and/or Ms. Barrett fabricated Sloane. Those interests motivated *The Atlantic* to breach its implied contractual obligation to Ms. Barrett to protect Sloane's anonymity.

240.   *The Atlantic* knew that including excessive detail about Sloane in the Article would make Sloane's exposure either probable or inevitable, but it still insisted on publishing those details.

241.   *The Atlantic*'s disregard for its promise to shield Sloane caused Sloane to regret her participation, grow increasingly anxious about the prospect of exposure and ramifications for her family and her children's futures, and ultimately to attack the Article's credibility, contributing to Mr. Peck's and *The Atlantic*'s publication of false statements about Ms. Barrett.

242.   This violation is compensable pursuant to common law breach of implied contract in the District of Columbia. As a direct and proximate cause of *The Atlantic*'s conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.

## EIGHTH CLAIM FOR RELIEF

### Rescission

### (As to *The Atlantic*)

243.   Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 182 of this complaint.

244.   *The Atlantic* published defamatory Editor's Notes about Ms. Barrett and her Article to satisfy critics like Erik Wemple of *The Washington Post*. *The Atlantic* published the first unlawful Editor's Note online on November 1, 2020 and then adapted this note for publication in its January/February 2021 edition.

245.    *The Atlantic* knew or was reckless toward the truth or falsity of claims it expressly or impliedly made about Ms. Barrett in its Editor's Notes because its main, if not sole, concern was defending its reputation against external attack rather than honest representation of the facts.

246.    *The Atlantic* published its defamatory Editor's Notes as an excuse for retracting Ms. Barrett's Article. It wanted to distance itself from Ms. Barrett because of Mr. Wemple's criticisms.

247.    Because it defamed Ms. Barrett and articulated falsehoods about the reliability and veracity of her Article, *The Atlantic* breached the covenant of good faith and fair dealing implicit in its Author's Agreement with Ms. Barrett.

248.    Through its Author's Agreement with Ms. Barrett, *The Atlantic* also assumed an implicit obligation to Ms. Barrett to protect the anonymity of her sources. As explained, *The Atlantic* also breached that duty.

249.    And by outright rejecting Ms. Barrett's request for the dramatic rights to her Article in its December 4, 2020 letter that reiterated falsehoods about Ms. Barrett, *The Atlantic* also breached its duty to conduct its dealings with Ms. Barrett fairly and in good faith. To further its own aims, *The Atlantic*'s Editor's Notes published falsehoods about Ms. Barrett that deterred its audience from reading her Article. After thereby suppressing the Article's important findings, *The Atlantic* tried through its December 4, 2020 letter to prevent the Article's ideas from resurfacing. This was unreasonable and done in bad faith.

250.   Further, *The Atlantic*'s stance that it would neither let Ms. Barrett nor attempt itself to market dramatic rights to the Article—as indicated in its Assistant General Counsel's December 4, 2020 letter to Ms. Barrett's counsel—was also a material breach of the Author's Agreement, unreasonable, and done in bad faith.

251.   Each of these breaches was material. An author that contracts with a reputable publishing company to provide an important investigative work that is the product of painstaking research and craftsmanship at a minimum expects that the company will not sacrifice that work and the personal and professional reputation of the author at the first sign of criticism from a competitor outlet, and that the company will not endeavor to withhold the Article from public view and deprive individuals or entities intellectual rights to the Article, contrary to its express contractual duty.

252.   Given these material breaches, Ms. Barrett seeks rescission of the Author's Agreement that purports to give *The Atlantic* exclusive rights to dramatize the Article. Ex. 5 ("Author agrees to license to publisher and its sub-licensees the following rights in the Work in any language: . . . (c) exclusive worldwide rights to dramatize the Work by radio, television, motion picture, or the Internet, and/or to publish, broadcast, or assign or sublicense the right to create derivative works to be displayed in such media.").

253.   Because *The Atlantic* breached the Author's Agreement in breaching the spirit of the contract, Ms. Barrett is entitled to pursue dramatization of the Article, which the agreement purports to give exclusively to *The Atlantic*.

254.    Equitable relief in the form of rescission of the Author's Agreement is necessary. There is no adequate remedy at law that can compensate for Ms. Barrett's inability to share the information and ideas in her Article with a global audience. Absent rescission, the Article will be confined to a citation in *The Atlantic*'s defamatory Editor's Notes and unable to manifest in other, more legitimate, lawful formats. As a direct and proximate cause of *The Atlantic*'s breaches of its contractual obligations pursuant to its Author's Agreement with Ms. Barrett, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for the following relief:

A.    Injunctive relief that the Court deems just and proper;

B.    Rescission of the Author's Agreement, including restoring to Ms. Barrett the right to dramatize the Article and related rights enumerated in section 2(c) of *The Atlantic*'s Author's Agreement with Ms. Barrett;

C.    Compensatory monetary relief in the amount to be determined at trial;

D.    Punitive damages;

E.    Attorneys' fees and costs of suit; and

F.    Such other or further relief as the Court deems proper.

Dated: January 7, 2022

/s/ *Hassan A. Zavareei*
Hassan A. Zavareei (DC Bar No. 456161)
Leora Friedman (DC Bar No. 1735514)
**TYCKO & ZAVAREEI LLP**
1828 L Street, NW Suite 1000
Washington, DC 20036
Telephone: (202) 973-0900

Facsimile: (202) 973-0950
hzavareei@tzlegal.com
lfriedman@tzlegal.com

Elliot C. Rothenberg (*pro hac vice forthcoming*)
Attorney at Law
124 Groveland Avenue
Minneapolis, MN 55403-3607
Telephone: (612) 508-5373
ecrothenberg@gmail.com