## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RUTH SHALIT BARRETT,

        Plaintiff,

    v.

THE ATLANTIC MONTHLY GROUP LLC and
DONALD CHRISTOPHER PECK,

        Defendants.

Civil Action No.
1:22-cv-00049-EGS

## DEFENDANTS' MOTION TO DISMISS

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants The Atlantic Monthly Group LLC and Donald Christopher Peck respectfully move this Court to dismiss the Complaint with prejudice for failure to state a claim.

Oral argument is requested.

Dated:  March 9, 2022

Respectfully submitted,

WILLIAMS & CONNOLLY LLP
By: */s/ Stephen J. Fuzesi*
Joseph M. Terry (D.C. Bar No. 473095)
Stephen J. Fuzesi (D.C. Bar No. 496723)
Whitney D. Hermandorfer
(D.C. Bar. No. 888314222)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jterry@wc.com
sfuzesi@wc.com
whermandorfer@wc.com

*Attorneys for Defendants The Atlantic
Monthly Group LLC and Donald
Christopher Peck*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RUTH SHALIT BARRETT,

        Plaintiff,

    v.

THE ATLANTIC MONTHLY GROUP LLC and
DONALD CHRISTOPHER PECK,

        Defendants.

Civil Action No.
1:22-cv-00049-EGS

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

WILLIAMS & CONNOLLY LLP
Joseph M. Terry
Stephen J. Fuzesi
Whitney D. Hermandorfer
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jterry@wc.com
sfuzesi@wc.com
whermandorfer@wc.com

*Attorneys for Defendants The Atlantic
Monthly Group LLC and Donald
Christopher Peck*

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**........................................................................................................................1

**BACKGROUND** ........................................................................................................................3

    A.    Barrett's Rise to Journalism Prominence..................................................................3

    B.    Controversy over Barrett's "Journalistic Malfeasance" and Her Departure
          from The New Republic..............................................................................................4

    C.    Barrett's Continued Journalism Career....................................................................6

    D.    Barrett's Article in The Atlantic ..............................................................................7

    E.    Investigation and Retraction ....................................................................................8

    F.    Reaction and Lawsuit.............................................................................................10

**LEGAL STANDARD** ..............................................................................................................11

**ARGUMENT** ...........................................................................................................................12

**I.**      **THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION**................12

    A.    The Statements at Issue Are Not Actionable .........................................................12

          1.    Statements Relating to Barrett's Admitted Deception...............................15

          2.    Statement as to The Atlantic's Need to Understand the Scope of the
              Deceptions and Errors in the Article.........................................................19

          3.    Statements Relating to Barrett's Departure from The New Republic .......20

          4.    Statements Relating to Barrett's Byline.....................................................22

          5.    Statements Relating to the Article's Additional Errors .............................24

          6.    Statements Relating to The Atlantic's Decision to Retract .......................25

    B.    The Complaint Fails to Plausibly Allege Actual Malice .......................................27

          1.    The Actual Malice Standard Applies..........................................................27

          2.    The Complaint Does Not Plausibly Allege Actual Malice........................30

**II.**     **THE COMPLAINT'S ANCILLARY TORT CLAIMS FAIL**....................................34

    A.    These Tort Claims Fail for the Same Reasons as the Defamation Claims ...........35

    B.    These Tort Claims Fail for Additional, Independent Reasons................................35

          1.    False Light (Claim 3) .................................................................................35

          2.    Tortious Interference (Claim 4) .................................................................36

**III.**    **THE COMPLAINT'S ANCILLARY CONTRACT CLAIMS FAIL** ........................37

    A.    The Contract Claims Fail for the Same Reasons as the Defamation Claims.........37

    B.    The Contract Claims Fail Because Barrett Admittedly Breached the
          Author's Agreement................................................................................................38

C.      The Contract Claims Fail for Additional, Independent Reasons ..........................39

    1.      Good Faith and Fair Dealing (Claim 5) ....................................39

    2.      Breach of Contract (Claim 6)...................................................41

    3.      Breach of Implied Contract (Claim 7) .....................................43

    4.      Rescission (Claim 8) ................................................................44

**CONCLUSION** ........................................................................................................44

**CERTIFICATE OF SERVICE** ...............................................................................46

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## FEDERAL CASES

*Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015) ..............................14, 17, 19

*Abbas v. Foreign Pol'y Grp., LLC*, 975 F. Supp. 2d 1 (D.D.C. 2013) ..............................13, 23, 26

*Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir. 2007) ....................................................3

*Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265 (D.C. Cir. 2014) ............................41

*Arpaio v. Cottle*, 404 F. Supp. 3d 80 (D.D.C. 2019) .................................................................32, 35

*Arpaio v. Zucker*, 414 F. Supp. 3d 84 (D.D.C. 2019) .....................................................................31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................ *passim*

*Bauman v. Butowsky*, 377 F. Supp. 3d 1 (D.D.C. 2019).............................................................13, 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .....................................................................11, 37

*Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998) ....................................................13

*Brimelow v. N.Y. Times Co.*, 2021 WL 4901969 (2d Cir. Oct. 21, 2021) ......................................28

*Camara v. Mastro's Rests. LLC*, 952 F.3d 372 (D.C. Cir. 2020) ...................................................43

*Carpenter v. King*, 792 F. Supp. 2d 29 (D.D.C. 2011) ...................................................................13

*Casciano v. JASEN Rides, LLC*, 109 F. Supp. 3d 134 (D.D.C. 2015)............................................43

*Chau v. Lewis*, 771 F.3d 118 (2d Cir. 2014)...................................................................................14

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991).........................................................................37

*Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520 (6th Cir. 2007) ..........................37

*Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213 (D.D.C. 2008)...................................................13

*CopyWatch, Inc. v. Am. Nat'l Red Cross*, 299 F. Supp. 3d 189 (D.D.C. 2018) ...........................43

*Couch v. Verizon Comm'ns, Inc.*, 2021 WL 4476698 (D.D.C. Sept. 30, 2021)............................31

*Authorities upon which counsel chiefly rely are marked with asterisks.*

Page(s)

Federal Cases—continued:

*Crawford v. Pres. & Dirs. of Georgetown Coll.*, 537 F. Supp. 3d 8 (D.D.C. 2021) ....................43

*\*Deripaska v. Associated Press*, 282 F. Supp. 3d 133 (D.D.C. 2017) .................................. *passim*

*Dilworth v. Dudley*, 75 F.3d 307 (7th Cir. 1996)..........................................................30

*Dodds v. Am. Broad. Co.*, 145 F.3d 1053 (9th Cir. 1998) ...............................................34

*Donald Marshall Berlin v. Bank of Am., N.A.*, 101 F. Supp. 3d 1 (D.D.C. 2015)........................38

*Dorsey v. Am. Express Co.*, 680 F. Supp. 2d 250 (D.D.C. 2010)..................................................38

*Dreamstone Ent. Ltd. v. Maysalward Inc.*, 2014 WL 4181026 (C.D. Cal. Aug. 18, 2014) ..........17

*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018)........................................................31, 32

*\*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ..................................................... *passim*

*Fonville v. District of Columbia*, 38 F. Supp. 3d 1 (D.D.C. 2014)................................................26

*Franklin v. Pepco Holdings, Inc.*, 875 F. Supp. 2d 66 (D.D.C. 2012) ..........................................14

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ..........................................................29

*Hoffman v. Wash. Post Co.*, 433 F. Supp. 600 (D.D.C. 1997) ........................................30

*Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128 (D.D.C. 2016)............................................3

*Hourani v. PsyberSolutions LLC*, 690 F. App'x 1 (D.C. Cir. 2017) ........................................3, 31

*Howard Town Ctr. Dev., LLC v. Howard Univ.*, 278 F. Supp. 3d 333 (D.D.C. 2017) ...........38, 39

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1998) ........................................................35

*Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir. 1986)....................................................15, 18

*Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080 (D.C. Cir. 2007) ......................................................14

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016) ................................................30, 31

*Jensen v. Times Mirror Co.*, 634 F. Supp. 304 (D. Conn. 1986)................................................28

*Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159 (D.D.C. 2016) ....................36

Page(s)

Federal Cases—continued:

*Joseph v. Xerox Corp.*, 594 F. Supp. 330 (D.D.C. 1984) ............................................................30

*Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106 (D.C. Cir. 2017)......................................*passim*

*Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711 (11th Cir. 1985) ............................................16

*Klayman v. Jud. Watch, Inc.*, 628 F. Supp. 2d 112 (D.D.C. 2009)................................................44

*Lemelson v. Bloomberg L.P.*, 903 F.3d 19 (1st Cir. 2018) ............................................................34

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) ......................12, 15, 22

*Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149 (D.D.C. 2018)..................................12, 13

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) ............................................................33, 34

*Magee v. Am. Inst. of Certified Pub. Accts.*, 245 F. Supp. 3d 106 (D.D.C. 2017)........................40

*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) ..................................................12, 21, 22

*McFarlane v. Esquire Mag.*, 74 F.3d 1296 (D.C. Cir. 1996) ......................................................31

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996) ..........................32, 33

*McNamara v. Picken*, 866 F. Supp. 2d 10 (D.D.C. 2012) ............................................................37

*Metz v. BAE Sys. Tech. Sols. & Servs., Inc.*, 979 F. Supp. 2d 26 (D.D.C. 2013) ...................39, 40

*Milkovich v. Lorain J. Co.*, 497 U.S. 1 (1990)............................................................................13

*Moldea v. N.Y. Times Co.*, 22 F.3d 310 (D.C. Cir. 1994)....................................................*passim*

*Montgomery v. Risen*, 197 F. Supp. 3d 219 (D.D.C. 2016)............................................13, 33, 34

*N.Y. Times v. Sullivan*, 376 U.S. 254 (1964) ........................................................................2, 31

*Newton v. Nat'l Broad. Co.*, 930 F.2d 662 (9th Cir. 1990) ........................................................15

*Ning Ye v. Holder*, 644 F. Supp. 2d 112 (D.D.C. 2009) ............................................................15

*Nunes v. WP Co.*, 513 F. Supp. 3d 1 (D.D.C. 2020)............................................................17, 23

*Nyambal v. AlliedBarton Sec'y Servs., LLC*, 153 F. Supp. 3d 309 (D.D.C. 2016)........................36

v

Page(s)

Federal Cases—continued:

*O'Donnell v. CBS, Inc.*, 782 F.2d 1414 (7th Cir. 1986) ................................................29

*Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724 (1st Cir. 1992) ..................26

*Robertson v. Cartinhour*, 867 F. Supp. 2d 37 (D.D.C. 2012)...........................13, 23, 36

*Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309 (7th Cir. 1988)......................................34

*Safex Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285 (D.D.C. 2021)...................28, 29

*Smith v. Clinton*, 253 F. Supp. 3d 222 (D.D.C. 2017) ...................................................14

*St. Amant v. Thompson*, 390 U.S. 727 (1968)................................................................31

*Steele v. Isikoff*, 130 F. Supp. 2d 23 (D.D.C. 2000)......................................................41

*\*Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231 (D.C. Cir. 2021)............2, 31, 33, 35

*\*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) .................................12, 16, 21, 27

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ...........................................................16

*Turner v. Wells*, 198 F. Supp. 3d 1355 (S.D. Fla. 2016) ...............................................16

*Vantage Commodities Fin. Servs. I, LLC v. Assured Risk Transfer PCC, LLC*,
    2019 WL 1877097 (D.D.C. Apr. 26, 2019).............................................................43

*Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) .......................28

*Washburn v. Lavoie*, 357 F. Supp. 2d 210 (D.D.C. 2004)............................................35

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ..............................14, 35

*\*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ........14, 17, 23, 24

*Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship.*,
    2019 WL 5395739 (D.D.C. Oct. 22, 2019) ............................................................39

*Xereas v. Heiss*, 933 F. Supp. 2d 1 (D.D.C. 2013) ...................................................17, 36

Page(s)

## STATE CASES

*Allworth v. Howard Univ.*, 890 A.2d 194 (D.C. 2006)....................................................39

*\*Armstrong v. Thompson*, 80 A.3d 177 (D.C. 2013).......................................18, 22, 25

*Campbell Music Co. v. Singer*, 97 A.2d 340 (D.C. 1953) ..............................................44

*Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132 (D.C. 2021) ....................................35

*Dean v. Garland*, 779 A.2d 911 (D.C. 2001) .................................................................44

*Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580 (D.C. 2000)...............................22

*Hart v. Vt. Inv. Ltd. P'ship.*, 667 A.2d 578 (D.C. 1995)................................................41

*Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984)..........................................................14

*Klayman v. Segal*, 783 A.2d 607 (D.C. 2001) .........................................................24, 36

*Paul v. Howard Univ.*, 754 A.2d 297 (D.C. 2000) ...................................................40, 43

*Providence Hosp. v. Grp. Hospitalization Inc.*, 494 A.2d 639 (D.C. 1985)................41

*Rosen v. Am. Isr. Pub. Affs. Comm., Inc.*, 41 A.3d 1250 (D.C. 2012)....................13, 17

*San Antonio Express News v. Dracos*, 922 S.W.2d 242 (Tex. Ct. App. 1996) ............30

*Solers, Inc. v. Doe*, 977 A.2d 941 (D.C. 2009)..............................................................12

*Sundberg v. TTR Realty, LLC*, 109 A.3d 1123 (D.C. 2015) ........................................40

*Warner v. Kan. City Star Co.*, 726 S.W.2d 384 (Mo. Ct. App. 1987)...........................29

*Wright v. Howard Univ.*, 60 A.3d 749 (D.C. 2013)........................................................40

## CONSTITUTION AND RULE

U.S. Const. amend. I ............................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6).................................................................................................2, 14

Page(s)

## OTHER AUTHORITIES

David A. Elder, *Defamation: A Lawyer's Guide* 5:17 (West 2019)...............................................28

Restatement (Second) of Contracts § 19(2) ....................................................................................43

Restatement (Second) of Torts
    § 652E ........................................................................................................................................35
    § 652E(c)....................................................................................................................................36

1 *Sack on Defamation* (5th ed. 2017)
    § 4:3.1 ........................................................................................................................................26
    § 5:3.5 ..................................................................................................................................28, 30

1 *Sack on Defamation* (4th ed. 2010)
    § 2:4.8 ........................................................................................................................................19

## INTRODUCTION

This defamation action is brought by Ruth Shalit Barrett, a writer with a widely publicized record of plagiarism and erroneous reporting in the mid-1990s. At the time, she candidly described her wrongdoing: "The fact is that someone else's words appeared in my story. Aside from lying, that's the most egregious offense in journalism."[1] Twenty-five years later, she was provided the opportunity to write a substantial article for The Atlantic. She responded to that opportunity by committing what she had acknowledged to be the "most egregious offense in journalism"—lying. Shortly after publication, it came to light that Barrett had deliberately included a knowing falsehood in her story and lied to the magazine's editors about it. Several additional factual errors also were identified. Numerous other aspects of the story rested on nothing more than her own word. The Atlantic thus retracted the article and published an editor's note explaining its reasons. A similar explanatory email was sent internally by editor Donald Peck. Barrett now sues, asserting claims of libel and ancillary tort and contract causes of action based on the editor's note and email.

Barrett's Complaint is extraordinary for many reasons, not the least of which is that she *admits* the central facts underlying the retraction, including that she intentionally falsified a fact in her article and lied to The Atlantic's editors about it. Prior to suit, Barrett publicly acknowledged to the New York Times that she made a "serious error" and posted online that it was "egregious." And in her Complaint, she now expressly concedes that The Atlantic "could have published an Editor's Note admonishing" her and "even retracted the entire article" based on her falsification.

Barrett does not challenge the factual accuracy of any statement actually made by The Atlantic regarding the retraction, except to quibble about whether her departure from The New

---

[1] Alicia C. Shepard, *Too Much Too Soon? (Interview)*, Am. Journalism Rev. (Dec. 1995), https://tinyurl.com/dz8mppaw.

Republic in the 1990s stemmed from the initial *discovery* of her plagiarism or the "*renewed spotlight*" placed on her conceded "transgressions" by another significant scandal.  Instead, Barrett principally claims that she was defamed as a result of the *implications* of The Atlantic's editorial judgments as articulated in the editor's note—including, for example, the magazine's conclusion that the publication itself had committed an error in judgment by giving her the assignment in the first place and by identifying her in the byline as Ruth S. Barrett, rather than by spelling out Shalit, the name by which she was known during her scandals.  Her claims, which amount to an argument that The Atlantic overreacted to her admitted wrongdoing, cannot be squared with her admissions that her conduct was "egregious," warranted "admonishment," and justified a retraction.

For multiple independent reasons, Barrett's claims fail as a matter of law:

*First*, none of the challenged statements can give rise to a claim for defamation.  Under well-settled principles of law, the statements at issue are not actionable because they are protected statements of opinion, lack defamatory meaning, or are not materially false.

*Second*, Barrett's claims are subject to the demanding actual malice standard of *New York Times v. Sullivan*, 376 U.S. 254 (1964).  Yet Barrett fails to plead facts plausibly showing that the Defendants acted with the required state of mind.  Rather, her pleading is conclusory at best on this score.  Courts in this Circuit and around the nation have routinely dismissed complaints on Rule 12(b)(6) motions with similarly unsupported allegations.  *See, e.g.*, *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021).

*Third*, Barrett's ancillary tort claims fall with the defamation claims, as it is well established that a plaintiff cannot plead around the constitutional safeguards applicable to defamation claims by repackaging those claims as related torts.  Each of the tort claims fails on its own terms, too, for failure to allege the necessary elements.

*Fourth*, the remaining claims—sounding in breach of contract—are similarly groundless. These contract claims too recycle Barrett's defamation allegations and thus fail for the same reasons.  Further, Barrett does not plausibly allege any actual breaches by The Atlantic of its contractual duties to her.  Nor could Barrett properly assert such a claim against The Atlantic given her admitted fabrication, which itself breached Barrett's own contractual duties.  In fact, she expressly pleads that she "did not cooperate" with The Atlantic, when her contract with the magazine obligated her to "cooperate fully."

For all of these reasons and more, the Complaint should be dismissed with prejudice.

## BACKGROUND[2]

### A.    Barrett's Rise to Journalism Prominence

Barrett's meteoric rise is widely documented.  She catapulted to become "a successful young writer" at The New Republic, authoring feature-length pieces on prominent politicians and other public figures.  Compl. 23.  These "acclaimed" stories swiftly earned Barrett a promotion to associate editor.  *Id.* ¶¶ 48-49.  By the age of 23, Barrett had written "long-form political stories" for The New York Times Magazine and secured a contract to write for GQ.  *Id.* ¶ 49.  Barrett's transition from "media employee to media celebrity" captured the press's attention."[3]  She was the

---

[2] "[I]n determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (alteration in original) (quoting *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007)).  The Court can properly take notice of the "publicly available historical articles" cited in this section, including in determining whether Barrett is a "public figure" for purposes of applying the actual malice standard. *See, e.g.*, *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140, 142 (D.D.C. 2017) (citation omitted) (articles supported finding that plaintiff was a limited-purpose public figure at the motion-to-dismiss stage); *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 143 (D.D.C. 2016) (same), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017).
[3] David Carr, *Goodbye to All That*, Wash. City Paper (Apr. 9, 1999), https://tinyurl.com/373u4mfd.

subject of "extensive profiles for the likes of George magazine."[4]  As one paper put it, "[a]t a time when being a hot young writer in Washington was a big deal, Shalit was the biggest deal of all."[5]

## B.  Controversy over Barrett's "Journalistic Malfeasance" and Her Departure from The New Republic

In 1994 and 1995, however, a series of "plagiarism episodes" surfaced.  Compl. ¶ 27.  It came to light that two of Barrett's pieces for The New Republic included "unattributed material" from other authors' articles.  *Id.* ¶¶ 51-52.  As a result, The New Republic "was forced to apologize to its readers," while Barrett "apologized to the writers whose quotes and sentences she had taken." *Id.* ¶¶ 52, 54.  Additional review of Barrett's work "quickly uncovered" similar problems, including unattributed material in two of her articles for The New York Times Magazine.  *Id.* ¶ 53.

Barrett found herself at the center of a "passionate debate."  *Id.* ¶ 29.  Media across the country reported on the controversy, with commentators publicly offering opinions on Barrett's "misdeeds."  *Id.*; *see id.* ¶¶ 30, 58, 60.[6]

In October 1995, Barrett's writing yet again launched her into the center of a media firestorm when she authored an article criticizing The Washington Post's efforts to promote racial diversity.  Compl. ¶ 56.  Barrett's piece was controversial, and its accuracy was immediately challenged.  One article reported that at least half of the 28 sources named by Barrett claimed "that

---

[4] Carr, *supra* note 3; *see also* Defs.' Mot. to Dismiss Ex. 1, Lisa DePaulo, *The Truth About Ruth*, George, at 150 (Feb./Mar. 1996) (cited at Compl. ¶ 60); *Who's Right, and Who's Wrong*, Media Week (Nov. 21, 1994), 1994 WLNR 5340053; Cynthia Grenier, *GQ's Big Party, Big Stories; Berets, Other 'Spec Warriors,'* Wash. Times (June 3, 1995), 1995 WLNR 303314.

[5] Carr, *supra* note 3.

[6] *See also, e.g.*, James Warren, *Watching the Words Anne Soukhanov's Tuned into the Capital Lingo*, Chi. Trib. (July 2, 1995), 1995 WLNR 4599800; Frank Ahrens, *A Writer's Repetitive Stress; New Republic Admits Phrases Were Copied*, Wash. Post (July 18, 1995), 1995 WLNR 5746551; Maureen Dezell, *A Recording of Early Risers*, Boston Globe (July 19, 1995), 1995 WLNR 2103717; Shepard, *supra* note 1; Garry Wills, *'The New Republic,' A Reprieve*, Albany Times Union (Apr. 24, 1996), 1996 WLNR 317017.

she presented their quotes inaccurately, incompletely, or both, in order to serve her agenda."[7] Other articles catalogued additional alleged lapses that reportedly "dumbfounded" Post editors.[8]

In what she admits was one particularly "serious error," Barrett incorrectly reported that an individual named in the article had been jailed for corruption though he had not even been indicted. Compl. ¶ 58. That reportedly led to the filing of a libel lawsuit against Barrett and The New Republic.[9] And additional criticism abounded. One review concluded that the 13-page article contained "at least 50 mistakes, distortions and perversions of fact, an average of one per roughly 250 words."[10] It further was revealed that, as in several of her prior pieces, Barrett's article included a sentence copied verbatim from a book about the Post.[11]

These events contributed to "relentless[]" public discussion of Barrett's accused "journalistic malfeasance." Compl. ¶¶ 4, 60; *see also id.* ¶ 114 (acknowledging Barrett was "accused of plagiarism and errors in her journalism"). Barrett took a leave of absence from The New Republic. *Id.* ¶ 61. As one magazine cover story summed it up: "Ruth Shalit doesn't just cover big stories, she is one."[12] All the while, Barrett engaged in her own press campaign to address what she dubbed "Ruthgate."[13] She defended her mistakes to the Washington Post and on the CNN television show Reliable Sources.[14] Barrett asserted that she was "being scrutinized like no other journalist," and proclaimed that, "except for" a few mistakes, her work "holds up

---

[7] John Cloud, *Baby Ruth*, Wash. City Paper (Oct. 20, 1995), https://tinyurl.com/47nvjj66.

[8] *Id.*; Shepard, *supra* note 1.

[9] *Baby Ruth Redux*, Wash. City Paper (Jan. 26, 1996), https://tinyurl.com/ut92z3ke.

[10] Ken Silverstein & Alexander Cockburn, *The Shalit Paradigm: Young Liars of the Right*, CounterPunch (Nov. 15, 1995), https://tinyurl.com/2bjm63pa.

[11] DePaulo, *supra* note 4, at 154.

[12] DePaulo, *supra* note 4, at 122; *see also id.* at 151-53; Bob Armstrong, *Look Out for the Word Thieves*, S.F. Examiner (Sept. 12, 1997), 1997 WLNR 594; Cloud, *supra* note 7.

[13] DePaulo, *supra* note 4, at 150.

[14] Ahrens, *supra* note 6; *see Reliable Sources* (CNN television broadcast Sept. 24, 1995) (Lexis).

extremely well."[15]   Later, though, Barrett acknowledged to the American Journalism Review: "The fact is that someone else's words appeared in my story.  Aside from lying, that's the most egregious offense in journalism."[16]  She similarly admitted that her use of others' work reflected "deplorable carelessness," deeming it a "horrible, idiotic problem" that was "never ever *ever* going to happen again."[17]  Later she referred to her conduct as "journalistic malpractice."[18]

In 1998, a scandal involving fabrications by New Republic editor Stephen Glass "put a renewed spotlight on" the "transgressions" committed by Barrett.  Compl. ¶¶ 64-65.  Barrett "was referenced in many of the stories" about Glass.  *Id.* ¶ 64.  According to Barrett, The New Republic informed her that her "continued employment at the magazine was exacerbating the negative publicity" it was receiving over Glass.  *Id.* ¶ 65.  As a result, Barrett departed The New Republic in early 1999.  *Id.*

## C.    Barrett's Continued Journalism Career

Following her departure from The New Republic, Barrett authored pieces in several national magazines and news outlets, including New York Magazine, The Wall Street Journal, ELLE, Details, Salon.com, Nerve.com, Surface, and Lingua Franca.  *Id.* ¶¶ 66-67.  Barrett's prior conduct remained the subject of attention and controversy,[19] but she continued writing "culturally relevant and lively journalism that sparked debate."  Compl. ¶ 68.

---

[15] DePaulo, *supra* note 4, at 125.

[16] Shepard, *supra* note 1.

[17] Cloud, *supra* note 7; DePaulo, *supra* note 4, at 155.

[18]    Ruth S. Barrett, *A Mad, Mad World Redux*, Medium (Nov. 23, 2020), https://tinyurl.com/7xww9nun; *see, e.g.*, Cloud, *supra* note 7.

[19] *See, e.g.*, Liza Mundy, *The Second-Chance Club*, Wash. Post (Oct. 3, 1999), 1999 WLNR 8855057 (labeling Barrett a "serial plagiarist"); Meredith O'Brien, *When the Words Aren't Our Own*, Quill (Oct. 1, 2000), 2000 WLNR 10210725 (discussing Barrett's "life after plagiarism" writing for Salon.com); John Podhoretz, *Lost in Translation*, Weekly Standard (Dec. 18, 2006), 2006 WLNR 27667141 (describing journalists "still enraged by the memory of the plagiarisms of Ruth Shalit"); Eric Alterman, *My Marty Peretz Problem—And Ours*, Am. Prospect (July/Aug.

D.      **Barrett's Article in The Atlantic**

In mid-2019, Barrett submitted a "pitch" to The Atlantic for a story on wealthy Connecticut parents' attempts to "turn[] their physically unremarkable children into elite competitive athletes so that they could qualify for preferential admission as Ivy League sports recruits," especially in "niche sports." *Id.* ¶ 69.  Barrett knew addressing the subject "risked upsetting some families," but thought it "served a superseding positive purpose—exposing the inequality inherent in such a system, and the harms to children's health and happiness." *Id.* ¶ 70.

By the end of the year, Barrett entered into an Author's Agreement with The Atlantic to write the article.  Compl. Ex. 5.  The contract made clear that The Atlantic was "under no obligation to publish the Work and acceptance of the Work is in the sole discretion" of The Atlantic.  *Id.* at 2.  The contract specified that The Atlantic "shall . . . have the right to edit, revise, modify, [and] abridge" Barrett's draft.  *Id.* at 3.  And the contract obligated Barrett "to cooperate fully in such procedures, including providing [The Atlantic] with any research material." *Id.*

After submission, Barrett's draft underwent an editing and fact-checking process.  Compl. ¶ 90.  The article was published online in October 2020, and in the magazine's November 2020 print edition, under the headline, "The Mad, Mad World of Niche Sports Among Ivy League-Obsessed Parents." *Id.* ¶ 81; Compl. Ex. 1.  The article focused, in particular, on a "buoyant, chatty, stay-at-home mom from Fairfield County, Connecticut," identified only as "Sloane."

---

2007), 2007 WLNR 30054205 (recalling Barrett's "serial plagiarism problem"); Samuel G. Freedman, *Don't Reward Deceitful Writers*, USA Today (Mar. 24, 2004), 2004 WLNR 6257075 (listing Barrett as "example of journalistic ignominy"); David Carr, *Web's Thirst for Content*, Int'l Herald Trib. (Aug. 20, 2012), 2012 WLNR 17580403 (describing Barrett as the "famed tyro offender of Washington journalism"); Victor Davis Hanson, *Powerful, Influential Get Pass on Their Lies*, Lake Cnty. News-Sun (Feb. 13, 2015), 2015 WLNR 39845375 (listing Shalit as "fantasy writer[]" whose work was "finally disowned"); Leah Finnegan, *Fifty Shades of Ruth Shalit, Journalistic Abuser*, TKTK (Feb. 25, 2015) ("Ruth Shalit, the infamously bad journalist with whom the '90's-era media had a very deliciously tortured relationship, is back."), https://tinyurl.com/2p8tnjmp.

Compl. Ex. 1, at 4.  The article purported to tell of her family's "fool's folly" through squash and fencing tournaments, including one in which the article portrayed her daughter as sustaining a "stab[] in the jugular" that was "right next to the carotid artery."  *Id.*  In describing Sloane to readers in the article's third paragraph, Barrett noted that she had not only two girls, but also a "son."  *Id.*  Barrett concedes that the inclusion of the son was a "falsehood."  Compl. ¶ 6.

## E.     Investigation and Retraction

Almost immediately after publication, serious questions were raised about Barrett's article. A media critic for the Washington Post, Erik Wemple, devoted multiple columns to what he called a "troubled" story.  *See id.* ¶¶ 89 & n.5, 102 & n.6.  His posts questioned not only whether "Sloane" truly had a son, but reported on numerous other questionable facets of the article, including its description of the fencing injury.[20]  Moreover, a lawyer for "Sloane" then contacted The Atlantic, "contest[ing] the accuracy of some of the Article's contents and claim[ing] that Ms. Barrett originated the idea to add the son."  Compl. ¶ 153.

The Atlantic quickly began investigating the allegations, including with the involvement of a "seasoned journalism professional," editor Donald Peck.  *Id.* ¶ 159.  As part of that process, editors reached out to Barrett and "confronted" her with the allegations, and "demanded to know whether Mr. Wemple was correct in his surmise about the composition of Sloane's family."  *Id.* ¶ 17.  When they did so, Barrett admits in her Complaint, she "did not cooperate."  *Id.* ¶ 18.  Rather than "reveal" the truth about her deliberate falsification, Barrett continued to hide it.  *Id.*

Ultimately, The Atlantic retracted the article and published an online editor's note explaining its decision.  *See* Compl. Ex. 2.  According to the note, The Atlantic had "established

---

[20] *See* Erik Wemple, *Opinion: Ruth Shalit Just Wrote for the Atlantic. Would Readers Know It from the Byline?* Wash. Post (Oct. 24, 2020), https://tinyurl.com/6c5c7rxu (cited at Compl. 37 n.5); Erik Wemple, *Opinion: The Atlantic's Troubled Niche-Sports Story*, Wash. Post (Oct. 30, 2020), https://tinyurl.com/5h8azufy (cited at Compl. 41 n.6).

that Barrett deceived The Atlantic and its readers about a section of the story that concerns a person referred to as 'Sloane.'"  *Id.* at 3.  The note further recounted that, before publication, Sloane had confirmed the existence of the "son" referenced in Barrett's draft to the magazine's fact-checking department.  *Id.*  After the Post began probing the article's accuracy, The Atlantic again reached out to Sloane.  *Id.*  At that point, the note explained, Sloane's attorney "informed us that she does not, in fact, have a son," and The Atlantic also "independently corroborated" that fact.  *Id.*  The note stated that Sloane's attorney told The Atlantic that Sloane "wanted to make herself less readily identifiable" by including the falsity, and that it was Barrett who had "first proposed the invention of a son, and encouraged Sloane to deceive The Atlantic as a way to protect her anonymity."  *Id.*

The note reflected that when asked about these allegations, Barrett "initially denied them, saying that Sloane had told her she had a son, and that she had believed Sloane."  *Id.*  However, as quoted directly in the note, Barrett acknowledged the next day that she was "complicit" in "compounding the deception."  *Id.* at 3-4.  The note presented Barrett's account, pointing out that she "denies that the invention of a son was her idea, and denies advising Sloane to mislead The Atlantic's fact-checkers, but told us that 'on some level I did know that it was BS' and 'I do take responsibility.'"  *Id.* at 4.  It further explained that "Barrett says that the fabricated son is the only detail about which she deceived our fact-checkers and editors."  *Id.*

The note went on to disclose "several additional errors" identified in the course of reviewing the article again after publication.  *Id.*  Those included a description of the "severity" of the neck injury sustained by one of Sloane's daughters; the characterization of a thigh injury by another—said to be a "deep gash"; the location of a lacrosse family in the article; and details concerning backyard hockey rinks.  *Id.*  The note further explained that Barrett's byline was being updated from "Ruth S. Barrett," as she requested, to "Ruth Shalit Barrett."  *Id.* at 4-5.  The note

described that, in 1999, Barrett—then known as Ruth Shalit—left her position as an associate editor at The New Republic "after plagiarism and inaccurate reporting were discovered in her work." *Id.* The note opined that "in the interest of transparency, we should have included the name that she used as her byline in the 1990s, when the plagiarism incidents occurred." *Id.* at 5.

In the end, the editor's note reasoned that Barrett's actions "fatally undermined the effectiveness of the fact-checking process" for her article. *Id.* As a result, the note concluded, "[i]t is impossible for us to vouch for the accuracy of this article," necessitating a retraction. *Id.*

Peck sent an email to Atlantic staff echoing many of the note's conclusions. Compl. Ex. 3. A substantially similar editor's note also was published in the print edition. Compl. Ex. 4.

## F.    Reaction and Lawsuit

Reacting publicly at the time, Barrett told The New York Times that fabricating Sloane's son "was a serious error and misjudgment" and said she was "sorry she had embarrassed The Atlantic and broken its trust with readers."[21] She acknowledged in an online post that there were "several errors" in the story—and that it was "egregious[]" to include the reference to a son, "a person who doesn't exist."[22] She stated, "The editors of the magazine viewed my inclusion of a nonexistent son as a cardinal lapse and retracted the piece. That is their prerogative."[23] Barrett's Complaint likewise expressly concedes that The Atlantic "could have taken a number of lawful actions" after "learning about the son"—including "publish[ing] an Editor's Note admonishing" her and "retract[ing] the entire article solely on the basis of this detail." Compl. ¶ 41.

---

[21] Michael Levenson, *The Atlantic Retracts Ruth Shalit Barrett Article on Niche Sports*, N.Y. Times (Nov. 1, 2020), https://tinyurl.com/2je9mynr.
[22] Barrett, *supra* note 18.
[23] *Id.*

Nonetheless, Barrett now brings this lawsuit against both The Atlantic and Peck.  Barrett claims defamation in connection with certain statements in the editor's note, published online and in print, as well as in Peck's internal email (Claims 1-2).  Barrett asserts ancillary claims for false light invasion of privacy (Claim 3) and tortious interference (Claim 4)—as well as contract-based claims (Claims 5-8).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do," nor will "naked assertions devoid of further factual enhancement." *Id.* (alteration and citation omitted).  A court need not "accept as true a legal conclusion couched as a factual allegation." *Id.*  There instead must be "well-pleaded factual allegations." *Id.* at 679.  And the well-pleaded facts must make out a plausible claim. "[U]nless a plaintiff is able to nudge his or her claim 'across the line from conceivable to plausible,' the complaint must be dismissed." *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140 (D.D.C. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570-71 (2007)).

These rules have particular import in cases against the press.  "To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017); *see Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013).

11

<u>**ARGUMENT**</u>

**I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION**

"In order to state a claim of defamation, [a] plaintiff must allege and prove four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (citation omitted).

This Complaint fails to state a claim for defamation both because the statements at issue are not legally actionable and because Barrett fails to plausibly allege that The Atlantic and Peck acted with actual malice, the degree of fault required here by the First Amendment.

**A.    <u>The Statements at Issue Are Not Actionable</u>**

Barrett's claims center on six categories of statements.  *See* Compl. ¶¶ 184-95.  None supports a libel claim, principally because the statements are not materially false, are protected statements of opinion, or lack defamatory meaning.  The relevant legal principles are as follows:

***Material Falsity.***  The plaintiff bears the burden of pleading and proving the material falsity of a challenged statement.  *Tavoulareas v. Piro*, 817 F.2d 762, 818 (D.C. Cir. 1987) (en banc).  It is well established that "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge [is] justified."  *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (internal quotation marks omitted).  The alleged falsity must be *material*.  If "the sting of the charge" is "substantially true," no cause of action arises.  *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1988).  And where "the question of truth or falsity is a close one, a court should err on the side of nonactionability."  *Libre by Nexus v. Buzzfeed, Inc.*,

311 F. Supp. 3d 149, 158 (D.D.C. 2018) (citation omitted) (granting motion to dismiss).  As a result, courts regularly grant motions to dismiss on the basis of substantial truth.  *See, e.g.*, *id.*[24]

    **Protected Opinion.**  Only provably false statements of objective fact can give rise to a claim for defamation.  *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990).  Thus, where a writer expresses "a subjective view, an interpretation, a theory, conjecture or surmise, rather than a claim to be in possession of objectively verifiable false facts, the statement is not actionable." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) (alterations and citation omitted); *Rosen v. Am. Isr. Pub. Affs. Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012) ("statement of pure opinion" cannot form basis of a claim); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 247-48 (D.D.C. 2016) (same), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017).

    Under the doctrine of opinion based on disclosed facts, statements are likewise protected when a conclusion is presented—whether subjective or not—"that is based upon true facts that are revealed to readers or which are already known to readers."  *Farah*, 736 F.3d at 539 (citation omitted); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 312 (D.C. Cir. 1994) (*Moldea II*).  This rule reflects that "readers understand that supported opinions represent the writer's interpretation of the facts presented," and that the "reader is free to draw his or her own conclusions based upon the facts."  *Abbas v. Foreign Pol'y Grp., LLC*, 975 F. Supp. 2d 1, 16-17 (D.D.C. 2013) (alteration and citation omitted) (applying to commentary "supported by facts provided in [the] article").

    Whether a statement "asserts actionable facts" or is one of opinion is a threshold issue that a court may properly determine at the motion-to-dismiss stage.  *Bauman v. Butowsky*, 377 F. Supp.

---

[24] *See also, e.g.*, *Robertson v. Cartinhour*, 867 F. Supp. 37, 59 (D.D.C. 2012) (granting motion to dismiss), *aff'd*, 553 F. App'x 1 (D.C. Cir. 2014); *Carpenter v. King*, 792 F. Supp. 2d 29, 38 (D.D.C. 2011) (same); *Ning Ye v. Holder*, 644 F. Supp. 2d 112, 119 n.4 (D.D.C. 2009) (same); *Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213, 217 & n.5 (D.D.C. 2008) (same).

3d 1, 11 (D.D.C. 2019) (citation omitted); *see Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624

(D.C. Cir. 2001) (explaining it is "a critical threshold question at the Rule 12(b)(6) stage").

 ***Defamatory Meaning.*** Before a claim for defamation can lie, "a court must evaluate

whether a statement is capable of defamatory meaning, which is a threshold question of law."

*Smith v. Clinton*, 253 F. Supp. 3d 222, 239 (D.D.C. 2017) (alterations omitted) (quoting *Jankovic*

*v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007)).   "Not all (or even most) maligning

remarks can be considered defamatory."   *Chau v. Lewis*, 771 F.3d 118, 127 (2d Cir. 2014).   A

statement must be more than unpleasant, offensive, pejorative or unflattering—instead, it must

make the plaintiff appear "odious, infamous, or ridiculous."   *Weyrich*, 235 F.3d at 627 (quoting

*Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)); *Franklin v. Pepco Holdings, Inc.*, 875 F.

Supp. 2d 66, 74 (D.D.C. 2012) ("[I]n the context of a defamation claim, believing that an individual

did something wrong is distinct from thinking that the individual was odious, infamous, or

ridiculous." (citation omitted)).   Courts consider a statement's meaning in the publication's "whole

context," rather than in "cherry-picked" portions.   *Deripaska*, 282 F. Supp. 3d at 149; *see Moldea*

*II*, 22 F.3d at 313-15.

 The law at the pleading stage is particularly demanding where claims rely on what is

allegedly *implied* by an otherwise "materially true" statement.   *White v. Fraternal Order of Police*,

909 F.2d 512, 519 (D.C. Cir. 1990).   It is not enough to plead that a "defamatory inference can

reasonably be drawn."   *Id.* at 520.   Rather, the plaintiff must *also* show that "the communication,

by the particular manner or language in which the true facts are conveyed," supplies "additional,

affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference."

*Id.*  This requires an "especially rigorous showing."   *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d

1328, 1339 (D.C. Cir. 2015) (citation omitted).

Applying these well-settled doctrines to the six categories of statements challenged in Claims 1 and 2 of the Complaint, Barrett's defamation allegations do not state a claim.

### 1.    Statements Relating to Barrett's Admitted Deception

Barrett first takes issue with statements, both in Peck's email and in the editor's note, relating to her admitted falsification of Sloane's son.  *See* Compl. ¶¶ 184(a), 185(c), 185b(c)[25] (Claim 1); *id.* ¶¶ 190(a), 191(c), 192(c) (Claim 2).  But, critically, Barrett does not contest the central charge these statements relay: that she knowingly included a falsity—Sloane's purported son—in her article and concealed that from editors.  To the contrary, Barrett now affirmatively and repeatedly admits that deception.  *See, e.g.*, Compl. ¶¶ 6, 14, 41, 79-80, 100, 112, 127, 130; *supra* p. 10.  Indeed, the very editor's note that she sues over specifically quotes Barrett as conceding that she was "complicit" in the falsification.  Compl. Ex. 2, at 3, Ex. 4, at 2.

By her own admissions, the "sting" of the challenged statements is (at the very least) "substantially true."  *Liberty Lobby, Inc.*, 838 F.2d at 1296.  Barrett may use different words today to describe her conduct—"alter[]," Compl. ¶ 135, "fudg[e]," *id.* ¶ 144, and "misrepresent[]," *id.* ¶ 130—but that does not change the thrust of the statements at issue here: that she intentionally included a falsehood in her article.  *See, e.g.*, *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986) (en banc) ("the First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words"); *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 685-86 (9th Cir. 1990) ("[c]omplaints or disagreements about choice of language," standing alone, do not "give rise to liability").

---

[25] The errata Complaint (at page 78) mis-numbers as paragraph 180 the paragraph containing allegations relating to the print editor's note.  To avoid confusion, we refer to this paragraph as paragraph 185b.  Additionally, for simplicity's sake, this discussion cites the allegations in Claim 1 (defamation).  The allegations in Claim 2 (defamation *per se*) are materially identical, and thus similarly fail.

Rather than challenge the express statements, Barrett pins her claim on alleged *implications* from these true statements—what she contends the statements "indicate" or "suggest."  Compl. ¶¶ 184(a), 185(c), 185b(c).  But these assertions are meritless for multiple reasons.

### a.    The Alleged Implication that Barrett Was Motivated by Illegitimate Interests

The principal implication Barrett asserts is that she was motivated by "illegitimate interests," rather than an "obligation to protect [Sloane's] anonymity."  *Id.* ¶ 184(a).  But this is refuted by the text of the email and editor's note.  Each expressly provides her explanation that "this was a fabrication *to make Sloane less identifiable, because she was concerned about maintaining anonymity*."  *Id.* (emphasis added); *accord* ¶¶ 185(c), 185b(c) (quoting editor's note statement that Barrett "first proposed the invention of a son . . . as a way to protect [Sloane's] anonymity").  And nothing in the email or editor's note counters that explanation or suggests any motive to the contrary.  "The plain words of the" publications at issue thus "explicitly rebut" the plausibly of Barrett's asserted implication.  *Tavoulareas*, 817 F.2d at 781; *see, e.g.*, *Trudeau v. FTC*, 456 F.3d 178, 195-96 (D.C. Cir. 2006) (rejecting alleged implication that conflicted with facts "ma[de] clear" by the challenged press release); *Deripaska*, 282 F. Supp. 3d at 148-49 (rejecting alleged implication that was "negate[d]" by article's "specifically include[ed] facts").

Further, the implication suggested by Barrett would not even be actionable.  It is well established that statements assessing a person's motivations are protected opinion and, thus, not actionable.  Such matters are "not capable of being proven true or false, because an individual's state of mind at a particular point in time 'is not subject to empirical proof.'"  *Turner v. Wells*, 198 F. Supp. 3d 1355, 1370 (S.D. Fla. 2016) (quoting *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 718 (11th Cir. 1985)); *accord Farah*, 736 F.3d at 539-40 (affirming dismissal because statement that authors were "not motivated by genuine belief, but rather by a desire to hold their

readers 'captive' and 'to sell books,'" is protected opinion); *Dreamstone Ent. Ltd. v. Maysalward Inc.*, 2014 WL 4181026, at *8 (C.D. Cal. Aug. 18, 2014) (accusation that claimant acted "maliciously" was opinion regarding "subjective state of mind").

> **b.   The Alleged Implications that Barrett Breached Company Policy or Journalistic Ethics or "Perpetrated a Material Fraud"**

Barrett additionally asserts that the statements falsely imply that misrepresenting Sloane's son "breached clear company policy and/or journalistic ethics" and "perpetrated a material fraud." Compl. ¶¶ 184(a), 185(c), 185b(c). This, too, fails for multiple reasons.

*First*, Barrett cannot satisfy the "especially rigorous showing" required to state a claim for defamation by implication—namely "affirmative evidence" from the face of the publications that Defendants "intend[ed] or endorse[d]" the specific inferences that she asserts. *White*, 909 F.2d at 519-21; *Abbas*, 783 F.3d at 1339. The Complaint does not even purport to offer such allegations. That alone precludes her implication-based claim. *See, e.g., Nunes v. WP Co.*, 513 F. Supp. 3d 1, 6-7 (D.D.C. 2020) (granting motion to dismiss); *Bauman*, 377 F. Supp. 3d at 15 (same).

*Second*, even assuming that the sentences at issue implied that Barrett's conduct violated "journalistic ethics" or "policy" or constituted a "material fraud," they still would not be actionable because such judgments would plainly reflect protected, subjective opinion and opinions based on disclosed facts. Barrett pleads that altering facts about sources raises questions without "unambiguous[] answer[s]." Compl. ¶ 138. In other words, on its face, the Complaint acknowledges that The Atlantic's assessment of Barrett's conduct is not objectively verifiable. *See Moldea II*, 22 F.3d at 312-15 (reviewer's statement that book contained "too much sloppy journalism to trust" not actionable); *Rosen*, 41 A.3d at 1255, 1258 (statement that employee's behavior "did not comport with standards [employer] expected" not actionable); *see also, e.g., Xereas v. Heiss*, 933 F. Supp. 2d 1, 18-19 (D.D.C. 2013) (statements that plaintiff was terminated

because of his "incompetence, dishonest business practices, [and] deceptive sales practices" not actionable (citation omitted)); *Armstrong v. Thompson*, 80 A.3d 177, 188 (D.C. 2013) (statements deeming misconduct "serious integrity violations" and "unethical behavior" not actionable).

*Third*, Barrett's own admissions demonstrate that such an implication would be substantially true and non-defamatory.  Barrett has described her own conduct here as "egregious," *see supra* p. 10, and expressly pleads that her conduct gave The Atlantic every right to issue a public "admonish[ment]" and to retract her "entire article."  Compl. ¶ 41.[26]  These concessions alone should doom her claim that any such implications are materially false and defamatory.

### c.    The Alleged Implication Relating to Inducing a Source to Lie

Barrett's claim based on the phrase that she was accused of inducing "at least one source to lie to our fact-checking department" also plainly fails.  Compl. ¶ 185(c).  It is not only substantially true, but literally so.  Barrett does not deny that, as recounted in the editor's note, Sloane's attorney "said that according to Sloane," Barrett had "encouraged Sloane to deceive The Atlantic as a way to protect her anonymity."  Compl. Ex. 2, at 3.  Nor does Barrett dispute that The Atlantic could have reported that "a source"—Sloane—accused Barrett of inducing her to lie.  Compl. ¶ 170.  Her challenge thus boils down to a matter of word choice ("at least one"), which does not give rise to an actionable claim in light of the undisputed facts.  *See, e.g.*, *Janklow*, 788 F.2d at 1304.[27]  Further, to the extent Barrett asserts that the phrase *implies* that Barrett "might" have allegedly induced more than one source to lie, Compl. ¶ 185(c), that is—at most—an allegation that The Atlantic raised a *question* whether additional investigation would show that

---

[26] As the Society of Professional Journalists' (SPJ) Code of Ethics reflects, journalists should "never deliberately distort facts."  SPJ Code of Ethics, https://www.spj.org/ethicscode.asp.

[27] In fact, the editor's note quotes Barrett herself as admitting "that she was 'complicit' in 'compounding the deception'" regarding Sloane's son "and that 'it would not be fair to Sloane' to blame her alone for deceiving The Atlantic."  Compl. Ex. 2, at 3-4, Ex. 4, at 2.

more than one source was implicated.  As discussed in the next section, raising such a question cannot support a libel claim.  *Abbas*, 783 F.3d at 1338.

      **2.**      **Statement as to The Atlantic's Need to Understand the Scope of the Deceptions and Errors in the Article**

Barrett next claims libel based on two sentences in Peck's internal email expressing that "[i]t is crucial for us to understand fully the scope of deceptions and errors in the article" and further noting that "[i]n addition to the lie about the son, we have so far identified and corrected a number of smaller errors."  Compl. ¶ 184(b).  Barrett has not pleaded that either statement is materially false, nor could she.  The only arguable statement of fact here is that The Atlantic discovered and corrected a "number of smaller errors" and that there was a "lie about the son."  *Id.* But Barrett affirmatively admits these facts are true.  *E.g.*, *id.* ¶¶ 20, 41, 149.

The remaining statement about what it is "crucial for us to understand" states not a fact, but Peck's opinion—directed to fellow staff members—about what the magazine reasonably and responsibly believed it needed to do in light of the fabrication and identification of additional errors: "to understand fully the scope of deceptions and errors in the article."  *Id.* ¶ 184(b); *see Deripaska*, 282 F. Supp. 3d at 147 (remark that speaker "would like to know more" about alleged misconduct not actionable because it "expresses a desire for more information, rather than a statement laden with factual content").  At most, this statement raises a *question* as to *whether* there may be additional errors in light of the disclosed facts.  Such questions "indicate a defendant's '*lack of definitive knowledge* about [an] issue'"—they do not impart actionable facts. *Abbas*, 783 F.3d at 1338 (emphasis added) (citation omitted).  Thus, "posing questions has rarely given rise to successful defamation claims," even when the questions are "embarrassing or unpleasant to [their] subject."  *Id.* at 1338-39 (citing *Sack on Defamation* § 2:4.8 (4th ed. 2010));

*see Deripaska*, 282 F. Supp. 3d at 147 ("[W]hether [plaintiff's] business deals are worth investigating is not a verifiable statement of fact.").

Barrett retreats to the same argument, discussed above, that Peck's statements imply a false assertion by "framing trivial errors as grounds for questioning the Article's veracity when Mr. Peck's main concern (the son) served only to protect Sloane's anonymity and does not evidence material fraud." Compl. ¶ 184(b).  But this contention fails for the very same reasons.  *See supra* p. 19.  And it is patently meritless in any event.  The Atlantic plainly had "grounds for questioning the Article's veracity," Compl. ¶ 184(b), when confronted with (i) Barrett's admitted falsification, *e.g.*, *id.* ¶¶ 79-80; (ii) the identification of further errors in the article, *id.* ¶¶ 104-06; (iii) allegations that Barrett "encouraged" at least one source to deceive the fact-checking department, Compl. Ex. 2, at 3, and (iv) significant sections of the article composed of quotes reportedly overheard by Barrett and unable to be verified by external sources, *see* Compl. Ex. 1, at 9.  It is hard to imagine a scenario that would have provided a stronger basis for questioning the article's veracity.

### 3.    Statements Relating to Barrett's Departure from The New Republic

Barrett additionally challenges statements relating to her departure from The New Republic.  In particular, Barrett recites a statement in Peck's email and the editor's note that, "[i]n 1999," Barrett "left *The New Republic* . . . after plagiarism and inaccurate reporting were discovered in her work."  Compl. ¶¶ 184(c), 185(a), 185b(a).  The Complaint contends this statement is false because (i) Barrett's "journalistic lapses" neither "occurred" nor were "discovered" "in 1999," but instead in "1994-1995," and (ii) she "did not exit *The New Republic* as a direct result of these incidents."  *Id.*  But this is a quibble, not a basis for a legal claim.

To begin, Barrett concedes the literal truth of the statement.  Barrett admits that she committed "four separate incidents" of plagiarism and then another "serious error" in 1994-1995, which were widely publicized at the time.  *Id.* ¶¶ 55, 58; *see supra* pp. 4-5.  She concedes that she

was "accused of plagiarism and errors in her journalism" and "journalistic malfeasance."  Compl.

¶¶ 4, 114.  She further acknowledges that in the immediate aftermath of these scandals, she "took

a leave of absence from *The New Republic*," and then departed for good "[i]n early 1999"

following "renewed" attention to her "transgressions of the mid-90s"—transgressions that were

"exacerbating the negative publicity" The New Republic was then receiving about another author's

misconduct.  *Id.* ¶¶ 61, 64-65.  Thus, by Barrett's own admissions, the factual statement contained

in the editor's note is true.  Barrett's departure from The New Republic "in 1999" did come "after"

discovery of her conduct.

In an effort to generate a claim, the Complaint contorts the sentences at issue to read "in

1999" as referring not only to the year of Barrett's departure (indisputably correct), but also to the

year in which her self-described "journalistic lapses" occurred.[28]  But even accepting the

Complaint's tortured reading, no defamation can lie, as technical precision is not the test.

*Substantial* truth is.  Here, the alleged "gist" or "sting" stems from allegedly suggesting a link

between Barrett's conduct and her departure from The New Republic, not from the precise timing

of the "lapses" vis-à-vis that departure.  *Masson*, 501 U.S. at 517; *see Tavoulareas*, 817 F.2d at

787 (report of a "direct link" between plaintiff's and his son's shipping companies was true

notwithstanding the article's failure "to make clear the formal, corporate relationship").

Barrett has not claimed—and cannot—that her "journalistic lapses" were unrelated to her

exit from The New Republic.  To the contrary, she pleads that she took a "leave of absence"

following high-profile scandals involving her plagiarism and a "serious error" in her reporting,

and that she then permanently departed the magazine when another author's scandal "put a

---

[28] Barrett's reading of the online editor's note is particularly strained, as it ignores the remainder
of the relevant paragraph.  This omitted language states that Barrett's "plagiarism incidents"
occurred "in the 1990s."  Compl. Ex. 2, at 5.

renewed spotlight" on her own "transgressions."  *See* Compl. ¶¶ 55, 58, 61, 64.  There is no material difference, *see Masson*, 501 U.S. at 517, between the "gist" or "sting" of Barrett's formulation and that of the note's description, saying Barrett "left" the magazine "after plagiarism and inaccurate reporting were discovered in her work."[29]  The challenged statements are at a minimum substantially true, and therefore not actionable.  *See also Armstrong*, 80 A.3d at 185-86 ("inaccuracy" in timeline of investigation not actionable because the "gist" of the charge—that an employee had been under investigation—was "not materially distinguishable" from the statement); *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 601 (D.C. 2000) (description of timeline not actionable, "notwithstanding any claimed inaccuracies as to dates and the like").

### 4.    Statements Relating to Barrett's Byline

The Complaint next claims defamation based on statements relating to Barrett's "initial byline"—*i.e.*, "Ruth S. Barrett"—which The Atlantic later updated to "Ruth Shalit Barrett." Peck's email and the editor's note state that The Atlantic originally "referred to Barrett as Ruth S. Barrett at her request."  Compl. ¶¶ 184(d), 185(b), 185b(b).  They then express regret over the magazine's own editorial decision to elect to use that byline, acknowledging that, in the interest of "transparency," The Atlantic "should have included the name that [Barrett] used as her byline in the 1990s," when her plagiarism occurred.  *Id.*  The online editor's note states that, "[w]hen writing recently for other magazines, Barrett was identified by her full name, Ruth Shalit Barrett."  Compl.

---

[29] "Other news organizations have apparently reached this conclusion as well"—a factor that lends further weight to the substantial truth of The Atlantic's description.  *Liberty Lobby, Inc.*, 838 F.2d at 1295 n.6; *see, e.g.*, Wemple, *Ruth Shalit Just Wrote*, *supra* note 20 (Barrett "left Washington in the late 1990s after laying down a trail of journalistic scandal"); Levenson, *supra* note 21 (Barrett "had been a rising young political reporter in the 1990s before accusations of plagiarism derailed her career as an associate editor at The New Republic"); Young, *supra* note 19 (Barrett left The New Republic "after continuing problems with sources and plagiarism"); *Battle Hymn of the Play-Do Republic*, Spy, at 26 (Sept./Oct. 1996) (Barrett's "word-snatching became so chronic and humiliating that [The New Republic] finally suspended her"), https://tinyurl.com/fz83cdkk.

Ex. 2, at 4.  The print note similarly states she "was typically identified by her full name."  Compl. Ex. 4, at 2.

Barrett does not claim that any of these express statements are false.  Indeed, she concedes that she "recommended" the byline "Ruth S. Barrett."  Compl. ¶ 184(d).  It is thus undisputed that The Atlantic "referred to Barrett as Ruth S. Barrett at her request."  *Id.*  Nor does Barrett challenge The Atlantic's assessment that it "should have" used the byline "Ruth Shalit Barret."  *Id.*  For good reason:  That statement does not recite any provably false fact about Barrett, but instead reflects a subjective judgment about what *The Atlantic* "should" have done to better promote "transparency" to its readers.  Any defamatory sting is aimed at The Atlantic itself, not Barrett.  *See Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 58 (D.D.C. 2012) (statements about someone other than plaintiff "[o]bviously . . . do not provide any basis for recovery").  And, in any event, it is a protected statement of opinion.  It is both subjective and an opinion based on disclosed facts—Defendants' judgment as to how Barrett's disclosed conduct in the 1990s "should have" affected the byline decision.  *See Abbas*, 975 F. Supp. 2d at 16-17 (quoting *Moldea II*, 22 F.3d at 318).

Barrett nonetheless alleges that these statements are actionable because they falsely *imply* that she "proposed the byline 'Ruth S. Barrett' to conceal her identity."  Compl. ¶ 184(d).  Yet again, Barrett fails to carry her burden of supplying "additional, affirmative" evidence from the face of the publications to suggest that Defendants "intend[ed] or endorse[d]" the defamatory inference she asserts.  *Nunes*, 513 F. Supp. 3d at 6-7 (emphasis omitted) (quoting *White*, 909 F.2d at 519-20).  More than that, the asserted inference is refuted by the text of the editor's note, which makes plain not only that it was *The Atlantic's* ultimate decision to refer to her as "Ruth S. Barrett,"

but that in other recent publications her full name had been used.[30]  The note is clear that if anyone is to blame for the naming convention, it is The Atlantic itself.

### 5.     Statements Relating to the Article's Additional Errors

Barrett further challenges the statement in the editor's note that "Sloane's attorney claimed that there are several other errors about Sloane in the article but declined to provide *The Atlantic* with examples."  Compl. ¶¶ 185(d), 185b(d).  That sentence cannot support a cause of action.

To begin, Barrett does not contest that Sloane's attorney in fact made this statement, exactly as reported by The Atlantic.  Barrett appears to contend it is false insofar as it suggests there may be additional errors in the article beyond those identified in the editor's note—because, she contends, she allegedly reviewed with Atlantic editors (and contested) some errors identified by Sloane's attorney.  *See id.* ¶¶ 161-63.  But the fact that she addressed *certain* identified errors is a non-sequitur.  It has no bearing on whether the attorney *claimed* there were even *more errors* but, as the editor's note explains, "*declined to provide* The Atlantic *with examples*."  *Id.* ¶¶ 185(d), 185b(d) (emphasis added).  Nothing in the Complaint contradicts this statement.

Nor could the sentence at issue here constitute defamation in any event.  First, in Barrett's own telling, publications routinely encounter and correct factual errors.  *Id.* ¶¶ 106-09, 150 (collecting examples).  By her own allegations, merely suggesting that there were "other errors"— let alone noting that the attorney "declined to provide *The Atlantic* with examples" of them— imparts nothing that "would invoke hatred or loathing for [Barrett], or that would hold [her] in disgrace or dishonor, or that would subject [her] to scornful laughter."  *Klayman v. Segal*, 783 A.2d 607, 618 (D.C. 2001).  Second, that is all the more pronounced here, where the editor's note

---

[30] And in any event, the readers' "impression" would not be materially different had Defendants *also* stated that Barrett "recommended" the byline "Ruth S. Barrett" in response to The Atlantic's proposing "Ruth Barrett."  *White*, 909 F.2d at 525.

already addresses both a deliberate falsification and a series of other errors—none of which Barrett disputes.  Any suggestion that there were additional, unidentified errors cannot reasonably be considered a *material* falsity in "the entire context" of the note as a whole, which is how it must be read.  *Armstrong*, 80 A.3d at 184, 187 (citation omitted); *see Deripaska*, 282 F. Supp. 3d at 149.

### 6.      Statements Relating to The Atlantic's Decision to Retract

Finally, the Complaint challenges two sentences from the editor's note reflecting the ultimate conclusions reached by the magazine in support of retracting Barrett's article: that given what had come to light—and was presented to readers in the note—The Atlantic "cannot attest to the trustworthiness and credibility of the author, and therefore . . . cannot attest to the veracity of the article."  Compl. ¶ 185(e); *see also id.* ("It is impossible for us to vouch for the accuracy of this article."); *id.* ¶ 185b(e) (The Atlantic "cannot attest to the trustworthiness and credibility of the author, and therefore . . . cannot attest to the veracity of the piece in its entirety.").

The challenged sentences are textbook statements of protected opinion, provided in the interest of transparency to inform readers of the editorial judgments made by the magazine.  First, they are opinions based on disclosed facts.  They expressly represent the conclusions reached by The Atlantic "based upon true facts that are revealed to readers" in the editor's note.  *Farah*, 736 F.3d at 539 (citation omitted).  The note explained that Barrett's article was subjected to a fact-checking process, but further expressed that her conduct in including a known fabrication and lying to editors "fatally undermined the effectiveness of the fact-checking process."  Compl. Ex. 2, at 5; Compl. Ex. 4, at 2.  As a result, The Atlantic concluded that "[i]t is impossible for us to vouch for the accuracy of this article."  *Id.*  The statements thus straightforwardly present The Atlantic's "supportable interpretation" of the facts disclosed.  *Moldea II*, 22 F.3d at 315, 317-18.

Barrett recognizes as much, previously acknowledging that it was The Atlantic's "prerogative" to "view[] [her] inclusion of a nonexistent son as a cardinal lapse" and "retract[] the

piece." *See supra* p. 10.  Even now, the Complaint concedes that The Atlantic had every right to "retract[] the entire article" based upon Barrett's choice to fabricate the son without The Atlantic's knowledge.  Compl. ¶ 41.  That Barrett ultimately disagrees with The Atlantic's assessment—and has urged readers to "draw their own conclusions about whether" the article's errors "are grounds to declare the entire article is fatally flawed and worthy of retraction"[31]—only underscores the statement's status as opinion based on disclosed facts.  *Cf. Abbas*, 975 F. Supp. 2d at 16-17. [32]

Second, the challenged statements reflect The Atlantic's subjective opinion.  Whether a person is sufficiently trustworthy or credible to warrant endorsement is an inherently subjective matter of opinion.  *See Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 729 (1st Cir. 1992) (statement about plaintiff's "honesty" represented speaker's "personal appraisal of the factual information contained in the article," and thus was protected opinion); *Fonville v. District of Columbia*, 38 F. Supp. 3d 1, 12 (D.D.C. 2014) (supervisor's statement that plaintiff's conduct "was 'unacceptable' and 'not consistent with what I expect from a command member of my staff'" was protected opinion).  And the law is "particularly solicitous of criticism" of authored works.  *Sack on Defamation* § 4:3.1.  Here, The Atlantic decided that Barrett's admittedly deceptive conduct warranted a retraction.  This determination is not provably true or false, but instead reflects

---

[31] Levenson, *supra* note 21.

[32] Notably, previous corrections by The Atlantic cited in the Complaint involve nothing like the lies and deception at issue here.  *See, e.g.*, Compl. ¶ 24.  Those extraordinary facts obviously "taint[] everything else," and appropriately so.  *Id.* ¶ 25.  Likewise, the Complaint's (baseless) assertion that a coach's quote in the article was "altered" during the editing process does not change anything.  It has no effect on whether the statements at issue are actionable.  Moreover, it is notable that the Complaint does not actually allege that the quotation was a falsehood.  Indeed, since the filing of this lawsuit, "[t]he coach himself, Jeff Brameier of Darien High School" publicly confirmed that "he was quoted accurately."  Erik Wemple, *Ruth Shalit Barrett Sues the Atlantic and Bashes this Media Critic*, Wash. Post (Jan. 13, 2022), https://tinyurl.com/z5cmdr7b.

a subjective—and constitutionally protected—exercise of The Atlantic's editorial judgment.  For all of these reasons, the Complaint does not state an actionable claim.

### B.   The Complaint Fails to Plausibly Allege Actual Malice

Barrett's defamation claim independently fails because the Complaint does not adequately allege that either The Atlantic or Peck personally acted with actual malice—the constitutionally required state-of-mind standard that applies here.

#### 1.   The Actual Malice Standard Applies

Whether a plaintiff is a public figure subject to the actual malice standard "is a matter of law for the court to decide."  *Kahl*, 856 F.3d at 114 (quoting *Tavoulareas*, 817 F.2d at 772).  Here, the governing principles amply support applying the actual malice standard.

Barrett has made a career of being in the public eye, both writing for national publications on matters of public interest and public debate—and personally being at the center of a whirlwind of publicity, from "acclaim[]" to highly critical coverage of her controversies.  *Supra* pp. 3-6; Compl. ¶¶ 48-60.  Barrett long ago achieved the status of a "media celebrity."  *Supra* p. 4.  Indeed, the filing of this lawsuit alone generated coverage from the New York Times to the Washington Post to Politico to Fox News to innumerable blogs and social media sites.[33]  Boilerplate assertions of being a "private individual" notwithstanding,[34] she is a public figure within the meaning of libel law.  At the very least, she qualifies as a "limited-purpose" public figure.

---

[33] *E.g.*, Katie Robertson, *Freelance Writer Accuses The Atlantic of Defamation*, N.Y. Times (Jan. 9, 2022), https://tinyurl.com/2p84f47k; Bryan Pietsch, *Ruth Shalit Barrett Sues Atlantic for $1 Million over Retraction of Viral Article, Allegations of Inaccuracies*, Wash. Post. (Jan. 9, 2022), https://tinyurl.com/2p9xvza3; Craig Howie & Josh Gerstein, *Freelance Writer Ruth Shalit Barrett Sues The Atlantic for $1 Million*, Politico (Jan. 8, 2022), https://tinyurl.com/yjer4hp7; *Media Buzz* (Fox News television broadcast Jan. 16, 2022) (Lexis).

[34] *E.g.*, Compl. ¶ 187.  The Court need not consider this "legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (citation omitted).  Tellingly, Barrett's Complaint otherwise implicitly concedes that the actual malice standard applies.  The defamation claims are pleaded as actual malice assertions; there is not a single mention of negligence in them.

Courts have "generally accorded" public-figure status to journalists for purposes of debates regarding both their journalistic practices and the subject of their writings.  *Defamation: A Lawyer's Guide* 5:17 (collecting cases); *accord Sack on Defamation* § 5:3.5 (collecting cases holding authors, including "columnist[s] and "freelance journalist[s]," to be limited-purpose public figures).  And indeed, the D.C. Circuit in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980)—the case establishing this Circuit's public-figure test—held an executive to be a public figure in part due to his role in approving the controversial, "consumer-oriented views that appeared" in his company's "monthly newspaper," *id.* at 1299-1300.

The D.C. Circuit's "three-part" test for public-figure status confirms that Barrett is a public figure.  *Kahl*, 856 F.3d at 114.  *First*, this case implicates at least two "public controvers[ies]"— defined as issues that are "being debated publicly" and which have "foreseeable and substantial ramifications for nonparticipants."  *Id.* (quoting *Waldbaum*, 627 F.2d at 1297).  As the Complaint itself reflects, the statements at issue relate to the longstanding, public controversy over Barrett's "talents, education, experience, and motives" as an author.  *Waldbaum*, 627 F.2d at 1298; *see* Compl. ¶ 29 (Barrett's conduct in the 1990s was subject to a "passionate debate"); *id.* ¶ 140 (Barrett's conduct with respect to Sloane's son and The Atlantic's challenged statements relate to a "complex ethical issue"); *supra* pp. 4-6.  As the *Waldbaum* Court explained, such matters are "relevant to the public's decision whether to listen to" a given public commentator.  627 F.2d at 1298.[35]  The Atlantic is "far from the only" entity to have commented on Barrett's practices, *Safex*

---

[35] Applying similar reasoning, courts routinely deem journalists public figures for purposes of controversies relating to their ethics or practices.  *See, e.g.*, *Brimelow v. N.Y. Times Co.*, 2021 WL 4901969, at *2 (2d Cir. Oct. 21, 2021) (plaintiff was a public figure due to his "long and distinguished career as a writer and journalist" and role as an author of a "bestselling book"); *Jensen v. Times Mirror Co.*, 634 F. Supp. 304, 308, 311 (D. Conn. 1986) (newspaper columnist who "engaged in interviews which were known to be incorporated into news stories" was a public

*Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285, 303-04 (D.D.C. 2021); to the contrary, the press has extensively covered the issue—as the Complaint recites. *See supra* pp. 3-6 (collecting coverage); *see also, e.g.*, Compl. ¶¶ 30, 51-64 (same); *id.* ¶¶ 89, 102 (discussing October 24, 2020 and October 30, 2020 Washington Post articles "highlighting the decades-old journalistic errors" of Barrett as well The Atlantic piece's "misstat[ements]").

In addition, since Barrett's article was part of what Barrett herself refers to as an "important" public controversy—namely, the debate around "equity in sports and college admissions or child and adolescent health"—the statements at issue, commenting on that article, are likewise part of the debate. *See* Compl. ¶¶ 111, 199. The Complaint casts Barrett's article as providing "valuable information on a topic of public importance." *Id.* ¶ 124. And it recounts the widespread "explorations" and "public discussion" of the topic that her article provoked. *Kahl*, 856 F.3d at 114-15; *see* Compl. ¶¶ 3, 81-83 (collecting responses to The Atlantic piece); *id.* ¶ 39 (characterizing article as an "important investigative work"); *id.* ¶¶ 3, 39, 81-83, 111 (noting examples of reactions and "important conversations" the article inspired).

*Second*, Barrett has "thrust" herself "to the forefront" of both debates. *Kahl*, 856 F.3d at 115 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)). Barrett acknowledges that the very point of writing for The Atlantic's "global audience" was to "serve[] a superseding positive purpose" of "exposing the inequality" inherent in the niche-sports system she described—even if it "risked upsetting" some. Compl. ¶¶ 70, 199. Simply put, Barrett "assumed a public

---

figure in regard to a statement explaining her termination for "allowing inaccurate information" she provided in the interviews "to be published"); *O'Donnell v. CBS, Inc.*, 782 F.2d 1414, 1417 (7th Cir. 1986) (broadcast executive was public figure as to the "announcement of his firing" because he had "advocate[d] a particular point of view" through his previous position); *Warner v. Kan. City Star Co.*, 726 S.W.2d 384, 385-86 (Mo. Ct. App. 1987) (newspaper editor was public figure in regard to report that he was discharged for allegedly violating conflict-of-interest rules).

role" in this controversial debate by penning a nationally published article "that invit[ed] attention and comment." *Kahl*, 856 F.3d at 115 (plaintiff assumed public role in relevant controversy by "publish[ing] a book about" the topic and "promot[ing] his . . . views" on a "personal website"); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 587 (D.C. Cir. 2016) (same for plaintiff who stated views in open letters "on the front page of two . . . newspapers" and "[i]n various interviews with members of the . . . press"); *Hoffman v. Wash. Post Co.*, 433 F. Supp. 600, 604 (D.D.C. 1997) (same for plaintiff who wrote books, gave lectures, and served as "editor and publisher" of magazine on subject of controversy), *aff'd*, 578 F.2d 442 (D.C. Cir. 1998); *Joseph v. Xerox Corp.*, 594 F. Supp. 330, 333-34 (D.D.C. 1984) (same for plaintiff who directed views on topic "at a national audience" by writing "chapters in books, newspaper articles, and several books").[36] And with respect to the controversy over her alleged misconduct, Barrett has repeatedly "used [her] access to the press to promote [her] cause." *Kahl,* 856 F.3d at 115; *see supra* pp. 5-6 (citing, *e.g.*, interviews with CNN, the Washington Post, and the American Journalism Review).

*Third*, the statements challenged by Barrett straightforwardly "relate[] to [Barrett's] role in the relevant public controvers[ies]"—namely, her past and present instances of misconduct and her article itself. *Kahl*, 856 F.3d at 115.

In short, Barrett is a public figure who must satisfy the actual malice standard here.

## 2.    The Complaint Does Not Plausibly Allege Actual Malice

The stringent actual malice standard requires Barrett to plead (and then prove) that the alleged defamation was published with "knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times*, 376 U.S. at 279-80. That is, the author must have

---

[36] *See also Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996) ("By publishing your views you invite public criticism and rebuttal. . . ."); *Sack on Defamation* § 5:3.5 (collecting cases); *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 252 (Tex. Ct. App. 1996) (same).

*knowingly* uttered a falsehood or, at the least, "*in fact entertained serious doubts* as to the truth of his publication" and said it anyway. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added). "[I]t is not enough to show that [a] defendant should have known better; instead, the plaintiff must offer evidence that the defendant *in fact harbored subjective doubt*." *Jankovic*, 822 F.3d at 589 (emphasis added). And actual malice is not measured on the basis of a news organization's alleged collective knowledge, but rather the state of mind of the specific "persons . . . having responsibility for the publication." *N.Y. Times*, 376 U.S. at 287.

This is a "famously 'daunting'" standard that few plaintiffs can ever meet. *Tah*, 991 F.3d at 240 (quoting *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)). As a result, courts in this Circuit routinely dismiss cases for failure to sufficiently allege actual malice. *See, e.g.*, *id.* at 243 (affirming dismissal); *Couch v. Verizon Comm'ns, Inc.*, 2021 WL 4476698, at *4 (D.D.C. Sept. 30, 2021); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 93-94 (D.D.C. 2019); *Deripaska*, 282 F. Supp. 3d at 143; *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 93 (D.D.C. 2018); *Hourani v. PsyberSolutions LLC*, 690 F. App'x 1, 4 (D.C. Cir. 2017) (affirming dismissal).

Barrett's Complaint does not come close to adequately pleading actual malice. It contains no "well-pleaded factual allegations," *Iqbal*, 556 U.S. at 679, that demonstrate actual malice on the part of The Atlantic or Peck individually with respect to any of the statements at issue. There is not a single non-conclusory factual allegation establishing that the journalists responsible for the relevant statements published them with any subjective disbelief as to their truth—let alone facts that would plausibly allow that conclusion to be drawn under the required "clear and convincing evidence" standard. *See, e.g.*, *Fairbanks*, 314 F. Supp. 3d at 93 (dismissing claims where "allegations do not provide clear and convincing evidence of actual malice"). Instead, the Complaint principally does no more than recite the "bare elements" of the standard—*e.g.*, that

31

each defendant "knew" the challenged assertions were "false or was reckless toward [their] truth or falsity"—while offering no relevant factual support.  *See* Compl. ¶¶ 184-85b.  This type of pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is precisely what "will not do."  *Iqbal*, 556 U.S. at 678 (citation omitted); *see Arpaio v. Cottle*, 404 F. Supp. 3d 80, 84 (D.D.C. 2019) (collecting cases).

The few factual allegations that Barrett attempts to offer in support of actual malice are patently insufficient.  With respect to Peck, in particular, the Complaint alleges (i) he "is a veteran journalist and media professional"; (ii) he "was in regular contact with the Article's main editor, Ms. Abraham"; and (iii) a December 4, 2020 letter authored by The Atlantic's assistant general counsel noted only "issues surrounding Sloane's family composition"—*i.e.*, her deliberate falsification—rather than the article as a whole.  *See* Compl. ¶ 184.  But neither Peck's biographical background nor a letter sent—by someone else—over a month after the challenged email supports his alleged subjective knowledge, "at the time of the publication," that the particular statements at issue in this case were false.  *Fairbanks*, 314 F. Supp. 3d at 92 (quoting *Kahl*, 856 F.3d at 118); *see McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996) ("the inference of actual malice must necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant *prior to publication*" (emphasis added)). Moreover, in any event, the Complaint grossly mischaracterizes the letter, attached here as Exhibit 2.  The letter specifically endorses the editor's note, further pointing out Barrett's "extraordinary admission of journalistic malpractice" and how she "violated the core promise underlying any journalist's work product: a commitment to tell the truth."  *Id.* at 2.

Nor can Barrett properly rest allegations of Peck's or The Atlantic's actual malice on the fact that an individual either "monitored" an article's "creation and editing" or was "in regular

contact" with an article's "main editor." *See, e.g.*, Compl. ¶¶ 184-85b.  That is true by definition of *all* editors and executives with responsibility for reviewing contested articles.  Deeming such a claim sufficient would render the "daunting" protection of the actual malice standard a nullity.  *Tah*, 991 F.3d at 240.  Likewise deficient is Barrett's assertion that "Ms. Abraham (the Article's main editor) was Ms. Barrett's longtime friend and colleague."  Compl. ¶¶ 185(a), 185b(a).  This has no bearing whatsoever on whether any statements made in the email (sent by Mr. Peck) or the editor's note were knowing falsehoods or published with serious doubt as to their truth.  In fact, Barrett does not even allege that Abraham played any role in drafting the statements at issue.[37]

Barrett's conclusory characterization of Sloane as a "disgruntled source" with respect to certain statements by her attorney, *e.g.*, *id.* ¶ 185(c), also fails to provide the requisite support.  "[T]he mere possibility that a source may be biased in some way or hold a subjective viewpoint does not, without more, create obvious reasons to doubt a source's accuracy or establish actual malice."  *Montgomery*, 197 F. Supp. 3d at 263; *Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003).  That is clearer still where a speaker "had some reason to believe" the source "based upon his own research."  *Montgomery*, 197 F. Supp. 3d at 263 (quoting *McFarlane*, 91 F.3d at 1513).  So it is here, where The Atlantic concluded that Barrett knowingly falsified Sloane's son and then lied about it—propositions that Barrett does not contest.  Barrett even affirmatively pleads that The Atlantic's fact-checker had previously "spoken with Sloane at length and found her to be poised and credible."  Compl. ¶ 96.

---

[37] Nor do any minor wording differences between the online editor's note and the print-edition note have any bearing on the question of actual malice.  Not only was the print note published later in time, and thus irrelevant to state of mind at the time of the online note, the differences also are facially inconsequential.  *See id.* ¶ 184(b).

Further, any assertion of actual malice is negated by The Atlantic's inclusion of comment from Barrett, providing readers with her account: namely, that while she was "complicit" in the falsification, she "denies that the invention of a son was her idea."  Compl. Ex. 2, at 3-4, Ex. 4, at 2; *see Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018) (affirming dismissal, noting requests for comment and publication of denial "tend[] to undercut any inference of actual malice"); *Lohrenz*, 350 F.3d at 439 ("reporting perspectives at odds with the publisher's own, tends to rebut a claim of malice" (quotation marks omitted)); *Montgomery*, 197 F. Supp. 3d at 261 (publication of denials rebuts claim of actual malice).

Indeed, it bears emphasis that Barrett's claims of defamation largely rest on asserted *implications*—unstated "indicat[ions]" or "suggestion[s]" allegedly arising from the actual statements written.  *E.g.*, Compl. ¶¶ 184(a), 185(c).  As a result, she must further demonstrate that those responsible for the publications affirmatively *intended those implications and knew them to be false.  See, e.g.*, *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998) (defendant must have "intended to convey the defamatory impression"); *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1317-18 (7th Cir. 1988) ("Proof of actual malice depends upon the defendant's actual state of mind"; accordingly, a plaintiff "must show with clear and convincing evidence that the Defendants intended or knew of the implications that the plaintiff is attempting to draw.").  Barrett does not and cannot supply any well-pleaded factual allegations supporting such intentions.

In short, the Complaint does not come close to adequately pleading actual malice.  This alone warrants dismissal, in addition to all of the other grounds addressed above.

## II.    THE COMPLAINT'S ANCILLARY TORT CLAIMS FAIL

The failure of Barrett's defamation claims also dooms her ancillary tort claims for false light and tortious interference as those claims cannot be used to plead around the First Amendment requirements applicable to defamation claims.  They each fail for independent reasons, as well.

## A.   These Tort Claims Fail for the Same Reasons as the Defamation Claims

"[T]he First Amendment considerations that apply to defamation apply also" to related torts.  *Farah*, 737 F.3d at 540.  A plaintiff thus "may not use related causes of action to avoid the constitutional requisites of a defamation claim."  *Moldea II*, 22 F.3d at 319-20; *accord Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56-57 (1998).  This rule plainly dictates dismissal of Barrett's claims for false light, *see, e.g.*, *Tah*, 991 F.3d at 243; *Moldea II*, 22 F.3d at 319-20; *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 140 (D.C. 2021), and tortious interference, *see, e.g.*, *Farah*, 736 F.3d at 540; *Cottle*, 404 F. Supp. 3d at 86.  Each claim stems from the same statements Barrett challenges as defamatory.  She cannot plead around the deficiencies plaguing her defamation claims by recasting them as other torts.  For this reason alone, these claims fail at the threshold.

## B.   These Tort Claims Fail for Additional, Independent Reasons

### 1.   False Light (Claim 3)

The elements of false light invasion of privacy largely mirror the elements of defamation, with the additional requirement that a plaintiff plead and prove the communication placed her in a "highly offensive" false light.  *Weyrich*, 235 F.3d at 628 (citing Restatement (Second) of Torts § 652E); *Washburn v. Lavoie*, 357 F. Supp. 2d 210, 216 (D.D.C. 2004), *aff'd*, 437 F.3d 84 (D.C. Cir. 2006).  The Complaint's allegations fail to establish that the challenged statements, considered "in the context within which they were made," placed Barrett in a "highly offensive" false light.  *Washburn*, 357 F. Supp. 2d. at 216.  As a result, the claim warrants dismissal for this reason, too.

Defendants accurately described that Barrett (i) admitted to deceiving The Atlantic and its readers regarding Sloane's son out of concern for Sloane's anonymity, and (ii) made further errors in the article.  The Atlantic's elaboration of these points in the course of explaining its decision to retract are only reasonably understood as reflecting The Atlantic's opinion regarding the proper exercise of its editorial discretion, not as invoking "hatred or loathing" of Barrett or subjecting her

35

to "disgrace or dishonor," *Klayman*, 783 A.2d at 618, nor as making a "major misrepresentation" of Barrett's "character, history, [or] activities," Restatement (Second) of Torts § 652E(c).  In short, the statements at issue—when compared to the pleaded truth—are not "highly offensive."

## 2.    Tortious Interference (Claim 4)

"[A] claim for tortious interference with prospective business relationships requires: '(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage.'" *Xereas*, 933 F. Supp. 2d at 11 (citation omitted).  Stating a claim requires far more than alleging a "mere possibility" of a future business relationship.  *Id.* (citation omitted).  Rather, a plaintiff "must plead the existence of a valid business expectancy with specificity," offering "facts about the terms of the relationships." *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 176 (D.D.C. 2016).  "[T]ortious interference claims are routinely dismissed where the plaintiff fails to name specific contractual relationships that the defendant allegedly interfered with, or to identify any facts related to future contracts compromised by the alleged interferer." *Nyambal v. AlliedBarton Sec'y Servs., LLC*, 153 F. Supp. 3d 309, 316 (D.D.C. 2016) (collecting cases).

Barrett advances only the vague allegations that she, "as a journalist, was or would soon pursue contracts with other media companies for the purpose of authoring additional articles" and would "seek[] commercial opportunities related to the Article."  Compl. ¶¶ 208-09.  Barrett's "general reference[]" to whatever "imagined" commercial opportunities she would have does not provide the requisite specificity—either as to their existence or The Atlantic's knowledge of them. *Robertson*, 867 F. Supp. 2d at 60; *see Johnson*, 202 F. Supp. 3d at 176, 177 (allegation that plaintiffs "had legitimate expectations of economic relationships with third parties" too general to support tortious interference claim).  Likewise, she provides no factual support for the proposition

that the statements at issue, *explaining a retraction that Barrett admits The Atlantic was entitled to make*, amounted to intentional interference with the purported opportunities.  This failure is compounded by Barrett's wildly speculative allegations of damage—seeking "all of the prospective income she might have otherwise gained by continuing her career in journalism," Compl. ¶ 211—which are too vague to survive review under *Twombly*.  *See McNamara v. Picken*, 866 F. Supp. 2d 10, 16 (D.D.C. 2012).  Barrett's tortious interference claim therefore fails as a matter of law for any number of reasons.

## III.   THE COMPLAINT'S ANCILLARY CONTRACT CLAIMS FAIL

Finally, Barrett also presses four ancillary contract claims.  These claims, too, fail because they recycle Barrett's flawed defamation allegations and for multiple other, independent reasons.

### A.    <u>The Contract Claims Fail for the Same Reasons as the Defamation Claims</u>

Although contract claims do not automatically trigger the First Amendment's protections when brought against the press, constitutional protections may be implicated "where a plaintiff attempts to use a state-law claim to avoid the strict requirements for establishing a libel or defamation claim."  *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (quoting *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991)).  Thus, in *Compuware Corp. v. Moody's Investors Servs., Inc.*, the Sixth Circuit applied the actual malice standard to a contract claim that was based on Moody's publication of a credit rating because the claim was "intimately tied to speech, expression, and publication" and alleged "reputational or defamation-type harm."  *Id.* at 531, 533.  There was "no material difference" between a contract claim targeting Moody's "incompeten[ce] . . . in compiling and evaluating its publication of protected expression" and torts "based on conduct that might support a pendant defamation claim."  *Id.* at 532.

*Compuware*'s reasoning applies equally to the contract claims here, each of which rests on the premise that Defendants defamed Barrett.  The Complaint asserts that The Atlantic breached

its duty of good faith and fair dealing by making "false factual assertions" about Barrett, Compl. ¶ 215—specifically identifying the editor's note as "falsely accus[ing]" Barrett and reciting "*other defamatory claims*" and "falsehoods," *see id.* ¶¶ 216, 218 (emphasis added). So too, the breach of contract claim turns on the allegation that The Atlantic "*libelously* assaulted" Barrett via the "*defamatory* Editor's Notes." *Id.* ¶¶ 231, 233 (emphasis added). Likewise, the breach of implied contract claim is premised on "Mr. Peck's and *The Atlantic*'s publication of false statements about Ms. Barrett." *Id.* ¶ 241. Barrett cannot evade the protections that bar her defamation claims by dressing those claims up in contract-law garb. *See supra* p. 35.

### B.   The Contract Claims Fail Because Barrett Admittedly Breached the Author's Agreement

Barrett's claims also fail under well-established doctrines of contract law. "To prevail on a breach of contract claim," the plaintiff must demonstrate—among other things—that "plaintiff performed his contractual obligations." *Dorsey v. Am. Express Co.*, 680 F. Supp. 2d 250, 254 (D.D.C. 2010), *aff'd* 2010 WL 3068952 (D.C. Cir. Oct. 26, 2010). A plaintiff's prior, material breach can "discharge[]" a defendant's "obligations under the [contract]." *Howard Town Ctr. Dev., LLC v. Howard Univ.*, 278 F. Supp. 3d 333, 394 (D.D.C. 2017), *aff'd*, 730 F. App'x 1 (D.C. Cir. 2018). Thus, "a party may defend against a breach of contract claim on the ground that its performance was excused by the other party's prior breach of the contract." *Donald Marshall Berlin v. Bank of Am., N.A.*, 101 F. Supp. 3d 1, 15 (D.D.C. 2015) (citation omitted).

Here, the contract on which Barrett sues (the Author's Agreement) expressly required Barrett to "cooperate fully" in the "procedures" associated with The Atlantic's right to "edit, revise, [and] modify," the article, including by providing The Atlantic with any "research material" and "access to subjects." Compl. Ex. 5, at 3 ¶ 4. But the Complaint not only admits that Barrett deliberately included a falsehood in her story—a step that itself violated her duty of cooperation.

It also expressly concedes that Barrett "*did not cooperate*" when editors questioned her about Sloane's son—a plain violation of her duty to "cooperate fully" in all editing and revision efforts. Compl. ¶ 18 (emphasis added).  Barrett even concedes that, based on her conduct, The Atlantic properly "could have . . . retracted the entire article." *Id.* ¶ 41.  In short, Barrett's claims arise out of her own, self-described "egregious" conduct.  *See supra* p. 10.

Barrett's misconduct "willful[ly]" deprived The Atlantic of "the benefit which [it] reasonably expected" under the contract.  *Howard Town Ctr. Developer, LLC*, 278 F. Supp. 3d at 394 (citation omitted).  Her material breach discharged The Atlantic from its contractual obligations and accordingly bars her contract-based claims.  *See, e.g.*, *id.* at 394-96 (developer's breach of term sheet released counterparty from obligations); *Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, 2019 WL 5395739, at *2 (D.D.C. Oct. 22, 2019) ("If any prior material breach on [plaintiff's] part is not excused, then any alleged breach on [defendant's] part is irrelevant.").

### C.   The Contract Claims Fail for Additional, Independent Reasons

#### 1.   Good Faith and Fair Dealing (Claim 5)

Under D.C. law, contracts "contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Metz v. BAE Sys. Tech. Sols. & Servs., Inc.*, 979 F. Supp. 2d 26, 32 (D.D.C. 2013) (quoting *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006)), *aff'd*, 774 F.3d 18 (D.C. Cir. 2014).  Barrett's assertion that The Atlantic breached this duty by publishing the editor's note, Compl. ¶¶ 215-16, does not state a claim.

First, and perhaps most fundamentally, the Complaint does not identify a contractual "fruit" to which Barrett was deprived.  That is, she fails to demonstrate a specific *contractual right* that she now says was violated.  Barrett does not allege that she had any contractual right that was infringed by the editor's note.  She does not point to any contractual terms to that effect, nor could

she.  Nor can Barrett even claim a right to publication of her article.  The contract expressly states that "acceptance of the Work is in the sole discretion of [the] Publisher," and further gives The Atlantic the ability to "edit, revise, [and] modify" the article at any time "in its sole discretion." Compl. Ex. 5, at 2 ¶ 1, 3 ¶ 4.  Barrett's failure to plead that The Atlantic deprived her of any specific "contractual right" forecloses her claim.  *Paul v. Howard Univ.*, 754 A.2d 297, 307 (D.C. 2000); *accord Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1134 (D.C. 2015) (no breach of covenant of good faith and fair dealing for misrepresentations or omissions where "the sales contract did not impose any duty . . . to inform appellants" about an impending project); *Metz*, 979 F. Supp. 2d at 33 (interference with benefit cannot give rise to claim for breach of covenant of good faith and fair dealing where benefit was "not a benefit provided . . . under the agreement").

Second, Barrett also has failed to plead facts demonstrating anything close to the type of misconduct necessary to sustain liability under this theory.  Examples of "bad faith" conduct necessary to show a breach of the duty of good faith and fair dealing include "lack of diligence, purposeful failure to perform, and interference with the other party's ability to perform."  *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013).  "[F]air dealing," for its part, "means reasonable conduct that is not arbitrary and capricious."  *Id.*  Again, Barrett admits that her own intentionally deceptive conduct entitled The Atlantic to "retract[] the entire article" and run an editor's note "admonishing" her.  Compl. ¶ 41.  Having made these concessions, Barrett cannot plausibly allege that The Atlantic's editorial judgment to retract the article and run just such an editor's note was made in bad faith or otherwise unreasonable.[38]  At bottom, Barrett disagrees with The Atlantic's decisions.  But Barrett's disagreement cannot sustain her claim.

---

[38] Barrett has not pleaded, for instance, that The Atlantic "fail[ed] to follow its own procedures" for dealing with an author's deception, *Magee v. Am. Inst. of Certified Pub. Accts.*, 245 F. Supp.

### 2.      Breach of Contract (Claim 6)

Barrett next claims that The Atlantic breached the express terms of her contract.  But she relies principally on a provision that expressly imposed obligations on *Barrett*, not The Atlantic.

Section 6(b) of the agreement, in the words of the Complaint, "*required Ms. Barrett, inter alia*, to represent and warrant that her work 'does not infringe . . . any other right, of any person or entity.'"  *Id*. ¶ 222 (emphasis added).  This allegation thus fails on its face:  It confirms that the provision imposed a duty on *Barrett*, not The Atlantic.  *Accord id.* ¶ 174 (describing provision as relating to "Barrett's duty").  Indeed, the provision is part of a series of contractual terms that the "[a]uthor represents and warrants."  Compl. Ex. 5, at 3 ¶ 6.  Because The Atlantic cannot breach a duty it did not have under "the literal import of the provision," Barrett's claim fails at the outset. *Providence Hosp. v. Grp. Hospitalization Inc.*, 494 A.2d 639, 639, 640 (D.C. 1985) (per curiam).

The Complaint nonetheless urges that this term "should be interpreted as imposing reciprocal obligations on *The Atlantic* not to infringe any rights of any person."  Compl. ¶ 229. And it claims, in particular, that the provision should be read to provide *Sloane* an enforceable right, by virtue of Barrett's promise to maintain her confidentiality, to stop The Atlantic from publicly identifying a deliberate falsehood in one of its articles.  *Id.* ¶ 223.  Barrett's imaginative reconstruction of the contract fails for numerous reasons.  For starters, a plaintiff cannot "reasonably expect the court to rewrite" the contract in its "favor, or to impose by judicial *fiat* a provision which the parties did not include therein."  *Hart v. Vt. Inv. Ltd. P'ship.*, 667 A.2d 578, 585 (D.C. 1995); *see, e.g.*, *Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 280 (D.C. Cir. 2014) (disclaiming power to "rewrite the plain terms of the contract to which [the parties] agreed").  Further, as explained in *Steele v. Isikoff*, 130 F. Supp. 2d 23, 31, 33 (D.D.C. 2000), "the

---

3d 106, 119 (D.D.C. 2017); to the contrary, she asserts that no such "policy" or "internal benchmark" existed, Compl. ¶¶ 133-34.

relationship between a reporter and a source is not contractual in nature," and thus "does not give rise to express or implied contractual duties," *id.* And, regardless, any such promise would inure to the benefit of Sloane—not Barrett.

The entire premise of the claim simply makes no sense. A journalist cannot admit to conspiring to include a deliberate fabrication in a story, hide it from the publisher, and then sue the publisher for breach of contract when the publisher reveals the falsehood. That is frivolous. Moreover, any details relating to Sloane's identity included in the article were, of course, there as part of the article that *Barrett* herself had personally drafted. And, by the time of the online editor's note, the falsity of the purported "son" was already publicly known, published by the Washington Post. *See* Compl. ¶¶ 97, 102. What is more, the relief Barrett seeks, including dramatic rights, would allow her to *further publicize* the article, not bury it. *See id.* at 105 (prayer for relief).

In fact, the only provision actually imposing an obligation on The Atlantic that Barrett cites in her claim is the magazine's agreement "to make commercially reasonable efforts" to market the rights to dramatize the article. *Id.* ¶¶ 232-33 (quoting Ex. 5, at 2 ¶ 2(c)). But Barrett wholly fails to allege facts as to what would have been "commercially reasonable" for The Atlantic to do with respect to a story that it retracted after the discovery of an intentional falsehood perpetrated by the article's author. After all, Barrett admits that The Atlantic legally could have both retracted the article and published an editor's note "admonishing" her. *Id.* ¶ 41. She further concedes that the article was the subject of extensive public criticism. *See, e.g.*, *id.* ¶¶ 89, 102. There is no plausible allegation that it would have been commercially reasonable for The Atlantic to market the further distribution of such a concededly retracted and "admonish[ed]" article. The Complaint fails to provide any answer, let alone one that satisfies Barrett's obligations under *Iqbal*.

### 3.      Breach of Implied Contract (Claim 7)

The Complaint next asserts that The Atlantic breached an *implied* contractual duty to protect the anonymity of Barrett's sources.  This fails for the same—and additional—reasons.

While "the terms of a written contract can be supplemented with terms implied from the parties' conduct" in some circumstances, *CopyWatch, Inc. v. Am. Nat'l Red Cross*, 299 F. Supp. 3d 189, 199 (D.D.C. 2018), implied contractual provisions cannot conflict with "the actual language of the . . . contract," *Paul*, 754 A.2d at 311.  "When there is an express agreement covering the same subject matter as an alleged implied contract, that agreement shows that the parties intended to be bound only to a formal written agreement."  *See, e.g.*, *Vantage Commodities Fin. Servs. I, LLC v. Assured Risk Transfer PCC, LLC*, 2019 WL 1877097, at *2 (D.D.C. Apr. 26, 2019) (citing *Casciano v. JASEN Rides, LLC*, 109 F. Supp. 3d 134, 141 (D.D.C. 2015)).

Nor can a party's conduct effectively "manifest[] . . . his assent" to an implied provision unless "he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents."  *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 375 (D.C. Cir. 2020) (quoting Restatement (Second) of Contracts § 19(2)).  Thus, "the mere fact that a party's conduct induces reasonable *expectations* does not necessarily show that the party has manifested assent to a contractual *obligation* to fulfill those expectations."  *Crawford v. Pres. & Dirs. of Georgetown Coll.*, 537 F. Supp. 3d 8, 18 (D.D.C. 2021).

Barrett's breach of implied contract claim runs aground on these principles.  As already discussed, Barrett's theory impermissibly conflicts with the express terms of the contract, which vest Barrett—not The Atlantic—with the duty to ensure that the work does not invade any third-party's privacy.  *See supra* p. 41.  In addition, Barrett has failed to plausibly plead that The Atlantic's conduct manifested its assent to an independent contractual duty to hide a deliberate falsehood from the public.  That is preposterous.

### 4.        Rescission (Claim 8)

Barrett's last contract claim seeks rescission of the Author's Agreement.  "Rescission is an equitable remedy" for a material breach that places the parties back in their positions "at the time the contract was made."  *Dean v. Garland*, 779 A.2d 911, 915 (D.C. 2001).  It is not a standalone theory of liability.  A party thus must elect whether to sue for damages or rescind the contract.  *See Campbell Music Co. v. Singer*, 97 A.2d 340, 342 (D.C. 1953) ("[O]ne cannot rescind for breach of [contract] and at the same time recover damages for the breach.").  Part and parcel of pursuing a rescission remedy, moreover, is one's ability and willingness to "restore the parties to the relative positions they would have occupied if no such contract had ever been made."  *Klayman v. Jud. Watch, Inc.*, 628 F. Supp. 2d 112, 127 (D.D.C. 2009), *aff'd*, 6 F.4th 1301 (D.C. Cir. 2021).

Barrett's rescission "claim" is thus doubly flawed.  In purporting to plead the requisite breach, the claim merely incorporates the faulty contract theories discussed above.  Because these theories fail as a matter of law, there is no ground for entertaining the remedy of rescission.  Even if there were, Barrett cannot satisfy the central requirement of rescission—namely, an ability to "restore" The Atlantic to the position it "would have occupied if no . . . contract had ever been made."  *Klayman*, 628 F. Supp. 2d at 127.  Here, Barrett cannot un-ring the bell caused by her own lies and deception, including the material harms incurred by The Atlantic.  Even in Barrett's own telling, her conduct exposed The Atlantic to significant public scrutiny, caused it to have to investigate and then retract an article, and otherwise expend considerable resources on this matter.  She is barred from pursuing rescission as a matter of law.

### **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: March 9, 2022

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ Stephen J. Fuzesi*
Joseph M. Terry (D.C. Bar No. 473095)
Stephen J. Fuzesi (D.C. Bar. No. 496723)
Whitney D. Hermandorfer
(D.C. Bar. No. 888314222)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jterry@wc.com
sfuzesi@wc.com
whermandorfer@wc.com


*Attorneys for Defendants The Atlantic*
*Monthly Group LLC and Donald*
*Christopher Peck*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 9, 2022, a copy of this Defendants' Motion to Dismiss and related papers was filed via the Court's electronic filing system, and served via that system upon all parties required to be served.

Dated: March 9, 2022                    By:    */s/ Whitney D. Hermandorfer*
                                               Whitney D. Hermandorfer

46