# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RUTH SHALIT BARRETT**, | Case No.: 1:22-cv-00049 |
| Plaintiff, | |
| v. | **ERRATA FIRST AMENDED COMPLAINT FOR MONETARY AND INJUNCTIVE RELIEF** |
| **THE ATLANTIC MONTHLY GROUP LLC,** | |
| and | |
| **DONALD CHRISTOPHER PECK**, | JURY TRIAL DEMANDED |
| Defendants. | |

i

**<u>INDEX OF EXHIBITS</u>**

EXHIBIT 1    "The Mad, Mad World of Niche Sports Among Ivy League-Obsessed Parents" by Ruth Shalit Barrett

EXHIBIT 2    October 30, 2020 First Editor's Note from The Atlantic Monthly Group

EXHIBIT 3    October 30, 2020 Memorandum of Donald Christopher Peck

EXHIBIT 4    November 1, 2020 Second Editor's Note from The Atlantic Monthly Group

EXHIBIT 5    January 2021 Third Editor's Note from The Atlantic Monthly Group

EXHIBIT 6    January 30, 2021 Opinion Article From Erik Wemple in *The Washington Post*

EXHIBIT 7    November 7, 2019 Author's Agreement Between Ruth Barrett and The Atlantic Monthly Group LLC

EXHIBIT 8    Text Showing Defamatory Statements

ii

**TABLE OF CONTENTS**

I.      **INTRODUCTION**................................................................................................1

II.     **SUMMARY OF THE FACTS**............................................................................9

III.    **FACTS COMMON TO ALL CAUSES OF ACTION** ...................................22

        A.    Ms. Barrett's Early Success ...........................................................22

        B.    Two Minor Lapses In 1994-1995 ...................................................22

        C.    Ms. Barrett Leaves *The New Republic* in 1999............................24

        D.    Ms. Barrett: Journalism Career And Life 1999-2019 ....................25

        E.    The Atlantic Hires Ms. Barrett.......................................................26

        F.    The Atlantic Accepts The Sloane Agreement .................................26

        G.    The Editorial Process Begins .........................................................27

        H.    Additional Facts Discovered During Fact Checking ......................27

        I.    The Atlantic Wants Sloane To Waive Her Anonymity ...................28

        J.    Sloane Protests ...............................................................................28

        K.    Sloane Wants The Article To Say She Has 4 Children ...................29

        L.    The Atlantic Policy Against Disclaimers........................................29

        M.    Ms. Barrett Supports Sloane ...................................................30~~30~~

        N.    The Atlantic Changes The Braemeier Quote ..................................30

        O.    The Article Is Published..................................................................31

        P.    Erik Wemple ..................................................................................32

        Q.    Wemple Speaks To Bross ...............................................................32

        R.    The Atlantic Tries To Appease Mr. Wemple ..................................33

        S.    The Atlantic Should Have Denied Mr. Wemple's Requests .................................33

        T.    The Atlantic Tells Ms. Barrett That It Might Share Information About Sloane With Mr. Wemple ..................................................................34

        U.    The Atlantic's Harassment Of Sloane Increases.............................35

        V.    The Atlantic Told Ms. Barrett Not To Defend Herself To Mr. Wemple.............35

        W.    Ms. Barrett's Zoom Call With Mr. Peck And Ms. LaFrance ................................36

        X.    The Atlantic's Investigations .........................................................37

        Y.    Ms. Barrett Emails Mr. Peck About The Son ................................39

        Z.    The First Editor's Note ..................................................................39

        AA.   Peck Memorandum ........................................................................40

iii

BB.  The Second Editor's Note and Retraction ............................................................41

CC.  The Third Editor's Note ................................................................................................42

DD.  *The Post* Article ..........................................................................................................43

EE.  The Article Was Accurate And Extensively Researched ....................................44

FF.  Retraction Conveys That The Atlantic's Investigation Concluded That The
      Article Was Flawed................................................................................................45

GG.  The Atlantic Always Published Corrections To Address Minor Errors ...............46

HH.  Ms. Barrett Did Not Leave *The New Republic* Because Of Plagiarism And
      "Inaccurate Reporting" in 1999 ...........................................................................48

II.  The Atlantic Published Numerous Writers Who Have Committed
      Plagiarism ...............................................................................................................49

JJ.  Ms. Barrett Did Not Try To Disguise Her Identity................................................49

IV.  **PARTIES, JURISDICTION AND VENUE** ..................................................................51

**CLAIMS FOR RELIEF** ..........................................................................................................51

## I.  INTRODUCTION

1.  Defendant The Atlantic Monthly Group LLC ("The Atlantic" or "Atlantic"), publisher of *The Atlantic* ("Magazine"), hired Plaintiff Ruth Shalit Barrett ("Ms. Barrett") to write an article, "The Mad, Mad World of Niche Sports Among Ivy League-Obsessed Parents." ("Article").[1] Defendant Donald Christopher Peck ("Mr. Peck") was the editor of the Magazine at the time. Ms. Barrett wrote the Article, which The Atlantic published in October 2020.[2]

2.  Ms. Barrett's article was a long-form investigative article that exposed efforts of affluent parents to use niche sports to give their already-privileged children further advantages in the competitive admissions process at elite colleges and universities. The story drew praise from established journalists, collegiate sports officials, and NCAA athletes. *New York Times* columnist Ginia Bellafante called it "an excellent article" that "outlines the shifting fortunes of wealthy and maniacal parents who immerse their children in boutique sports—squash, fencing—purely as a means of lubricating the path to the Ivy League."

3.  Ms. Barrett's lengthy story was based on multiple on-the-record interviews, sixteen named sources, dozens of pages of NCAA participation data, and a profusion of empirical, verifiable facts. It also featured an important confidential source: a Fairfield County sports mom identified in the Article and herein as Sloane. Sloane had agreed to cooperate and provide detailed information for the Article on the condition that The Atlantic mask her identity and her family's.

4.  Sloane had a legitimate reason for desiring confidentiality: her daughters, who were 11, 13 and 15 at the time, did not want to be recognizable in the published article and felt they would suffer retribution if their identity were to become known. Ms. Barrett understood the

---

[1] A copy of the Article is attached as **Exhibit 1**.
[2] All dates are in 2020 unless otherwise indicated.

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

sensitivity of the subject matter and believed that the family's concerns were well-founded, as the Article described in detail the adverse effects Sloane's daughters had suffered in their quest to transform themselves into Ivy League-recruitable premier athletes.

5.     Sloane, a deeply private stay-at-home mom who had never previously spoken to a reporter, was impelled by civic-mindedness to share her family's story: she wanted to warn others to look at the data and to get out while they still could, before they wasted precious time, money and emotional resources on "a fool's folly," as she felt she had. At the same time, she realized she was taking a significant risk in lambasting the sports of squash and fencing in the pages of the Magazine, as her family remained highly invested in these sports and her children still flew around the country to compete in these sports.

6.     Ms. Barrett was grateful for Sloane's participation and believed her engaging personal story would ~~helped~~help dramatize the broader purpose of the Article, which was to expose the accelerating inequality in contemporary youth athletics and the harms to children's health and happiness. She assured Sloane that she would be protected and her anonymity maintained at all costs. Ms. Barrett's editors had full knowledge of her agreement with Sloane and assumed the same duties of confidentially towards her when they took the Article: Mr. Peck at one point described Sloane as "a source we agreed to shield."

7.     As the fact-checking and editing process progressed, Sloane grew concerned that The Atlantic had broken this agreement. In a series of emails and text messages, she informed Ms. Barrett that The Atlantic was including too many specific details about her family and had rendered her potentially identifiable in the Article. Ms. Barrett shared Sloane's concerns and asked The Atlantic to remove or blur certain details in order to protect Sloane. Ms. Barrett's editors agreed

| Formatted: Font: Times New Roman |
| Formatted: Font: Times New Roman |

to a few minor changes; but on the whole, treated her requests with impatience and pressed forward with publication.

8.     This placed Ms. Barrett in an untenable situation. She, like all journalists, had an ethical duty to protect her confidential sources—indeed, she was required by her contract with The Atlantic to do so—but when she reminded her editors of her obligations to Sloane, she found that she could not get traction. Pressured by her distraught source, who had become increasingly convinced that she and her minor children were about to be de-veiled and exposed in a feature piece in a national magazine, Ms. Barrett agreed to support Sloane's request to insert a minor masking detail into the Article. Specifically, the final version of the Article stated, in passing, that Sloane had four children (three daughters and a son) when in truth Sloane had three daughters only.

9.     Ms. Barrett is able to establish with evidence in her possession that this single, two-word reference to a "son" was included in the piece at the express request of Sloane and her husband. This trivially erroneous detail about Sloane's family had no bearing on the overall thesis of the Article and did not serve to make the Article more or less believable. Its only purpose was to give Sloane a vestige of plausible deniability that she was Ms. Barrett's source.

10.     Ms. Barrett and her confidential source turned out to be correct in their surmise that The Atlantic had included too many specific details about Sloane and had not adequately masked her, in violation of their agreement. In the days following the publication of Ms. Barrett's article, Sloane was tracked down and effectively outed by a writer for *The Washington Post* ("*The Post*"). This traumatizing, intrusive and unnecessary exposure of a source who could have easily been protected by The Atlantic quickly led to a cascading chain of adverse consequences for Sloane, The Atlantic and, most grievously, for Ms. Barrett.

3

11.     In the aftermath of the predictable—and predicted—outing of Ms. Barrett's confidential source,  The Atlantic declined to reflect on its own conduct and instead turned angrily on Ms. Barrett. The Atlantic and Mr. Peck retracted her accurate, truthful article in full and disseminated a series of false statements in which they accused Ms. Barrett of being a dishonest journalist. In these statements, which consist of three Editor's Notes, an email memorandum to staff and public comments by employees of The Atlantic in a January 30, 2021 article in *The Washington Post*, The Atlantic attributed its decision to retract to Ms. Barrett's dishonesty and to the presence of "factual errors" in the Article. These five publications included objectively false claims, false implications drawn solely from those false claims, *and* an overarching false narrative about both the Article and Ms. Barrett's professional and personal integrity built on the underlying lies. As such, this is a classic defamation-in-the-workplace lawsuit arising out of false accusations of dishonesty by an employer. Numerous courts have found such accusations to be defamatory and to be provable statements of fact.

12.     The false portrait painted by The Atlantic was one of a proven fabulist whose career has been a series of continuous fabrications; who persuaded Mr. Peck and his colleagues to publish her work under a deceptive byline that concealed her true identity; and who almost singlehandedly orchestrated a scheme to induce The Atlantic, its editors, and its fact checkers to include multiple, materially fraudulent assertions in the Article that rendered the entire piece untrustworthy and gave The Atlantic no option but to retract it. This mosaic of attacks on Ms. Barrett's journalistic honor rested on a series of objectively false factual assertions and implications, including (among others detailed below) that Ms. Barrett:

- Was fired from a previous publication in 1999 after that publication "discovered" plagiarism and inaccurate reporting in her work;

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

4

- Convinced The Atlantic to publish her work under a misleading alias-byline intended to outwit search engine algorithms and prevent readers from learning about her past;

- "[D]eceived the Atlantic and its readers" about Sloane;

- Lied to fact checkers and editors about the makeup of Sloane's family;

- Caused a source to lie to The Atlantic's fact checkers;

- Proposed the concept of a fictitious fourth child and inserted this "fabrication" into the Article; and

- Included many other major inaccuracies in the Article.

13.     This narrative, and the claims purportedly supporting it, are false.

14.     To begin: The Atlantic precipitated this crisis through its own irresponsibility and disregard of its duty to protect Sloane. It was The Atlantic's indifference to this ethical and contractual obligation that forced Ms. Barrett to make a decision of conscience, ultimately causing her to conclude that she could not break an important promise she had made to her source, and that she was morally bound to choose loyalty to her source over another important journalistic principle—accuracy.

15.     Ms. Barrett's principled and ethically defensible decision to support the inclusion of a single, minor masking detail in a piece that wrongfully exposed a source should not have discredited the piece as a whole, as it had no material bearing on the substance of the Article; and such masking is not unusual when necessary to protect individuals—especially minor children—from being identifiable in an article. As will be shown, The Atlantic's own editors actually employed the same masking technique elsewhere in her piece, based on a "concern" expressed by its in-house legal department.

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

5

16.     Further, The Atlantic's insinuation that Ms. Barrett's piece was riddled with errors, exaggerations and embellishments has been disproved as a libelous falsehood. A line-by-line re-check of the Article, conducted by The Atlantic's lead fact-checker and Director of Research at the behest of the masthead editors, found no inaccuracies in the Article save the precise square footage of a hockey rink and the zip code of a lacrosse mom. "From my perspective, the son was the only thing," the fact-checker and Senior Associate Editor at The Atlantic admitted to Ms. Barrett in a December 5, 2020 text message. "I wish I could turn back time and fix this." And yet The Atlantic withheld that information from readers and continued to perpetuate the false impression of a largely fabricated, error-filled article.

17.     On top of that, The Atlantic accused Ms. Barrett of trying to hide her identity, chastising her in its Editor's Note for "request[ing]" a misleading byline that lacked "transparency" and was inconsistent with the byline she had used "recently." Both claims are false. Contemporaneous communication shows that Ms. Barrett proposed the byline "Ruth S. ~~Ms.~~ Barrett" as a way to *increase* her identifiability after The Atlantic chose a generic, opaque byline for her—"Ruth ~~Ms.~~ Barrett"—that did not comport with any byline she had ever used previously. Ms. Barrett first spotted this byline in galley proofs on September 10, 2020 and subsequently emailed her Article's main editor, senior editor of The Atlantic Laurie Abraham, to request that it be changed. This change rendered her byline *more* transparent than the byline chosen by The Atlantic and it brought it into conformity with the byline Ms. Barrett had used "~~recentli~~recently"— including in stories she authored that had been commissioned and edited by Ms. Abraham.

18.     Further, in a text message sent to her editor on October 16—one day prior to the publication of the Article—Ms. Barrett asked if her Magazine bio could include a link to her author's page, which featured a curated selection of articles written under both bylines: Ruth Shalit

6

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

Barrett and Ruth S. Barrett. Had The Atlantic supported Ms. Barrett in this request to supplement her contributor's bio with a link to her author's page on her own website, this would have also served to increase transparency and to erase any doubts as to her identity. But The Atlantic refused. "Checked and we don't link to websites," her editor informed her in a text.

19.     Further still: The Atlantic lied about Ms. Barrett's past, falsifying both the timing and the circumstances of her departure from a previous publication and implying she had fled that publication in a career-ending spasm of plagiarism and inaccurate reporting.

20.     In short, the true picture is that of a talented investigative and feature writer who had thoroughly distanced herself from lapses she committed in her early 20s with a track record of twenty-five years of unimpeachable journalism for multiple national outlets. In 2019, she was recruited to write for The Atlantic and wrote a rock-solid article that withstood extraordinary scrutiny from fact checkers both within and outside The Atlantic. The piece contained only one objectively inaccurate discrepancy: the masking detail proposed and advocated for by Ms. Barrett's confidential source. Ms. Barrett did not object to the inclusion of this detail because of her duties to Sloane and because of her repeated, failed attempts to convince The Atlantic to adhere to *its* ethical responsibilities by omitting particularized factual details that rendered Sloane identifiable.

21.     Faced with attacks and criticism from a competitor outlet, The Atlantic and Mr. Peck chose to make Ms. Barrett the scapegoat.

22.     Details are an essential part of any piece since readers are known to enjoy details which add realism even though they might appear at first glance to be trivial. As George Orwell once wrote of Charles Dickens, "the unmistakable mark of Dickens' writing is the unnecessary detail." But the downside of including a mass of minor details is that where a piece relies on a

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

source whose cooperation was obtained by a promise of confidentiality, those details can provide clues which make it possible to discover the source's identity. It is a hollow and treacherous gesture to pay lip service to a confidentiality agreement by omitting the source's name from an article if the publisher nevertheless includes such an array of detailed personal information that an inquisitive third party can discover the source's identity with relative ease. Yet this is precisely what Defendants did in this case, and they compounded their malfeasance by pulverizing Ms. Barrett's reputation because of her efforts to protect Sloane.

23.     While this conduct establishes causes of action for defamation, this lawsuit also includes causes of action for breach of contract based on the written contract between Ms. Barrett and The Atlantic. That contract explicitly required The Atlantic, *inter alia*, to help promote the derivative rights of the Article. Instead, The Atlantic unlawfully torpedoed an effort by a successful producer and actress to develop a television adaptation. The contract also expressly required Ms. Barrett to avoid infringing anyone's privacy rights, which includes Sloane's contractual right to confidentiality. Yet, The Atlantic obstructed Ms. Barrett's efforts to comply with those terms (which constitutes a breach by The Atlantic) by saturating the Article with identifying information about Sloane. And by actively undertaking measures to destroy the credibility of the Article, and its author, and carrying out one-sided investigations in which The Atlantic withheld or elided evidence that could contradict its criticisms of Ms. Barrett, The Atlantic denied Ms. Barrett the fruits of the article in breach of the obligation of good faith and fair dealing. These causes of action are not duplicative of or derivative of the defamation causes of action, as they include separate distinct factual bases.

**Formatted:** Font: Times New Roman
**Formatted:** Font: Times New Roman

## II.      SUMMARY OF THE FACTS

24.      The Article included numerous references to a mother of three daughters who was identified only as Sloane. Sloane had agreed to be Ms. Barrett's source in return for Ms. Barrett's promise of confidentiality (the "Sloane Agreement"). The Sloane Agreement was a legally enforceable contract which placed Ms. Barrett under a legal and ethical duty to ensure that Sloane's identity would not be publicly disclosed or be made discoverable. In the course of their discussions about the Article, Ms. Barrett had informed her editor about Sloane and explained that she needed a guarantee of anonymity as a condition of her participation. When it commissioned the story, The Atlantic knowingly assumed the same duties as Ms. Barrett to protect Sloane's identity. Indeed, in an October 26, 2020 text message to Ms. Barrett, her editor confirmed that The Atlantic was, in theory, on the same page as Ms. Barrett with respect to its obligations to Sloane, admitting that Mr. Peck had described her as "a source we agreed to shield."

25.      During the fact checking and editing process, The Atlantic revised the Article to include additional details about Sloane and her family which rendered them identifiable. For example, Ms. Barrett's original draft had referred to a July 2019 squash tournament in which one of Sloane's children competed. According to Sloane, this tournament had been held in San Francisco, but she provided no more details. The fact-checker could not verify that the tournament had taken place, but Ms. Barrett researched it for her and was able to verify that the tournament had indeed taken place as Sloane had described—not in San Francisco, but in Redwood City, another city in northern California. Ms. Barrett had assumed that The Atlantic needed the exact name, date and location of the tournament for fact-checking purposes, in order to check the roster and verify that ~~Sloane's~~Sloane's daughter had indeed participated—and that she indeed had her scores expunged over a malicious refereeing dispute. Once the fact-checker had successfully

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

verified the existence of the tournament, Sloane's daughter's participation in the tournament, and the subsequent scrubbing of all of her scores from the U.S Squash database—all consistent with ~~Sloane's~~Sloane's claims—Ms. Barrett lobbied The Atlantic for permission to describe the tournament in generic terms, and to place Sloane's daughter at "a squash tournament in northern California" rather than placing her at "California Summer Gold" in Redwood City. But The Atlantic insisted on adding the name, location and date of the tournament to the Article, on the grounds that greater specificity would enhance the ~~Article's~~Article's credibility.

26.     Sloane and her husband became increasingly concerned about the excessive level of detail that The Atlantic intended to include in the Article. They feared that The Atlantic's vivid depiction of Sloane as a Fairfield County mom with advanced public-health degrees, a background in statistics and three daughters who play squash and fence on a national level was tantamount to identifying her by name. In late August, several weeks before the Article shipped off to press, Sloane decided that the Article could not describe her as the mother of three daughters. She had come to believe that this specific fact would make it too easy to identify her and her family, when combined with the other facts that were going to be included in the Article. This prompted her to text Ms. Barrett on August 28, saying, "No [redacted.] No [redacted.] <u>No 3 kids</u>. It's way too identifying. it's like using my name. The spirit of our agreement is that I am not identifiable." (emphasis added.)

27.     During several phone ~~conversation~~conversations in late August, Sloane and her husband wondered aloud whether it was conceivable that they might have a fourth child. Ms. Barrett responded that she was not going to interrogate Sloane about the way that she chose to describe her own household; but that the Article was now getting perilously close to publication, and she had to decide how she was going to describe her family and stick to that description.

10

28.     Ms. Barrett did not induce Sloane, or any other source, to lie to The Atlantic's fact-checkers. On the contrary, in her written communication with Sloane and her husband, Ms. Barrett emphasized that although she sympathized with the family's desire to conceal their identity, she could not knowingly provide The Atlantic's fact-checker with false information: ""[Sloane] previously ok'd [an educational descriptor] with me and also confirmed in fact check. So switching it to [different educational descriptor ] is **introducing something that we know to be not true.**"

29.     Ms. Barrett came to believe that Sloane was justified in her fear that The Atlantic was publishing too many specific details about her and felt increasingly frustrated that The Atlantic would not protect her with a simple disclaimer stating that several details had been changed to protect her family's privacy. She was therefore sympathetic to Sloane's ideation of an extra child as a way to shore up her anonymity. However, Ms. Barrett was no longer able to access or alter the text of her article at this late stage of the editing process. It was Sloane who told the fact-checker that she had a son and requested that a reference to him be added to the Article. The fact-checker assented to this request.

30.     Thus, contrary to allegations The Atlantic would later make against her, Ms. Barrett did not invent the "son"; nor did she make the decision to insert a reference to an extra child into the Article. In her heart, she knew that Sloane did not have a son but she considered the addition of this trivial masking detail to be justified, due to The Atlantic's cavalier treatment of her confidential source. She made a defensible decision under unique circumstances—a decision that The Atlantic would subsequently pathologize as "lies," "fabrication,"lie[s]," "fabricat[ion]," and "deceit."decei[t]." Ms. Barrett derived no benefit from this decision. This decision did not serve to fuel the thesis of her story; nor did it make her article more powerful or believable. There was nothing self-serving about this decision and it would end up harming her greatly.

11

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

31.     Though it subsequently erupted in a frenzy of histrionic indignation after it discovered that there was no son, The Atlantic's editors had already employed this same masking technique in editing the Article, proposing to alter a lacrosse coach's quote so that it referenced "multiple" students rather than a single student. On September 14, Ms. Barrett noticed that a quote from Darien High School lacrosse coach Jeff Braemeier had been updated from, "My own captain is one of my best defensive kids ever. 4.2 GPA. I couldn't get him into an Ivy. I tried" to "I've had multiple high-end players with worthy grades. I couldn't get them into an Ivy. I tried." When Ms. Barrett asked her editor and fact-checker why the quote had been altered—for the worse, in her opinion—and why Coach Braemeier, who had been describing one particular student, was now referencing "multiple" students—she was told that the change was at the instigation of The Atlantic's legal department. "Saw that," the fact-checker and a Senior Associate Editor at The Atlantic texted Ms. Barrett, in response to her inquiry. "Was a legal request to make him less identifiable."

32.     The Article was published online on October 17. It immediately vaulted to the top of the Magazine's Popular list and was well-received by readers and experts in the field.

33.     *The Washington Post,* an outlet that had a history of hostility toward Ms. Barrett after she wrote a highly critical cover story about it for *The New Republic,* was a notable exception. On October 19, Erik Wemple, the media correspondent for *The Washington Post,* contacted The Atlantic with questions about the Article, and in particular, about Sloane. When faced with questions from a competitor outlet about an article it has published, a customary response from a publication such as The Atlantic would be to respectfully answer all of the ~~reporters'~~ reporter's questions and concerns and to provide backup when necessary; but to politely decline to answer questions or to disclose personal details about sources promised confidentiality. As former *New*

12

*York Times* Washington bureau chief Craig Whitney explained to a journalist who questioned him about an anonymous source who had provided information to *the Times*: "We ~~don't~~don't discuss our sources." Similarly, former *Des Moines Register* editor Jim Gannon once told the reporter Andrew Rosenthal, "My position is I do not comment on our sources to whom we have granted any degree of anonymity."

34.     Faced with inquiries from Erik Wemple about its confidential source, Sloane, The Atlantic did not tell Mr. Wemple that it was unable to disclose personal details about Sloane, as it had promised her that she would neither be identified nor identifiable; but that it was satisfied that she was credible and that her story was accurate. Instead, The Atlantic told Mr. Wemple to sit tight and immediately began to badger and harass Sloane with an escalating series of inappropriate, intrusive requests. During the week of October 19th, well before the discovery of the masking detail of a fourth child, fact-checkers from The Atlantic contacted Sloane to ask her to provide "photographs" of her minor daughters. They also asked for photocopies of her 13-year-old daughter's "medical records" to substantiate a fencing injury that had already been verified by The Atlantic's fact-checkers and confirmed by multiple witnesses who had attended the tournament in question. Sloane responded to this flood of requests from The Atlantic with a terse, one-line email stating that the information she had provided to The Atlantic was accurate.

35.     Mr. Wemple discovered Sloane's real identity and contacted her at her home, explaining that he believed that she was the anonymous mom featured in The Atlantic article about niche-sports mayhem. Mr. Wemple also contacted The Atlantic, stating that although he thought he had found the "real" Sloane, his leading candidate had three children, not four; and he requested clarification. Thus, the fictitious fourth child was the only fact that was protecting Sloane from being conclusively identified by Mr. Wemple. Rather than supporting Sloane by refusing to

13

disclose identifying information about her and her children to a reporter for *The Washington Post*, The Atlantic disclosed facts about Sloane to *The Post* and informed Ms. Barrett that it intended to reveal further details about her in the interest of "transparency."

36.     Meanwhile, Mr. Wemple had additional questions about the Article. He reached out to The Atlantic and to Ms. Barrett to dispute claims Ms. Barrett had made about lacrosse recruiting at Division Three colleges, the hourly rate charged by private coaches, and the top-ten ranking of a squash instructor named Imran Khan, among other claims. Ms. Barrett possessed factual backup that could have refuted all of these concerns—criticisms which Mr. Wemple himself admitted could be viewed as "nitpicking." However, The Atlantic instructed her not to communicate with Mr. Wemple. Instead, The Atlantic asked Ms. Barrett to pull together a large folio of additional notes, interview transcripts and other documentation and deliver it to its research department. The Atlantic told Ms. Barrett that it would use this information to respond to Mr. Wemple and to refute his inaccurate characterizations of the Article. Ms. Barrett complied.

37.     On October 29th, Ms. Barrett sent her editor an email stating that Mr. Wemple continued to email her on a daily basis with the same set of questions about the Article. She requested permission to respond to Mr. Wemple and to defend the accuracy of her reporting. Her editor never replied. Instead, Ms. Barrett received a reply from Mr. Peck, an editor at The Atlantic whom she had never previously met or communicated with in any form. Mr. Peck informed her that her editor had forwarded her request for permission to speak to Mr. Wemple and that he was "hoping we can talk ASAP... ~~I'd~~I'd like to hear more from you."

38.     Ms. Barrett accepted Mr. Peck's invitation to join him on a 2:00pm Zoom call later that day. Mr. Peck had led her to believe that the purpose of the call was to coordinate a response to *The Washington Post*'s sustained and ongoing attack on the Article.

14

> **Formatted:** Font: Times New Roman
>
> **Formatted:** Font: Times New Roman

39.     It turned out the call was an ambush. As soon as the call began and without any opportunity to prepare, Ms. Barrett was confronted with a letter purportedly sent to The Atlantic from Sloane's attorney ("Sloane Letter"). In this letter, Sloane—through her attorney—contended that she did not have a son, that the "son" had been forced on her by Ms. Barrett, against her wishes; and that she had been bullied by Ms. Barrett into lying to the fact-checker about his existence. The letter also claimed that the Article contained inaccuracies about Sloane and her family.

40.     Mr. Peck, who was joined on the Zoom call by executive editor Adrienne LaFrance, gave Ms. Barrett no advance warning about the Sloane Letter, refused to provide her with a copy of it, and would not even allow her to read it in full. Instead, Mr. Peck and Ms. LaFrance read selected portions of the letter aloud to Ms. Barrett and asked her to respond on live video.

41.     Ms. Barrett, confused and distraught, denied Sloane's allegations and defended the accuracy of the Article. Mr. Peck and Ms. LaFrance appeared displeased and skeptical of Ms. Barrett; at one point, Mr. Peck asked her if Sloane was a single individual or if she was, instead, "a composite." Ms. Barrett strongly denied the charge that Sloane was a composite. She reminded the Atlantic executives that the problem with her source was not that there were any discrepancies or falsehoods in her account; but that The Atlantic had rendered her with such forensic truthfulness and specificity as to render her identifiable. At no time during this process was she told that this call was effectively a disciplinary hearing, that it was her conduct which was being evaluated, and that The Atlantic was in the process of issuing a public statement that would effectively destroy her career. In fact, when Ms. Barrett grew uncomfortable on the Zoom call and indicated that she wanted to consult with an attorney—on the grounds that The Atlantic had counsel, Sloane was now represented by counsel, and she should have representation as well—Mr. Peck reassured her

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

that this step was unnecessary and that the entire point of the call was to "return the focus" to the Article.

42.     When Mr. Wemple began to raise questions about the piece, The Atlantic performed a line-by-line, post-publication investigation into its accuracy and truthfulness. As a result of this investigation, which was spearheaded by The Atlantic's senior fact-checker and director of research, The Atlantic acknowledged two factual inaccuracies in the Article. First: an anonymous lacrosse mom whom Ms. Barrett had described as living in Greenwich was actually from a neighboring town. Second: the fabled backyard hockey rinks of Darien, Connecticut, which Ms. Barrett had referred to as "Olympic-sized,"size[d]," would have been more precisely characterized as "NHL-sized" or "commercially-sized." The Atlantic published corrections for the hockey-rink error and the lacrosse-mom error. On October 22, before The Atlantic cut ties with Ms. Barrett, her editor texted her to reassure her that Mr. Peck had spoken to her about the hockey-rink correction and that he considered it to be a "nothing correction."

43.     In addition to the first re-investigation of the Article, which resulted in the discovery of these two trivial errors, a second investigation was performed by Mr. Peck and Ms. LaFrance into the allegations made by the Sloane Letter. This investigation by two insiders neither objectively examined The Atlantic's actions nor did it make a genuine attempt to discover the truth. Ms. Barrett had documents and screenshots in her possession which would have disproved Sloane's false claims, including the charge that it was Ms. Barrett who pressured Sloane to add the son reference. However, Mr. Peck never asked Ms. Barrett for evidence relating to this issue, and Ms. Barrett did not volunteer it because she did not know until the First Editor's Note appeared that The Atlantic planned to repudiate her and denounce her conduct publicly.

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

44.     On October 30, Mr. Peck confirmed to Ms. Barrett what she had already heard through the grapevine: he was preparing an Editor's Note. Mr. Peck implied that the note was going to focus on Sloane and asked Ms. Barrett if there was anything else she wanted to tell him about Sloane. Ms. Barrett feared that he was going to reveal Sloane's real identity and that he intended to castigate Sloane as an unreliable source who had lied to The Atlantic and deceived The Atlantic about having a son. Ms. Barrett emailed Mr. Peck to let him know that it would be unfair to scapegoat Sloane. She informed Mr. Peck that she had known that Sloane had only three children. Ms. Barrett had nothing tangible to gain personally from this voluntary disclosure—her sole motive was to protect Sloane.

45.     On October 30, The Atlantic published an Editor's Note on its web site ("First Editor's Note")[3]. This Note, which was now attached to the top of Ms. Barrett's Article, stated that "new information emerged that has raised serious concerns about its accuracy, and about the credibility of the author, Ruth Shalit Barrett."

46.     In summary, the First Editor's Note (a) accused Ms. Barrett of dishonesty in writing the Article, in particular because she had not disclosed earlier that Sloane did not have a son, (b) accused Ms. Barrett of dishonestly disguising her identity in her byline for the Article, (c) strongly implied that Ms. Barrett had been fired by *The New Republic* for plagiarism and inaccurate reporting in 1999, and (d) alleged that Ms. Barrett was a dishonest journalist with a history of fabrication who was undeserving of this assignment. It further stated that it was investigating serious concerns about "the accuracy" of the Article and vowed to "communicate our findings to

---

[3] A copy of the First Editor's Note is attached as **Exhibit 2**.

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

our readers as speedily as possible." On October 30, Mr. Peck sent an email to The Atlantic's editorial staff making similar accusations ("Peck Memorandum").[4]

47.     On November 1, The Atlantic published another version of the Editor's Note on its website ("Second Editor's Note") which purportedly contained the findings of its investigation. It largely repeated the allegations in the First Editor's Note and also announced that The Atlantic was taking the exceptional step of retracting the Article, explaining that this was done because "[w]e cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the article."[5] It further stated that Sloane had claimed there were several errors in the Article; that the checking of some details of Sloane's story relied solely on interviews with her or her family; and its fact checkers had identified several other errors. The only reasonable inference to be drawn from these statements is that the investigation referenced in the First Editor's Note had been completed and that the Article had been retracted because it had been found to contain multiple errors, which reflected very poorly on Ms. Barrett as the author of the Article.

48.     This inference is false. In fact, The Atlantic's post-hoc investigation of Ms. Barrett's article had turned up only two minor errors, one of which Mr. Peck had described as a "nothing correction." And, as the fact-checker had revealed to Ms. Barrett on December 5th, "the son was the only thing."

49.     The Atlantic's maximal punishment of Ms. Barrett is difficult to reconcile with its far more lenient treatment over the years of prior authors in similar circumstances. No previous lapses by its writers—some of which involved significant factual inaccuracies and accusations of deception—led to the public repudiation of the writer or retraction of their work. For example,

---

[4] A copy of the Peck Memorandum is attached as **Exhibit 3**.
[5] A copy of the Second Editor's Note is attached as **Exhibit 4**.

18

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

when one writer profiled a nurse for The Atlantic in April, he inaccurately described her as having two siblings instead of four. Here is the straightforward correction that The Atlantic ran in response: "An earlier version of this article misstated how many siblings Daisy Donorila had. She was the youngest of five, not the youngest of three."

50.     In November and December, Aretae Wyler, The Atlantic's COO, conducted an internal investigation into why the Article had been assigned to Ms. Barrett.

51.     An Editor's Note appeared in the January/February 2021 print edition which republished most of the defamatory allegations against Ms. Barrett ("Third Editor's Note").[6] And yet this Third Editor's Note also withdrew several of The Atlantic's most incendiary charges against Ms. Barrett, such as the charge that she "encouraged Sloane to deceive" to The Atlantic. The Atlantic has left the Second Editor's Note up on its website, however, and has never updated it to reflect that several of its derogatory claims were subsequently withdrawn.

52.     *The Post* published an article by Mr. Wemple on January 30, 2021, entitled "Opinion: Editor who worked on Ruth Shalit Barrett's retracted Atlantic story is no longer with the magazine" ("*The Post* Story").[7] It reported that "according to magazine sources," Ms. Abraham, "when"[w]hen pressed," had told Ms. Wyler that Ms. Barrett had purposefully tried to disguise her identity—allegedly to prevent people from realizing that she was the person who had been committed two minor journalistic lapses in 19951994-1995 at *The New Republic*. This is a provably false and defamatory statement which was not only made by Ms. Abraham to Ms. Wyler, but also by the Atlantic employee, who repeated it to Mr. Wemple, thereby republishing it.

---

[6] A copy of the Third Editor's Note is attached as **Exhibit 5**.
[7] A copy of *The Post* Story is attached as **Exhibit 6**.

19

53.     Neither the First Editor's Note, the Second Editor's Note, the Third Editor's Note (collectively, the "Editor's Notes") nor the Peck Memorandum disclosed the truth to readers,: namely, that Sloane was a protected source whose participation in the Article was governed by a legally binding confidentiality agreement; that Ms. Barrett's editors consented to this agreement and were aware of it at every turn; that Sloane and Ms. Barrett had protested that The Atlantic had failed to shield Sloane as agreed, but that their protests fell on deaf ears; and that the masking detail arose out of this painful situation and was not a fraudulent scheme by Ms. Barrett.

54.     Defendants knowingly omitted (or changed) these facts to insulate themselves from criticism that an honest report of their actions would have generated. In doing so, they hid crucial context from readers that would have led any reasonable person to see Ms. Barrett's conduct in a different light: as a defensible effort to protect her wrongfully-exposed source, rather than as a reprehensible display of her "fabrication," "deceit,"fabricat[ion]," "decei[t]," and "lies."lie[s]." Therefore, the statements described in detail below in the Editor's Notes and the Peck Memorandum and those made to *The Post* (collectively, "Defamatory Statements") defamed Ms. Barrett by falsely accusing her of acting dishonestydishonestly by not disclosing earlier to The Atlantic that Sloane did not have a son (First Cause of Action); by falsely alleging that Ms. Barrett was fired in 1999 by *The New Republic* for misconduct (Second Cause of Action); by falsely alleging that Ms. Barrett had dishonestly tried to disguise her identity by suggesting a misleading byline (Third Cause of Action); and by falsely alleging that Ms. Barrett is a dishonest journalist who should never have been assigned to write the Article (Fourth Cause of Action). As well as defaming Ms. Barrett, the Defamatory Statements portray her in a grossly offensive manner which constitutes false light (Fifth Cause of Action).

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

55.     The Defamatory Statements have had a catastrophic effect on Ms. Barrett's life, and have caused her severe humiliation, anger, embarrassment and emotional distress. They have had an equally catastrophic effect on her career. She seeks both compensatory and punitive damages.

56.     In addition, Ms. Barrett seeks damages against The Atlantic for breach of contract and the implied covenant of good faith and fair dealing. In thwarting Ms. Barrett's efforts to fulfill the term in the Author's Agreement[8] requiring her to represent and warrant that her work "does not infringe . . . any other right, of any person or entity, " nor "invade the privacy . . . rights of anyone," The Atlantic breached the contract. The Atlantic also breached the term in the Author's Agreement requiring that it make "commercially reasonable efforts . . . to make such intellectual property rights ([for dramatic purposes)] available to interested parties and to market such rights." The Editor's Notes deterred almost all commercial interest in Ms. Barrett's Article. Ms. Barrett nonetheless received an inquiry from a Hollywood production company who was interested in developing the Article for television. She retained a lawyer who reached out to The Atlantic about exploiting these rights, as stipulated in her contract. The Atlantic responded with a letter in which it invalidated Ms.  Barrett's contract, rescinded her rights to her work and implied that it was considering suing her for repayment of her writer's fee. In the same letter, The Atlantic informed Ms. Barrett it was entitled to take these steps because she had described her confidential source as the mother of four kids instead of three, a decision which The Atlantic proclaimed to be "a stunning act of journalistic malpractice." As a result, that project, and all other efforts to create derivative works, have been blocked, and Ms. Barrett, who had a 50% interest in any net revenues, has lost both her share of the revenues and the prestige of being associated with such projects.

---

[8] A copy of the Author's Agreement is attached as **Exhibit 7**.

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

57.     In addition, The Atlantic breached the implied covenant of good faith and fair dealing through bad faith conduct that evaded the spirit of the Author's Agreement and deprived Ms. Barrett of the fruits of that agreement—the prestige of publishing with The Atlantic and future earnings that might flow from that prestige. The Atlantic not only maligned Ms. Barrett in the Editor's Notes but also compromised the anonymity of her confidential source, Sloane; harassed Sloane for personal information to pacify Mr. Wemple; withheld information and/or documentation from Mr. Wemple that could have rebutted his criticisms of Ms. Barrett and her Article; instructed Ms. Barrett not to defend her Article to Mr. Wemple; and implemented (and publicized to *The Post*) the so-called results of a sham investigation into what transpired with Ms. Barrett. Individually and altogether, this conduct defied the purpose of the Author's Agreement in sacrificing Ms. Barrett for The Atlantic's benefit.

**III.     FACTS COMMON TO ALL CAUSES OF ACTION**

**A.     Ms. Barrett's Early Success**

58.     In January 1993, six months after graduating from Princeton University, Ms. Barrett, then known by her maiden name, Ruth Shalit, was hired as a reporter-researcher at *The New Republic*. Within a year, she had published 14 feature-length pieces, including an acclaimed cover story. By mid-1994, at age 23, she had been promoted to associate editor, had been hired to write long-form political stories for *The New York Times Magazine*, and was under contract to write a monthly politics column for *GQ*.

**B.     Two Minor Lapses In 1994-1995**

59.     As her responsibilities increased, Ms. Barrett became increasingly overwhelmed. In 1994 and 1995, Ms. Barrett included unattributed material from two other pieces appeared in two of her articles infor *The New Republic*. The first was a cover story published in July 1994, in

22

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

which three sentences of biographical information and a quote from a *Legal Times* article by Daniel Klaidman appeared in Ms. Barrett's article without attribution. Ms. Barrett had herself interviewed—at length—the same Washington attorney whom Mr. Klaidman quoted in his article, yet she did not use any quotes from her own interview. Instead, she published the quote the attorney had given Mr. Klaidman. Neither this quote nor the three sentences were attributed to Mr. Klaidman or to *Legal Times*. Second, three phrases containing 29 words from a *National Journal* article appeared virtually unaltered in Ms. Barrett's profile of Steve Forbes in July 1995. These two lapses, totaling six sentences, all occurred within a 12-month time frame. Ms. Barrett apologized to the writers whose quotes and sentences she had taken.

60.     *The New Republic* published two separate corrections as a result of these lapses. Her editors also publicly defended her when she was later attacked by *The Post* (see below);). suggesting that *The Post* was inflating these two incidents of minor plagiarism for its own self-serving purposes. "The attack upon Shalit herself is particularly low," her editors wrote in a statement that was published in *The New Republic* on October 16th, 1995. "The 'plagiarism' charges have been dealt with—and apologized for—in *TNR*'s pages and, together, concern a total of six sentences transcribed accidentally from Nexis. There is no other reason to revisit that matter other than to distract from the story itself."

61.     Ms. Barrett's improper use of unattributed material in her political profile-writing of the 1990s, while admittedly sloppy and reckless, was considered gray-zone plagiarism at the time. It kicked off a passionate debate about what does and does not constitute plagiarism. In a 1997 *New Yorker* piece entitled "Purloined Letters: Are We Too Quick to Denounce Plagiarism?" writer James Kincaid described the sentences Ms. Barrett had taken as "boilerplate." Comparing her transgressions to those of serial plagiarist David Sumner, who stole dozens of poems by

23

acclaimed authors and presented them to poetry journals as his own original work, Kincaid wrote, "What's curious is that anyone should have professed similar indignation over what Shalit did. Can we not distinguish Shalit from Sumner? Is 'budding interest in developing a white-collar criminal defense practice' a phrase, even without the buds, worthy of being declared 'original'? Should we be marshaling our legal forces to protect it?"

62.    In an article published in *The Hartford Courant* on April 29, 1999, reporter David Daley called Ms. Barrett "the smoothest sentence stylist of her generation" and called the pile-on against her "profoundly unfair." He posited that "[i]f every Washington reporter who borrowed background from National Journal or Legal Times were run out of town, the National Press Club would be an even lonelier place." Daley concluded: "Her epitaph doesn't deserve to be 'Ruth Shalit, plagiarist.'"

**C.    Ms. Barrett Leaves *The New Republic* in 1999**

63.    After the two lapses discussed above, everyone moved on, and Ms. Barrett continued to work for *The New Republic*. She wrote multiple investigative pieces, editorials, and cover stories that were well-received, anthologized, and cited in scholarly journals and major newspapers. She also published television criticism and book reviews, and appeared on NPR. In 1999, nearly *four years* after the last of her two mistakes in 1995, Ms. Barrett elected to leave *The New Republic*.

64.    The ~~Editors'~~Editor's Notes defame Ms. Barrett by claiming that she left *The New Republic* in 1999 "after . . . inaccurate reporting w[as] discovered in her work." This is false. The clear, and only reasonable inference, from this statement is that new inaccuracies were discovered in her work in 1999 and drove her exit. And yet, not a single error or factual inaccuracy was "discovered" in her work in 1999; and factual inaccuracies did not cause her to leave the

24

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

publication. Moreover, a review of *The New Republic* corrections archive shows that no errors were found in any of Ms. Barrett's articles in 1998, 1997, or 1996. Ms. Barrett was not pushed out of *The New Republic* due to a ~~discovery"~~discover[y]" of errors and mistakes in her journalistic work, and she did not have an unusual and concerning history of "inaccurate reporting" for *The New Republic* or for any other publication. In her six years at *The New Republic*, only one of her articles (a 1995 piece about *The Washington Post*) was found to contain a factual error that was significant enough to warrant a correction. This error was acknowledged and corrected in 1995 using the standard practice of issuing a post-publication correction, which occurs with articles from dozens of journalists all the time as a matter of course. It has no relevance to her professional work for The Atlantic 27 years later.

**D.      Ms. Barrett: Journalism Career And Life 1999-2019**

65.      Over the next several years, Ms. Barrett worked in advertising and also published feature pieces, cultural essays and book reviews in *New York Magazine*, *The Wall Street Journal*, *ELLE*, *Details*, Nerve.com, *Surface*, and *Lingua Franca*. She had contracts with national magazines, was hired as a contributing editor, and was put on mastheads. Before Defendants destroyed her career, she was busy, thriving, and fulfilled in all aspects of her life. She was an active volunteer in her community and in her children's schools. She enjoyed the respect of her friends, family and peers. She wrote culturally relevant and lively journalism that sparked debate. She had a full and happy life, did not consider herself damaged goods, and had no need to turn to The Atlantic in desperation for a career-salvaging "second chance." During this time, she worked on several pieces with Ms. Abraham who was a respected editor.

66.      Ms. Barrett married in 2004, adopted her husband's last name, and changed her byline from "Ruth Shalit" to "Ruth Shalit Barrett" or "Ruth S. Barrett." In recent years, she has

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

maintained a publicly accessible website at https://www.ruthsbarrett.com/ with links to articles she has written, some of which predated her marriage and have her old byline, "Ruth Shalit." She has never tried to disguise or disassociate herself from the two journalistic lapses noted above from her early 20s.

**E.      The Atlantic Hires Ms. Barrett**

67.      In mid-2019, Ms. Barrett told Ms. Abraham, who had recently started to work for The Atlantic as a Senior Features Editor, about a trend she had noticed in her preppy Connecticut town: parents were spending huge amounts of money in the hope of turning their children into elite competitive athletes so that they could qualify for preferential admission as Ivy League sports recruits. Additionally, she noted that there were certain niche sports or micro-sports—squash, fencing, water polo, sailing—that seemed particularly susceptible to this sort of optimizing and gamesmanship, resulting in an overheated stampede into these sports among families with disposable income. Ms. Abraham loved the idea and in October 2019, she distributed Ms. Barrett's two-page pitch to her colleagues, who responded enthusiastically. On December 30, 2019, Ms. Barrett signed an Author's Agreement with The Atlantic to provide services, namely, the writing of the Article.

**F.      The Atlantic Accepts The Sloane Agreement**

68.      The Article makes frequent mention of a mother of three daughters identified in the Article as Sloane. Sloane agreed in the summer of 2019 to be Ms. Barrett's source in return for a promise of confidentiality for herself and her family (the "Sloane Agreement"). The Sloane Agreement constituted a legally enforceable contract pursuant to *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), which placed Ms. Barrett under a legal and ethical obligation to ensure that the identity of Sloane and her family would not be publicly disclosed or be made discoverable. The

Atlantic's senior editors had full knowledge of the Sloane Agreement. In an email to Ms. Barrett, her Article's editor—who was a senior editor for The Atlantic—reported that Mr. Peck had described Sloane as "a source we agreed to shield." Indeed, the Article itself explains that Sloane requested not to be identified by her first name, in order "to protect her ~~daughters''~~ daughters' privacy and college-recruitment chances." (Exh. 1, page 4 of 13.)

**G.    The Editorial Process Begins**

69.    Ms. Barrett wrote the Article and sent the first draft to her editor on or about July 13. After it was delivered, the editorial process began, lasting until September 16. Fact-checkers spoke to Sloane and asked for more information about many of the events in Ms. Barrett's draft. Ms. Barrett worked with her editor and Michelle Ciarrocca, Senior Associate Editor at The Atlantic and the Article's fact-checker, to try to find ways to protect Sloane, and repeatedly expressed her concerns to them that the piece included too many specific, identifying details about Sloane's family. Among other changes, Ms. Barrett wanted to modify her description of Sloane's educational credentials and delete a reference to the model of her car. Her editor did agree to a few deletions and alterations, but overall, she expressed impatience about Sloane's concerns and stated on several occasions that she had done enough for Sloane. "I don't want to change anything else! …. She can't keep re-negotiating the details. This is a magazine!" And yet Sloane continued to insist—correctly, as it turned out—that The Atlantic was including so many specific facts about her family that she would be identifiable.

**H.    Additional Facts Discovered During Fact Checking**

70.    The fact checking led to the discovery of additional details. For example, Ms. Barrett's draft had referred to one of Sloane's daughters being the victim of a refereeing dispute at a squash tournament in San Francisco. The Atlantic insisted on adding additional details about the

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

tournament and in placing Sloane's daughter at "California Summer Gold" in "Redwood City."
(*See* Exh. 1, page 4 of 13.) Ms. Barrett protested at its inclusion and pushed for it to be described
generically as "a ([squash])] tournament in northern California," but was overruled.

**I.    The Atlantic Wants Sloane To Waive Her Anonymity**

71.    The Atlantic's editors believed that Sloane's concerns about her overexposure were
invalid. The Article's main editor declared repeatedly that Sloane, on some level, had to know that
her sports-mom friends were going to figure out that she was Sloane—and that she should just
accept this and move on. Ms. Barrett's editor was displeased with Sloane's continued insistence
on anonymity and continued to push Ms. Barrett to persuade Sloane to go "on the record" as a
named source. On July 23, she texted Ms. Barrett, "Do you think ([Sloane])] would like to be shot
with her girls, or would let us shoot them playing their sports. Squash player in her boat on a
beautiful day? Would that even maybe help entice her to use her name… ?" On another occasion,
she urged Ms. Barrett, in a text message, to "get [Sloane] to use her name." On August 11, she
emailed Ms. Barrett a lengthy note in which she praised the fact-checker who had been assigned
to her story and speculated that she "might even be able to assist in getting ([Sloane])] to use her
name." On another occasion, when Ms. Barrett protested, in a text message, that The Atlantic was
in danger of rendering Sloane identifiable, her editor replied, via text: "Yep, why it sorta makes
sense for her to use her name but don't want to put it to her that way of course." Ms. Barrett pushed
back strongly, explaining that Sloane and her family did not want to be publicly identified, and
that Sloane planned to deny that she was Ms. Barrett's source if confronted.

**J.    Sloane Protests**

72.    As the editing and fact-checking process progressed, Sloane's concerns escalated.
She continued to reach out to Ms. Barrett, imploring her to take additional steps to mask her

28

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

identity in a way that was consistent with their agreement. Her husband called Ms. Barrett and told her that Sloane was no longer sleeping at night. He also mentioned that his daughters were distraught and feared adverse consequences if their identities were to become known. "She is identifiable," he texted. "Fencers/Squash plus [an educational credential] means identifiable." Sloane also texted Ms. Barrett. "Ruth I am just way too exposed. We would be shunned by so many people."

**K.      Sloane Wants The Article To Say She Has 4 Children**

73.      Sloane and her husband became increasingly concerned about the excessive level of details about her that The Atlantic intended to include in the Article. In late August, Sloane and her husband told Ms. Barrett that they wanted the Article to say that they had a fourth child (a fictitious son) in order to give themselves some deniability. This is known as a masking detail.

**L.      The Atlantic Policy Against Disclaimers**

74.      Ms. Barrett proposed a solution: a brief disclaimer stating that minor identifying details about Sloane had been changed to preserve her confidentiality and protect her children's privacy. This would have given The Atlantic the flexibility to include a few masking details in the Article that would have assuaged Sloane's concerns while also preempting any accusation of misleading readers about these trivial, irrelevant facts. It is also common industry practice. But The Atlantic said no. Ms. Barrett was told it was the policy of The Atlantic not to run such disclaimers. Such a policy is unreasonable because it eliminates an important tool that is commonly used to protect confidential sources. Indeed, this decision by The Atlantic significantly contributed to the impossible ethical position Ms. Barrett found herself in—and which ultimately led to inclusion of the fourth ~~son~~child reference.

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

74.

**Formatted:** Indent: First line:  0.5",  No bullets or numbering

**M.      Ms. Barrett Supports Sloane**

75.      Ms. Barrett was sympathetic to Sloane's request to add a fourth child but at this stage of the editing process, she told Sloane that she was not able to change the text of the Article herself. Sloane proceeded to tell the fact-checker about her son and asked that a reference to him be added to the Article. Her request was granted. Ms. Barrett did not make that decision, but she was aware of the inclusion of this masking detail and considered that its inclusion was fully justified because The Atlantic's insistence on including other facts that made Sloane's identity discoverable constituted a breach of the Sloane Agreement. Ms. Barrett knew that this trivial detail about the "son" was erroneous; but her failure to disclose it to The Atlantic was not due to lack of professionalism, shoddy journalism, or dishonesty. On the contrary, it was a result of her commitment to protect her confidential source—a paramount ethical duty of any reputable journalist. And it had no material bearing on the substance of the Article. It was, in short, a unique response to an exceptionally difficult situation that Ms. Barrett had never encountered before and which The Atlantic created with its inflexibility, lack of empathy for Sloane's desire to protect her ~~children's~~children's privacy, and disregard for Ms. Barrett's ethical and contractual obligations to Sloane.

**N.      The Atlantic Changes The Braemeier Quote**

76.      The acceptability of masking when necessary to protect confidential sources is evidenced by the fact that The Atlantic's editors changed a quote in the Article to protect the identity of another subject of the Article. On September 14, Ms. Barrett noticed that a quote from Darien High School lacrosse coach Jeff Braemeier had been updated from, "My own captain is one of my best defensive kids ever. 4.2 GPA. I couldn't get him into an Ivy. I tried" to "I've had

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

30

multiple high-end players with worthy grades. I couldn't get them into an Ivy. I tried." When Ms. Barrett asked her editor and fact-checker why the quote had been altered and why Coach Braemeier, who had been describing one particular student, was now referencing "multiple students—she was told that the change was at the instigation of The Atlantic's legal department. "Saw that," the fact-checker texted Ms. Barrett, in response to her inquiry. "Was a legal request to make him less identifiable." In the final published version of the Article, the quote was further altered to read: "I've had a few team captains who were among my best defensive kids ever. Near-perfect ~~GPA's~~GPAs. I couldn't get them into an Ivy. I tried." (*See* Exh. 1, page 8 of 13.)

**O.     The Article Is Published**

77.     On October 17, the Article was published under the title, "The Mad, Mad World of Niche Sports Among Ivy League-Obsessed Parents." It drew praise from established journalists, collegiate sports officials, and NCAA athletes. One individual wrote to Ms. Barrett to let her know that "as a former NCAA athlete, a trustee of the Women's Sports Foundation, a recent board member of the Stanford Athletic Department and the parent of three teenagers, I agree whole-heartedly with your assessment." The founder of a Massachusetts squash academy emailed Ms. Barrett to let her know that the Article was "excellent and 100% accurate... if not understated. I know many of the names mentioned in the article personally and have witnessed behavior on par and at times worse than what you chronicled." And a collegiate squash player from a NESCAC conference school emailed Ms. Barrett, stating "I recently just read your article 'The Mad, Mad World of Niche Sports' and genuinely want to say thank you. I don't think anyone could've painted a clearer image of what the squash world is like." The Article prompted US Squash to reaffirm its commitment to inclusion, as the organization circulated an email on October 23 stating that "US Squash's mission is to increase access, support lifelong engagement, encourage sportsmanship and

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

achieve excellence. Articles such as this make us that much more determined in the ongoing pursuit of our mission."

**P.    Erik Wemple**

78.    On October 19, *The Post*'s media correspondent, Erik Wemple, called and emailed Ms. Barrett, asking if she would speak with him about her Article. Her editor advised Ms. Barrett not to speak to Mr. Wemple and to allow The Atlantic to handle it.

**Q.    Wemple Speaks To Bross**

79.    Several days later, Ms. Abraham called Ms. Barrett to fill her in on a conversation that Anna Bross, the Magazine's Vice President of Communications, had had with Mr. Wemple. According to Ms. Abraham, Ms. Bross had reached out to *The Washington ~~Post~~Post's* media critic to ask why *The Post* was now choosing to pursue Ms. Barrett, after a period of years in which it had allowed her to resume her journalistic career free from special censure and harassment.

80.    According to Ms. Abraham, Mr. Wemple informed Ms. Bross that *The Atlantic*, unlike *New York Magazine* or *ELLE*, was a Washington-based publication. Ms. Barrett's article for *The Atlantic*, he continued, could therefore be seen as her "Washington comeback." Ms. Bross protested that Ms. Barrett's article for *The Atlantic* was a culture story, not a work of political journalism and did not augur her comeback as a Washington political reporter. Mr. Wemple disagreed, reiterating his claim that The Atlantic had its headquarters in Washington.

81.    Ms. Barrett was confused and shaken to hear of this exchange. She did not understand why it was up to *The Washington Post*, a powerful and notoriously vindictive corporate media entity with a documented conflict of interest in covering her, to decide whether she would be "allowed" to write feature pieces for other publications. She did not understand why a 49-year-

32

old woman with a decades-long track record of unblemished work could not, at this point, be a writer on her own terms, and instead had to be gatekept through *The Washington Post*'s lens and power.

**R.      The Atlantic Tries To Appease Mr. Wemple**

82.      Although ~~The Atlantic,~~ at this point~~,~~: The Atlantic was defending the Article, it was clearly rattled by the intensity of Mr. Wemple's questioning. The Article's editor admitted to Ms. Barrett that The Atlantic felt caught off guard and deflated. At this point, ~~it~~The Atlantic began to engage in outrageous mistreatment of Sloane to appease Mr. Wemple. In preparing his initial October 24 story, Mr. Wemple had reached out to The Atlantic to question whether Sloane's 12-year-old daughter had indeed sustained a neck injury at a fencing tournament in July 2019. Employees from The Atlantic began to hound Sloane with phone and email requests for photographs and medical records that would corroborate the injury—despite the fact that this incident had already been confirmed in fact-checking. Mr. Wemple eventually conceded that the neck injury did occur, but maintained that Ms. Barrett had used hyperbole in describing it.

**S.      The Atlantic Should Have Denied Mr. Wemple's Requests**

83.      Ms. Barrett was stunned that a media critic from *The Post* would request the confidential medical records of a 12-year-old girl and even more surprised that The Atlantic would seriously consider this request. The Atlantic's communications with Sloane on this subject were especially intrusive, unwarranted, and bordering on harassment. Further, unmasking Sloane served no valid journalistic purpose. Sloane was a stay-at-home mom who had invested significant time and money into her daughters' high-end sports, only to see them struggle and suffer painful injuries. Sloane did not appear to have a self-serving motive for participating in the Article. She

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

was not suing US Fencing or the sport's corporate sponsor. By her own telling, the only person she blames in the Article is herself. Ms. Barrett was taken aback by Mr. Wemple's prolonged focus on her confidential source and by the ferocity of his efforts to uncloak Sloane and expose her identity. She was surprised that The Atlantic appeared keen to comply with his relentless and increasingly intrusive demands for information about Sloane, when the proper course would have been to tell Mr. Wemple that The Atlantic was satisfied that its confidential source was reliable and that it would not disclose any more information about her. The Article's fact-checker had spoken with Sloane at length during the fact checking process and found her to be poised and credible.

**T.     The Atlantic Tells Ms. Barrett That It Might Share Information About Sloane With Mr. Wemple**

84.     During this phase, Ms. Barrett kept pressing The Atlantic for reassurance that it was not going to publish Sloane's real name under any circumstances, but she did not get that reassurance. The Article's fact-checker and Senior Associate Editor at The Atlantic texted her on October 27: "I'm pushing back hard against giving [Mr. Wemple] any details… even if off the record." This was the opposite of reassuring. The fact that a Senior Associate Editor for The Atlantic claimed she was "pushing back hard" against providing details to Mr. Wemple suggested that it was most likely already happening and that others at The Atlantic wanted to provide those details. Ms. Barrett wrote to Ms. Abraham, her Article's main editor, and asked if The Atlantic could reassure her that it would not, under any circumstances, reveal Sloane's identity. On October 26, Ms. Abraham responded, "[Peck] says we would be highly unlikely to reveal a source we agreed to shield -- can't see us revealing her name *unless a lot else turns out to be wrong*." (Emphasis added).

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

85.     On October 26, Ms. Ciarrocca texted Ms. Barrett, acknowledging that answering some of Mr. Wemple's questions could identify Sloane: "Wemple is continuing to dispute the story. A whole new list of items, **but responding to some would compromise Sloane's identity.** He's claiming she doesn't have a son?!" (Emphasis added).

**U.     The Atlantic's Harassment Of Sloane Increases**

86.     Following Mr. Wemple's questions about the "son," The Atlantic's harassment of Sloane escalated. Editors bombarded her and her husband with repeated texts, phone calls, and emails, demanding that she answer Mr. Wemple's personal questions about the exact makeup of her family and threatening adverse action in the form of an admonitory correction if she refused.

**V.     The Atlantic Told Ms. Barrett Not To Defend Herself To Mr. Wemple**

87.     From October 24 to 26, Mr. Wemple called Ms. Barrett every day. He had a list of specific questions about the piece and wanted answers. Ms. Barrett believed she had the necessary information to defend her piece and to rebut each of his claims, but she once again complied with The Atlantic's directive not to communicate with him: "For the record: I would like to defend my piece," she emailed her editor on October 29th, 2020. "I worked hard on it and am able to rebut everything that Wemple is disputing ... If you and the magazine prefer that I not speak to him directly, I will respect that. But I don't think it makes sense to leave his claims unchallenged." At that time, she thought The Atlantic would appropriately handle the matter on her behalf, as it had promised; but that did not happen. Counter to its promise to Ms. Barrett, The Atlantic did not give Mr. Wemple any information and/or documentation in its possession that would have rebutted his flyspecking critiques of the Article. Instead, The Atlantic began to exclude Ms. Barrett from its correspondence with Mr. Wemple, and to exclude Ms. Abraham from its internal deliberations regarding the situation.

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

35

**W.     Ms. Barrett's Zoom Call With Mr. Peck And Ms. LaFrance**

88.     Ms. Abraham did not respond to the email from Ms. Barrett on October 29. Instead Ms. Barrett received an email from Mr. Peck later that day referencing her email to Ms. Abraham and asking her to join a Zoom call. The call immediately proved to be an ambush, as Mr. Peck and another editor, Adrienne LaFrance, confronted Ms. Barrett with a letter from Sloane's attorney ("Sloane Letter"). In this letter, Sloane stated, via her attorney, that she did not have a son, that the inclusion of the "son" was Ms. Barrett's idea, that Ms. Barrett had pressured Sloane into going along with the idea of the "son" and had coerced her into lying to the fact-checker, and that the Article was false in certain respects.

89.     Ms. Barrett, stunned, refuted these allegations. She explained that the request to add a fourth child came from Sloane and her husband, and that it was likely motivated by a fear that the Article contained too many identifying facts about Sloane. She also pointed out that the allegation that she had invented the son and had coerced Sloane into going along with it made no sense—Ms. Barrett had nothing to gain from such an invention, whereas Sloane clearly did.

90.     Ms. Barrett told Mr. Peck and Ms. LaFrance that she was uncomfortable with the fact that she was now the only party without representation and asked if they could resume the Zoom call at a later date after she had hired her own attorney. Mr. Peck reassured her that this was unnecessary because Sloane had no intention of suing The Atlantic. They gave Ms. Barrett the impression that they were not going to take adverse action against her, and that they only wanted to get to the bottom of what had transpired with Sloane, so that they could return attention to the Article. This reassurance was false.

91.     Relying on that reassurance, Ms. Barrett proceeded to refute the charges of inaccuracy contained in the Sloane letter. For example, according to Mr. Peck and Ms. LaFrance,

36

Sloane was now denying that she had set up an indoor fencing strip in their basement during the pandemic so that her daughters could practice and spar with one another. Ms. Barrett was able to find a voice recording in which Sloane described her pandemic basement fencing strip. She sent this recording to Ms. LaFrance and to Mr. Peck later that evening. "Great," Mr. Peck replied.

**X.      The Atlantic's Investigations**

92.     The Atlantic conducted three post-publication investigations. The first investigation ~~into~~concerned the accuracy of the Article and was a second fact-checking exercise conducted by the Article's fact-checker, Ms. Ciarrocca, and ~~Ms.~~Atlantic research director Yvonne Rolzhausen. It correctly concluded that the Article was accurate in almost every respect. The second investigation was conducted by Mr. Peck. Its subject is believed to have been the allegations in Sloane's Letter. The third investigation was to determine how the Article had been assigned to Ms. Barrett, and was conducted by Ms. Wyler. According to *The Post* Article, Ms. Wyler's report ("Wyler Report") was presented to The Atlantic's staff on December 18.

93.     Ms. Barrett is informed and believes and thereon alleges that Mr. Peck's investigation regarding the Article was a sham intended to whitewash The Atlantic and heap all the blame on Ms. Barrett and, to a lesser extent, Sloane. If it had wanted to mount a good faith investigation, The Atlantic would have hired an outsider, just as *Rolling Stone* had hired Steve Coll, dean of the Columbia University Graduate School of Journalism, to investigate its "Rape On Campus" story. An outside investigator would have performed an objective investigation into The Atlantic's conduct in over-exposing Sloane and her family, as well as the resulting actions taken by Sloane and Ms. Barrett. A thorough, fair and objective investigation conducted by an outsider would have concluded that Sloane's invention of her "son," and Ms. Barrett's decision not to disclose to The Atlantic that there was no son, were the direct result of their increasing realization

37

that The Atlantic was not adhering to the Sloane Agreement. Such a conclusion might have led to the re-publication of the Article and a public apology being made to Ms. Barrett and Sloane, thereby doing much to repair the massive reputational injury that Ms. Barrett had suffered.

94.     Instead, The Atlantic decided that the investigation would be performed by insiders, including one insider (Mr. Peck) who had been directly involved in the Article and in coordinating The Atlantic's post-publication interactions with Sloane. His investigation was biased and made no attempt to find out the truth.

95.     For example, one key disputed issue was whether Ms. Barrett had invented the son, as the Sloane Letter alleged, or whether Sloane and her husband had invented it. Ms. Barrett had nothing to gain personally from such an act. Moreover, she had documents, such as texts from Sloane, which conclusively proved that she was telling the truth. However, Mr. Peck never asked her for evidence relating to this issue, and Ms. Barrett did not volunteer it because she did not know in advance that Defendants were going to publish vicious personal attacks on her. As will be seen, The Atlantic never gave Ms. Barrett a fair chance to defend herself and instead merely repeated Sloane's allegations that Ms. Barrett had invented the son and coerced Sloane into supporting the idea. The Atlantic never made a good-faith attempt to determine whether these incendiary allegations were true, or indeed, to give Ms. Barrett an opportunity to comment in advance on the defamatory accusations made against her.

96.     The Atlantic was well-aware of this obligation. Several weeks before the Article was published, Ms. Barrett and her editor received an email from the fact-checker regarding a section of the Article that portrayed an ultra-high-net-worth squash dad in a negative light, stating that she wanted to pass along "the latest from legal" concerning this parent, a hedge-fund manager who had recently relocated from Connecticut to Palm Beach Gardens. "More concerned that we

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

38

give father a chance to comment on specifics," wrote The Atlantic's in-house legal counsel. "I don't think anything we're writing is defamatory -- but I can also imagine a billionaire asset manager getting aggressive that we were in the wrong if we don't give him a chance to comment, so let's make sure we do so." Apparently The Atlantic believes that billionaire asset managers ought to be given a "chance to comment" on allegations against them, but considers this step optional in the case of freelance contract writers who may not be in a position to "get aggressive" when they are abruptly smeared and defamed.

**Y.      Ms. Barrett Emails Mr. Peck About The Son**

97.      On October 30, Mr. Peck told Ms. Barrett that he was preparing an Editor's Note. She feared that he was going to reveal Sloane's real identity and that he was going to write that Sloane was a liar who did not have a son and was an unreliable source. To avoid this, she told Mr. Peck that she knew that Sloane did not have a son. Even though Sloane had made false allegations against her, Ms. Barrett believed that Sloane was the victim of The Atlantic's demands and threats and that she was lashing out to try to protect herself. Ms. Barrett had nothing tangible to gain personally from this voluntary disclosure—her sole motive was that it might lessen the severity of Mr. Peck's criticism of Sloane in his Editor's Note.

**Z.      The First Editor's Note**

98.      Late in the evening of October 30, The Atlantic published the First Editor's Note on its website. It stated that "new information emerged that has raised serious concerns about its accuracy, and about the credibility of the author, Ruth Shalit Barrett. We have established that ~~Ms.~~ Barrett deceived The Atlantic and its readers about a section of the story that concerns a person referred to as 'Sloane.'" It further stated that "according to Sloane, ~~Ms.~~ Barrett had first proposed

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

the invention of a son, and encouraged Sloane to deceive The Atlantic as a way to protect her anonymity," adding that Ms. Barrett denied those accusations.

99.     It further claimed that "[w]hen writing recently for other magazines, ~~Ms.~~ Barrett was identified by her full name, Ruth Shalit Barrett. (Barrett is her married name.) In 1999, when she was known by Ruth Shalit, she left The New Republic, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work." This sentence states expressly or by implication that Ms. Barrett (a) was forced out of her job at *The New Republic* in 1999 following the "~~discovery~~"discover[y]" of "plagiarism and inaccurate reporting" in her work, and (b) deliberately hid her history from readers by insisting on a misleading byline she had not used "~~in the past~~recently." Each of these claims is demonstrably false.

100.    It also alleged that Ms. Barrett was a dishonest journalist who should never have been hired by The Atlantic to write the Article. Finally it stated that it was investigating these concerns and that "we will communicate our findings to our readers as speedily as possible."

## AA.   Peck Memorandum

101.    The same evening, Mr. Peck emailed the Peck Memorandum to The Atlantic's editorial staff concerning his continuing investigation of the Article. He told his colleagues he had learned that Ms. Barrett "was complicit with a source in the story . . . in an effort to deceive *The Atlantic* and its readers about the makeup of Sloane's family;" that she had "lied about [Sloane's son] to the fact-checking department;" and that "we just confirmed ~~Ms.~~ Barrett's role in the fabrication of the son." He apologized for the decision to assign the story to Ms. Barrett, stating that it had been a mistake, and promised a full and complete investigation: "It is crucial for us to understand fully the scope of deceptions and errors in the article." He promised that The Atlantic "will examine all of the processes involved in the assignment and publication of the article, and

40

work to reform them so that this doesn't happen again. There is no doubt, however, that our choice of writer played the largest role. In 1999, when ~~Ms.~~ Barrett (her married name) was known by Ruth Shalit, she left *The New Republic*, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work." He further alleged that she had requested the byline "Ruth S. Barrett" to prevent readers from associating her with the two lapses that had in fact occurred in 1994-95, and that ~~"in"~~"[i]n the ~~interests~~interest of transparency," The Atlantic had changed her byline to "Ruth Shalit Barrett."

**BB.    The Second Editor's Note and Retraction**

102.    On November 1, The Atlantic published the Second Editor's Note on its website, announcing that it was retracting the Article in its entirety. To justify this punishment—an extremely rare occurrence in journalism, generally reserved for instances of grievous error or fraud—it claimed that "new information" had come to light which revealed that Ms. Barrett had acted dishonestly in the writing of the Article and that accordingly, the accuracy of the Article could not be trusted. Specifically, The Atlantic claimed that it had to retract the Article because it "cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the article." It further alleges that "We have established that ~~Ms.~~ Barrett deceived *The Atlantic* and its readers about a section of the story that concerns a person referred to as 'Sloane.'" It further stated that "according to Sloane, ~~Ms.~~ Barrett had first proposed the invention of a son, and encouraged Sloane to deceive *The Atlantic* as a way to protect her anonymity," adding that Ms. Barrett denied those accusations. It further stated that Ms. Barrett "misled our fact-checkers, lied to our editors, and is accused of inducing at least one source to lie to our fact-checking department."

103.    It ~~also~~ stated that The Atlantic could not "vouch for the accuracy of ~~the~~th[e] article," ~~and~~ Defendants claimed that "[w]hen writing recently for other magazines, ~~Ms.~~ Barrett was identified by her full name, Ruth Shalit Barrett. (Barrett is her married name.) In 1999, when she was known by Ruth Shalit, she left *The New Republic*, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work." This sentence states expressly or by implication that Ms. Barrett (a) was forced out of her job at *The New Republic* in 1999 following the "~~discovery~~"discover[y]" of "plagiarism and inaccurate reporting" in her work, and (b) deliberately hid her history from readers by insisting on a misleading byline she had not used "~~in the past~~recently." Each of these claims is demonstrably false.

**CC.    The Third Editor's Note**

104.    ~~Its~~In  its January/February 2021 print edition (also digitally accessible to ~~*The Atlantic*~~*Atlantic's* subscribers), The Atlantic published the Third Editor's Note which differed in several respects from the Second Editor's Note. Therein, The Atlantic repeated many of the online note's falsehoods and false implications but walked back some of its most incendiary charges—establishing that The Atlantic knew or should have known that these charges were false:

 a) The Second Editor's Note "identified a~~the~~ need to clarify a detail about a neck injury . . . to be more precise about its severity," but the Third Editor's Note omits this supposedly necessary clarification, thereby acknowledging that there were even less errors in the Article than the Second Editor's Note had claimed.

 b) The Second Editor's Note claims Ms. Barrett "is accused of inducing at least one source to lie to our fact-checking department," but the Third Editor's Note confines this accusation to just "a source," thereby eliminating the suggestion in the Second Editor's Note that she had induced multiple sources to lie.

42

c)      The Second Editor's Note states that Ms. Barrett "encouraged Sloane to deceive *The Atlantic*," but the Third Editor's Note omits this false accusation, and merely states that Sloane's attorney claimed Ms. Barrett "proposed the invention of a son as way to protect her anonymity," thereby acknowledging that there had been no deceit by Ms. Barrett.

d)      The Second Editor's Note states that, "When writing recently for other magazines, ~~Ms.~~ Barrett was identified by her full name, Ruth Shalit ~~Ms.~~ Barrett," but the Third Editor's Note walks that back, stating, "When writing recently for other magazines, ~~Ms.~~ Barrett was <u>typically</u> identified by her full name, Ruth Shalit Barrett." (emphasis added). The addition of "typically" denotes that she would sometimes be identified differently, which is more accurate since she had frequently used the byline "Ruth S. Barrett" since her marriage, whereas the Second Editor's Note communicated that when writing recently for other magazines, she had only been identified as Ruth Shalit Barrett, which is false.

105.    Despite this and other alterations, The Atlantic has not corrected the Second Editor's Note to reflect what it has learned since November 1<u>, 2020</u>. Instead, it has left damaging statements about Ms. Barrett on its website that it knows are false and misleading.

**DD.    *The Post* Article**

106.    ~~The~~ Atlantic employees made statements to Mr. Wemple in connection with the Wyler Report and Ms. Abraham's departure which appeared in an article by <u>Mr.</u> Wemple in *The Post* ~~Article~~. Initially, The Atlantic proclaimed that "[w]e do not comment on specific employment or personnel matters." It then proceeded to do just that, making several derogatory comments from anonymous persons on specific issues concerning Ms. Barrett. *The Post* Article reported that,

"When pressed as part of Wyler's investigation, Abraham said Barrett was hoping that Google searches would no longer surface prominent reports on her pockmarked journalistic history." This statement was made by Ms. Abraham to Ms. Wyler, and republished by unnamed Atlantic employees to *The Post*. Its clear meaning and implication is that Ms. Barrett had tried to disguise her name in her byline to prevent people from realizing that she had once written articles under her maiden name of Ruth Shalit. Whereas each of the Editor's Notes implied that Ms. Barrett had tried to disguise herself by foisting a misleading byline on The Atlantic to distance herself from her early career lapses, this constitutes an express statement to that effect. This allegation is false.

107.   *The Post* Article is also significant because it exposes The Atlantic's rank hypocrisy. It quotes anonymous Atlantic sources impugning Ms. Barrett by claiming that The Atlantic had retracted the Article on the grounds that Ms. Barrett had been "'complicit' in disguising the identity of the story's central character," as if this was some sort of capital offense in the profession of journalism. On the contrary, honoring promises of confidentiality is one of journalism's most important ethical requirements. The ~~Atlantic~~Atlantic's sources conveniently failed to mention that the story's central character—otherwise known as the story's central source—cooperated with The Atlantic only on the condition that her identity be disguised, just as these editors insisted on not being named themselves as they smeared Ms. Barrett in the pages of *The Post*.

**EE.    The Article Was Accurate And Extensively Researched**

108.   The Article was based on multiple on-the-record interviews, extensive high school and collegiate participation data, and a profusion of verifiable facts. Numerous text exchanges between Ms. Barrett and the fact-checker, attempting to clarify the color of a squash player's ponytail, or whether lacrosse has topped the list of most added high-school sports for the past six

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

years or the past seven years, are a testament to the fact that the Article was meticulously fact-checked and subjected to rigorous editorial scrutiny.

109.    Although the Editor's Note accuses Ms. Barrett of engaging in the cardinal journalistic sin of "~~fabrication,"~~fabricat[ion]," the only falsehood that The Atlantic ever uncovered in the Article (even after it conducted a post publication ~~investigations~~investigation) was the inclusion of a minor masking detail shielding Sloane's identity ~~of~~. The Atlantic's research chief, Yvonne Rolzhausen, had exhaustively researched the Article and found that it was accurate aside from the son and two trivial errors: the exact dimensions of Darien hockey rinks and the hometown of an unnamed lacrosse parent.[9] The Article's fact-checker took responsibility for this first error: "Olympic sized rinks are even bigger than NHL. I should have flagged this[.]" She reassured Ms. Barrett that articles often contain small, unintended errors that do not erode their veracity. "Every piece has mistakes," she emailed Ms. Barrett on October 22. "It's just a matter of who actually notices!"

**FF.    Retraction Conveys That The Atlantic's Investigation Concluded That The Article Was Flawed**

110.    In the Second Editor's Note, The Atlantic explained its decision to retract the Article as follows: "We cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the article." It further stated that Sloane had claimed there were several errors in the Article; that the checking of some details of Sloane's story relied solely on interviews with her or her family; and its fact checkers had identified several other errors. The only reasonable inference to be drawn from these statements is that the investigation

---

[9] The Atlantic made two other corrections with respect to injuries suffered by two of Sloane's daughters, but this reflected a difference in subjectively describing the severity of those injuries, not whether they had suffered injuries.

45

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

referenced in the First Editor's Note had been completed and that the Article had been retracted because it had been found to contain multiple errors, which reflected very poorly on Ms. Barrett as the author of the Article. This inference is false. Apart from the "son," only two minor errors had been found, and both of those had already been corrected. The Atlantic editor who had rigorously fact-checked the Article texted Ms. Barrett on December 6 stating, "from my perspective, the son was the only thing. But, sadly, seems that was enough… it tainted everything else."

111.    Ms. Barrett is informed and believes and thereon alleges that The Atlantic had never before retracted an article or decimated an author's character for similar errors. Retraction is recognized as being an appropriate measure only in extreme situations, such as the multiple articles in *The New Republic* that were entirely fabricated by Stephen Glass, or *Rolling Stone's* 2014 "Rape on Campus" story based on allegations by a young woman that she was raped by members of a fraternity at the University of Virginia after it was discovered concerns arose that the source had not been raped and had made up the entire story, which reflected very poorly on the writer. Thus, by announcing to the world that it was retracting the Article, The Atlantic falsely implied that Ms. Barrett was the author of an article which was in the same category of extreme unreliability as "Rape On Campus," and/or that she was a fraudster in the same category as Glass.

**GG.    The Atlantic Always Published Corrections To Address Minor Errors**

112.    Rather than retracting an article or attacking an author's character when minor errors have been discovered in an article, The Atlantic has always published factual corrections by simply correcting the mistakes in neutral, non-judgmental terms. For example, when writer Timothy McLaughlin profiled a Filipino nurse named Daisy Donorila for The Atlantic in April, he inaccurately described his central subject as having two siblings instead of four. Here is the

46

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

straightforward correction that The Atlantic ran in response: "An earlier version of this article misstated how many siblings Daisy Donorila had. She was the youngest of five, not the youngest of three."

113.    Other examples of corrections are: "This article originally mischaracterized the size of WNYC's newsroom. We regret the error;"[10] "An earlier version of this essay mischaracterized what Bolton said about Trump's involvement in investigations;"[11] "This section previously and erroneously grouped the views of William and Benjamin Hurlbut together. It mischaracterized the nature of the conversation between He and Benjamin Hurlbut. It has also been revised to clarify William Hurlbut's stance on the ethics of embryo use, which do not, as previously stated, arise from conservative religious beliefs;"[12] "This article previously mischaracterized parts of the IVF process;"[13] "This article previously mischaracterized why Brad Birkenfeld was charged with conspiracy;"[14] "This story originally stated that Chu's study was of affluent families"; "It also incorrectly reported that Chu was a parent at the time of her study"; and "It also incorrectly

---

[10] Gillian B. White, *Why Public Media Has a Sexual-Harassment Problem*, THE ATLANTIC (Feb. 2, 2018).

[11] Thomas Wright, *What Matters Most Is That Bolton Publishes the Book Before the Election*, THE ATLANTIC, https://www.theatlantic.com/ideas/archive/2020/06/i-am-not-a-bolton-fan-but-he-deserves-credit/613183/ (June 18, 2020, 4:26 PM ET).

[12] Ed Yong, *The CRISPR Baby Scandal Gets Worse by the Day*, THE ATLANTIC, https://www.theatlantic.com/science/archive/2018/12/15-worrying-things-about-crispr-babies-scandal/577234/ (Dec. 4, 2018, 10:55 AM ET) (emphasis added).

[13] Sarah Zhang, *IVF Mix-Ups Have Broken the Definition of Parenthood*, THE ATLANTIC, https://www.theatlantic.com/science/archive/2019/07/ivf-embryo-mix-up-parenthood/593725/#Correction1 (July 11, 2019, 2:23 PM ET).

[14] Peter Stone, *A Million-Dollar Pardon Offer at the Trump Hotel*, THE ATLANTIC, https://www.theatlantic.com/politics/archive/2021/02/corey-lewandowski-allegedly-pitched-more-1-million-trump-pardon/617980/#Correction1 (Feb. 10, 2021, 6:16 PM ET).

reported that the boys would play with Chu's hair. We regret the errors."[15] All of these factual errors, which The Atlantic termed "mischaracterize[ations]"—including describing someone as a parent when she is not—are more material than the number and gender of a confidential source's children.

**HH.    Ms. Barrett Did Not Leave *The New Republic* Because Of Plagiarism And "Inaccurate Reporting" in 1999**

114.    The Second Editor's Note contains the following statement: "In 1999, when she was known by Ruth Shalit, she left *The New Republic*, where she was an associate editor, after[16] plagiarism and inaccurate reporting were discovered in her work." (emphasis added). The Peck Memorandum and the First and Third Editor's Notes contain very similar statements. They are false and misleading either on their face or by implication because "plagiarism and inaccurate reporting" were not "discovered" in Ms. Barrett's work in 1999. Ms. Barrett did not commit journalistic lapses at *The New Republic* in 1999. The two minor lapses at *The New Republic* described above occurred over a twelve-month time span in 1994-1995. It is further false and misleading because Ms. Barrett did not exit *The New Republic* as a direct result of these incidents.

115.    Further, the statement is false and misleading because Ms. Barrett was never accused of, nor responsible for, "inaccurate reporting" rising to the level of journalistic malfeasance that could precipitate a forced exit from *The New Republic*. She does not have an unusual and concerning history of "inaccurate reporting." During her six years at *The New Republic*, only one of her articles, her 1995 piece about *The Post*, was found to contain a factual

---

[15] Michael Reichert, *Male Violence Is Everywhere*, THE ATLANTIC, https://www.theatlantic.com/education/archive/2018/02/male-violence-is-everywhere/554261/ (Feb. 28, 2018).

[16] "~~After~~"[A]fter" in this context states on its face or implies a causative relationship, *i.e.*, that Ms. Barrett left *The New Republic* because of the discovery of plagiarism and inaccurate reporting in her work.

error that was significant enough to warrant a correction. This error was acknowledged, dealt with, and corrected back in 1995. It has no relevance to her professional work for The Atlantic 27 years later. The Atlantic knew or was reckless toward its falsity because Ms. Abraham (the Article's main editor) was Ms. Barrett's longtime colleague, who Ms. Barrett had worked with for approximately twenty years, and knew the truth about these issues and also because the true facts were readily available in the public record.

**II.     The Atlantic Published Numerous Writers Who Have Committed Plagiarism**

116.    The Atlantic could conceivably have a strict zero-tolerance policy regarding plagiarism and believe that any individual who has ever committed it should be unemployable in journalism forever. But this is not the case. The Atlantic has knowingly and enthusiastically published the work of Doris Kearns Goodwin, Nina Totenberg, and other writers who have acknowledged a far more egregious past history of plagiarism. Ms. Goodwin's 2002 book, *The Fitzgeralds and The Kennedys*, contained more than 50 sentences plagiarized from a biography of Kathleen Kennedy written by Lynne McTaggart. As a result, Ms. Goodman's publisher Simon & Schuster was compelled to recall and pulp all copies of the book and to pay a sizable monetary settlement to Ms. McTaggart. Seven years later, it happened again; Ms. Goodwin's bestseller *No Ordinary Time* was found to contain multiple passages pulled from Joseph Lash's Eleanor and Franklin and Hugh Gallagher's *FDR's Splendid Deception*. And yet in 2018, only nine years later, The Atlantic published a lengthy article by Ms. Goodwin on the legacy of Lyndon Johnson. The Atlantic did not subsequently retract Ms. Goodwin's piece and inform its readers that it could not "attest to [her] trustworthiness" due to her past transgressions.

**JJ.     Ms. Barrett Did Not Try To Disguise Her Identity**

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

49

117.    The Second Editor's Note contains the following: "Originally, we referred to her as Ruth S. Barrett. When writing recently for other magazines, ~~Ms.~~ Barrett was identified by her full name, Ruth Shalit Barrett. . . . We typically defer to authors on how their byline appears . . . . We referred to ~~Ms.~~ Barrett as Ruth S. Barrett at her request, but in the interest of transparency, we should have included the name that she used as her byline in the 1990s, when the plagiarism incidents occurred." The Peck Memorandum and the First Editor's Note contain very similar statements.

118.    This statement is false, both on its face and in its implication that Ms. Barrett acted deceptively by trying to conceal her identity. Ms. Barrett has published pieces in other magazines in recent years as both "Ruth Shalit Barrett" and "Ruth S. Barrett." Her own website has links to articles in which she is identified variously as "Ruth Shalit," "Ruth Shalit Barrett" and "Ruth S. Barrett." The first version of the byline for this Article, which was prepared by The Atlantic and appeared in a prepublication draft, identified the author simply as "Ruth Barrett." Ms. Barrett did not request this byline. She reminded her Article's main editor, with whom she had worked on several other stories in recent years, that she was normally identified in bylines as "Ruth S. Barrett" and asked that her initial be included. Further, she asked her editor to include an embedded link to her website in ~~the byline~~her bio in the online version of the Article.

119.    Further evidence that Ms. Barrett did not try to disguise herself is that when The Atlantic was considering whether to commission the Article, and a few editors requested to see recent clips of Ms. Barrett's work, Ms. Barrett's editor circulated a feature piece ~~by~~ Ms. Barrett had published in *New York Magazine* the previous year under the byline Ruth Shalit Barrett. The notion that Ms. Barrett engaged in any misrepresentation or chicanery in connection with her byline is a malicious lie.

50

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

## IV.    PARTIES, JURISDICTION AND VENUE

120.    Ms. Barrett is a natural person residing in Connecticut. The Atlantic is a limited liability corporation with its principal place of business in the District of Columbia. Upon information and belief, all of The Atlantic's members reside outside of Connecticut. Mr. Peck is a natural person residing in the District of Columbia.

121.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because complete diversity exists between Ms. Barrett, on the one hand, and The Atlantic and Mr. Peck on the other, and because the matter in controversy exceeds $75,000.

122.    This Court has personal jurisdiction over Mr. Peck and The Atlantic because they reside and/or transact business in the District of Columbia and committed torts in the District of Columbia, as described in this Complaint.

123.    Venue is proper in this Court pursuant to pursuant to 28 U.S.C. § 1391(b) because a substantial part of Ms. Barrett's claims occurred in the District of Columbia.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Defamation Per Se - Accusations That Ms. Barrett Acted Dishonestly With Respect To The Article**

**(As to The Atlantic and Mr. Peck)**

124.    Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 123 of this complaint.

### Publication

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

51

125.    On October 30, Defendants published the Peck Memorandum by email to numerous persons, including the editorial staff of The Atlantic. It contains the following defamatory statements:

a.    "~~Ms.~~ Barrett was complicit with a source in the story, referred to as 'Sloane,' in an effort to deceive *The Atlantic* and its readers about the makeup of Sloane's family" ("Defamatory Statement No. 1");[17]

b.    "~~Ms.~~ Barrett . . . lied about [the fabrication of Sloane's son] to the fact-checking department" ("Defamatory Statement No. 2"); and

c.    "[W]e just confirmed ~~Ms.~~ Barrett's role in the fabrication of the son[.]" ("Defamatory Statement No. 3").

126.    On October 30, Defendants publicly published on its website the First Editor's Note which contains the following defamatory statements:

a.    "We have established that ~~Ms.~~ Barrett deceived The Atlantic and its readers about a section of the story that concerns a person referred to as '~~Sloane~~Sloane.'" ("Defamatory Statement No. 4");

b.    "Her attorney also said that according to Sloane, ~~Ms.~~ Barrett had first proposed the invention of a son, and encouraged Sloane to deceive The Atlantic as a way to protect her anonymity~~.~~." ("Defamatory Statement No. 5");

127.    On November 1, Defendants publicly published on its website the Second Editor's Note which contains the following defamatory statements:

---

[17] The Text of the Peck Memorandum, ~~and~~ the Editor's Notes ~~and the Post Article~~ showing where each of the Defamatory Statements appears is attached as Exhibit 8.

a. "We have decided to retract this article. We cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the article." ("Defamatory Statement No. 6");

b.     "We have established that Barrett deceived *The Atlantic* and its readers about a section of the story that concerns a person referred to as 'Sloane.'" ("Defamatory Statement No. 7");

c. "Her attorney also said that according to Sloane, Barrett had first proposed the invention of a son, and encouraged Sloane to deceive *The Atlantic* as a way to protect her anonymity." ("Defamatory Statement No. 8");

d. "[Ms. Barrett] misled our fact-checkers, lied to our editors, and is accused of inducing at least one source to lie to our fact-checking department" ("Defamatory Statement No. 9").

128.     In or about December, Defendants publicly published in the Magazine's January/February issue the Third Editor's Note which contains the following defamatory statements:

a.   "[W]e have decided to retract this article. We cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the piece in its entirety" ("Defamatory Statement No. 10");

b.   "We have established that Barrett deceived the *The Atlantic* and its readers about a section of the story that concerns a person referred to as 'Sloane.'" ("Defamatory Statement No. 11");

c.   "Sloane's attorney told *The Atlantic* that Sloane had misled the magazine because she had wanted to make herself less readily identifiable—and that ~~Ms.~~ Barrett had proposed the invention of a son as a way to protect her anonymity~~''~~." ("Defamatory Statement No. 12"); and

d.   "[Ms. Barrett] misled our fact-checkers [and] lied to our editors, and is accused of inducing ~~one~~a source to lie to our fact-checking department" ("Defamatory Statement No. 13").

**<u>Falsity</u>**

129.   Defamatory Statements Nos. 1 through 13 are defamatory on their face and by implication in the context of the document in which they appear, because their overall gist and sting is reasonably susceptible of only one construction, namely~~:~~, that Ms. Barrett acted dishonestly in the course of her employment when she omitted to tell The Atlantic that she knew that Sloane did not have a son until October 30, that Ms. Barrett acted dishonestly in the course of her employment by inducing Sloane and other unnamed sources to lie to The Atlantic, and further, that the Article was retracted because Ms. Barrett was dishonest and because it was riddled with errors and/or falsehoods.

130.   This is false. Ms. Barrett's omission to tell The Atlantic that she knew that Sloane did not have a son until October 30 was an honest and principled decision for the following reasons:

a.   The Sloane Agreement required both Ms. Barrett and The Atlantic to protect the identity of Sloane and her family (which included 3 minor children) by neither stating their names nor including too much information about them in the Article so as to render them identifiable;

b.   The Atlantic's inclusion of too much information in the Article about Sloane and her family placed them in serious danger of being publicly identified and breached the Sloane Agreement;

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

c.   Sloane and Ms. Barrett protested to The Atlantic at the inclusion of too much information in the Article about Sloane and her family, but The Atlantic largely ignored them;

d.   Sloane's invention of a "son" was a justified and legitimate exercise of self-help to protect herself and her children from being publicly identified;

e.   Whether or not Sloane had a son was a trivial detail which was irrelevant to the Article, save as a masking detail to protect Sloane's identity;

f.   The Atlantic had told Ms. Barrett that it would publicly disclose Sloane's identity and/or the non-existence of her "son" if it learned that there was no son;

g.   In the circumstances, Ms. Barrett's duty to protect her confidential source outweighed her duty to be truthful with her employer;

h.   Ms. Barrett had nothing to gain personally from omitting to tell The Atlantic that she knew that Sloane did not have a son; in fact, as events have shown, she had much to lose.

i.   Apart from the "son," The Atlantic's fact-checking and investigation found only two minor errors which it corrected; and

j.   The Second Editor's Note "identified athe need to clarify a detail about a neck injury . . . to be more precise about its severity," but the Third Editor's Note omitted this statement, thereby acknowledging that Defendants had even less concerns about inaccuracies in the Article than the Second Editor's Note suggests; and

k.   The Second Editor's Note claims Ms. Barrett "is accused of inducing at least one source to lie to our fact-checking department," but the Third Editor's Note confines this accusation to just "a source," thereby eliminating the suggestion in the Second Editor's Note that she had induced multiple sources to lie.

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

131.    Defamatory Statements Nos. 1 through 13 are actionable as a matter of law irrespective of special harm and constitute libel per se because they constitute words which impute that Ms. Barrett is unable to perform or lacks integrity in performing her employment duties; and/or that Ms. Barrett lacks fitness for the proper conduct of her lawful business, trade or profession.

**Fault**

132.    Because Defendants never openly confess to publishing with actual malice, proof of actual malice may plausibly be inferred from indirect and circumstantial evidence, considered in its totality. As the United States Supreme Court explained in *Herbert v. Lando*, 441 U.S. 153, 164 n. 12 (1979): "The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the ~~plaintiff's~~plaintiff's rights . . . ."

133.    Defendants published Defamatory Statements Nos. 1 through 13 with negligence, gross negligence, and with actual malice (defined as knowledge of falsity or reckless disregard for truth or falsity). This may plausibly be inferred from the facts alleged above, including, but not limited to, the following:

    a.  Defendants knew that The Atlantic was bound by the Sloane Agreement, and was therefore obliged to protect Sloane and her family, which included three minor children, by ensuring that they were neither identified nor identifiable in the Article;

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

b. Defendants received pre-publication protests from Sloane and Ms. Barrett that The Atlantic's intended inclusion of so much information about Sloane and her family in the Article rendered them identifiable, but Defendants largely ignored those protests;

c. The Atlantic published the Article with a great deal of specific information about Sloane and her family (such as specific details of the squash tournament in Redwood City);

d. Defendants knew that Sloane's real identity was discovered as a result of the inclusion of so much information about her and her family in the Article;

e. Defendants recognized that it was acceptable to change details in an article to disguise someone's identity, as evidenced by the fact that The Atlantic changed Coach Braemeier's quote to disguise the identity of a student;

f. Defendants knew or should have known that the "son" was a trivial masking detail intended to accomplish a legitimate purpose, *i.e.*, to protect Sloane's anonymity;

g. Defendants knew or should have known that the "son" was invented to protect Sloane and her family from the danger of public exposure caused by The Atlantic's breaches of its legal and ethical obligations to Sloane;

h. Defendants knew or should have known that if they had included in Mr. Peck's Memorandum and the Editor's Notes the full circumstances which led to Ms. Barrett's decision not to disclose to The Atlantic that she knew that Sloane did not have a son, they would face public criticism for failing to protect a confidential source;

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

57

i.   Defendants knew that apart from the "son," The Atlantic's investigation referenced in the Peck Memorandum and the First Editor's Note found only two minor errors which it corrected;

j.   Defendants knew that the entire Article was not so deeply flawed and full of errors and lies that the only appropriate response was to retract it;

k.   Defendants knew or should have known that the announcement of the retraction of Ms. Barrett's entire Article constituted a severe indictment of Ms. Barrett's professional qualities and would be interpreted to mean that the entire Article had been made up;

l.   The Atlantic initiated an investigation into the Article but did so in a biased and bad faith manner, using insiders who failed to examine The Atlantic's conduct in over-exposing Sloane, and made no good faith efforts to gather evidence, to act objectively and or to determine the truth before jumping to a self-serving judgment;

m.  Defendants published derogatory information about Ms. Barrett without seeking her side of the story, and without even informing her that they intended to publish a statement about her;

n.   Defendants excluded from deliberations their senior colleague, Laurie Abraham, who had worked with Ms. Barrett in the past, had recruited her to write the Article and could have provided them with accurate, truthful information about Ms. Barrett;

o.   Defendants refused to allow Ms. Barrett to read the letter from ~~Sloane's~~Sloane's attorney and would not provide Ms. Barrett with a copy of it;

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

p. Defendants failed to press Sloane to provide any evidence that would have verified her claims against Ms. Barrett—and failed to give Ms. Barrett the chance to provide evidence that would have refuted these claims;

q. When Ms. Barrett ~~provide~~provided an audiotape to Defendants on October 29, 2020, showing that Sloane's denial of a pandemic basement fencing strip was a lie, Defendants had notice that Sloane's accusations were untrue. Any reasonable editor would have understood that this lie undermined Sloane's credibility and that it de-legitimized her accusations against Ms. Barrett;

r. The Atlantic could have pursued evidence that would have supported or discredited Sloane's allegations, but failed to do so;

s. The Atlantic failed to check quotes with Ms. Barrett, did not run derogatory information by her, or apply any of its other regular fact-checking process to its Editor's Notes;

t. At some point in or around mid-November, editors at The Atlantic prepared the Third Editor's Note. By this time, the editors had procured enough information to make them skeptical of several of the Second Note's broader claims. Based on that information, Defendants revised the original Editor's Note for the print edition. Nonetheless, Defendants never issued corrections to the Second Editor's Note or even updated the online version of the note to reflect the newer, less derogatory version. Instead, they left the old version online for over a year and it remains online up until this day.

**Damages**

59

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

134.    Ms. Barrett has suffered general damages in that Defamatory Statements Nos. 1 through 13 have damaged her reputation, and exposed her to hatred, contempt, ridicule, embarrassment and humiliation. In addition, they have caused her great embarrassment, stress and emotional distress, and have impaired her ability to practice journalism, her profession of much of the past twenty-plus years. Whereas before the Article, Ms. Barrett had been a busy and successful journalist, she has not been offered one single assignment by another magazine since Defendants defamed her. These violations are compensable pursuant to common law defamation in the District of Columbia. As a direct and proximate cause of this conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm including loss of earning capacity in her profession.

<u>SECOND CLAIM FOR RELIEF</u>

**Defamation Per Se – Accusation that Ms. Barrett Was Fired In 1999 For Misconduct**

**(As to The Atlantic and Mr. Peck)**

135.    Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 123 of this complaint.

<u>Publication</u>

136.    The Peck Memorandum contains the following defamatory statement: "In 1999, when ~~Ms.~~ Barrett (her married name) was known by Ruth Shalit, she left *The New Republic*, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work"." ("Defamatory Statement No. 14").

137.    The First and Second Editor's Notes contain the following defamatory statement: "In 1999, when she was known by Ruth Shalit, she left *The New Republic*, where she was an

60

associate editor, after plagiarism and inaccurate reporting were discovered in her work." ("Defamatory Statement No. 15").

138.    The Third Editor's Note contains the following defamatory statement: "In 1999, when she was known by Ruth Shalit, she left *The New Republic* after plagiarism and inaccurate reporting were discovered in her work." ("Defamatory Statement No. 16").

**<u>Falsity</u>**

139.    Defamatory Statements Nos. 14 through 16 are defamatory on their face and by implication in the context of the document in which they appear, because their overall gist and sting is reasonably susceptible of only one construction, namely, that "plagiarism and inaccurate reporting" was "discovered" in Ms. Barrett's work in 1999, and that Ms. Barrett had to leave *The New Republic* at that time as a result. In fact, no "plagiarism and inaccurate reporting" was discovered in Ms. Barrett's work in 1999. The two minor lapses described above occurred over a twelve-month time span in 1994-1995. Ms. Barrett continued to work at *The New Republic* until 1999 and did not exit as a direct result of these incidents. Nor was she accused of, or responsible for, "inaccurate reporting" rising to the level of journalistic malfeasance that could have precipitated a forced exit from *The New Republic* (rather, just one of her articles for *The New Republic* contained a serious error, which should have been caught by *The New Republic*'s fact checkers). *The New Republic*'s own statement—made ~~two years~~three months later when *The Washington Post* tried to revisit the allegations—makes it clear that this was not the reason for her separation from *The New Republic*: "The 'plagiarism' charges have been dealt with—and apologized for—in TNR's pages and, together, concern a total of six sentences transcribed accidentally from Nexis. There is no other reason to revisit that matter other than to distract from the story itself."

140.    The effect of Defamatory Statements Nos. 14-16, especially when read in the context of other derogatory statements in Mr. Peck's Memorandum and the Editor's Notes, was to communicate, expressly and by implication, insinuation and innuendo, that Ms. Barrett was a dishonest and untrustworthy journalist.

141.    Defamatory Statements Nos. 14-16 are actionable as a matter of law irrespective of special harm and constitute libel per se because they constitute words that impute a person is unable to perform or lacks integrity in performing her employment duties; and words that impute a person lacks fitness for the proper conduct of her lawful business, trade or profession.

**Fault**

142.    ~~Defendants published Defamatory Statements Nos. 14 through 16 with negligence, gross~~ Defendants published Defamatory Statements Nos. 14 through 16 with negligence, gross negligence, and with actual malice (defined as knowledge of falsity or reckless disregard for truth or falsity). This may plausibly be inferred from the facts alleged above, including, but not limited to, the following:

a.   The Atlantic initiated an investigation into the Article but did so in a biased and bad faith manner, using insiders who failed to examine The Atlantic's conduct in over-exposing Sloane, and made no good faith efforts to gather evidence, to act objectively and or to determine the truth before jumping to a self-serving judgment;

b.   Defendants published derogatory information about Ms. Barrett without seeking her side of the story, and without even informing her that they intended to publish a statement about her;

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

c.  Defendants excluded from deliberations their senior colleague, Laurie Abraham, who had worked with Ms. Barrett in the past, had recruited her to write the Article and could have provided them with accurate, truthful information about Ms. Barrett;

d.  The Atlantic failed to check quotes with Ms. Barrett, did not run derogatory information by her, or apply any of its other regular fact-checking process to its Editor's Notes;

e.  Laurie Abraham, who was a senior Atlantic employee and the Article's main editor, was Ms. Barrett's longtime colleague, and knew the true facts, as set forth above;

f.  The true facts, as set forth above, and the dates of the two errors, are a matter of public record and easily discoverable; and

g.  A publicly available statement—made in response to attacks on Ms. Barrett by *The Washington Post* months after the two incidents were discovered—makes plain that Ms. Barrett was not fired in 1999 for these incidents, and belie the contention that she committed journalistic malpractice: "The 'plagiarism' charges have been dealt with—and apologized for—in TNR's pages and, together, concern a total of six sentences transcribed accidentally from Nexis. There is no other reason to revisit that matter other than to distract from the story itself."

## Damages

143.   Ms. Barrett has suffered general damages in that Defamatory Statements Nos. 14-16 have damaged her reputation, and exposed her to hatred, contempt, ridicule, embarrassment and humiliation. In addition, they have caused her great embarrassment, stress and emotional distress, and have impaired her ability to practice journalism, her profession of much of the past

63

twenty-plus years. Whereas before the Article, Ms. Barrett had been a busy and successful journalist, she has not been offered one single assignment by another magazine since Defendants defamed her. These violations are compensable pursuant to common law defamation in the District of Columbia. As a direct and proximate cause of this conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.

**THIRD CLAIM FOR RELIEF**

**Defamation Per Se – Statement Alleging That Ms. Barrett Tried To Disguise Her Identity**

**(As to The Atlantic and Mr. Peck)**

144.    Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 123 of this complaint.

**Publication**

145.    The Peck Memorandum contains the following defamatory statement: "The assignment [to Ms. Barrett] was a mistake. So was the initial byline under which the piece ran. We typically defer to authors on how their byline appears, and originally we referred to Ms. Barrett as Ruth S. Barrett at her request. In the interest of transparency to our readers, we should have included the name that she used in her byline in the 1990s. We have changed the byline on this article to Ruth Shalit Barrett." ("Defamatory Statement No. 17").

146.    The First and Second Editor's Note contains the following defamatory statement: "Originally, we referred to her as Ruth S. Barrett. When writing recently for other magazines, Ms. Barrett was identified by her full name, Ruth Shalit Barrett . . . . We typically defer to authors on how their byline appears . . . . We referred to Ms. Barrett as Ruth S. Barrett at her request, but in the interest of transparency, we should have included the name that she used as her byline in the

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

1990s, when the plagiarism incidents occurred. We have changed the byline on this article to Ruth

Shalit Barrett." ("Defamatory Statement No. 18").

147.    The Third Editor's Note contains the following defamatory statement: "Originally,

we referred to the author of the article as Ruth S. Barrett. When writing recently for other

magazines, ~~Ms.~~ Barrett was typically identified by her full name, Ruth Shalit Barrett. . . . We

typically defer to authors on how their byline appears. We referred to ~~Ms.~~ Barrett as Ruth S. Barrett

at her request, but in the interest of transparency, we should have included the name that she used

as her byline in the 1990s. On our website, we have changed the byline on this article to Ruth

Shalit  Barrett." ("Defamatory Statement No. 19").

148.    As evidenced by *The Post* Article, Ms. Abraham told Ms. Wyler on or about

November or December that Ms. Barrett was hoping to disguise her name in her byline to prevent

people from realizing that she had once written articles under her maiden name of Ruth Shalit.

("Defamatory Statement No. 20"). In or about January 2021, The Atlantic republished this

statement to *The Post*.

**<u>Falsity</u>**

149.    Defamatory Statements Nos. 17 through 20 are defamatory on their face and by

implication in the context of the document in which they appear, because their overall gist and

sting is reasonably susceptible of only one construction, namely, that Ms. Barrett deviously

proposed the byline "Ruth S. Barrett" to conceal her identity. They are false and misleading for

the following reasons:

a)   In recent years, Ms. Barrett has had articles published in reputable magazines under

the byline, "Ruth S. Barrett" as well as "Ruth Shalit Barrett;"

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman

b)  Ms. Barrett's website displays articles by her which were published in reputable magazines in recent years under the byline, "Ruth S. Barrett" as well as "Ruth Shalit Barrett;"

c)  The Atlantic first proposed a byline of "Ruth Barrett," but Ms. Barrett then recommended the more transparent byline, "Ruth S. Barrett;"

d)  Laurie Abraham was the Article's main editor and would have seen and approved the first-pass proof of Ms. Barrett's Article that contained the initial byline, "Ruth Barrett;" and

e)  In the Third Editor's Note, The Atlantic added the word "typically" to Defamatory Statement No. 19, which read "[w]hen writing recently for other magazines, ~~Ms.~~ Barrett was <u>typically</u> identified by her full name, Ruth Shalit Barrett." (emphasis added).

150.    The effect of Defamatory Statements Nos. 17-20, especially when read in the context of other derogatory statements in Mr. Peck's Memorandum and the Editor's Notes, was to communicate, expressly and by implication, insinuation and innuendo, that Ms. Barrett was a dishonest and untrustworthy journalist.

151.    Defamatory Statements Nos. 17-20 are actionable as a matter of law irrespective of special harm and constitute libel per se because they constitute words that impute a person is unable to perform or lacks integrity in performing her employment duties; and words that impute a person lacks fitness for the proper conduct of her lawful business, trade or profession.

**<u>Fault</u>**

152.    Defendants published Defamatory Statements Nos. 17-20 with negligence, gross negligence, and with actual malice (defined as knowledge of falsity or reckless disregard for truth or falsity). This may plausibly be inferred from the following:

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

a)  In recent years, Ms. Barrett has had articles published in reputable magazines under the byline, "Ruth S. Barrett" as well as "Ruth Shalit Barrett;" these are a matter of public record and easily discoverable.

b)  Ms. Barrett's website displays articles by her which were published in reputable magazines in recent years under the byline, "Ruth S. Barrett" as well as "Ruth Shalit Barrett;"

c)  The Atlantic first proposed a byline of "Ruth Barrett," but Ms. Barrett then recommended the more transparent byline, "Ruth S. Barrett;"

d)  Laurie Abraham was the Article's main editor and would have seen and approved the first-pass proof of Ms. Barrett's Article that contained the initial byline, "Ruth Barrett;" and

e)  In the Third Editor's Note, The Atlantic added the word "typically" to Defamatory Statement No. 20, which read "[w]hen writing recently for other magazines, ~~Ms.~~ Barrett was <u>typically</u> identified by her full name, Ruth Shalit  Barrett." (emphasis added). This is evidence that Defendants knew or should have known when they Published the First and Second Editor's Note that their statement that "[w]hen writing recently for other magazines, Barrett was identified by her full name," was false.

### **Damages**

153.  Ms. Barrett has suffered general damages in that Defamatory Statements Nos. 17-20 have damaged her reputation, and exposed her to hatred, contempt, ridicule, embarrassment and humiliation. In addition, they have caused her great embarrassment, stress and emotional distress, and have impaired her ability to practice journalism, her profession of much of the past twenty-plus years. Whereas before the Article, Ms. Barrett had been a busy and successful journalist, she has not been offered one single assignment by another magazine since Defendants defamed her. These violations are compensable pursuant to common law defamation in the District

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

of Columbia. As a direct and proximate cause of this conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.

## FOURTH CLAIM FOR RELIEF

**Defamation Per Se – Statement That Ms. Barrett Is A Dishonest Journalist With A History of Fabricating Facts**

**(As to The Atlantic and Mr. Peck)**

154.    Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 123 of this complaint.

### Publication

155.    This cause of action is based on the totality of all of the specific defamatory statements identified above (Defamatory Statements Nos. 1-20), together with two additional defamatory statements.

156.    Defendants' Peck Memorandum contains the following defamatory statement: "We"[W]e decided to assign Ms. Barrett this freelance story in part because more than two decades separated her from her journalistic malpractice, and because she had been published in recent years byin reputable magazines. But this was self-evidently an act of poor judgment on our part, and one we regret. The assignment was a mistake." ("Defamatory Statement No. 21").

157.    The First, Second, and Third Editor's Notes contain the following or similar defamatory statement: "We decided to assign Ms. Barrett this freelance story in part because more than two decades separated her from her journalistic malpractice at *The New Republic* and because in recent years her work has appeared in reputable magazines. We took into consideration the argument that Ms. Barrett deserved a second chance to write feature stories such as this one. We

**Formatted:** Font: Times New Roman
**Formatted:** Font: Times New Roman

were wrong to make this assignment, however. It reflects poor judgment on our part, and we regret our decision~~"~~." ("Defamatory Statement No. 22").

**Falsity**

158.    Together, Defamatory Statements Nos. 21-22 are false and defamatory in their overall gist and sting because they are reasonably susceptible of only one construction: ~~Namely~~namely, that Ms. Barrett is a deeply dishonest journalist who tried to hide her identity from readers to get a "second chance." Then, once she got her second chance, she continued her prior history of deceit and fabrication to make up facts to insert into the Article. This is false because Ms. Barrett never had any history or record of fabrication, invention, lying, inaccurate reporting, veracity, or dishonesty. And she was never found to have committed "journalistic malpractice."

159.    In her six years at *The New Republic*, only one of Ms. Barrett's articles was found to contain a factual error that was significant enough to warrant correction (the statement that someone had ~~been "jailed~~"served time for corruption" when they had been investigated for corruption several times but never jailed). *The New Republic* corrected this mistake in 1995 through a post-publication correction, which is common. This was not a fabrication and there was never any suggestion that Ms. Barrett made this up. It was a mistake and treated as such.

160.    And with respect to her work on the Article, Ms. Barrett did not "deceive" The Atlantic's readers or encourage Sloane to do so. She did not request a certain byline to hide her identity—she used her real name and tried to make the byline more transparent by adding her middle initial. It is patently false that "[w]hen writing recently for other magazines, Barrett was identified by her full name, Ruth Shalit Barrett." She had published under the name Ruth S. Barrett. She did not lie to fact checkers. She did not propose the invention of the son—that was created by Sloane and her husband. She did not "encourage" a source to "deceive The Atlantic."

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

69

161.    The effect of Defamatory Statements Nos. 1-22 was to communicate, expressly and by implication, insinuation and innuendo, that Ms. Barrett was a dishonest and untrustworthy journalist who was run out of journalism for making up facts and that she fabricated facts in the Article,; and it was for these reasons ("the trustworthiness and credibility of the author"), The Atlantic believed the entire Article could have been infected with fabrications ("therefore, we cannot attest to the veracity of the article"). In the end, though, after its final investigation, The Atlantic admitted that this was untrue. All the other facts held up or required only minor corrections. The son was the only thing.

162.    Defamatory Statements Nos. 21-22 are actionable as a matter of law irrespective of special harm and constitute libel per se because they constitute words that impute a person is unable to perform or lacks integrity in performing her employment duties; and words that impute a person lacks fitness for the proper conduct of her lawful business, trade or profession.

**Fault**

163.    Callously indifferent to the devastation that Defamatory Statements Nos. 1-22 would visit upon Barrett, Defendants published with negligence and with knowledge of falsity and reckless disregard for truth or falsity in order to stave off criticism from *The Washington Post*. A review of Ms. Barrett's history would not have supported the claims that she had made up facts in her prior work or was fired for journalistic malpractice. The Atlantic never made any effort to speak to Ms. Barrett about her past or give her an opportunity to show that the issues from her early career (when she was 2223 and 2324 years old) had nothing to do with fabricating or inventing facts.

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

164.    Similarly, if The Atlantic had even let Ms. Barrett know that it was planning to tell the world that Ms. Barrett had encouraged a source to lie and proposed the invention of the son, Ms. Barrett could have provided written evidence that this was untrue.

165.    If The Atlantic had looked at its own correspondence, it would have seen that its editors proposed the byline "Ruth Barrett," and that Ms. Barrett made her identity more clear by adding her middle initial. It could have also looked at her website to discovery that—contrary to its claims—Ms. Barrett had in fact published articles with the byline Ruth S. Barrett. It appears that The Atlantic only bothered to Google her other articles *after* it defamed Ms. Barrett, since the Third Editor's note excluded this false accusation by inserting the modifier "typically" to its prior false statement that in her recent writings Ms. Barrett "was identified by her full name, Ruth Shalit Barrett."

166.    Put simply, The Atlantic would have had to have buried its head in the sand to not know the falsity of these defamatory statements. Assuming The Atlantic really did not know the truth of the matter, it was both negligent and reckless for it not to speak to her or conduct a simple investigation before destroying her career. Indeed, after the dust had settled, the fact-checker and editor admitted to Ms. Barrett that the ""they (**higher ups** () **all know,** from my perspective) all know, the son was the only thing." (emphasis added). And she further admitted that The Atlantic had not uncovered "any other lies/deception."

## Damages

167.    Ms. Barrett has suffered general damages in that Defamatory Statements Nos. 21-22 have damaged her reputation, and exposed her to hatred, contempt, ridicule, embarrassment and humiliation. In addition, they have caused her great embarrassment, stress and emotional distress, and have impaired her ability to practice journalism, her profession of much of the past

71

**Formatted:** Font: Times New Roman
**Formatted:** Font: Times New Roman

twenty-plus years. Whereas before the Article, Ms. Barrett had been a busy and successful journalist, she has not been offered one single assignment by another magazine since Defendants defamed her. An editor from The Atlantic admitted to Ms. Barrett that "this has been devastating" to Ms. Barrett and that Ms. Barrett's "future journalistic endeavors might not recover." These violations are compensable pursuant to common law defamation in the District of Columbia. As a direct and proximate cause of this conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.

**FIFTH CLAIM FOR RELIEF**

**Invasion of Privacy-False Light**

**(As to The Atlantic and Mr. Peck)**

168.    Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 123 of this complaint.

169.    Defendants published Defamatory Statements 1-22 either to The Atlantic's staff or to the public. They conveyed the following contentions: that (1) Ms. Barrett acted dishonestly in the course of her employment when she omitted to tell The Atlantic that she knew that Sloane did not have a son until October 30; (2) "plagiarism and inaccurate reporting" was "discovered" in Ms. Barrett's work in 1999, and that Ms. Barrett had to leave The New Republic at that time as a result; (3) Ms. Barrett deviously proposed the byline "Ruth S. Barrett" to conceal her identity; and (4) Ms. Barrett is a deeply dishonest journalist with a history of fabrication who should not have been given the opportunity to write for The Atlantic.

170.    These contentions are false because (1) Ms. Barrett acted in an honest and principled manner when she omitted to tell The Atlantic that she knew that Sloane did not have a son—she did so to protect her confidential source from The Atlantic's unlawful and unethical

72

conduct; (2) "plagiarism and inaccurate reporting" was not "discovered" in Ms. Barrett's work in 1999, and Ms. Barrett did not leave *The New Republic* at that time as a result; (3) Ms. Barrett did not propose the byline "Ruth S. Barrett" to conceal her identity—it was the byline she suggested after The Atlantic proposed that her byline should read "Ruth Barrett," and she has written under the byline "Ruth S. Barrett" for other publications; and (4) Ms. Barrett is an honest, principled and highly skilled journalist who has written for, and who is well-qualified to write for, the most prestigious magazines.

171.    These contentions place Ms. Barrett in a false light and would be highly offensive to any reasonable person.

172.    As a direct and proximate cause of said conduct, Ms. Barrett has suffered and will continue to suffer economic and significant emotional harm.


172.

**SIXTH CLAIM FOR RELIEF**

**Breach of Covenant of Good Faith and Fair Dealing**

**(As to The Atlantic)**

173.    Ms. Barrett realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 123 of this complaint.

174.    Ms. Barrett signed an Author's Agreement with The Atlantic on December 30, 2019. This was a contract of adhesion authored exclusively by The Atlantic. Ms. Barrett was not given an opportunity to propose revisions to the contract or to negotiate the terms of the contract.

Instead, it was presented on a take it or leave it basis and this is the same form contract that The Atlantic requires all freelance writers to sign.

175.    From this contract arises an implied covenant of good faith and fair dealing. The covenant of good faith and fair dealing is implied in every contract, and it prohibited The Atlantic from engaging in bad faith or arbitrary and capricious conduct that would destroy or injure Ms. Barrett's right to receive the fruits of the contract.

176.    It is a breach of the duty of good faith and fair dealing for a party to evade the spirit of the contract or to interfere with the performance by the other party. The component of good faith includes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. Bad faith involves evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. Bad faith conduct includes subterfuges and evasions. Bad faith may be overt or may consist of inaction.

177.    The fair dealing requirement requires the parties to act reasonably—not arbitrarily or capriciously—and may require more than mere honesty.

178.    The spirit of the bargain here was that Ms. Barrett would write a piece of investigative journalism, and The Atlantic would edit, publish, and promote that work to the mutual benefit of both parties consistent with journalistic ethics—including the protection of confidential sources. The common purpose was to develop a high-quality piece of investigative journalism that would educate readers, enhance readership for The Atlantic, and imbue the author with the prestige that comes with writing a long-form article published by one of the world's most venerated publications. Both parties reasonably expected that they would promote and protect the

74

integrity of the Article—as that was in their mutual interests and the very point of the joint venture that was embodied by the agreement.

179.     The Atlantic breached its duty of good faith and fair dealing through several actions—and inactions—at several stages of the writing and publication of the Article. Those breaches continued through The Atlantic's interactions with *The Post*'s media critic, the publication of the Peck Memorandum and the Editor's Notes, and The Atlantic's interference with Ms. Barrett's efforts to create and exploit derivative works. This count of breach of contract is separate from and not dependent upon defamation counts in other portions of this Complaint. Separately and collectively, the following actions and inactions unreasonably undermined the spirit of the agreement, interfered with her ability to adhere to her obligations under the contract, and deprived Ms. Barrett of the fruits of the agreement.

180.     **Failure to Protect a Confidential Source.** Section 6(b) of the Author's Agreement required Ms. Barrett to represent and warrant that her work "does not infringe . . . any other right, of any person or entity," nor "invade the privacy … rights of anyone." Promises of confidentiality to sources in exchange for information are enforceable legal rights under the law of contracts and promissory estoppel. *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991). The Atlantic made promises of confidentiality to Sloane in exchange for information. During the editing of the Article, The Atlantic repeatedly sought to undermine and violate the promises of confidentiality that were owed to Sloane. Ultimately, actions taken by The Atlantic led to the unmasking of the confidential source in violation of the spirit of the Author's Agreement. This conduct was unreasonable, arbitrary, and capricious and interfered with Ms. Barrett's efforts to adhere to her express obligations under the contract to protect Sloane's contractual right to confidentiality and privacy.

181.    **Dealings with Mr. Wemple.** When Mr. Wemple began inquiring about specific facts contained in the Article, The Atlantic engaged in conduct that undermined the spirit of agreement and denied Ms. Barrett the fruits of that agreement.

182.    The Atlantic did not reply to Mr. Wemple's inquiries with factual evidence to substantiate the challenged portion of the Article, as is commonplace and acceptable conduct in similar circumstances, even though Ms. Barrett had supplied The Atlantic with substantial information and documentation that would refute each of Mr. Wemple's claims. Instead, The Atlantic unreasonably yielded to Mr. Wemple's hysteria by disclosing identifying information about Sloane, a confidential source whose anonymity Ms. Barrett and The Atlantic had agreed to protect. The Atlantic's failure to rebut Mr. Wemple's criticisms of the Article amounted to ratification of his charges and facilitated his public smearing of Ms. Barrett and her Article.

183.    The Atlantic also harassed Sloane with requests for personal materials, including her 12-year-old daughter's medical records to quell Mr. Wemple's unreasonable suspicion of her daughter's neck injury at a saber fencing tournament in July of 2019—an injury corroborated by parents at the event, confirmed by The Atlantic's fact-checker, and that Mr. Wemple ultimately conceded did, in fact, occur. (At the same time that The Atlantic was violating the agreement of confidentiality by badgering Ms. Barrett's source of factual material to disclose her identity, The Atlantic's own employees were anonymously attacking Ms. Barrett in the pages of another publication, *The Post*.)

184.    Throughout its engagement with Mr. Wemple, The Atlantic even instructed Ms. Barrett not to speak to Mr. Wemple and prohibited her from protecting the Article herself.

185.    This conduct was unreasonable and arbitrary and capricious. Withholding exculpatory information from a reporter who questions the factual accuracy of the Article is

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

directly contrary to the purpose and spirit of the agreement. Compromising Sloane's anonymity does the same. Through this conduct, The Atlantic acted solely in self-interest and contrary to the spirit to the contract.

186.    **The Editor's Notes.** Separate and apart from the allegations of defamation and falsity, The Atlantic breached its duties of good faith and fair dealing by publishing three separate Editor's Notes. These notes went out of their way to malign Ms. Barrett and to disparage her character. They also intentionally destroyed the value and credibility the Article that the Author's Agreement was designed to promote and protect. Those notes stripped Ms. Barrett of the most valuable fruits of the agreement—the prestige of publishing with The Atlantic.

187.    The Atlantic's Editor's Notes were unreasonable, *i.e.* arbitrary and capricious. Nothing beyond a simple correction was required, and the scurrilous attacks and character assassination evidence reek of bad faith.

188.    Moreover, publication of the Editor's Notes had no good faith purpose. The Atlantic's publishing of its Editor's Notes was in bad faith and counter to the spirit and common purpose of the Author's Agreement because they were calculated to defend The Atlantic's reputation against external criticism, at the cost of the integrity of the Article and Ms. Barrett's reputation.

189.    **Failure to Conduct a Fair and Thorough Investigation.** Although Ms. Barrett maintains that there was never anything to investigate, to the extent that The Atlantic was going to publicly defenestrate its own writer and destroy her writing career, it was a violation of its duty of good faith for it do so without conducting a fair and thorough investigation into what actually transpired. The supposed "four-week investigation of how the mishap unfolded" was conducted by The Atlantic *after* it published its Editor's Note. Though the results of the investigation were

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

77

never made public, "magazine sources" leaked some details to *The Post*, which then published them in a column by Mr. Wemple in his January 30, 2021 column. According to that column, Atlantic Chief Operating Officer Aretae Wyler presented the findings of the internal investigation at a December 18, 2020 all-staff meeting.

190.    That investigation was unfair and inadequate for many reasons. First and foremost, Ms. Barrett was never given notice of the investigation or an opportunity to provide evidence supporting her course of conduct. Instead, The Atlantic never contacted her during the course of that investigation. It was in bad faith—and contrary to the central purpose of the Author's Agreement—to conduct a one-sided investigation that did not allow Ms. Barrett to defend the integrity of the Article. To the extent that an investigation occurred, it was driven by the fear of the *The* Post, not principles of fairness and neutrality. It was also not reasonable for The Atlantic to not hire a neutral third party to conduct the investigation—as is the standard practice when a publication investigates one of its own authors. This shoddy and one-sided investigation violated the spirit of the contract—which was to promote and protect the integrity of the Article—and further damaged Ms. Barrett's professional reputation as a writer. By leaking this information to *The Post*, The Atlantic ensured that this one-sided investigation would cause further harm to Ms. Barrett's career and reputation.

191.    Separately and together, these bad faith actions violated The Atlantic's duty of good faith and fair dealing. As a direct and proximate result of this breach, Ms. Barrett has suffered and will continue to suffer economic harm. Namely, The Atlantic's breach inflicted loss of earning capacity in making it more difficult or impossible for Ms. Barrett to practice her profession of writing. As such, the breach destroyed Ms. Barrett's rights to the fruit of her contractual relationship with The Atlantic.

**SEVENTH CLAIM FOR RELIEF**

**Breach of Contract**

**(As to The Atlantic)**

192.    Ms. Barrett realleges and incorporates herein by reference each and every allegation
contained in paragraphs 1 through 123 of this complaint.

193.    The Atlantic and Ms. Barrett entered into a contract—written by The Atlantic
itself—that in section 6(b) required Ms. Barrett, *inter alia*, to represent and warrant that her work
"does not infringe . . . any other right, of any person or entity," nor "invade the privacy … rights
of anyone."

194.    Promises of confidentiality to sources in exchange for information are enforceable
legal rights under the law of contracts and promissory estoppel. *Cohen v. Cowles Media Co.*, 501
U.S. 663 (1991).

195.    Ms. Barrett agreed with her source that she would be treated as confidential, *i.e.*
that she would not be identified or described in a way that would make her identifiable in the
Article that Ms. Barrett was writing.

196.    In exchange for and in reliance upon this agreement, the source provided
information that The Atlantic published for a profit.

197.    At the behest of the source, Ms. Barrett agreed to alter a family descriptor so that
the source would not be identifiable. The altered description was solely for the purpose of

protecting the confidentiality of the source. It was not material to the narrative and did not alter the thrust of Ms. Barrett's Article.

198.    Ms.  Barrett did not intend to deceive readers of her Article, and the alteration could not be reasonably interpreted as deceptive under any colloquial and/or professional journalism definition of the term "deceit."

199.    The Atlantic wrote its contract with Ms. Barrett, and any ambiguity in interpretation of the contract should be resolved in favor of the party who did not write it: Ms. Barrett rather than The Atlantic.

200.    Section 6(b) should be interpreted as imposing reciprocal obligations on The Atlantic not to infringe any rights of any person, including rights under an agreement of confidentiality.

201.    At the very least, the contract should be interpreted as barring The Atlantic from thwarting Ms. Barrett's efforts to fulfill the requirements of the very contract that The Atlantic wrote.

202.    Instead, after its publication of Ms. Barrett's Article, The Atlantic chose to dishonor its contractual and ethical obligations. Editors of The Atlantic pressured the source to reveal identifying details, deliberately and voluntarily disclosed facts about the source to a third-party media organization, and assaulted Ms. Barrett in print for her good faith efforts to abide by the contract between her and The Atlantic. The Atlantic's treatment of its confidential source was especially reprehensible and unjustifiable. In the days following publication of Ms. Barrett's Article, The Atlantic staffers repeatedly contacted the source and her spouse attempting to have the source disclose personal information—including sensitive family details—that would have in

Formatted: Font: Times New Roman
Formatted: Font: Times New Roman

80

toto unmasked the source's identity in violation of the confidentiality agreement between the source and Ms. Barrett.

203.   Ms. Barrett has suffered present and future pecuniary income losses from Defendants' breach of contract due to being unable to practice her profession as a writer. Ms. Barrett's damages on this count fall within the specific language of *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991).

204.   The Atlantic also materially breached its contract with Ms. Barrett in failing to "make commercially reasonable efforts" to market the Article for dramatization and other commercial opportunities, such as hiring an agent for that purpose. *See* Exh. 7, ~~page 1~~pages 2-3 of 4~~5~~ ("In return, Publisher agrees to make commercially reasonable efforts, including through a contractual relationship with an agent selected by Publisher, to make such intellectual property rights available to interested parties and to market such rights. Publisher agrees to pay Author fifty percent (50%) of all net revenues (after agent and attorney's fees) from the sale of such rights.").

205.   The Atlantic further violated this provision by actively preventing Ms. Barrett from pursuing such opportunities. Namely, The Atlantic published its defamatory Editor's Notes, thereafter maintained and continues to maintain the online Editor's Note (absent correction, and despite retreating from some falsehoods in that note in its January/February 2021 print version), and rejected Ms. Barrett's request for dramatic rights to her Article while communicating—through its counsel—its aspiration that the Article obtain no opportunities for public dissemination through any medium.

206.   As a direct and proximate cause of The Atlantic's breach of the Author's Agreement, Ms. Barrett has suffered and will continue to suffer economic harm. Namely, The

Formatted: Font: Times New Roman

Formatted: Font: Times New Roman

Atlantic's breach wrongfully lowered Ms. Barrett's earning capacity by making it more difficult or impossible for her to practice her profession of writing.

207.    This cause of action is independent of the causes of action for defamation; it does not rely on the same sets of allegations submitted in relation to these other causes of action.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for the following relief:

A.    Injunctive relief that the Court deems just and proper;

B.    Rescission of the Author's Agreement, including restoring to Ms. Barrett the right to dramatize the Article and related rights enumerated in section 2(c) of The Atlantic's Author's Agreement with Ms. Barrett;

C.    Compensatory monetary relief in the amount to be determined at trial;

D.    Punitive damages;

E.    Attorneys' fees and costs of suit; and

F.    Such other or further relief as the Court deems proper.


Dated: ~~March 30~~April 6, 2022

/s/ Hassan A. Zavareei
Hassan A. Zavareei (DC Bar No. 456161)
Leora Friedman (DC Bar No. 1735514)
**TYCKO & ZAVAREEI LLP**
1828 L Street, NW Suite 1000
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
lfriedman@tzlegal.com

Elliot C. Rothenberg (*pro hac vice*)
Attorney at Law
124 Groveland Avenue
Minneapolis, MN 55403-3607

**Formatted:** Font: Times New Roman
**Formatted:** Font: Times New Roman

82

Telephone: (612) 508-5373
ecrothenberg@gmail.com


Alexander Rufus-Isaacs (*pro hac vice*)
Rufus-Isaacs Acland & Grantham, LLP
9420 Wilshire Blvd., Suite B100
Beverly Hills, California 90212
Telephone: (310) 770-1307
Facsimile: (424) 258-7383
aisaacs@rufuslaw.com

83

**Formatted:** Font: Times New Roman

**Formatted:** Font: Times New Roman