## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RUTH SHALIT BARRETT,

        Plaintiff,

    v.

THE ATLANTIC MONTHLY GROUP LLC and
DONALD CHRISTOPHER PECK,

        Defendants.

Civil Action No.
1:22-cv-00049-EGS

---

### DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants The Atlantic

Monthly Group LLC and Donald Christopher Peck respectfully move this Court to dismiss the

Amended Complaint with prejudice for failure to state a claim.

Oral argument is requested to the extent it would assist the Court.

Dated:  April 13, 2022

Respectfully submitted,

WILLIAMS & CONNOLLY LLP
By: */s/ Stephen J. Fuzesi*
Joseph M. Terry (D.C. Bar No. 473095)
Stephen J. Fuzesi (D.C. Bar. No. 496723)
Whitney D. Hermandorfer
(D.C. Bar. No. 888314222)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jterry@wc.com
sfuzesi@wc.com
whermandorfer@wc.com

*Attorneys for Defendants The Atlantic
Monthly Group LLC and Donald
Christopher Peck*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RUTH SHALIT BARRETT,

          Plaintiff,

    v.

THE ATLANTIC MONTHLY GROUP LLC and
DONALD CHRISTOPHER PECK,

          Defendants.

Civil Action No.
1:22-cv-00049-EGS

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

WILLIAMS & CONNOLLY LLP
Joseph M. Terry
Stephen J. Fuzesi
Whitney D. Hermandorfer
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jterry@wc.com
sfuzesi@wc.com
whermandorfer@wc.com

*Attorneys for Defendants The Atlantic
Monthly Group LLC and Donald
Christopher Peck*

### TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND .................................................................................................................4

    A.    Barrett's Rise to Journalistic Prominence ..............................................................4

    B.    Controversy over "Journalistic Malfeasance" and Departure from The New Republic.........................................................................................................4

    C.    Barrett's Continued Journalism Career...................................................................7

    D.    Barrett's Article in The Atlantic ............................................................................8

    E.    Investigation and Retraction .................................................................................9

    F.    Reaction and Lawsuit...........................................................................................12

LEGAL STANDARD .......................................................................................................12

ARGUMENT .....................................................................................................................13

I.     THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION..............13

    A.    The Statements at Issue Are Not Actionable .......................................................14

        1.    Barrett's Participation in the Falsity and Deception (Claim 1).................16

        2.    Barrett's Departure from The New Republic (Claim 2) ...........................22

        3.    Statements Relating to Barrett's Byline (Claim 3) ..................................25

        4.    The Decision to Assign Barrett the Article (Claim 4) .............................26

    B.    The Complaint Fails to Plausibly Allege Actual Malice ......................................28

        1.    The Actual Malice Standard Applies .......................................................28

        2.    The Complaint Does Not Plausibly Allege Actual Malice.......................32

II.    THE COMPLAINT'S ANCILLARY FALSE LIGHT CLAIM FAILS....................36

III.   THE COMPLAINT'S ANCILLARY CONTRACT CLAIMS FAIL ........................37

    A.    The Contract Claims Fail for the Same Reasons as the Defamation Claims........37

    B.    The Contract Claims Fail Because of Barrett's Admitted Breach........................39

    C.    The Contract Claims Fail for Additional, Independent Reasons ..........................40

        1.    Good Faith and Fair Dealing (Claim 6) ...................................................40

        2.    Breach of Contract (Claim 7)...................................................................42

CONCLUSION ..................................................................................................................45

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015) .............................16, 20, 26

*Abbas v. Foreign Pol'y Grp., LLC*, 975 F. Supp. 2d 1 (D.D.C. 2013) .........................15, 26, 27

*Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir. 2007) ....................................................4

*Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265 (D.C. Cir. 2014) ............................43

*Arpaio v. Cottle*, 404 F. Supp. 3d 80 (D.D.C. 2019) ....................................................................33

*Arpaio v. Zucker*, 414 F. Supp. 3d 84 (D.D.C. 2019) ..................................................................32

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................. *passim*

*Bauman v. Butowsky*, 377 F. Supp. 3d 1 (D.D.C. 2019)..........................................................15, 26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................13

*B&H Nat'l Place, Inc. v. Beresford*, 850 F. Supp. 2d 251 (D.D.C. 2012)....................................40

*Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998) ...................................................14

*Brimelow v. N.Y. Times Co.*, 2021 WL 4901969 (2d Cir. Oct. 21, 2021) ....................................30

*Carpenter v. King*, 792 F. Supp. 2d 29 (D.D.C. 2011) .................................................................14

*Chau v. Lewis*, 771 F.3d 118 (2d Cir. 2014)................................................................................15

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991)........................................................................38

*Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520 (6th Cir. 2007) ..........................38

*Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213 (D.D.C. 2008)..................................................14

*Couch v. Verizon Commc'ns, Inc.*, 2021 WL 4476698 (D.D.C. Sept. 30, 2021) ..........................32

*Deripaska v. Associated Press*, 282 F. Supp. 3d 133 (D.D.C. 2017) ................................. *passim*

*Dilworth v. Dudley*, 75 F.3d 307 (7th Cir. 1996)..........................................................................31

*Authorities upon which counsel chiefly rely are marked with asterisks.*

Page(s)

Federal Cases—continued:

*Dodds v. Am. Broad. Co.*, 145 F.3d 1053 (9th Cir. 1998) ..............................36

*Donald Marshall Berlin v. Bank of Am., N.A.*, 101 F. Supp. 3d 1 (D.D.C. 2015)........................39

*Dorsey v. Am. Express Co.*, 680 F. Supp. 2d 250 (D.D.C. 2010) ...................................39

*Dreamstone Ent. Ltd. v. Maysalward Inc.*, 2014 WL 4181026 (C.D. Cal. Aug. 18, 2014) .........19

*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018)........................................32, 33

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) .........................................*passim*

*Fonville v. District of Columbia*, 38 F. Supp. 3d 1 (D.D.C. 2014)................................21

*Foretich v. Am. Broad. Cos.*, 1997 WL 669644 (D.D.C. Oct. 17, 1997) ....................................34

*Franklin v. Pepco Holdings, Inc.*, 875 F. Supp. 2d 66 (D.D.C. 2012) ...........................15

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ...........................................30

*Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358 (D.D.C. 2018) ....................................23

*Harder v. Sunrise Senior Living, Inc.*, 2009 WL 5171843 (E.D. Mich. Dec. 22, 2009) .............27

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) ..............................34

*Himmelstein v. Comcast of the Dist., LLC*, 908 F. Supp. 2d 49 (D.D.C. 2012) ..........................42

*Hoffman v. Wash. Post Co.*, 433 F. Supp. 600 (D.D.C. 1997) ....................................31

*Hourani v. Mirtchev*, 943 F. Supp. 2d 159 (D.D.C. 2013) ...........................................23

*Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128 (D.D.C. 2016)....................................4, 34

*Hourani v. PsyberSolutions LLC*, 690 F. App'x 1 (D.C. Cir. 2017) ....................................23, 32

*Howard Town Ctr. Dev., LLC v. Howard Univ.*, 278 F. Supp. 3d 333 (D.D.C. 2017) ...............39

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1998) .......................................37

*Iheberme v. Cap. One, N.A.*, 933 F. Supp. 2d 86 (D.D.C. 2013)............................................40, 41

*Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir. 1986)...........................................17, 20

Page(s)

Federal Cases—continued:

*Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080 (D.C. Cir. 2007) ......................................15

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016) ...........................31, 32, 33

*Jensen v. Times Mirror Co.*, 634 F. Supp. 304 (D. Conn. 1986)..................................30

*Joseph v. Xerox Corp.*, 594 F. Supp. 330 (D.D.C. 1984) .............................................31

*Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106 (D.C. Cir. 2017) .................................... *passim*

*Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711 (11th Cir. 1985) ...............................19

*Lemelson v. Bloomberg L.P.*, 903 F.3d 19 (1st Cir. 2018) ..........................................34

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) ...................14, 17, 24

*Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149 (D.D.C. 2018)..........................14

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) ..................................................35

*Lohrenz v. Donnelly*, 223 F. Supp. 2d 25 (D.D.C. 2002) ........................................34, 36

*Magee v. Am. Inst. of Certified Pub. Accts.*, 245 F. Supp. 3d 106 (D.D.C. 2017)........................42

*Maljack Prod. Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373 (D.C. Cir. 1995) .............42

*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) ......................................14, 24

*McFarlane v. Esquire Mag.*, 74 F.3d 1296 (D.C. Cir. 1996) ........................................32

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996) ...........................35, 36

*Metz v. BAE Sys. Tech. Sols. & Servs., Inc.*, 979 F. Supp. 2d 26 (D.D.C. 2013) ...................40, 41

*Milkovich v. Lorain J. Co.*, 497 U.S. 1 (1990)..............................................................14

*Moldea v. N.Y. Times Co.*, 22 F.3d 310 (D.C. Cir. 1994)................................... *passim*

*Montgomery v. Risen*, 197 F. Supp. 3d 219 (D.D.C. 2016).....................................15, 35

*N.Y. Times v. Sullivan*, 376 U.S. 254 (1964) .........................................................3, 32

*Newton v. Nat'l Broad. Co.*, 930 F.2d 662 (9th Cir. 1990) ..........................................17

Page(s)

Federal Cases—continued:

*Ning Ye v. Holder*, 644 F. Supp. 2d 112 (D.D.C. 2009) ...................................................14

*Nunes v. WP Co.*, 513 F. Supp. 3d 1 (D.D.C. 2020)........................................................26

*O'Donnell v. CBS, Inc.*, 782 F.2d 1414 (7th Cir. 1986) ...............................................30

*Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724 (1st Cir. 1992) ...............................21

*Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610 (7th Cir. 2013) ...................................34, 36

*Rishikof v. Mortada*, 70 F. Supp. 3d 8 (D.D.C. 2014) ...................................................23

*Robertson v. Cartinhour*, 867 F. Supp. 2d 37 (D.D.C. 2012).............................................14, 25, 27

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ...................................................................27

*Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309 (7th Cir. 1988)........................................36

*Safex Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285 (D.D.C. 2021)................................30

*Smith v. Clinton*, 253 F. Supp. 3d 222 (D.D.C. 2017) ...................................................15

*St. Amant v. Thompson*, 390 U.S. 727 (1968)...........................................................32, 34

*Stafford v. George Wash. Univ.*, 2019 WL 2373332 (D.D.C. June 5, 2019)................................23

*Steele v. Isikoff*, 130 F. Supp. 2d 23 (D.D.C. 2000)......................................................44

*\*Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231 (D.C. Cir. 2021)....................................3, 32, 37

*\*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) .................................................14, 18, 24, 28, 33

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) .........................................................18

*Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018).........................................................27

*Turner v. Wells*, 198 F. Supp. 3d 1355 (S.D. Fla. 2016) ...............................................19

\**Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) ...............................29, 30

*Washburn v. Lavoie*, 357 F. Supp. 2d 210 (D.D.C. 2004) .............................................37

Page(s)

Federal Cases—continued:

*W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*,
 235 F.3d 629 (D.C. Cir. 2001) ...........................................................................2, 23

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ........................15, 26, 37

*Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445 (S.D.N.Y. 2018) ...........18

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ........................16, 26

*Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*,
 2019 WL 5395739 (D.D.C. Oct. 22, 2019) ................................................................39

**STATE CASES**

*Adler v. Abramason*, 728 A.2d 86 (D.C. 1999)  ...........................................................42

*\*Armstrong v. Thompson*, 80 A.3d 177 (D.C. 2013) .............................................24, 28

*Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132 (D.C. 2021)  ................................37

*Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580 (D.C. 2000).............................25

*Hart v. Vt. Inv. Ltd. P'ship*, 667 A.2d 578 (D.C. 1995).................................................43

*Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984)........................................................15

*Klayman v. Segal*, 783 A.2d 607 (D.C. 2001) ............................................................37

*Providence Hosp. v. Grp. Hospitalization Inc.*, 494 A.2d 639 (D.C. 1985)...............43

*Rosen v. Am. Isr. Pub. Affs. Comm., Inc.*, 41 A.3d 1250 (D.C. 2012).........................14

*San Antonio Express News v. Dracos*, 922 S.W.2d 242 (Tex. Ct. App. 1996) ...........31

*Solers, Inc. v. Doe*, 977 A.2d 941 (D.C. 2009).............................................................13

*Sundberg v. TTR Realty, LLC*, 109 A.3d 1123 (D.C. 2015) .........................................41

*Warner v. Kan. City Star Co.*, 726 S.W.2d 384 (Mo. Ct. App. 1987)............................30

Page(s)

## CONSTITUTION AND RULE

U.S. Const. amend. I ............................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6).................................................................................................3, 15


## OTHER AUTHORITIES

American Heritage College Dictionary 1104 (4th ed. 2007) ......................................................17

Chambers Dictionary 1302 (2002) ........................................................................................17

David A. Elder, *Defamation: A Lawyer's Guide* 5:17 (West 2019).............................................29

Merriam-Webster's Third New International Dictionary 1797 (2002) .......................................17

Restatement (Second) of Torts
    § 652E ................................................................................................................37

1 *Sack on Defamation* (5th ed. 2017)
    § 4:3.1 ................................................................................................................21
    § 5:3.5 ...........................................................................................................29, 31

1 *Sack on Defamation* (4th ed. 2010)
    § 2:4.8 ................................................................................................................20

## <u>INTRODUCTION</u>

This defamation action is brought by Ruth Shalit Barrett, a writer with a widely publicized record of plagiarism and erroneous reporting in the mid-1990s.  At that time, she candidly described her wrongdoing:  "The fact is that someone else's words appeared in my story.  Aside from lying, that's the most egregious offense in journalism."[1]  Twenty-five years later, she was provided the opportunity to write a substantial article for The Atlantic.  She responded to that opportunity by committing the "most egregious offense in journalism"—lying.  Shortly after publication, it came to light that Barrett was complicit in deliberately including a knowing falsehood in her story and then lying to the magazine's editors about it.  Several additional factual errors also were identified, and numerous other aspects of the story rested on nothing more than her own word and, thus, could not be independently verified.  The Atlantic retracted the article and published an editor's note explaining its reasons.  A similar explanatory email was sent internally by editor Donald Peck.  Barrett now sues, asserting claims of libel and other ancillary causes of action based on the editor's note and email.

Barrett's Complaint is extraordinary for many reasons, not the least of which is that she *admits* the central facts underlying the retraction, including the intentional falsification of a fact in her article and her decision to hide the truth from The Atlantic's editors.  Prior to suit, Barrett publicly acknowledged that her conduct with respect to the article was "egregious" and a "serious error."  Indeed, in her original Complaint filed in this action, she expressly conceded that The Atlantic "could have published an Editor's Note admonishing" her and "even retracted the entire article" based on the falsification.  Tellingly, Barrett now omits those admissions (and others) from her Amended Complaint.  But she cannot make the admissions in her original Complaint vanish

---

[1] Alicia C. Shepard, *Too Much Too Soon? (Interview)*, Am. Journalism Rev. (Dec. 1995), https://tinyurl.com/dz8mppaw.

by eliding them now.  *See, e.g.*, *W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001).  Nor, in any event, can she plead around the fundamental, undisputed truths that doom her claims from the outset.

Ultimately, Barrett's Amended Complaint amounts to a 207-paragraph rationalization for *why* she engaged in her misconduct, both when writing for The Atlantic and earlier in her career. But nothing changes the underlying, undisputed facts of *what* she did:

- Barrett participated in the falsification of a fact in her Atlantic article, knew it was an "invention," and then made a knowing "decision" to hide that deliberate "falsehood" from The Atlantic's editors, including during the fact-checking process.  Errata Amended Complaint ("Am. Compl.") ¶¶ 30, 75, 93, 97, 109, 130(d), ECF No. 22-1.

- Prior to The Atlantic's decision to retract the article, Barrett expressly admitted both her complicity in the falsification and her deception.  In an email referenced in the Amended Complaint, she wrote to Peck, the editor:  "The Editor's Note shouldn't blame [Sloane, the source] for the invention of a son.  That would not be truthful or fair.  I was complicit. . . .  I'm sorry for prevaricating and being evasive here."  Am. Compl. ¶ 97; MTD Am. Compl. ("MTD") Ex. 1.

- Earlier in her career, Barrett was embroiled in controversy at The New Republic over plagiarism and inaccurate reporting—what she now calls "lapses"—and left thereafter.  Those scandals are a matter of public record.  As detailed below, Barrett has previously conceded her conduct was "egregious," "deplorable," and "journalistic malpractice."  *See infra* p. 6.

Because Barrett cannot plead around these admitted truths, her Amended Complaint instead principally quibbles over the specific words used by The Atlantic in characterizing her actions and its description of her departure from The New Republic in the 1990s.  Barrett likewise takes issue with the magazine's editorial judgments—like its conclusion that the *publication itself*

erred by assigning her the story and by identifying her in the byline as Ruth S. Barrett, rather than by spelling out Shalit, the name by which she was known during the 1990s.  For multiple independent reasons, these claims fail as a matter of law:

*First*, none of the challenged statements can give rise to a claim for defamation.  Under well-settled principles of law, the statements at issue are not actionable because they are protected statements of opinion, are not materially false, and/or lack defamatory meaning.

*Second*, Barrett's claims are subject to the demanding actual malice standard of *New York Times v. Sullivan*, 376 U.S. 254 (1964).  Yet Barrett fails to plead facts plausibly showing that the Defendants acted with the required state of mind.  Rather, her pleading is conclusory at best.  Courts routinely dismiss complaints on Rule 12(b)(6) motions with similarly unsupported allegations.  *See, e.g.*, *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021).

*Third*, Barrett's ancillary false light claim falls with the defamation claims, as it is well established that a plaintiff cannot plead around the constitutional safeguards applicable to libel claims by repackaging those claims as other torts.  The claim fails on its own terms, too.

*Fourth*, the remaining two claims—sounding in breach of contract—are similarly groundless.  To the extent these claims recycle Barrett's defamation allegations, they fail for the same reasons.  Further, Barrett does not plausibly allege any actual breaches by The Atlantic of its contractual duties to her.  Nor could Barrett properly assert such claims given her admitted falsification and deception of The Atlantic, which breached her own contractual duty to "cooperate fully."  In fact, she expressly pleaded in her original Complaint that she "did not cooperate" with The Atlantic.  Original Errata Complaint ("Compl.") ¶ 18, ECF No. 3-1.

For these reasons and more, the Amended Complaint should be dismissed with prejudice.

# BACKGROUND[2]

## A.   Barrett's Rise to Journalistic Prominence

Barrett's meteoric rise is widely documented.  She catapulted to "[e]arly [s]uccess" as a young writer at The New Republic, authoring feature-length pieces on prominent politicians and other public figures.  Am. Compl. at 22.  By the age of 23, Barrett had written "long-form political stories" for The New York Times Magazine and secured a contract to write for GQ.  *Id.* ¶ 58.  Barrett's transition from "media employee to media celebrity" captured the press's attention.[3]  She was the subject of "extensive profiles for the likes of George magazine."[4]  As one paper put it, "at a time when being a hot young writer in Washington was a big deal, Shalit was the biggest deal of all."[5]

## B.   Controversy over "Journalistic Malfeasance" and Departure from The New Republic

In 1994 and 1995, however, a series of what Barrett previously called "plagiarism episodes" surfaced.  Compl. ¶ 27.  It came to light that two of Barrett's articles for The New Republic included "unattributed material" from other authors' articles.  Am. Compl. ¶ 59.  As a result, The New Republic "was forced to apologize to its readers," while Barrett "apologized to

---

[2]  "[I]n determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quoting *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007)).  The Court can properly take notice of the "publicly available historical articles" cited in this section, including in determining whether Barrett is a "public figure" for purposes of the actual malice standard.  *See, e.g.*, *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140, 142 (D.D.C. 2017) (articles supported finding that plaintiff was a public figure at the motion-to-dismiss stage); *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 143 (D.D.C. 2016) (same), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017).

[3]  David Carr, *Goodbye to All That*, Wash. City Paper (Apr. 9, 1999), https://tinyurl.com/373u4mfd.

[4]  *Id.*; *see also* MTD Ex. 2, Lisa DePaulo, *The Truth About Ruth*, George, at 150 (Feb./Mar. 1996) (cited at Compl. ¶ 60); *Who's Right, and Who's Wrong*, Media Week (Nov. 21, 1994), 1994 WLNR 5340052; Cynthia Grenier, *GQ's Big Party, Big Stories; Berets, Other 'Spec Warriors,'* Wash. Times (June 3, 1995), 1995 WLNR 303314.

[5]  Carr, *supra* note 3.

the writers whose quotes and sentences she had taken." *Id.*; Compl. ¶¶ 52, 54.  Additional review of Barrett's work "quickly uncovered" similar problems, including unattributed material in two of her articles for The New York Times Magazine.  Compl. ¶ 53.[6]

Barrett found herself at the center of a "passionate debate."  Am. Compl. ¶ 61.  Media across the country reported on the controversy, with commentators publicly offering opinions on Barrett's "borrow[ing]" of words.  *Id.* ¶¶ 61-62; *see id.* ¶ 60.[7]

In October 1995, Barrett's writing yet again launched her into the center of a media firestorm when she authored an article criticizing the Washington Post's efforts to promote racial diversity.  Am. Compl. ¶¶ 60, 115; Compl. ¶ 56.  Barrett's piece was controversial, and its accuracy was immediately challenged.  One article reported that at least half of the 28 sources named by Barrett claimed "that she presented their quotes inaccurately, incompletely, or both, in order to serve her agenda."[8]  Other articles catalogued additional alleged lapses that reportedly "dumbfounded" Post editors.[9]

In what she admits was one particularly "serious error," Barrett incorrectly reported that an individual named in the article had been jailed for corruption though he had not even been indicted.  Am. Compl. ¶ 139; Compl. ¶ 58.  That reportedly led to the filing of a libel lawsuit against Barrett and The New Republic.[10]  And additional criticism abounded.  One review

---

[6] *See also* MTD Ex. 2, DePaulo, at 155.

[7] *See also, e.g.*, James Warren, *Watching the Words Anne Soukhanov's Tuned into the Capital Lingo*, Chi. Trib. (July 2, 1995), 1995 WLNR 4599800; Frank Ahrens, *A Writer's Repetitive Stress; New Republic Admits Phrases Were Copied*, Wash. Post (July 18, 1995), 1995 WLNR 5746551; Maureen Dezell, *A Recording of Early Risers*, Boston Globe (July 19, 1995), 1995 WLNR 2103717; Shepard, *supra* note 1; Garry Wills, *'The New Republic,' A Reprieve*, Albany Times Union (Apr. 24, 1996), 1996 WLNR 317017.

[8] John Cloud, *Baby Ruth*, Wash. City Paper (Oct. 20, 1995), https://tinyurl.com/47nvjj66.

[9] *Id.*; Shepard, *supra* note 1.

[10] *Baby Ruth Redux*, Wash. City Paper (Jan. 26, 1996), https://tinyurl.com/ut92z3ke.

concluded that the 13-page article contained "at least 50 mistakes, distortions and perversions of fact, an average of one per roughly 250 words."[11]  It further was revealed that, as in several of her prior pieces, Barrett's article included a sentence copied verbatim from a book about the Post.[12]

These events contributed to what Barrett conceded in her original Complaint was "relentless[]" public discussion of her accused "journalistic malfeasance."  Compl. ¶¶ 4, 60; *see also id.* ¶ 114 (Barrett "was accused of plagiarism and errors in her journalism").  Barrett took a leave of absence from The New Republic.  *Id.* ¶ 61.  As one magazine cover story summed it up: "Ruth Shalit doesn't just cover big stories, she is one."[13]  All the while, Barrett engaged in her own press campaign to address what she dubbed "Ruthgate."[14]  She defended her mistakes to the Washington Post and on the CNN television show Reliable Sources.[15]  Barrett asserted that she was "being scrutinized like no other journalist," and proclaimed that, "except for" a few mistakes, her work "holds up extremely well."[16]  Later, though, Barrett told the American Journalism Review:  "The fact is that someone else's words appeared in my story.  Aside from lying, that's the most egregious offense in journalism."[17]  She similarly admitted that her use of others' work reflected "deplorable carelessness," deeming it a "horrible, idiotic problem" that was "never ever *ever* going to happen again."[18]  Later she referred to her conduct as "journalistic malpractice."[19]

---

[11] Ken Silverstein & Alexander Cockburn, *The Shalit Paradigm: Young Liars of the Right*, CounterPunch, at 1 (Nov. 15, 1995), https://tinyurl.com/2bjm63pa.

[12] MTD Ex. 2, DePaulo, at 154.

[13] MTD Ex. 2, DePaulo, at 122; *see also id.* at 151-53; Bob Armstrong, *Look Out for the Word Thieves*, S.F. Examiner (Sept. 12, 1997), 1997 WLNR 594; Cloud, *supra* note 8.

[14] MTD Ex. 2, DePaulo, at 150.

[15] Ahrens, *supra* note 7; *see Reliable Sources* (CNN television broadcast Sept. 24, 1995) (Lexis).

[16] MTD Ex. 2, DePaulo, at 125.

[17] Shepard, *supra* note 1.

[18] Cloud, *supra* note 8; MTD Ex. 2, DePaulo, at 155.

[19] Ruth S. Barrett, *A Mad, Mad World Redux*, Medium (Nov. 23, 2020), https://tinyurl.com/7xww9nun; *see, e.g.*, Cloud, *supra* note 8.

In another concession expressly pleaded in her original Complaint and now deleted from her Amended Complaint, Barrett alleged that in 1998, a scandal involving fabrications by New Republic editor Stephen Glass "put a renewed spotlight on" the "transgressions" that she had committed.  Compl. ¶¶ 63-65.  Barrett "was referenced in many of the stories" about Glass.  *Id.* ¶ 64.  The New Republic informed her that her "continued employment at the magazine was exacerbating the negative publicity" it was receiving over Glass.  *Id.* ¶ 65.  As a result, she pleaded, Barrett departed The New Republic in early 1999.  *Id.*[20]

## C.   Barrett's Continued Journalism Career

Following her departure from The New Republic, Barrett authored pieces in several national magazines and news outlets, including New York Magazine, The Wall Street Journal, ELLE, Details, Salon.com, Nerve.com, Surface, and Lingua Franca.  Am. Compl. ¶ 65.  Barrett's prior conduct remained the subject of attention and controversy,[21] but she continued writing "culturally relevant and lively journalism that sparked debate."  Am. Compl. ¶ 65.

---

[20] *Cf.* Am. Compl. ¶¶ 63-64 (asserting only that Barrett "elected to leave *The New Republic*" in 1999 while omitting any mention of Glass, the resulting criticism of The New Republic, and Barrett's connection to that criticism in 1998-1999).

[21] *See, e.g.*, Liza Mundy, *The Second-Chance Club*, Wash. Post (Oct. 3, 1999), 1999 WLNR 8855057 (labeling Barrett a "serial plagiarist"); Meredith O'Brien, *When the Words Aren't Our Own*, Quill (Oct. 1, 2000), 2000 WLNR 10210725 (discussing Barrett's "life after plagiarism"); John Podhoretz, *Lost in Translation*, Weekly Standard (Dec. 18, 2006), 2006 WLNR 27667141 (describing journalists "still enraged by the memory of the plagiarisms of Ruth Shalit"); Eric Alterman, *My Marty Peretz Problem—And Ours*, Am. Prospect (July/Aug. 2007), 2007 WLNR 30054205 (recalling Barrett's "serial plagiarism problem"); Samuel G. Freedman, *Don't Reward Deceitful Writers*, USA Today (Mar. 24, 2004), 2004 WLNR 6257075 (listing Barrett as "example of journalistic ignominy"); David Carr, *Web's Thirst for Content*, Int'l Herald Trib. (Aug. 20, 2012), 2012 WLNR 17580403 (describing Barrett as the "famed tyro offender of Washington journalism"); Victor Davis Hanson, *Powerful, Influential Get Pass on Their Lies*, Lake Cnty. News-Sun (Feb. 13, 2015), 2015 WLNR 39845375 (listing Shalit as "fantasy writer[]" whose work was "finally disowned"); Leah Finnegan, *Fifty Shades of Ruth Shalit, Journalistic Abuser*, TKTK (Feb. 25, 2015) ("Ruth Shalit, the infamously bad journalist with whom the '90's-era media had a very deliciously tortured relationship, is back."), https://tinyurl.com/2p8tnjmp.

D.      **Barrett's Article in The Atlantic**

In mid-2019, Barrett submitted a "pitch" to The Atlantic for a story on wealthy Connecticut parents who were "spending huge amounts of money in the hope of turning their children into elite competitive athletes so that they could qualify for preferential admission as Ivy League sports recruits," especially in "niche sports" like "squash, fencing, water polo, and sailing."  *Id.* ¶ 67. Barrett knew the subject of the article "risked upsetting some families," but thought it "served a superseding positive purpose—exposing the inequality inherent in such a system, and the harms to children's health and happiness."  Compl. ¶ 70; *see* Am. Compl. ¶ 178.

By the end of 2019, Barrett entered into an Author's Agreement with The Atlantic to write the article.  Am. Compl. Ex. 7.  The contract made clear that The Atlantic was "under no obligation to publish the Work and acceptance of the Work is in the sole discretion" of The Atlantic.  *Id.* at 2.  The contract specified that The Atlantic "shall . . . have the right to edit, revise, modify, [and] abridge" Barrett's draft.  *Id.* at 4.  And the contract obligated Barrett "to cooperate fully in such procedures, including providing [The Atlantic] with any research material."  *Id.*

The contract further made clear that Barrett was authoring the story solely as an "independent contractor."  *Id*. at 3.  She was a freelancer engaged to write this article and *not* made an employee or otherwise hired by The Atlantic.  *See id*.

After Barrett submitted her draft, it underwent an editing and fact-checking process.  Am. Compl. ¶ 69.  The article was published online in October 2020, and in the November 2020 print edition, under the headline, "The Mad, Mad World of Niche Sports Among Ivy League-Obsessed Parents."  *Id.* ¶ 77; Am. Compl. Ex. 1.  The article focused, in particular, on a "buoyant, chatty, stay-at-home mom from Fairfield County, Connecticut," identified only as "Sloane."  Am. Compl. Ex. 1, at 4.  The article purported to tell of her family's "fool's folly" through squash and fencing tournaments, including one in which the article portrayed her daughter as sustaining a "stab[] in

the jugular" that was "right next to the carotid artery." *Id.*  In describing Sloane to readers in the article's third paragraph, the article noted that she had not only three girls, but also a "son." *Id.*

Barrett concedes that the inclusion of the son was an "invention" that she knew to be a "falsehood." Am. Compl. ¶¶ 30, 75, 93, 97, 109, 130(d).  In fact, Barrett admits, she participated in conversations with Sloane and her husband during which the idea of including that falsity was conceived.  *Id.* ¶ 27.  Nonetheless, Barrett made a "decision not to disclose to The Atlantic that there was no son." *Id.* ¶ 93.

### E.    Investigation and Retraction

Almost immediately after publication, serious questions were raised about Barrett's article. A media critic for the Washington Post, Erik Wemple, devoted multiple columns to what he called a "troubled" story.  *See id.* ¶ 82; Compl. ¶¶ 89 & n.5, 102 & n.6.  His posts questioned not only whether Sloane truly had a son, but reported on numerous other questionable facets of the article, including its description of the fencing injury.[22]  A lawyer for Sloane also then contacted The Atlantic, stating that Sloane "did not have a son, that the inclusion of the 'son' was Ms. Barrett's idea, that Ms. Barrett had pressured Sloane into going along with the idea of the 'son' and had coerced her into lying to the fact-checker, and that the Article was false in certain respects." Am. Compl. ¶ 88.

The Atlantic quickly began investigating.  *Id.* ¶¶ 90, 92.  Among other things, the article's fact-checker reached out to Barrett and asked, "He's claiming she doesn't have a son?!" *Id.* ¶ 85. Barrett admits that she did not reveal the truth.  *See id.* ¶¶ 93, 130.  Further, other editors "confronted" her on a Zoom call with the allegations, including that Sloane's son was a fabrication.

---

[22] *See* Erik Wemple, *Opinion: Ruth Shalit Just Wrote for the Atlantic. Would Readers Know It from the Byline?* Wash. Post (Oct. 24, 2020), https://tinyurl.com/6c5c7rxu (referenced at Am. Compl. ¶ 82); Erik Wemple, *Opinion: The Atlantic's Troubled Niche-Sports Story*, Wash. Post (Oct. 30, 2020), https://tinyurl.com/5h8azufy (cited at Compl. 41 n.6).

*Id.* ¶ 88.   Barrett admits that, in response, she "denied Sloane's allegations and defended the accuracy of the Article."   *Id.* ¶ 41.   She falsely told the editors, including Peck, that there were no "discrepancies or falsehoods in her account."   *Id.*   As she further acknowledged in her original Complaint, Barrett "did not cooperate."   Compl. ¶ 18.   Rather than "reveal" the truth about her deliberate falsification, Barrett continued to hide it.   *Id.*; *see also* Am. Compl. ¶¶ 93, 130.

After that Zoom call, Peck followed up by email to ask if "there's anything else you want to let me know."   MTD Ex. 1, at 2; Am. Compl. ¶ 44.   Barrett then finally admitted her knowing involvement—and her deception:

> Yes.  There is something else.  The Editor's Note shouldn't blame [Sloane] for the invention of a son.  That would not be truthful or fair.  I was complicit.  I'm sure I knew deep down that she probably didn't.  I'm sorry for prevaricating and being evasive here.

*See* MTD Ex. 1, at 2.   The Atlantic posted an editor's note online that day, noting that since publication, "new information emerged that has raised serious concerns about [the article's] accuracy, and about the credibility of the author, Ruth Shalit Barrett."   Am. Compl. Ex. 2, at 2-3. The Atlantic then decided to retract the article and published an updated note explaining its decision.   *See id.* Ex. 4.   A substantially similar note later appeared in the print edition.   *Id.* Ex. 5. (The Amended Complaint refers to these as the "first," "second," and "third" notes, respectively.)

According to the editor's note, The Atlantic had "established that Barrett deceived The Atlantic and its readers about a section of the story that concerns a person referred to as 'Sloane.'" *Id.* Ex. 4, at 3.   The note further recounted that, before publication, Sloane had confirmed the existence of the "son" referenced in Barrett's draft to the magazine's fact-checking department. *Id.*   After the Post began probing the article's accuracy, The Atlantic again reached out to Sloane. *Id.*   At that point, the note explained, Sloane's attorney "informed us that she does not, in fact, have a son," and The Atlantic also "independently corroborated" that fact.   *Id.*   The note stated that

Sloane's attorney told The Atlantic that Sloane "wanted to make herself less readily identifiable" by including the falsity, and that it was Barrett who had "first proposed the invention of a son, and encouraged Sloane to deceive The Atlantic as a way to protect her anonymity."  *Id.*

The note reflected that when asked about these allegations, Barrett "initially denied them, saying that Sloane had told her she had a son, and that she had believed Sloane."  *Id.*  However, as quoted in the note, Barrett then conceded that she was "'complicit.'"  *Id.*  The note presented Barrett's account, pointing out that she "denies that the invention of a son was her idea, and denies advising Sloane to mislead The Atlantic's fact-checkers, but told us that 'on some level I did know that it was BS' and 'I do take responsibility.'"  *Id.* at 4.  The note explained that "Barrett says that the fabricated son is the only detail about which she deceived our fact-checkers and editors."  *Id.*

The note went on to disclose "several additional errors" identified in the course of reviewing the article again after publication.  *Id.*  Those included a description of the "severity" of the neck injury sustained by one of Sloane's daughters; the characterization of a thigh injury by another—said to be a "deep gash"; the location of a lacrosse family in the article; and details concerning backyard hockey rinks.  *Id.*

The note further explained that Barrett's byline was being updated from "Ruth S. Barrett," as she requested, to "Ruth Shalit Barrett."  *Id.*  The note described that, in 1999, Barrett—then known as Ruth Shalit—left her position as an associate editor at The New Republic "after plagiarism and inaccurate reporting were discovered in her work."  *Id.*  The note opined that "in the interest of transparency, we should have included the name that she used as her byline in the 1990s, when the plagiarism incidents occurred."  *Id.* at 5.

In the end, the editor's note opined that Barrett's actions "fatally undermined the effectiveness of the fact-checking process" for her article.  *Id.*  As a result, The Atlantic believed

it was "impossible for us to vouch for the accuracy of this article," necessitating a retraction.  *Id.*

Peck sent an email to Atlantic staff echoing many of the note's conclusions.  Am. Compl. Ex. 3.

## F.    Reaction and Lawsuit

Reacting publicly at the time, Barrett told The New York Times that falsifying Sloane's son "was a serious error and misjudgment" and she was "sorry she had embarrassed The Atlantic and broken its trust with readers."[23]  She admitted in an online post that there were "several errors" in the story—and that it was "egregious[]" to include the reference to a son, "a person who doesn't exist."[24]  She stated, "The editors of the magazine viewed my inclusion of a nonexistent son as a cardinal lapse and retracted the piece.  That is their prerogative."[25]  As noted earlier, Barrett's original Complaint likewise conceded that The Atlantic "could have taken a number of lawful actions" after "learning about the son"—including "publish[ing] an Editor's Note admonishing" her and "retract[ing] the entire article solely on the basis of this detail."  Compl. ¶ 41.

Nonetheless, Barrett now brings this lawsuit against both The Atlantic and Peck.  Barrett claims defamation in connection with certain statements in the editor's note, published online and in print, as well as in Peck's internal email (Claims 1-4).  Barrett asserts an ancillary claim for false light invasion of privacy (Claim 5)—as well as contract-based claims (Claims 6-7).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "A pleading that offers labels and conclusions or a formulaic

---

[23] Michael Levenson, *The Atlantic Retracts Ruth Shalit Barrett Article on Niche Sports*, N.Y. Times (Nov. 1, 2020), https://tinyurl.com/2je9mynr.
[24] Barrett, *supra* note 19.
[25] *Id.*

recitation of the elements of a cause of action will not do," nor will "naked assertions devoid of further factual enhancement." *Id.* (alteration and citation omitted).  A court need not "accept as true a legal conclusion couched as a factual allegation." *Id.*  There instead must be "well-pleaded factual allegations." *Id.* at 679.  And the well-pleaded facts must make out a plausible claim. "[U]nless a plaintiff is able to nudge his or her claim 'across the line from conceivable to plausible,' the complaint must be dismissed." *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140 (D.D.C. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570-71 (2007)).

These rules have particular importance in cases against the press.  "To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits."  *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017); *see Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013).

## ARGUMENT

## I.      THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION

"In order to state a claim of defamation, [a] plaintiff must allege and prove four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."  *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (citation omitted).

The Amended Complaint fails to state a claim for defamation both because the statements at issue are not legally actionable and because Barrett fails to plausibly allege that The Atlantic and Peck acted with actual malice, the degree of fault required here by the First Amendment.

A.    <u>The Statements at Issue Are Not Actionable</u>

Barrett's claims center on four categories of statements (Claims 1-4).  None supports a libel claim, principally because the statements are not materially false, are protected statements of opinion, and/or lack defamatory meaning.  The relevant legal principles are as follows:

*Material Falsity.*  The plaintiff bears the burden of pleading and proving the material falsity of a challenged statement.  *Tavoulareas v. Piro*, 817 F.2d 762, 818 (D.C. Cir. 1987) (en banc).  It is well established that "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge [is] justified."  *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (internal quotation marks omitted).  The alleged falsity must be *material*.  If "the sting of the charge" is "substantially true," no cause of action arises.  *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1988).  And where "the question of truth or falsity is a close one, a court should err on the side of nonactionability."  *Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149, 158 (D.D.C. 2018) (citation omitted) (granting motion to dismiss).  As a result, courts regularly grant motions to dismiss on the basis of substantial truth.  *See, e.g.*, *id.*[26]

*Protected Opinion.*  Only provably false statements of objective fact can give rise to a claim for defamation.  *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990).  Thus, where a writer expresses "a subjective view, an interpretation, a theory, conjecture or surmise, rather than a claim to be in possession of objectively verifiable false facts, the statement is not actionable."  *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) (alterations and citation omitted); *Rosen v. Am. Isr. Pub. Affs. Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012) ("statement

---

[26] *See also, e.g.*, *Robertson v. Cartinhour*, 867 F. Supp. 37, 59 (D.D.C. 2012) (granting motion to dismiss), *aff'd*, 553 F. App'x 1 (D.C. Cir. 2014); *Carpenter v. King*, 792 F. Supp. 2d 29, 38 (D.D.C. 2011) (same); *Ning Ye v. Holder*, 644 F. Supp. 2d 112, 119 n.4 (D.D.C. 2009) (same); *Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213, 217 & n.5 (D.D.C. 2008) (same).

of pure opinion" cannot form basis of a claim); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 247-48 (D.D.C. 2016) (same), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017).

Under the doctrine of opinion based on disclosed facts, statements are likewise protected when a conclusion is presented—whether subjective or not—"that is based upon true facts that are revealed to readers or which are already known to readers." *Farah*, 736 F.3d at 539 (citation omitted); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 312 (D.C. Cir. 1994) (*Moldea II*).  This rule reflects that "readers understand that supported opinions represent the writer's interpretation of the facts presented," and that the "reader is free to draw his or her own conclusions based upon the facts." *Abbas v. Foreign Pol'y Grp., LLC*, 975 F. Supp. 2d 1, 16-17 (D.D.C. 2013) (alteration and citation omitted) (applying to commentary "supported by facts provided in [the] article").

Whether a statement "asserts actionable facts" or is instead opinion is a threshold issue that a court may properly determine at the motion-to-dismiss stage. *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 11 (D.D.C. 2019) (citation omitted); *see Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001) (explaining it is "a critical threshold question at the Rule 12(b)(6) stage").

***Defamatory Meaning.***  Before a claim for defamation can lie, "a court must evaluate whether a statement is capable of defamatory meaning, which is a threshold question of law." *Smith v. Clinton*, 253 F. Supp. 3d 222, 239 (D.D.C. 2017) (alterations omitted) (quoting *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007)).  "Not all (or even most) maligning remarks can be considered defamatory." *Chau v. Lewis*, 771 F.3d 118, 127 (2d Cir. 2014).  A statement must be more than unpleasant, offensive, pejorative or unflattering—instead, it must make the plaintiff appear "odious, infamous, or ridiculous." *Weyrich*, 235 F.3d at 627 (quoting *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)); *Franklin v. Pepco Holdings, Inc.*, 875 F. Supp. 2d 66, 74 (D.D.C. 2012) ("[I]n the context of a defamation claim, believing that an individual

did something wrong is distinct from thinking that the individual was odious, infamous, or ridiculous." (citation omitted)).  Courts consider a statement's meaning in the publication's "whole context," rather than in "cherry-picked" portions.  *Deripaska*, 282 F. Supp. 3d at 149.

The law at the pleading stage is particularly demanding where claims rely on a meaning allegedly *implied* by an otherwise "materially true" statement.  *White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990).  It is not enough to plead that a "defamatory inference can reasonably be drawn."  *Id.* at 520.  Rather, the plaintiff must *also* show that "the communication, by the particular manner or language in which the true facts are conveyed," supplies "additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference."  *Id.*  This requires an "especially rigorous showing."  *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1339 (D.C. Cir. 2015) (citation omitted).

Applying these well-settled doctrines to the statements challenged in Claims 1-4, Barrett's defamation allegations do not state a claim.

### 1.    Barrett's Participation in the Falsity and Deception (Claim 1)

Barrett first takes issue with statements in Peck's email and the editor's note relating to her admitted participation in the falsification of Sloane's son and deception of The Atlantic's editors. These statements cannot, as a matter of law, support a cause of action.

### a.    Statements Characterizing Barrett's Conduct

Barrett complains about The Atlantic's characterization of her conduct, apparently disagreeing with its choice of words, such as "deceived," "lied," "misled," "fabrication," and "complicit."  *See* Am. Compl. ¶¶ 125-28 (Claim 1).

But, critically, Barrett does not contest the central charge these statements relay: that she knowingly participated in the inclusion of a falsity—Sloane's purported son—in her article and concealed that from editors.  To the contrary, Barrett now affirmatively and repeatedly admits that

deception.  As recounted earlier, she expressly pleads that she was "aware" of the inclusion of the falsehood at the time, "support[ed] the inclusion," and made a deliberate "decision not to disclose to The Atlantic that there was no son."  *Id.* ¶¶ 75, 15, 93.  She further pleads that when confronted by editors, she continued to conceal the truth, "defended the accuracy" of what was in the article, and represented that there were no "discrepancies or falsehoods in [Sloane's] account."  *Id.* ¶ 41.  But she admits today that Sloane's son was both a "falsehood" and an "invention."  *Id.* ¶¶ 109, 130(d).  And in her own email to Peck just before publication of the editor's note and the magazine's decision to retract, Barrett not only admitted that she was "complicit," but also that she was guilty of "prevaricating" and "being evasive."  MTD Ex. 1, at 2.[27]

By her own admissions, the "sting" of the challenged statements is (at the very least) "substantially true."  *Liberty Lobby, Inc.*, 838 F.2d at 1296.  Barrett may prefer different words to describe her conduct—perhaps "prevaricat[e]" as she used in her email to Peck, but that is just another word for the same conduct, "to deviate from the truth."[28]  Barrett's preferences among synonyms do not change the indisputably true thrust of the statements at issue: that she participated in intentionally including a falsehood in her article and then concealed that from The Atlantic's editors.  Disagreement over word choice does not give rise to a claim for libel.  *See, e.g.*, *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986) (en banc) ("the First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words"); *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 685-86 (9th Cir. 1990) ("[c]omplaints or disagreements about choice of language," standing alone, do not "give rise to liability").

---

[27] Her Amended Complaint likewise acknowledges that it would be wrong to "knowingly provide The Atlantic's fact-checker with false information."  Am. Compl. ¶ 28.

[28] Merriam-Webster's Third New International Dictionary 1797 (2002); *see also, e.g.*, American Heritage College Dictionary 1104 (4th ed. 2007) ("[t]o stray from or evade the truth"); Chambers Dictionary 1302 (2002) ("to avoid stating the truth").

Barrett does not even genuinely appear to contest the truth (let alone *substantial* truth) of The Atlantic's wording at issue in Claim 1.  Nor could she.  One challenged statement literally quotes Barrett's own word: "complicit."  She cannot possibly maintain that is materially false. *See, e.g.*, *Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445, 454-55 (S.D.N.Y. 2018) (statements about plaintiff not false where they were "not materially different from the statements Plaintiff made").  Instead, Barrett attempts to suggest falsity because, in her mind, her conduct was based on "honest and principled" reasons.  Am. Compl. ¶ 130.  But *why* she allegedly was motivated to act—to protect Sloane's identity—does not render a description of *what* she did to be false.  In any event, the text of the email and editor's note each expressly conveys Barrett's explanation for her motivation.  They make clear that "this was a fabrication *to make Sloane less identifiable, because she was concerned about maintaining anonymity*."  Am. Compl. Ex. 3 (emphasis added); *accord id*. Ex. 4, at 3 ("Sloane's attorney told The Atlantic that *she wanted to make herself less readily identifiable*" and that, according to Sloane, Barrett "first proposed the invention of a son . . . *as a way to protect [Sloane's] anonymity*" (emphases added)).  Nothing in the email or editor's note counters that explanation or suggests any motive to the contrary.

Thus, to the extent Barrett maintains that the email or note suggest anything different about her motivations, "[t]he plain words of the" publications at issue "explicitly rebut" that contention. *Tavoulareas*, 817 F.2d at 781; *see, e.g.*, *Trudeau v. FTC*, 456 F.3d 178, 195-96 (D.C. Cir. 2006) (rejecting alleged implication that conflicted with facts "ma[de] clear" by the challenged press release); *Deripaska*, 282 F. Supp. 3d at 148-49 (rejecting alleged implication that was "negate[d]" by article's "specifically includ[ed] facts").

Further, any asserted implication as to Barrett's motive would not even be actionable as a matter of law.  It is well established that statements assessing a person's motivations are protected

18

opinion and, thus, not actionable.  Such matters are "not capable of being proven true or false, because an individual's state of mind at a particular point in time 'is not subject to empirical proof.'"  *Turner v. Wells*, 198 F. Supp. 3d 1355, 1370 (S.D. Fla. 2016) (quoting *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 718 (11th Cir. 1985)); *accord Farah*, 736 F.3d at 539-40 (affirming dismissal because statement that authors were "not motivated by genuine belief, but rather by a desire to hold their readers 'captive' and 'to sell books,'" is protected opinion); *Dreamstone Ent. Ltd. v. Maysalward Inc.*, 2014 WL 4181026, at *8 (C.D. Cal. Aug. 18, 2014) (accusation that claimant acted "maliciously" was opinion regarding "subjective state of mind").

### b.    Statement of Sloane's Attorney

Relatedly, Barrett asserts libel based on The Atlantic's quotation of Sloane's attorney that, according to Sloane, Barrett "had first proposed the invention of a son."  Am. Compl. ¶¶ 126(b), 127(c), 128(c).  But to begin, Barrett does not dispute that Sloane's attorney, in fact, stated this to The Atlantic.  *See id.* ¶ 39.  And she acknowledges that directly after the quotation, The Atlantic included Barrett's denial, making clear that "Barrett denies that the invention of a son was her idea."  *Id.* ¶¶ 98, 102; Am. Compl. Ex. 2, at 3, Ex. 4, at 4, Ex. 5.

There is not even an arguable material falsity here.  Again, whether or not Barrett disputes that the idea *originated with* Sloane, she does not deny her participation—her complicity—in the inclusion of the falsehood in the article and the concealment of it.  Barrett pleads that she was part of phone conversations with Sloane and her husband during which the idea originated.  Am. Compl. ¶ 27.  She pleads that she "was aware" of and "support[ed]" the inclusion of the falsehood.  *Id.* ¶¶ 8, 15, 75.  She pleads that she made a deliberate "decision" to hide the truth from The Atlantic's editors.  *Id.* ¶ 93.  And she pleads that she emailed Peck on October 30 to admit her complicity specifically because "*it would be unfair to scapegoat Sloane*."  *Id.* ¶ 44 (emphasis added).  In that email itself, Barrett expressly states that the "Editor's Note shouldn't blame

[Sloane, the source] for the invention of a son.  That would not be truthful or fair.  I was complicit."  MTD Ex. 1, at 2.  Barrett's attempt to assert a claim here is patently meritless.

### c.    Statement Relating to Inducing a Source to Lie

Barrett's claim based on the phrase that she was accused of inducing "at least one source to lie to our fact-checking department" also plainly fails.  Am. Compl. ¶ 127(d).  The statement is not only substantially true, but literally so.  Barrett does not deny that, as the editor's note recounts, Sloane's attorney "said that according to Sloane" Barrett had "encouraged Sloane to deceive The Atlantic as a way to protect her anonymity."  *Id.* Ex. 4, at 3.  Nor does Barrett dispute that The Atlantic could have reported that "a source"—Sloane—accused Barrett of inducing her to lie.  Her challenge thus boils down to a matter of word choice ("at least one").  This does not give rise to an actionable claim.  *See, e.g.*, *Janklow*, 788 F.2d at 1304.

Further, to the extent Barrett asserts that the phrase *implies* that Barrett *might* have allegedly induced more than one source to lie, that is—at most—an allegation that The Atlantic raised a *question* whether additional investigation would show that more than one source was implicated, given the information that had come forward in just the days prior with respect to Sloane.  Such questions "indicate a defendant's '*lack of definitive knowledge* about [an] issue'"— they do not impart actionable facts.  *Abbas*, 783 F.3d at 1338 (emphasis added) (citation omitted).  Thus, "posing questions has rarely given rise to successful defamation claims," even when the questions are "embarrassing or unpleasant to [their] subject."  *Id.* at 1338-39 (citing *Sack on Defamation* § 2:4.8 (4th ed. 2010)); *see Deripaska*, 282 F. Supp. 3d at 147 ("[W]hether [plaintiff's] business deals are worth investigating is not a verifiable statement of fact.").

### d.    Statements Relating to The Atlantic's Decision to Retract

Barrett additionally challenges one sentence from the editor's note reflecting the ultimate conclusions reached by the magazine in support of retracting her article:  that given what had come

to light—and was presented to readers in the note—The Atlantic "cannot attest to the trustworthiness and credibility of the author, and therefore . . . cannot attest to the veracity of the article."  Am. Compl. ¶ 127(a); *id.* ¶ 128(a) (The Atlantic "cannot attest to the trustworthiness and credibility of the author, and therefore . . . cannot attest to the veracity of the piece in its entirety.").

The challenged sentence is a textbook statement of protected opinion, provided in the interest of transparency to inform readers of the editorial judgments made by the magazine.  First, it is an opinion based on disclosed facts.  It expressly represents the conclusions reached by The Atlantic "based upon true facts that are revealed to readers" in the editor's note.  *Farah*, 736 F.3d at 539 (citation omitted).  The note explained that Barrett's article was subjected to a fact-checking process, but further expressed that her conduct in including a known fabrication and lying to editors "fatally undermined the effectiveness of the fact-checking process."  Am. Compl. Ex. 4, at 5, Ex. 5.  As a result, The Atlantic concluded that it "cannot attest to the veracity of the article."  *Id.* Ex. 4, at 3.  The statements thus straightforwardly present The Atlantic's "supportable interpretation" of the facts disclosed.  *Moldea II*, 22 F.3d at 315, 317-18.

Second, the challenged statement reflects The Atlantic's subjective opinion.  Whether a person is sufficiently trustworthy or credible to warrant endorsement is an inherently subjective matter of opinion.  *See Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 729 (1st Cir. 1992) (statement about plaintiff's "honesty" represented speaker's "personal appraisal of the factual information contained in the article," and thus was protected opinion); *Fonville v. District of Columbia*, 38 F. Supp. 3d 1, 12 (D.D.C. 2014) (supervisor's statement that plaintiff's conduct "was 'unacceptable' and 'not consistent with what I expect from a command member of my staff'" was protected opinion).  And the law is "particularly solicitous of criticism" of authored works.  *Sack on Defamation* § 4:3.1.  Here, The Atlantic decided that Barrett's admittedly deceptive

conduct warranted a retraction.  This determination is not provably true or false, but instead reflects a subjective—and constitutionally protected—exercise of The Atlantic's editorial judgment.

Indeed, Barrett previously has recognized that it was The Atlantic's "prerogative" to "view[] [her] inclusion of a nonexistent son as a cardinal lapse" and "retract[] the piece."  *See supra* p. 12.  Likewise, her original Complaint conceded that The Atlantic had every right to "retract[] the entire article"—and to "admonish" her personally.  Compl. ¶ 41.  In short, The Atlantic was entitled to express its opinion.  And Barrett even previously opined that her own conduct was "egregious" and reflected a "serious error."  *See supra* p. 12.[29]

### 2.    Barrett's Departure from The New Republic (Claim 2)

In Claim 2, Barrett challenges statements relating to her departure from The New Republic. In particular, Barrett recites a statement in Peck's email and the editor's note that, "[i]n 1999," Barrett "left *The New Republic* . . . after plagiarism and inaccurate reporting were discovered in her work."  Am. Compl. ¶¶ 136-38.  The Amended Complaint contends this statement is false because (i) Barrett's journalistic "lapses" neither "occurred" nor were "discovered" "in 1999," but instead in "1994-1995," and (ii) she "did not exit [The New Republic] as a direct result of these incidents."  *Id.* ¶ 139.  But this is a quibble, not a basis for a legal claim.

---

[29] Barrett's attempts to distract from her admitted misconduct with criticism of other decisions by The Atlantic are legally irrelevant.  They have no bearing on the truth of the statements at issue. Nor do the previous corrections by The Atlantic cited in the Amended Complaint involve anything like the lies and deception at issue here.  *See, e.g.*, Am. Compl. ¶¶ 112-13.  Those extraordinary facts obviously "taint[] everything else," and appropriately so.  *Id.* ¶ 110.  Likewise, the assertion that a coach's quote in the article was "change[d]" during the editing process, at a time when The Atlantic's fact-checking department was in touch with sources, does not change anything.  *Id.* ¶ 76. It has no effect on whether the statements at issue are actionable.  Moreover, it is notable that the Amended Complaint does not actually allege that the quotation was a falsehood.  Nor could Barrett assert that consistent with the requirements of Rule 11.  Since the filing of Barrett's original Complaint, "[t]he coach himself, Jeff Brameier of Darien High School" publicly confirmed that "he was quoted accurately."  Erik Wemple, *Ruth Shalit Barrett Sues the Atlantic and Bashes this Media Critic*, Wash. Post (Jan. 13, 2022), https://tinyurl.com/z5cmdr7b.

To begin, Barrett's original and amended Complaints concede the literal truth of the statement.[30]  Barrett admits that she committed multiple "incidents" of plagiarism and then another "serious error" in 1994-1995, which were widely publicized at the time.  *Id.* ¶¶ 60, 139; Compl. ¶¶ 55, 58; *see supra* pp. 4-7.  She concedes that she was "accused of plagiarism and errors in her journalism" and "journalistic malfeasance."  Compl. ¶¶ 4, 114.  She further acknowledges that in the aftermath of her scandals, she "took a leave of absence from *The New Republic*," and then departed for good "[i]n early 1999" following "renewed" attention to her "transgressions of the mid-90s"—transgressions that were "exacerbating the negative publicity" The New Republic was then receiving about another author's misconduct.  *Id.* ¶¶ 61, 64-65.  Thus, by Barrett's own admissions, the factual statement contained in the editor's note is true.  Barrett's departure from The New Republic "in 1999" did come "after" discovery of her conduct.

In an effort to generate a claim, Barrett contorts the sentences at issue to read "in 1999" as referring not only to the year of Barrett's departure (indisputably correct), but also to the year in which her self-described "lapses" occurred.[31]  But even accepting that tortured reading, no defamation can lie, as technical precision is not the test.  *Substantial* truth is.  Here, the alleged

---

[30] "[I]t is appropriate for the court to look beyond the amended complaint to the record, which includes the original complaint."  *W. Assocs. Ltd. P'ship*, 235 F.3d at 634; *see, e.g.*, *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 372 (D.D.C. 2018); *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 170-71 & n.15 (D.D.C. 2013), *aff'd*, 796 F.3d 1 (D.C. Cir. 2015).  That is particularly so where a plaintiff's amended complaint "has deleted facts that may have been unfavorable to him."  *Stafford v. George Wash. Univ.*, 2019 WL 2373332, at *1 (D.D.C. June 5, 2019); *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 14 (D.D.C. 2014) (a court is "authorized to accept the facts described in the original complaint as true" where a "plaintiff blatantly changes his statement of facts in order to respond to the defendant's motion to dismiss" (citation and alteration omitted)).  A court also need not accept an amended complaint's allegations as true when they "contradict those in the[] original complaint."  *Hourani*, 943 F. Supp. 2d at 171; *see, e.g.*, *Rishikov*, 70 F. Supp. 3d at 14.

[31] Barrett's reading of the online editor's note is particularly strained, as it ignores the remainder of the relevant paragraph.  This omitted language states that Barrett's "plagiarism incidents" occurred "in the 1990s."  Am. Compl. Ex. 2, at 4, Ex. 4, at 5.

"gist" or "sting" stems from allegedly suggesting a link between Barrett's conduct and her departure from The New Republic, not from the precise timing of the "lapses" vis-à-vis that departure. *Masson*, 501 U.S. at 517; *see Tavoulareas*, 817 F.2d at 787 (report of a "direct link" between plaintiff's and his son's shipping companies was true notwithstanding the article's failure "to make clear the formal, corporate relationship").

Barrett has not claimed that her "lapses" were unrelated to her exit from The New Republic. She attempts to artfully plead that she did not "exit as a *direct* result of these incidents." Am. Compl. ¶ 139 (emphasis added).  But that conclusory assertion cannot render the statement materially false.  She does not deny that her high-profile scandals related to her departure.  Again, Barrett has pleaded that she took a "leave of absence" following them, and that she then permanently departed when another author's scandal "put a renewed spotlight" on her own "transgressions."  *See* Compl. ¶¶ 55, 58, 61, 64-65.  There is no material difference, *see Masson*, 501 U.S. at 517, between the "gist" or "sting" of Barrett's formulation and that of the note's description, saying Barrett "left" the magazine "after plagiarism and inaccurate reporting were discovered in her work."[32]  The challenged statements thus are not actionable.  *See also Armstrong v. Thompson*, 80 A.3d 177, 185-86 (D.C. 2013) ("inaccuracy" in timeline of investigation not actionable because the "gist" of the charge—that an employee had been under investigation—was "not materially distinguishable" from the statement); *Guilford Transp. Indus., Inc. v. Wilner*, 760

---

[32] "Other news organizations have apparently reached this conclusion as well"—a factor that lends further weight to the substantial truth of The Atlantic's description. *Liberty Lobby, Inc.*, 838 F.2d at 1295 n.6; *see, e.g.*, Wemple, *Ruth Shalit Just Wrote*, *supra* note 22 (Barrett "left Washington in the late 1990s after laying down a trail of journalistic scandal"); Levenson, *supra* note 23 (Barrett "had been a rising young political reporter in the 1990s before accusations of plagiarism derailed her career as an associate editor at The New Republic").

A.2d 580, 601 (D.C. 2000) (description of timeline not actionable, "notwithstanding any claimed inaccuracies as to dates and the like").

### 3.     Statements Relating to Barrett's Byline (Claim 3)

The Amended Complaint next claims defamation based on statements relating to Barrett's "initial byline"—*i.e.*, "Ruth S. Barrett"—that The Atlantic later updated to "Ruth Shalit Barrett." Peck's email and the editor's note state that The Atlantic originally "referred to Barrett as Ruth S. Barrett at her request." Am Compl. ¶¶ 145-47 (Claim 3). They then express regret over the magazine's own editorial decision to elect to use that byline, acknowledging that, in the interest of "transparency," The Atlantic "should have included the name that [Barrett] used as her byline in the 1990s," when her plagiarism occurred. *Id.* The online editor's note states that, "[w]hen writing recently for other magazines, Barrett was identified by her full name, Ruth Shalit Barrett." Am. Compl. Ex. 2, at 4, Ex. 4, at 4. The print note similarly states she "was typically identified by her full name." *Id.* Ex. 5.

Barrett cannot claim that any of these express statements are false. Indeed, she concedes that she "recommended" the byline "Ruth S. Barrett." Am. Compl. ¶ 149(c). It is thus undisputed that The Atlantic "referred to Barrett as Ruth S. Barrett at her request." *Id.* Likewise, The Atlantic's assessment that it "should have" used the byline "Ruth Shalit Barrett" is clearly not actionable. That sentence does not recite any provably false fact about Barrett, but instead reflects a subjective judgment about what *The Atlantic* "should" have done to better promote "transparency" to its readers. Any defamatory sting is aimed at The Atlantic itself, not Barrett. *See Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 58 (D.D.C. 2012) (statements about someone other than plaintiff "[o]bviously . . . do not provide any basis for recovery"). And, in any event, it is a protected statement of opinion. It is both subjective and an opinion based on disclosed facts—

Defendants' judgment as to how Barrett's disclosed conduct in the 1990s "should have" affected the byline decision. *See Abbas*, 975 F. Supp. 2d at 16-17 (quoting *Moldea II*, 22 F.3d at 318).

Barrett nonetheless alleges that these statements are actionable because they falsely *imply* that she "proposed the byline 'Ruth S. Barrett' to conceal her identity." Am. Compl. ¶ 149. But Barrett cannot satisfy the "especially rigorous showing" required to state a claim for defamation by implication—namely "affirmative evidence" from the face of the publications that Defendants "intend[ed] or endorse[d]" the specific inferences that she asserts. *Abbas*, 783 F.3d at 1339; *White*, 909 F.2d at 520. The Amended Complaint does not even purport to offer such allegations. That alone precludes Barrett's implication-based claim. *See, e.g.*, *Nunes v. WP Co.*, 513 F. Supp. 3d 1, 6-7 (D.D.C. 2020) (granting motion to dismiss); *Bauman*, 377 F. Supp. 3d at 15 (same). More than that, the asserted inference is also refuted by the text of the editor's note, which makes plain not only that it was *The Atlantic's* ultimate decision to refer to her as "Ruth S. Barrett," but that in other recent publications her "full name" had been used. Am. Compl. Ex. 2, at 4, Ex. 4, at 4. The note is clear that if anyone is to blame for the naming convention, it is The Atlantic itself.[33]

### 4.    The Decision to Assign Barrett the Article (Claim 4)

Barrett claims defamation based on statements in which The Atlantic criticizes its own decision to assign the article to Barrett—that it was "self-evidently an act of poor judgment on our

---

[33] Barrett appends to this claim a separate statement found not in any publication of The Atlantic, but rather in an article *in the Washington Post*. *See* Am. Compl. ¶ 52; *id.* Ex. 6. Citing anonymous "magazine sources," the Post reported that as part of The Atlantic's investigation, former Atlantic editor "Abraham said Barrett was hoping that Google searches would no longer surface prominent reports" of her past scandals. *Id.* at 2. The Post also reported Barrett's denial of that proposition. This brief reference to hoping that Google searches would not turn up her history does not even rise to the level of defamatory speech, which would require Barrett to appear "odious, infamous, or ridiculous" as a result of that reference. *Weyrich*, 235 F.3d at 627. After all, Barrett does not contest her underlying misconduct. Likewise, in positing a belief as to her motive, the sentence amounts to a non-actionable statement of opinion under the well-settled law discussed earlier. *See supra* p. 18.

part, and one we regret." *See* Am. Compl. ¶¶ 156-57 (Claim 4).  For many reasons already addressed with respect to Claims 1-3, Barrett cannot claim libel based on these statements either.

As a threshold matter, these are self-critical statements characterizing The Atlantic's own decision-making as reflecting "poor judgment *on our part*." *Id.* Ex. 3, Ex. 4, at 5, Ex. 5 (emphasis added).  The criticism in these sentences is expressly aimed at the magazine itself, not at Barrett. For this reason alone, the claim fails.  The allegedly defamatory statement must be "specifically directed at the plaintiff." *Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966); *see also, e.g.*, *Robertson*, 867 F. Supp. 2d at 58.

Moreover, much like other statements reflecting the magazine's conclusions previously addressed, these statements are not actionable for multiple reasons, as they constitute opinions based on disclosed facts and subjective opinion.  They are The Atlantic's assessment of its own judgment based on the facts presented.  The "reader is free to draw his or her own conclusions." *Abbas*, 975 F. Supp. 2d at 16 (citation omitted).  The Atlantic's (self-critical) assessment also is inherently subjective.  It represents the magazine's own opinion as to what it considered to be "poor judgment." *See*, *e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1266, 1271 (11th Cir. 2018) (labeling action "poor judgment" was protected opinion); *Harder v. Sunrise Senior Living, Inc*., 2009 WL 5171843, at *5 (E.D. Mich. Dec. 22, 2009) (same).

Finally, Barrett additionally appears to take issue with the magazine's use of the phrase "journalistic malpractice" to characterize her past scandals.  This assertion is baseless.  To start, Barrett has personally used the exact same phrase to describe her conduct. *See supra* p. 6.  She has similarly described her conduct as "egregious," "deplorable," and "horrible." *See id*.  She concedes in her Amended Complaint that she committed "journalistic lapses," which she refers to as "transgressions" that were "reckless." Am. Compl. ¶¶ 61, 66.  And she previously pleaded that

she was accused in the 1990s of "journalistic malfeasance."  Compl. ¶ 4.  The Atlantic's statement is not false, let alone materially so.  Moreover, to the extent Barrett now disagrees with the characterization, that is a matter of opinion.  The Atlantic was entitled to express its view that her prior conduct, which she acknowledged to be "the most egregious offense in journalism" aside "from lying"—constituted "journalistic malpractice."  *See, e.g.*, *Armstrong*, 80 A.3d at 188 (calling misconduct "serious integrity violations" and "unethical behavior" not actionable).

## B.   The Complaint Fails to Plausibly Allege Actual Malice

Barrett's defamation claim independently fails because the Amended Complaint does not adequately allege that either The Atlantic or Peck personally acted with actual malice—the constitutionally required state-of-mind standard that applies here.

### 1.    The Actual Malice Standard Applies

Whether a plaintiff is a public figure subject to the actual malice standard "is a matter of law for the court to decide."  *Kahl*, 856 F.3d at 114 (quoting *Tavoulareas*, 817 F.2d at 772).  Here, the governing principles amply support applying the actual malice standard.

Barrett has made a career of being in the public eye, both writing for national publications on matters of public interest and public debate—and personally being at the center of a whirlwind of publicity, from "acclaim[]" to highly critical coverage of her controversies.  *Supra* pp. 4-7; Am. Compl. ¶¶ 58-62; Compl. ¶¶ 48-60.  Barrett long ago achieved the status of a "media celebrity." *Supra* p. 4.  Indeed, the filing of this lawsuit alone generated coverage from the New York Times to the Washington Post to Politico to Fox News to innumerable blogs and social media sites.[34]  She

---

[34] *E.g.*, Katie Robertson, *Freelance Writer Accuses The Atlantic of Defamation*, N.Y. Times (Jan. 9, 2022), https://tinyurl.com/2p84f47k; Bryan Pietsch, *Ruth Shalit Barrett Sues Atlantic for $1 Million over Retraction of Viral Article, Allegations of Inaccuracies*, Wash. Post (Jan. 9, 2022), https://tinyurl.com/2p9xvza3; Craig Howie & Josh Gerstein, *Freelance Writer Ruth Shalit Barrett Sues The Atlantic for $1 Million*, Politico (Jan. 8, 2022), https://tinyurl.com/yjer4hp7; *Media Buzz* (Fox News television broadcast Jan. 16, 2022) (Lexis).

is a public figure within the meaning of libel law.  At the very least, she qualifies as a "limited-purpose" public figure.  Her Amended Complaint does not even attempt to deny it.

Courts have "generally accorded" public-figure status to journalists for purposes of debates regarding both their journalistic practices and the subject of their writings.  *Defamation: A Lawyer's Guide* 5:17 (collecting cases); *accord Sack on Defamation* § 5:3.5 (collecting cases holding authors, including "columnist[s] and "freelance journalist[s]," to be limited-purpose public figures).  And indeed, the D.C. Circuit in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980)—the case establishing this Circuit's public-figure test—held an executive to be a public figure in part due to his role in approving the controversial, "consumer-oriented views that appeared" in his company's "monthly newspaper," *id.* at 1299-1300.

The D.C. Circuit's "three-part" test for public-figure status confirms that Barrett is a public figure.  *Kahl*, 856 F.3d at 114.  *First*, this case implicates at least two "public controvers[ies]"—defined as issues that are "being debated publicly" and which have "foreseeable and substantial ramifications for nonparticipants."  *Id.* (quoting *Waldbaum*, 627 F.2d at 1297).  To begin, Barrett's article was a national publication with a "broader purpose" regarding what Barrett has deemed an "important" public controversy—namely, the debate around "equity in sports and college admissions or child and adolescent health."  Am. Compl. ¶¶ 2, 6, 178; Compl. ¶¶ 111, 199.  The statements at issue, commenting on that article and its reporting, are likewise part of the debate.  The Amended Complaint casts Barrett's article as a "high-quality piece of investigative journalism that would educate readers."  Am. Compl. ¶ 178; *see* Compl. ¶ 124 (article provided "valuable information on a topic of public importance").  And it recounts the widespread "praise" and public

commentary of the topic that her article provoked.  *Kahl*, 856 F.3d at 114-15; *see* Am. Compl. ¶¶ 2, 77.[35]

As the Amended Complaint reflects, the statements at issue additionally relate to the longstanding, public controversy over Barrett's "talents, education, experience, and motives" as an author.  *Waldbaum*, 627 F.2d at 1298; *see* Am. Compl. ¶¶ 61-62 (Barrett's conduct in the 1990s was subject to a "passionate debate"); Compl. ¶ 140 (Barrett's conduct with respect to Sloane's son and The Atlantic's challenged statements relate to a "complex ethical issue"); *supra* pp. 4-7.  As the *Waldbaum* Court explained, such matters are "relevant to the public's decision whether to listen to" a given public commentator.  627 F.2d at 1298.[36]  The Atlantic is "far from the only" entity to have commented on Barrett's practices, *Safex Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285, 303-04 (D.D.C. 2021); to the contrary, the press has extensively covered the issue, *see supra* pp. 4-7; *see also* Am. Compl. ¶¶ 33, 60-62 (same); Compl. ¶¶ 30, 51-64, 89, 102 (same).

*Second*, Barrett has "thrust" herself "to the forefront" of both debates.  *Kahl*, 856 F.3d at 115 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)).  Barrett acknowledges that the very point of writing for The Atlantic's "global audience" was to "serve[] a superseding

---

[35] *See also* Compl. ¶¶ 3, 39, 81-83, 111 (collecting examples of responses to the article as well as "important conversations" the article inspired); *id.* ¶ 39 (characterizing article as an "important investigative work").

[36] Applying similar reasoning, courts routinely deem journalists public figures for purposes of controversies relating to their ethics or practices.  *See, e.g.*, *Brimelow v. N.Y. Times Co.*, 2021 WL 4901969, at *2 (2d Cir. Oct. 21, 2021) (plaintiff was a public figure due to his "long and distinguished career as a writer and journalist" and role as an author of a "bestselling book"); *Jensen v. Times Mirror Co.*, 634 F. Supp. 304, 308, 311 (D. Conn. 1986) (newspaper columnist who "engaged in interviews which were known to be incorporated into news stories" was a public figure in regard to a statement explaining her termination for "allowing inaccurate information" she provided in the interviews "to be published"); *O'Donnell v. CBS, Inc.*, 782 F.2d 1414, 1417 (7th Cir. 1986) (broadcast executive was public figure as to the "announcement of his firing" because he had "advocate[d] a particular point of view" through his previous position); *Warner v. Kan. City Star Co.*, 726 S.W.2d 384, 385-86 (Mo. Ct. App. 1987) (newspaper editor was public figure in regard to report that he was discharged for allegedly violating conflict-of-interest rules).

positive purpose" of "exposing the inequality" inherent in the niche-sports system she described—even if it "risked upsetting" some.  Compl. ¶¶ 70, 199; *see* Am. Compl. ¶ 178 (goal of article was to "educate readers" and "enhance readership for The Atlantic").  Simply put, Barrett "assumed a public role" in this controversial debate by penning a nationally published article "that invit[ed] attention and comment."   *Kahl*, 856 F.3d at 115 (plaintiff assumed public role in relevant controversy by "publish[ing] a book about" the topic and "promot[ing] his . . . views" on a "personal website"); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 587 (D.C. Cir. 2016) (same for plaintiff who stated views in open letters "on the front page of two . . . newspapers" and "[i]n various interviews with members of the . . . press"); *Hoffman v. Wash. Post Co.*, 433 F. Supp. 600, 604 (D.D.C. 1997) (same for plaintiff who wrote books, gave lectures, and served as "editor and publisher" of magazine on subject of controversy), *aff'd*, 578 F.2d 442 (D.C. Cir. 1998); *Joseph v. Xerox Corp.*, 594 F. Supp. 330, 333-34 (D.D.C. 1984) (same for plaintiff who directed views on topic "at a national audience" by writing "chapters in books, newspaper articles, and several books").[37]  And with respect to the controversy over her misconduct, Barrett has repeatedly "used [her] access to the press to promote [her] cause."  *Kahl*, 856 F.3d at 115; *see supra* p. 6 (citing, *e.g.*, interviews with CNN, the Washington Post, and the American Journalism Review).  She clearly has inserted herself in that controversy as well.

*Third*, the statements challenged by Barrett straightforwardly "relate[] to [Barrett's] role in the relevant public controvers[ies]"—namely, her article and her past and present instances of misconduct.  *Kahl*, 856 F.3d at 115.

In short, Barrett is a public figure who must satisfy the actual malice standard here.

---

[37] *See also Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996) ("By publishing your views you invite public criticism and rebuttal. . . ."); *Sack on Defamation* § 5:3.5 (collecting cases); *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 252 (Tex. Ct. App. 1996) (same).

## 2.    The Complaint Does Not Plausibly Allege Actual Malice

The stringent actual malice standard requires Barrett to plead (and then prove) that the alleged defamation was published with "knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times*, 376 U.S. at 279-80.   That is, the author must have *knowingly* uttered a falsehood or, at the least, "*in fact entertained serious doubts* as to the truth of his publication" and said it anyway.  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added).   "[I]t is not enough to show that [a] defendant should have known better; instead, the plaintiff must offer evidence that the defendant *in fact harbored subjective doubt*."  *Jankovic*, 822 F.3d at 589 (emphasis added).   And actual malice is not measured on the basis of a news organization's alleged collective knowledge, but rather the state of mind of the specific "persons . . . having responsibility for the publication."  *N.Y. Times*, 376 U.S. at 287.

This is a "famously 'daunting'" standard that few plaintiffs can ever meet.  *Tah*, 991 F.3d at 240 (quoting *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)).   As a result, courts in this Circuit routinely dismiss cases for failure to sufficiently allege actual malice.  *See, e.g.*, *id.* at 243 (affirming dismissal); *Couch v. Verizon Commc'ns, Inc.*, 2021 WL 4476698, at *4 (D.D.C. Sept. 30, 2021); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 93-94 (D.D.C. 2019); *Deripaska*, 282 F. Supp. 3d at 143; *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 93 (D.D.C. 2018); *Hourani v. PsyberSolutions LLC*, 690 F. App'x 1, 4 (D.C. Cir. 2017) (affirming dismissal).

a.    Barrett's Amended Complaint does not come close to adequately pleading actual malice.  It contains no "well-pleaded factual allegations," *Iqbal*, 556 U.S. at 679, that demonstrate actual malice on the part of The Atlantic or Peck individually with respect to any of the statements at issue.  There is not a single non-conclusory factual allegation establishing that the journalists responsible for the relevant statements published them with any subjective disbelief as to their truth—let alone facts that would plausibly allow that conclusion to be drawn under the required

"clear and convincing evidence" standard.  *See, e.g.*, *Fairbanks*, 314 F. Supp. 3d at 93 (dismissing claims where "allegations do not provide clear and convincing evidence of actual malice"). Instead, the Amended Complaint principally does no more than recite the "bare elements" of the standard—*e.g.*, that each defendant "knew" the challenged assertions were false—while offering no relevant, well-pleaded factual support.  *See* Am. Compl. ¶¶ 133, 142, 152, 163.  This type of pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is precisely what "will not do."  *Iqbal*, 556 U.S. at 678 (citation omitted); *see Arpaio v. Cottle*, 404 F. Supp. 3d 80, 84 (D.D.C. 2019) (collecting cases).

      b.     The few factual allegations that Barrett attempts to offer are largely boilerplate or irrelevant and patently insufficient to demonstrate that The Atlantic or Peck "in fact harbored subjective doubt," *Jankovic*, 822 F.3d at 589, as to any statement at issue in this lawsuit:

      Most of Barrett's self-described "fault" allegations have no bearing at all on the truth or falsity of the statements at issue—let alone on whether The Atlantic or Peck acted with actual malice.  These assertions include, for example, that The Atlantic was "obligated to protect Sloane and her family" with respect to the underlying article and "published the Article with a great deal of specific information about Sloane and her family."  Am. Compl. ¶ 133(a), (c).  Those allegations have nothing to do with whether those responsible for the statements at issue in this case harbored subjective doubt *as to those statements*.  *See Tavoulareas*, 817 F.2d at 794 (plaintiffs "must demonstrate actual malice *in conjunction* with a false defamatory statement," not "in the abstract").

      Other assertions, like that The Atlantic "should have known" that the invention of the son was designed "to protect Sloane's anonymity," *see* Am. Compl. ¶ 133(f), are not only irrelevant but nonsensical.  As already discussed, the publications at issue explicitly reflected that the

falsehood was included "*to make Sloane less identifiable, because she was concerned about maintaining anonymity*." *Id.* Ex. 3 (emphasis added); *accord id.* Ex. 4, at 3.

Barrett further asserts perceived inadequacies in The Atlantic's factual investigation prior to publication—including the extent to which The Atlantic sought her comment. But because actual malice is a "subjective" standard, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989), it is specifically "*not* measured by whether a reasonably prudent man would have published, or would have investigated before publishing," *St. Amant*, 390 U.S. at 731 (emphasis added). Indeed, "failure to investigate is precisely what the Supreme Court has said is insufficient to establish reckless disregard for the truth." *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013). Not even "an extreme departure from professional standards" will suffice. *Harte-Hanks*, 491 U.S. at 665; *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 45 (D.D.C. 2002). Nor will "a publisher's failure to engage in dialogue with the allegedly defamed party" lead to an inference of actual malice. *Foretich v. Am. Broad. Cos.*, 1997 WL 669644, at *7 (D.D.C. Oct. 17, 1997); *see also, e.g.*, *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 141 (D.D.C. 2016).[38]

And here, of course, The Atlantic *did* seek out and include comment from Barrett. As a result, any possible assertion of actual malice is *negated* by The Atlantic's inclusion of comment from her, providing readers with her account: namely, that while she was "'complicit'" in the falsification, she "denies that the invention of a son was her idea." Am. Compl. Ex. 4, at 3-4, Ex. 5; *see Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018) (affirming dismissal, noting requests for comment and publication of denial "tend[] to undercut any inference of actual

---

[38] These principles squarely foreclose any relevance, for example, of Barrett's suggestion that The Atlantic *should have* dug up a 1995 "publicly available statement" by New Republic editors commenting on her plagiarism. *See* Am. Compl. ¶¶ 60, 142(g). Regardless, this statement came *four years prior* to her departure from The New Republic, which Barrett's own original Complaint specifically tied to her "transgressions." *See supra* pp. 23-24.

malice"); *Lohrenz v. Donnelly*, 350 F.3d 1272, 1286 (D.C. Cir. 2003) ("reporting perspectives at odds with the publisher's own, tend[s] to rebut a claim of malice" (citation omitted)); *Montgomery*, 197 F. Supp. 3d at 261 (publication of denials rebuts claim of actual malice).

Strikingly, Barrett also ignores her own admissions—including her admissions at the very time that The Atlantic was considering whether to exercise its editorial discretion to retract her article—that she was "*complicit*," that any editor's note "*shouldn't blame [Sloane] for the invention of a son*" because that "would not be truthful or fair," and that she had both been "*prevaricating*" and "*being evasive*."  MTD Ex. 1, at 2 (emphases added).[39]  That email is now incorporated by reference in her Amended Complaint.  *See* Am. Compl. ¶¶ 44, 97.  And, if that were not enough, Barrett has further conceded previously that The Atlantic "*could have . . . retracted the entire article solely on the basis of this detail*"—the inclusion of the son—while also publishing a note "admonishing Ms. Barrett" for her conduct.  Compl.  ¶ 41 (emphasis added).  Barrett does not even argue in her Amended Complaint that The Atlantic was somehow barred from retracting, just that it was not "the *only* appropriate response."  Am. Compl. ¶ 133(j) (emphasis added).

Grasping for straws, Barrett apparently seeks to make an issue of minor wording changes between the online editor's note and the version published (some three months later) in the print edition.  They have no bearing on the question of actual malice.  To begin, the differences are facially inconsequential.  *See id.* ¶ 104.  Moreover, the print note was published later in time, and

---

[39] Barrett's admissions, moreover, meaningfully aligned with Sloane's account.  Her allegation that she disputed another error raised by Sloane's attorney as to a detail in the story, *see* Am. Compl. ¶ 133(q), does not bear on Sloane's account with respect to the son.  More specifically, it again provides no well-pleaded facts demonstrating that The Atlantic subjectively disbelieved what Sloane's attorney stated with respect to the son.  *See Montgomery*, 197 F. Supp. 3d at 263 (quoting *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1513 (D.C. Cir. 1996)).

is thus irrelevant to The Atlantic's state of mind at the time that the online note was published: "[t]he actual malice inquiry focuses on the defendant's state of mind *at the time of publication*." *Kahl*, 856 F.3d at 118 (emphasis added); *see also, e.g.*, *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996) ("the inference of actual malice must necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant *prior to publication*" (emphasis added)).   Thus, contrary to Barrett's claims based on The Atlantic's purported failure to "correct[]" the online editor's note, Am. Compl. ¶ 105, actual malice "cannot be inferred from a publisher's failure to retract a statement," *Pippen*, 734 F.3d at 614; *see also, e.g.*, *Lohrenz*, 223 F. Supp. 2d at 56 ("[T]here is no duty to retract or correct a publication, even where [unlike here] grave doubt is cast upon the veracity of the publication after it has been released.").

Further, to the extent Barrett's claims of defamation rest on asserted *implications* allegedly arising from the actual text of the written statements, she must additionally demonstrate that those responsible for the publications affirmatively *intended those implications and knew them to be false. See, e.g.*, *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998) (defendant must have "intended to convey the defamatory impression"); *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1317-18 (7th Cir. 1988) ("Proof of actual malice depends upon the defendant's actual state of mind"; accordingly, a plaintiff "must show with clear and convincing evidence that the Defendants intended or knew of the implications that the plaintiff is attempting to draw.").   Barrett does not and cannot supply any well-pleaded factual allegations supporting such intentions.

In sum, the Amended Complaint does not come close to adequately pleading actual malice.

## II.   THE COMPLAINT'S ANCILLARY FALSE LIGHT CLAIM FAILS

The failure of Barrett's defamation claims dooms her ancillary claim for false light invasion of privacy (Claim 5).  "[T]he First Amendment considerations that apply to defamation apply also"

to related torts.  *Farah*, 737 F.3d at 540.  A plaintiff thus "may not use related causes of action to avoid the constitutional requisites of a defamation claim."  *Moldea II*, 22 F.3d at 319-20; *accord Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56-57 (1998).  This rule plainly dictates dismissal of Barrett's claim for false light.  *See, e.g.*, *Tah*, 991 F.3d at 243; *Moldea II*, 22 F.3d at 319-20; *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 140 (D.C. 2021).

The claim also fails for additional, independent reasons. The elements of false light invasion of privacy largely mirror the elements of defamation, with the additional requirement that a plaintiff plead and prove the communication placed her in a "highly offensive" false light. *Weyrich*, 235 F.3d at 628 (citing Restatement (Second) of Torts § 652E); *Washburn v. Lavoie*, 357 F. Supp. 2d 210, 216 (D.D.C. 2004), *aff'd*, 437 F.3d 84 (D.C. Cir. 2006).  The Atlantic's explanation of its decision to retract is only reasonably understood as reflecting The Atlantic's opinion regarding the proper exercise of its editorial discretion, not as invoking "hatred or loathing" of Barrett or subjecting her to "disgrace or dishonor," *Klayman v. Segal*, 783 A.2d 607, 618 (D.C. 2001), nor as making a "major misrepresentation" of Barrett's "character, history, [or] activities," Restatement (Second) of Torts § 652E(c).  Barrett's allegations thus fail to establish that the challenged statements, considered "in the context within which they were made," placed Barrett in a "highly offensive" false light.  *Washburn*, 357 F. Supp. 2d. at 216.

## III.    THE COMPLAINT'S ANCILLARY CONTRACT CLAIMS FAIL

Finally, Barrett presses two ancillary contract claims (Claims 6-7).  These claims, too, fail because they recycle Barrett's faulty defamation allegations and for other, independent reasons.

### A.    <u>The Contract Claims Fail for the Same Reasons as the Defamation Claims</u>

Although contract claims do not automatically trigger the First Amendment's protections when brought against the press, constitutional protections may be implicated "where a plaintiff attempts to use a state-law claim to avoid the strict requirements for establishing a libel or

defamation claim." *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (quoting *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991)).  Thus, in *Compuware Corp. v. Moody's Investors Servs., Inc.*, the Sixth Circuit applied the actual malice standard to a contract claim that was based on Moody's publication of a credit rating because the claim was "intimately tied to speech, expression, and publication" and alleged "reputational or defamation-type harm," *id.* at 531, 533.  There was "no material difference" between a contract claim targeting Moody's "incompeten[ce] . . . in compiling and evaluating its publication of protected expression" and torts "based on conduct that might support a pendant defamation claim." *Id.* at 532.

*Compuware*'s reasoning applies equally to the contract claims here.  While the Amended Complaint asserts that the contract claims are "not dependent upon defamation counts," Am. Compl. ¶ 179, in reality the claims are replete with allegations that Defendants defamed Barrett. They contend, for instance, that The Atlantic breached its duty of good faith and fair dealing by publishing editor's notes that "malign[ed]" Barrett and "disparage[d] her character." *Id.* ¶ 186. These notes, the Amended Complaint continues, constituted "scurrilous attacks and character assassination" that "cost" Barrett her "reputation." *Id.* ¶¶ 187-88.[40]  Barrett's good faith and fair dealing claim accordingly seeks Barrett's alleged "loss of earning capacity" stemming from harm to her ability "to practice her profession of writing." *Id.* ¶ 191.  These allegations are just another way of claiming defamation.  The same goes for the breach of contract claim, which alleges that The Atlantic "assaulted Ms. Barrett in print" and harmed her ability "to practice her profession as a writer"—specifically asserting harm from The Atlantic's "*defamatory* Editor's Notes."

---

[40] *See also id.* ¶ 182 (Atlantic's conduct "facilitated . . . public smearing of Ms. Barrett"); *id.* ¶ 189 (Atlantic "publicly defenestrate[d] Barrett" and "destroy[ed] her writing career"); *id.* ¶ 190 (Atlantic's investigation "damaged Ms. Barrett's professional reputation as a writer" and further "harm[ed]" her "career and reputation").

*Id.* ¶¶ 202-06 (emphasis added).  Barrett cannot evade the protections that bar her defamation

claims by dressing those claims up in contract-law garb.  *See supra* p. 38.

### B.      The Contract Claims Fail Because of Barrett's Admitted Breach

Barrett's claims also fail under well-established doctrines of contract law.  "To prevail on

a breach of contract claim," the plaintiff must demonstrate—among other things—that "plaintiff

performed his contractual obligations."  *Dorsey v. Am. Express Co.*, 680 F. Supp. 2d 250, 254

(D.D.C. 2010), *aff'd* 2010 WL 3068952 (D.C. Cir. Oct. 26, 2010).  A plaintiff's prior, material

breach can "discharge[]" a defendant's "obligations under the [contract]."  *Howard Town Ctr.*

*Dev., LLC v. Howard Univ.*, 278 F. Supp. 3d 333, 394 (D.D.C. 2017), *aff'd*, 730 F. App'x 1 (D.C.

Cir. 2018).  Thus, "a party may defend against a breach of contract claim on the ground that its

performance was excused by the other party's prior breach of the contract."  *Donald Marshall*

*Berlin v. Bank of Am., N.A.*, 101 F. Supp. 3d 1, 15 (D.D.C. 2015) (citation omitted).

Here, the contract on which Barrett sues (the Author's Agreement) expressly required

Barrett to "cooperate fully" in the "procedures" associated with The Atlantic's right to "edit, revise,

[and] modify," the article, including by providing The Atlantic with any "research material" and

"access to subjects."  Am. Compl. Ex. 7, at 3 ¶ 4.  Yet the Amended Complaint admits that Barrett

deliberately included a falsehood in her story, concealed that invention, and made a "*decision not*

*to disclose* to The Atlantic that there was no son," including when editors questioned her on the

subject.  Am. Compl. ¶ 93 (emphasis added).  These are plain breaches of her duty to "cooperate

fully."  Moreover, Barrett's original Complaint even explicitly conceded that she "*did not*

*cooperate*."  Compl. ¶ 18 (emphasis added).  Barrett cannot plausibly maintain a contract claim in

the face of this admission, which expressly pleads a breach of the contract.  *See, e.g.*, *Howard*

*Town Ctr. Dev., LLC*, 278 F. Supp. 3d at 394-96 (developer's breach released counterparty from

obligations); *Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, 2019 WL 5395739, at *2 (D.D.C.

Oct. 22, 2019) ("If any prior material breach on [plaintiff's] part is not excused, then any alleged breach on [defendant's] part is irrelevant.").

### C. The Contract Claims Fail for Additional, Independent Reasons

#### 1. Good Faith and Fair Dealing (Claim 6)

In Claim 6, Barrett collects a series of grievances she has with The Atlantic and packages them as a purported breach of the implied covenant of good faith and fair dealing. Her allegations do not state such a claim for multiple reasons.

*First*, while D.C. law recognizes that contracts contain an implied covenant of good faith and fair dealing, this covenant does not stand on its own. Rather, "[a]ny claimed duty of good faith and fair dealing must comport with the terms of the parties' contract." *Ihebereme v. Cap. One, N.A.*, 933 F. Supp. 2d 86, 105 (D.D.C. 2013), *aff'd*, 573 F. App'x 2 (D.C. Cir. 2014). "In order to survive a motion to dismiss," a plaintiff alleging breach of the covenant therefore "must allege facts to show that defendant has taken steps, or refused to take steps, which ultimately had the effect of destroying or injuring the right to receive the fruits of the contract." *Metz v. BAE Sys. Tech. Sols. & Servs., Inc.*, 979 F. Supp. 2d 26, 32 (D.D.C. 2013) (citation omitted), *aff'd*, 774 F.3d 18 (D.C. Cir. 2014). A plaintiff who fails to plausibly allege that she was contractually "entitled" to the benefit cannot sustain a claim—no matter whether the plaintiff "*believed* the terms" to be different. *Ihebereme*, 933 F. Supp. 2d at 105 (rejecting claim on this basis).[41]

---

[41] *See also, e.g.*, *Metz*, 979 F. Supp. 2d at 33 (dismissing claim premised on interference with right that was "not a benefit provided to [plaintiff] under the agreement"); *B&H Nat'l Place, Inc. v. Beresford*, 850 F. Supp. 2d 251, 260 (D.D.C. 2012) (rejecting claim based on defendants' withholding of business plans "because defendants simply had no duty under the [agreements] to disclose their business plans"); *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1134 (D.C. 2015) (no claim based on defendant's misrepresentations or omissions where "the sales contract did not impose any duty . . . to inform" plaintiffs about the impending project at issue).

The Amended Complaint runs roughshod over this principle. In effect, it would convert the limited implied covenant into a freestanding, wide-ranging duty to do as the plaintiff pleases. In addition to calling the editor's note "unreasonable," Am. Compl. ¶ 187, Barrett asserts that The Atlantic failed to adequately protect Sloane's confidentiality, *id.* ¶ 180; disagrees with The Atlantic's strategy for communicating with Mr. Wemple, *id.* ¶¶ 181-85; and criticizes The Atlantic's internal investigation into the circumstances surrounding the publication of Barrett's article, resulting from her own misconduct, *id.* ¶¶ 189-90. Barrett does not, however, identify a contractual "fruit" to which she was deprived. She may not like how The Atlantic proceeded, but she fails to plausibly demonstrate that The Atlantic denied her a specific *contractual right* conferred by the Author's Agreement—a contract which, after all, made clear it was "the entire agreement" between the parties. Am. Compl. Ex. 7, at 4 ¶ 10.

Indeed, far from alleging that *she* had any contractual right to confidentiality, Barrett acknowledges that any such right was "owed to Sloane." Am. Compl. ¶ 180; *see infra* p. 44. Nor does Barrett point to any contractual right concerning how The Atlantic would communicate with reporters probing the article or how The Atlantic would conduct an internal examination in the wake of misconduct. Barrett's theory instead appears to boil down to the untethered assertion that The Atlantic was bound at all costs to "promote and protect the integrity of the Article" and "imbue the author with . . . prestige." Am. Compl. ¶ 178. But that is not what the contract provides.

*Second*, Barrett's wildly vague and speculative damages allegations only underscore the implausibility of her claim. The Amended Complaint does not even attempt to link The Atlantic's challenged conduct with harm to any particular contractual benefit. Instead, the damages allegations begin and end with the statement that The Atlantic's alleged breach of the covenant of good faith and fair dealing lowered Barrett's "earning capacity in making it more difficult for [her]

to practice her profession of writing." *Id.* ¶ 191.  Barrett entirely fails to link The Atlantic's breach with a benefit actually conferred by the contract.

*Third*, Barrett also has failed to plead facts demonstrating the type of misconduct necessary to sustain liability under this theory.  At bottom, Barrett disagrees with The Atlantic's editorial judgments.  But Barrett's disagreement with The Atlantic's "judgment" does not show The Atlantic acted unfairly or unreasonably, when faced with the undisputed facts regarding the fabrication and ensuing "prevaricat[ion]," MTD Ex. 1, at 2.  *Himmelstein v. Comcast of the Dist., LLC*, 908 F. Supp. 2d 49, 54-55 (D.D.C. 2012) (breach of the covenant requires more than a party's "bad judgment" (quoting *Maljack Prod., Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995)).  In light of the litany of concessions Barrett has made—both as to the extent of her misconduct and that The Atlantic was within its rights not only to retract the article, but to "admonish" her for it—she does not and cannot plausibly allege that The Atlantic's decisions here were made in bad faith or otherwise unreasonable.  *See Adler v. Abramason*, 728 A.2d 86, 90-91 (D.C. 1999) (no breach "when reasonable persons in the parties' shoes would have expected the contract to be performed as it was").[42]

### 2.     Breach of Contract (Claim 7)

Barrett's final claim, alleging an express breach of contract, also fails as a matter of law.

a.     Barrett principally rests her claim on Section 6(b) of the Author's Agreement.  But this provision expressly imposed obligations on *Barrett*, not The Atlantic.  In the words of the Amended Complaint, Section 6(b) "*required Ms. Barrett, inter alia*, to represent and warrant that her work 'does not infringe . . . any other right, of any person or entity,'" nor "'invade the privacy

---

[42] Barrett has not pleaded, for instance, that The Atlantic "fail[ed] to follow its own procedures" for dealing with an author's willful deception, *Magee v. Am. Inst. of Certified Pub. Accts.*, 245 F. Supp. 3d 106, 119 (D.D.C. 2017); to the contrary, she has identified no prior instance in which this type of willful fabrication and after-the-fact deception has occurred.  *See also supra* note 29.

. . . rights of anyone.'" Am. Compl. ¶ 193 (emphasis added).  This allegation thus fails on its face.

The provision is part of a series of contractual terms that the "*[a]uthor* represents and warrants"—

and even agrees to "indemnify" and "hold . . . harmless" The Atlantic for any claims arising out

of them.  *Id.* Ex. 7, at 3 ¶ 6.  Because The Atlantic cannot breach a duty it did not have under "the

literal import of the provision," Barrett's claim fails at the outset.  *Providence Hosp. v. Grp.*

*Hospitalization Inc.*, 494 A.2d 639, 639-40 (D.C. 1985) (per curiam).

The Amended Complaint nonetheless urges that this term "should be interpreted as

imposing reciprocal obligations on The Atlantic not to infringe any rights of any person."  Am.

Compl. ¶ 200.  And it claims, in particular, that the provision should be read to provide the article's

"source[]"—*Sloane*—an "enforceable legal right[]," by virtue of Barrett's promise to maintain her

confidentiality, to stop The Atlantic from publicly identifying a deliberate falsehood in one of its

articles. *Id.* ¶ 194.  Barrett's imaginative reconstruction of the contract fails for numerous reasons.

For starters, a plaintiff cannot "reasonably expect the court to rewrite" the contract in its

"favor, or to impose by judicial *fiat* a provision which the parties did not include therein."  *Hart v.*

*Vt. Inv. Ltd. P'ship*, 667 A.2d 578, 585 (D.C. 1995); *see Armenian Assembly of Am., Inc. v.*

*Cafesjian*, 758 F.3d 265, 280 (D.C. Cir. 2014) (disclaiming power to "rewrite the plain terms of

the contract to which [the parties] agreed").  Barrett's argument for how the contract "should be"

read cannot trump what the contract *actually* says.  Am. Compl. ¶ 200.  Further, as explained in

*Steele v. Isikoff*, 130 F. Supp. 2d 23, 31, 33 (D.D.C. 2000), "the relationship between a reporter

and a source is not contractual in nature," and thus "does not give rise to express or implied

contractual duties," *id.*  And, regardless, any promise of *source* confidentiality would benefit the

source—Sloane—not Barrett.  So too, any harm from a breach of such a promise would be Sloane's

to assert, not Barrett's.  *Cf.* Am. Compl. ¶ 203 (alleging "past and future pecuniary income losses" due to Barrett's being "unable to practice her profession as a writer").

In all events, The Atlantic never disclosed Sloane's identity.  Indeed, by the time the online editor's note revealed the falsity of the purported "son," that falsity was already publicly known—published by the Washington Post.  *Supra* p. 9.  To the extent the Amended Complaint alleges that publication of personal details compromised Sloane's identity, it ignores that any such details were there as part of the article that *Barrett* had personally drafted and approved for publication.  What is more, the relief Barrett seeks, including dramatic rights, would allow her to *further publicize* the article, not bury it out of concern for Sloane's confidentiality.  Am. Compl. at 81.

The entire premise of the claim simply makes no sense.  A journalist cannot admit to conspiring to include a deliberate fabrication in a story, hide it from the publisher, and then sue the publisher for breach of contract when the publisher reveals the falsehood.  That is frivolous.

b.    Barrett additionally cites the magazine's agreement "to make commercially reasonable efforts" to market dramatic rights to the article.  *Id.* ¶¶ 204-05 (quoting Ex. 7, at 2).  But Barrett wholly fails to allege facts as to what efforts would have been "commercially reasonable" with respect to a story that had been retracted, and publicly criticized, after the discovery of an intentional falsehood perpetrated by the article's author.  After all, Barrett previously admitted that The Atlantic legally could have both retracted the article and published an editor's note "admonishing" her, Compl. ¶ 41, and even now concedes that "knowingly provid[ing] false information" to the article's fact-checkers was something she "could not" do, Am. Compl. ¶ 28.  Barrett moreover concedes that her article was the subject of "attacks and criticism" and led to "adverse consequences" for The Atlantic, including by prompting "post-publication investigations."  *Id.* ¶¶ 10, 21, 92; *see id.* ¶¶ 33-36.  There are no plausible, well-

pleaded factual allegations demonstrating that it would have been commercially reasonable for The Atlantic to market the further distribution of this article.

  c. Finally, as with her good faith and fair dealing claim, Barrett fails to identify any damages associated with the particular contractual violations she asserts—aside from the single speculative assertion that The Atlantic "wrongfully lowered [her] earning capacity by making it more difficult or impossible for her to practice her profession of writing." *Id.* ¶ 206; *see id.* ¶ 203. The Amended Complaint does not attempt to explain how The Atlantic's alleged conduct regarding Sloane's confidentiality, or its decision to not promote an article with an acknowledged falsehood, would make it "impossible" for Barrett to continue in her profession. Once again, Barrett's inability to plead remotely plausible damages flowing from the express breaches she asserts further highlights the fundamental flaws with her claim.

## CONCLUSION

  For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Dated: April 13, 2022

             Respectfully submitted,

             WILLIAMS & CONNOLLY LLP

             By: */s/ Stephen J. Fuzesi*
             Joseph M. Terry (D.C. Bar No. 473095)
             Stephen J. Fuzesi (D.C. Bar No. 496723)
             Whitney D. Hermandorfer
             (D.C. Bar No. 888314222)
             725 Twelfth Street, N.W.
             Washington, DC 20005
             Telephone: (202) 434-5000
             Facsimile: (202) 434-5029
             jterry@wc.com
             sfuzesi@wc.com
             whermandorfer@wc.com

             *Attorneys for Defendants The Atlantic*
             *Monthly Group LLC and Donald*
             *Christopher Peck*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2022, a copy of this Defendants' Motion to Dismiss Amended Complaint and related papers was filed via the Court's electronic filing system, and served via that system upon all parties required to be served.


Dated: April 13, 2022                    By:    */s/ Whitney D. Hermandorfer*
                                                Whitney D. Hermandorfer

46