# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RUTH SHALIT BARRETT**, | |
| Plaintiff, | |
| v. | |
| **THE ATLANTIC MONTHLY GROUP LLC,** | Case No.: 1:22-cv-00049-EGS |
| and | |
| **DONALD CHRISTOPHER PECK**, | |
| Defendants. | |

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARD...................................................................................................... 7

OBJECTION TO AND REQUEST TO STRIKE EXTRANEOUS, INFLAMMATORY
EVIDENCE CITED AND QUOTED IN THE MOTION TO DISMISS...................................... 7

ARGUMENT ................................................................................................................. 10

    I.      The Complaint states a claim for defamation in Counts 1 through 4. .................... 10

          A.    All the statements alleged in the Complaint are false and defamatory,
               individually and as a collective unit. ............................................................ 10

               1.    In their statements concerning Ms. Barrett's role in the inclusion of
                    the masking detail, Defendants lied and concealed objective facts
                    about Ms. Barrett's motive, materially overstated her role in the
                    events to falsely portray her as a journalist who engineered a
                    "fabrication";  falsely claimed that she lied or induced others to lie
                    about aspects of the Article other than the masking detail, and then
                    constructed a skewed, unprotected defamatory "opinion" based on
                    all these fabrications. ....................................................................... 11

               2.    Defendants' perpetuation of the false and defamatory claim by
                      Sloane's attorney that Ms. Barrett "first proposed" to include the
                      masking detail and "encouraged" Sloane to lie about it is
                      actionable because Defendants wove this allegation into their
                      broader false narrative about her conduct in order to make the
                    statement appear true. ....................................................................... 18

               3.    Defendants' statements about the Article's retraction are not
                      protected opinions because they contain embedded false factual
                      assertions about Ms. Barrett's character and are constructed from
                      many other false factual statements. ................................................. 19

                4.    Defendants' statements about Ms. Barrett's departure from *The
                    New Republic* have only one reasonable meaning: that she was
                    fired after, and because, new instances of plagiarism and
                    inaccuracies were "discovered" in her work for that publication. . . 22

               5.    Defendants' false statements about Ms. Barrett's byline are
                      literally false, but even if they weren't, Defendants can't hide
                    behind literal truth. .......................................................................... 24

                6.    Defendants' self-serving comeuppance for assigning the Article to
                      Ms. Barrett is actionable because it, too, is built on false facts, fails
                      to disclose crucial refuting facts, and conveys ingrained
                      defamatory factual assertions. .......................................................... 26

B.    The actual malice standard does not apply, and even if it did, Ms. Barrett alleged it. ................................................................................27

    1.    The actual malice standard doesn't apply in this case. ...................27

    2.    In the alternative, Ms. Barrett sufficiently pleaded actual malice. 32

II.    The Complaint states a false light claim. ................................................. 36

III.    The Complaint states two contract claims. ............................................... 37

A.    The contract claims plead distinct theories, and contain separate elements, from those underlying Ms. Barrett's defamation claims. ...........................37

B.    Ms. Barrett performed all her obligations under the Author's Agreement. ................................................................................................39

C.    Claim 6 states a claim for breach of the duty of good faith and fair dealing. ................................................................................................41

D.    Claim 7 states a claim for breach of Sections 6(b) and 2(c) of the Author's Agreement. ...............................................................................42

CONCLUSION ................................................................................................ 44

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC*,
   922 A.2d 439 (D.C. 2007)......................................................................... 39

*Abbas v. Foreign Policy Group, LLC*
   783 F.3d 1328 (D.C. Cir. 2015) ............................................................... 18

*Afro–American Pub. Co. v. Jaffe*,
   366 F.2d 649 (D.C. Cir. 1966) ........................................................... 22, 25

*Allen v. Mnuchin*,
   No. 18-1214(RC), 2019 WL 2581323 (D.D.C. June 24, 2019) ........................ 7, 23

*Am. First Inv. Corp. v. Goland*,
   925 F.2d 1518 (D.C. Cir. 1991) ............................................................... 42

*Arpaio v. Cottle*,
   No. 18-CV-02387 (APM), 2019 WL 11322515 (D.D.C. Dec. 3, 2019).................. 35

*Ashcraft & Gerel v. Coady*,
   244 F.3d 948 (D.C. Cir. 2001) ................................................................. 40

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................... 7

*Bell Atl. Corp. v. Twombley*,
   550 U.S. 544 (2007) ............................................................................... 7

*Brown v. Petrolite Corp.*,
   965 F.2d 38 (5th Cir. 1992) .................................................................... 35

*Burns v. McGraw-Hill Broadcasting Co., Inc.*,
   659 P.2d 1351 (Colo. 1983) .................................................................... 14

*Busby v. Capital One, N.A.*,
   932 F. Supp. 2d 114 (D.D.C. 2013) ............................................................ 7

*Cochran v. Indianapolis Newspapers*,
   372 N.E.2d 1211 (Ind. 1978).................................................................... 35

*Cohen v. Cowles Media Co.*,
   501 U.S. 663 (1991) ........................................................................... 5, 38

*Competitive Enter. Inst. v. Mann*,
   150 A.3d 1213 (D.C. 2016).................................................................... 20

*Compuware Corp. v. Moody's Invs. Servs., Inc.*,
   499 F.3d 520 (6th Cir. 2007).................................................................. 38

*Condit v. Dunne*,
   317 F. Supp. 2d 344 (S.D.N.Y. 2004) ........................................................ 8

*Cureton v. U.S. Marshal Serv.*,
   322 F. Supp. 2d 23 (D.D.C. 2004) ........................................................... 23

*Dameron v. Washington Mag., Inc.*,
   779 F.2d 736 (D.C. Cir. 1985) ................................................................ 18

*Denny v. Mertz*,
   302 N.W.2d 503 (Wis. Ct. App. 1981) .................................................. 30

*Donald Marshall Berlin v. Bank of Am., N.A.*,
   101 F. Supp. 3d 1 (D.D.C. 2015) .......................................................... 39

*Dorsey v. Am. Express Co.*,
   680 F. Supp. 2d 250 (D.D.C. 2010) ...................................................... 37

*Eastwood v. National Enquirer, Inc.*,
   123 F.3d 1249 (9th Cir. 1999) ............................................................... 33

*Farah v. Esquire Mag.*,
   736 F.3d 528 (D.C. Cir. 2013) ..................................................... 10, 14

*Fitzgerald v. Penthouse Int'l, Ltd.*,
   691 F.2d 666 (4th Cir. 1982) ................................................................ 30

*Foretich v. Capital Cities/ABC, Inc.*,
   37 F.3d 1541 (4th Cir. 1994) ................................................................ 28

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) .............................................................................. 28

*Glass v. Ickes*,
   117 F.2d 273 (D.C. Cir. 1940) ....................................................... 22, 25

*Gruhala v. Lacy*,
   559 S.W.2d 286 (Mo. Ct. App. 1977) .................................................. 41

*Guilford Transp. Indus., Inc. v. Wilner*,
   760 A.2d 580 (D.C. 2000) .............................................................. 11, 25

*Hourani v. Mirtchev*,
   943 F. Supp. 2d 159 (D.D.C. 2013), *aff'd*, 796 F.3d 1 (D.C. Cir. 2015) .................. 23

*Hourani v. PsyberSolutions LLC*,
   690 F. App'x 1 (D.C. Cir. 2017) ............................................................ 8

*Howard v. Gutierrez*,
   474 F. Supp. 2d 41 (D.D.C. 2007) ........................................................ 21

*Hutchinson v. Proxmire*,
   443 U.S. 111 (1979) .............................................................................. 32

*Jankovic v. Int'l Crisis Grp.*,
   593 F.3d 22 (D.C. Cir. 2010) ................................................................ 20

*Jankovic v. Int'l Crisis Grp.*,
   72 F. Supp. 3d 284 (D.D.C. 2014) ............................................ 27, 33, 34

*Jankovic v. Int'l Crisis Grp.*,
   822 F.3d 576 (D.C. Cir. 2016) .............................................................. 29

*Kahl v. Bureau of Nat'l Affs., Inc.,*
  856 F.3d 106 (D.C. Cir. 2017) ......................................................... 10, 34

*Leftwich v. Gallaudet Univ.,*
  878 F. Supp. 2d 81 (D.D.C. 2012) ......................................................... 16

*Lluberes v. Uncommon Prods., LLC,*
  663 F.3d 6 (1st Cir. 2011) ......................................................... 32

*Lohrenz v. Donnelly,*
  223 F. Supp. 2d 25 (D.D.C. 2002) ......................................................... 36

*Masson v. New Yorker Mag., Inc.,*
  501 U.S. 496 (1991) ......................................................... 11, 35

*McGarry v. Univ. of San Diego,*
  154 Cal. App. 4th 97 (2007) ......................................................... 35

*Milkovich v. Lorain Journal Co.,*
  497 U.S. 1 (1990) ......................................................... 19, 20, 27

*Moldea v. New York Times Co.,*
  15 F.3d 1137 (D.C. Cir. 1994) ......................................................... 19, 27

*Moore v. Brouillette,*
  No. 20-1060 (CKK), 2020 WL 7318007 (D.D.C. Dec. 11, 2020) ......................................................... 16

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ......................................................... 33, 34

*Patton Boggs, LLP v. Chevron Corp.,*
  791 F. Supp. 2d 13 (D.D.C. 2011) ......................................................... 8

*Paulin v. George Washington Univ. Sch. of Med. & Health Scis.,*
  878 F. Supp. 2d 241 (D.D.C. 2012) ......................................................... 41

*Pigford v. Veneman,*
  215 F.R.D. 2 (D.D.C. 2003) ......................................................... 9

*Potomac Valve & Fitting Inc. v. Crawford Fitting Co.,*
  829 F.2d 1280 (4th Cir. 1987) ......................................................... 14

*Psota v. New Hanover Twp.,*
  No. CV 20-5004, 2021 WL 6136930 (E.D. Pa. Dec. 29, 2021) ......................................................... 13

*Radtke Pats. Corp. v. Coe,*
  121 F.2d 103 (D.C. Cir. 1941) ......................................................... 8, 9

*Reliance Ins. Co. v. Barron's,*
  442 F. Supp. 1341 (S.D.N.Y. 1977) ......................................................... 28

*See Rutledge v. City of Chicago,*
  No. 13 C 0870, 2013 WL 6645510 (N.D. Ill. Dec. 17, 2013) ......................................................... 36

*Simon v. Circle Assocs., Inc.,*
  753 A.2d 1006 (D.C. 2000) ......................................................... 40, 43

*Sprouse v. Clay Communication*,
    211 S.E.2d 674 (W. Va. 1975) ............................................................... 35

*Stark v. Zeta Phi Beta Sorority, Inc.*,
    587 F. Supp. 2d 170 (D.D.C. 2008) .................................................... 10, 11

*Tah v. Glob. Witness Publ'g, Inc.*,
    991 F.3d 231 (D.C. Cir. 2021) ............................................................... 26

*Tatum v. The Dallas Morning News, Inc.*,
    493 S.W.3d 646 (Tex. Ct. App. 2015) .............................................. 29, 30

*Taylor v. District of Columbia*,
    840 F. Supp. 2d 348 (D.D.C. 2012) ........................................................ 9

*United States Conf. of Mayors v. Great-W. Life & Annuity Ins. Co.*,
    327 F. Supp. 3d 125 (D.D.C. 2018) ...................................................... 43

*Vasquez v. Whole Foods Market, Inc*.,
    302 F. Supp. 3d 36 (D.D.C 2018) .............................................. 14, 15, 34

*Waldbaum v. Fairchild Publications, Inc.*,
    627 F.2d 1287 (D.C. Cir. 1980) ..................................................... passim

*Wayment v. Clear Channel Broad., Inc.*,
    116 P.3d 271 (Utah 2005) ...................................................................... 29

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) ................................................... 10, 17, 18

*Zimmerman v. Al Jazeera Am., LLC*,
    246 F. Supp. 3d 257 (D.D.C. 2017) ........................................... 17, 19, 22

## Other Authorities

11 Williston on Contracts § 32:12 (4th ed. 2021)............................................. 43

Defamation: A Lawyer's Guide § 5:17 (2021).................................................. 31

Law of Defamation, § 2:118 (2d ed. 2021);..................................................... 28

Restatement (Second) of Torts § 652E(c)........................................................ 37

## Rules

Fᴇᴅ. R. Cɪᴠ. P. 15 ............................................................................................. 24

Fᴇᴅ. R. Cɪᴠ. P. 12(b)(6) .................................................................................... 7

## INTRODUCTION

This is a defamation and contract case at the pleading stage. Ms. Barrett's duty at this juncture is simple: plead enough facts that, if construed in her favor and ultimately proven true, plausibly establish the elements of her claims. She has done so.

Her Complaint[1] lays out two opposing narratives. The first details a story of a talented, ethical writer with a 25-year track record of unimpeachable work who wrote a widely acclaimed feature story ("the Article") for *The Atlantic* that withstood unprecedented scrutiny, including a line-by-line post-publication investigation. Compl. ¶¶ 2, 58-66, 77. During the Article's editing process and in the days following its publication, Defendants'[2] actions placed Ms. Barrett in a corner. She had recruited a confidential source ("Sloane") who agreed to provide her with quotes and primary documents for her story on the condition that she would neither be identified nor *identifiable* in the Article. *Id.* ¶¶ 3-5, 24, 68. Consequently, Ms. Barrett and the Defendants were duty-bound by contract and journalistic ethics to protect Sloane's anonymity. And yet, as the editing process progressed, it became clear to both Ms. Barrett and her source that *The Atlantic* was providing her with no meaningful shielding and that Sloane and her family were potentially identifiable in the Article. *Id.* ¶¶ 7, 69, 70, 71. These concerns, repeatedly voiced in writing by Ms. Barrett and her source, turned out to be well-founded: "Sloane" was, in fact, tracked down, identified and contacted at her home by a *Washington Post* reporter just days after the Article posted. *Id.* ¶¶ 10, 34.

Aware of the potential for this harmful outcome, Ms. Barrett had asked *The Atlantic* and its editors to take one or more of a series of ethically correct steps to protect Sloane and render her

---

[1] In this Opposition, all references to "the Complaint" are to the Errata First Amended Complaint, D.E. 22-1 (cited herein as "Compl.").

[2] Defendants are The Atlantic Monthly Group LLC ("Atlantic Group"), which publishes *The Atlantic*, and Donald Christopher Peck, *The Atlantic*'s editor at the time.

and her family unidentifiable in the article, as stipulated in the agreement. But *The Atlantic* refused, stating it had done enough for Sloane. *Id.* ¶¶ 7, 25, 70, 71, 74.

Left with no good options, Ms. Barrett acceded to Sloane and her husband's plea to allow them to obscure a crucial identifying detail about their family makeup. *Id.* ¶¶ 8, 73. Shortly before the piece went to press, Sloane—who has three daughters only—mentioned to a fact-checker for *The Atlantic* that she had a fourth child, a son. *Id.* ¶¶ 29, 75. The fact-checker believed Sloane and inserted a single, two-word reference to a "son" into the Article. *Id.* ¶ 29. At this point, Ms. Barrett could have spoken up and disputed the existence of a fourth child, but she chose not to. She saw the predicament her source was in and felt obligated to protect Sloane, who had trusted her and provided extensive help with her article on the basis of assurances that her anonymity would be preserved. *Id.* ¶ 75. Additionally, Ms. Barrett understood that the practice of including a trivially erroneous fact, or "masking detail," in an otherwise truthful article can be considered appropriate under certain circumstances, in order to protect the privacy of a subject or to safeguard a child from harm.  *Id.* ¶ 15. In fact, *The Atlantic* itself had employed this tactic earlier in editing Ms. Barrett's Article, altering a lacrosse coach's quote to protect a student's anonymity.  *Id.* ¶¶ 31, 76.

After the inclusion of a fictional reference to a son came to light and suggestions were made that other inaccuracies might be present in Ms. Barrett's piece, the research department of *The Atlantic* conducted an exhaustive, line-by-line recheck of the entire article. *Id.* ¶ 42, 92. This re-investigation found no material discrepancies and discovered only two trifling errors. *Id.* ¶¶ 16, 48, 92, 109.

This first narrative is what Ms. Barrett will prove to the jury. But the Complaint alleges that Defendants—sensitive to mounting pressure from Erik Wemple, a powerful *Washington Post* media critic—elected to tell another story.  Following Mr. Wemple's prolonged attacks on the

Article and on the moral fitness of its author, Defendants published a series of investigatory "findings" that eviscerated Ms. Barrett's character, credibility, and fitness as a writer so severely that they have destroyed the career she has spent decades building.

The story relayed by Defendants in their separate public statements—three Editor's Notes and an internal email sent by Peck to all of the magazine's editorial employees—was one of a serial liar who had been fired in the past for egregious journalistic misconduct and was so hopelessly unemployable that Defendants had decided out of pity to give her a risky "second chance." After *The Atlantic* assigned her the Article, she immediately put into motion a nefarious conspiracy to "deceive *The Atlantic* and its readers." Impelled by no discernible motive other than a mischievous impulse to publish falsehoods in *The Atlantic*, she "induced" Sloane to fabricate a non-existent fourth child and goaded her into requesting a mention of him in the Article. She also "induced" other sources to lie about material facts in the Article. When confronted about her misdeeds, she affirmatively misled and "concealed" these deceptions from *The Atlantic*'s fact-checkers and editors.  Piling lies upon lies, she even went so far as to "propose" a misleading byline that she had never used before in order to hide her dark past and trick readers into believing that she was a reputable journalist.  When the piece was published and her confidential source was discovered to be the mother of only three kids—not four, as she had claimed—Defendants' subsequent investigation destroyed any remaining confidence they had in the integrity of both Ms. Barrett and the Article. Based on these discoveries, Defendants had no choice but to apologize for placing *any* trust in this journalistic pariah and pathological cheat. Defendants retracted her Article in full, forcibly changed her byline to expose her true identity, and expressed regret for "poor judgment" all around. *Id.* ¶¶ 11, 12.

The divergence in gist and sting between these two narratives is readily apparent. Moreover, far from straining to read the allegations this way, the Court need only read them once, on their face. The Complaint comprehensively spells out and supports the falsity and defamatory nature of both Defendants' individual false statements and implications with a bevy of specific facts. It also details the who, what, where, and when of their publication, builds an extensive roadmap of evidence Ms. Barrett will use at trial to prove Defendants' fault (and even actual malice, were that required here), and details the devastating impacts these defamatory statements have had on her career, reputation, and life. She has therefore done more than enough to plausibly state each of her claims for relief.

Defendants' Motion to Dismiss (D.E. 23, "the Motion") is full of sound and fury signifying nothing. There is plenty to rebut, but first, a prefatory point: The purpose of a motion to dismiss is to test the sufficiency of a plaintiff's pleadings. It is not the place to dump extraneous materials and allegations into the record purely to smear Ms. Barrett in the eyes of the Court and the public. Defendants know this, but they apparently believe they can do so with impunity. Their Motion is awash in extraneous, incorrect factual assertions and mischaracterizations. But the Court is limited to considering what's in the four corners of the Complaint. The Court should strike or at least disregard this scandalous material.

Turning to the merits of their Motion, Defendants' central argument is that because the core of Ms. Barrett's defamation claims is that Defendants accused her of dishonesty, and because Ms. Barrett has admitted to knowingly publishing an inaccuracy, her claims are unactionable, as Defendants' accusations are "materially" true. Loaded for bear with adverbs and italicizing, they relentlessly repeat the catechism that Ms. Barrett "admits" and "concedes" that she was

"complicit" in "falsification," "deception," "conceal[ment]," and "induce[ment]." Thus, they ask, how could any court allow these patently meritless claims to proceed?

But, just as Defendants omitted *the* key plot point from its public statements excoriating Ms. Barrett, so too do they exclude a crucial fact from their arguments before the Court: Sloane was a protected confidential source operating under the scaffolding of a contractual agreement with Atlantic Group. Promises of confidentiality in journalism are considered binding legal contracts under the law of contracts and promissory estoppel and the ethics of the profession. These promises have special inviolability. *See Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991).

Defendants were aware of this promise and duty at every turn. *Id.* ¶¶ 6, 24, 68, 84. And yet they dishonored it in practice, repeatedly pressuring Ms. Barrett to put Sloane "on the record" and ultimately rendering her identifiable in the Article. *Id.* ¶ 71. It was Defendants' failure to disguise Sloane in a manner consistent with its original agreement that led to her de-veiling as Ms. Barrett's source, a crisis that placed Ms. Barrett in a position of great pressure and conflict. Faced with this unprecedented situation, Ms. Barrett chose to protect her source.

Defendants are silent about these case-defining allegations. They do not deny the existence of a confidentiality agreement, nor do they deny their full knowledge and approval of this agreement. Nor do they deny that this agreement was immolated due to their dereliction—and that an important confidential source who had provided extensive quotes and material to *The Atlantic* on the condition that her identity be protected was not protected and was betrayed, outed, and exposed. Instead, they try to paper over these allegations and put Ms. Barrett on the defensive by repeating generalized charges that she admitted to "falsification" and "deception."

These arguments fail for the same reasons that Defendants' conduct is actionable—their assertions about Ms. Barrett's "dishonesty" distort and misrepresent her principled conduct. They

refuse to admit what we all know to be true: not all "dishonesty" is created equal. Yes, at a literal level, Ms. Barrett did engage in *some* form of trivial dishonesty. But it was benign in nature—her motive was not to deceive, but to keep faith and fulfill a crucial promise with a source. *Id.* ¶¶ 3, 24, 68. *The Atlantic*'s aberrant and indefensible treatment of Sloane was the sole and singular factor driving all of Ms. Barrett's actions before and after publication. *Id.* ¶ 75. And yet Defendants purposefully omitted this crucial context from their circulars, stripping Ms. Barrett's actions of all nuance and reason and depicting her as a one-dimensional supervillain who set out to "deceive" for sport. *Id.* ¶¶ 98, 101, 102, 104.

Any reasonable juror knows there are situations in which benign deception is considered ethical and defensible—to prevent harm to minors, safeguard someone's privacy, or protect a secret one is professionally bound to keep. *Id.* ¶ 15. Defendants' own conduct in altering the quote from the lacrosse coach to protect the privacy of a high school-age student-athlete proves this. *Id.* ¶¶ 31, 76. A reporter's obligation to her source falls squarely within this category because the duty to protect sources has long been acknowledged as a key component of journalistic work. *Id.* ¶ 107. This form of "dishonesty" doesn't shatter credibility, ruin careers, or turn otherwise-successful authors into pariahs. But the type of insidious dishonesty portrayed by Defendants in the four communications they published about Ms. Barrett and the Article does. *That* type is indefensible.

Defendants also rely on hyper-formalistic legal standards no court has ever accepted, quibbling over semantics, and stripping their various defamatory statements of their surrounding context to try to get Ms. Barrett's defamation claims thrown out. But precedent holds that literal, technical, and isolated meanings of words do not dictate whether a claim is false, defamatory, or published negligently or with actual malice.

Their arguments pertaining to Ms. Barrett's false light and contract claims fare no better. Her allegations independently satisfy the elements of these claims. She is not trying to "avoid" any First Amendment-mandated pleading standards because she has pleaded facts establishing distinct elements and is seeking distinct relief for the unique harms flowing from those violations. And she can establish these claims even if an actual-malice standard applied here (it doesn't). The Motion is meritless, and the Court should deny it in full.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may only "test[] whether a plaintiff has properly stated a claim." *Allen v. Mnuchin*, No. 18-1214(RC), 2019 WL 2581323, at *6 (D.D.C. June 24, 2019). It is not the place for "determination of a plaintiff's ultimate likelihood of success on the merits." *Id.* The complaint survives a motion to dismiss if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It must only state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007). And the court must take all the factual statements in the complaint as true and draw all the reasonable inferences from them in the plaintiff's favor. *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133 (D.D.C. 2013).

## OBJECTION TO AND REQUEST TO STRIKE EXTRANEOUS, INFLAMMATORY EVIDENCE CITED AND QUOTED IN THE MOTION TO DISMISS

Defendants' Motion is laced with quotes and references to extraneous news articles and mischaracterizations of those articles, all of which appear to be nothing more than a thinly veiled attempt to use the judicial process to wage a PR war against Ms. Barrett and improperly influence

the Court's view of the case.[3] The Court should strike or at least refuse to consider them.

At this stage, the Court's analysis is limited to the materials within the four corners or attached to the Complaint, or materials relied on and integral to the Complaint. *E.g.*, *Condit v. Dunne*, 317 F. Supp. 2d 344, 357-58 (S.D.N.Y. 2004). Although it is commonplace for parties to "provide the Court with a certain amount of background information" in pleadings or other filings to provide context, *Patton Boggs, LLP v. Chevron Corp.*, 791 F. Supp. 2d 13, 22 (D.D.C. 2011), it is unacceptable to provide such extraneous information to intimidate a party or try to sway the Court's opinion on the merits, *see Radtke Pats. Corp. v. Coe*, 121 F.2d 103, 103 (D.C. Cir. 1941) (per curiam) (disapproving of and striking assertions in brief designed to intimidate or harass witnesses or parties or "prevent the impartial administration of justice").

Nor is there any legitimate reason to take judicial notice of these assertions and materials. Although the D.C. Circuit opined in an unpublished opinion that a district court did not err in taking judicial notice of "certain facts" pertaining to limited-purpose public figure status, that was only because all those facts were "not in dispute." *Hourani v. PsyberSolutions LLC*, 690 F. App'x 1, 3 (D.C. Cir. 2017) (per curiam). Ms. Barrett does not dispute that the cited articles were published, but she *does* dispute the inflammatory claims about her character portrayed by Defendants' selective quotation of them, which have nothing to do with any arguments related to public-figure status and, again, just portray Ms. Barrett in a false light.

Solely to illustrate the prejudice of letting these assertions into the record unrebutted, here are a few examples. Defendants mischaracterize Ms. Barrett's 1995 cover story for *The New Republic* as a piece "criticizing the Washington Post's efforts to promote racial diversity." Mot. 5.

---

[3] *See* Mot. 1 & n.1, 5 n.7, n.8, n.9, n.10, 6 n.11-19, 9 n.22, 12 n.23, n.24, 22 & n.29, 24 n.32, 27, 28 n.34, 42 n.42, 44.

This is a tendentious and misleading description of the article that conveys a false image of Ms. Barrett and her piece as racist. In truth, the piece was an influential and impactful piece of journalism. *Washington Post* columnist Juan Williams, among others, praised it as a catalyst for necessary discussion about a sensitive topic, and her editors at *The New Republic* described it as "a model of nuance, balance and fair-mindedness." Indeed, just recently, another journalist wrote that Ms. Barrett's piece was far more "layered" than her critics acknowledged: It discussed the frustrations of black journalists at the *Washington Post* and stressed that having a diverse newsroom was imperative.[4] Defendants also go to great lengths to squeeze in quotes from the most inaccurate and demeaning articles they can find, such as claims that she is a "fantasy writer," that she is an "infamously bad journalist," and that her work was "finally disowned." Mot. 7 n.21. Ms. Barrett eagerly awaits a chance to refute the other pieces in an *appropriate* stage of the case.

Defendants' aggregation of jibes and insults are provably wrong, but Ms. Barrett can't do that here and is instead left to absorb Defendants' use of these quotes for no legitimate purpose other than to personally attack or intimidate her. Accordingly, the Court should strike this evidence. *See Pigford v. Veneman*, 215 F.R.D. 2, 5 (D.D.C. 2003) (striking "scandalous" assertions in briefs); *Coe*, 121 F.2d at 103 (striking portions of appellate brief containing assertions of extraneous "charges and innuendoes" as "irrelevant, immaterial[,] and scurrilous"). At very least, it should disregard it in its consideration of the Motion to Dismiss. *E.g.*, *Taylor v. District of Columbia*, 840 F. Supp. 2d 348, 351 (D.D.C. 2012).

---

[4] *See* Cathy Young, *Truth, Lies, and Second Chances*, ARC DIGITAL (Jan. 8, 2022), https://www.arcdigital.media/p/truth-lies-and-second-chances?s=r. Ms. Barrett cites this article only for the proposition that Defendants' characterization of her piece is disputed, not for the truth of the article.

**ARGUMENT**

**I.    The Complaint states a claim for defamation in Counts 1 through 4.**

Contrary to Defendants' suggestion using a cherry picked quote from a case decided at the merits stage, Mot. 13 (quoting *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017)), heightened pleading standards do not apply in defamation cases. *Croixland Properties Ltd. P'ship v. Corcoran*, 174 F.3d 213, 215 (D.C. Cir. 1999) ("[T]he Federal Rules of Civil Procedure impose no special pleading requirements for defamation as they do for a specified list of other matters."). To state a claim for defamation under District of Columbia law, a plaintiff must allege "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Stark v. Zeta Phi Beta Sorority, Inc.*, 587 F. Supp. 2d 170, 175 (D.D.C. 2008) (internal quotation marks omitted). The Complaint satisfies each of these elements as to each of its four defamation claims.

**A.    All the statements alleged in the Complaint are false and defamatory, individually and as a collective unit.**

Notwithstanding Defendants' eagerness to prematurely try this case in pleadings and motions practice, the Court "must assume, as the complaint alleges, the falsity of any express or implied factual statements made in the publications at issue." *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (internal quotation marks omitted). The alleged false statements must also have a defamatory meaning. *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990). A defamatory meaning is one that "tends to injure [the] plaintiff in [her] trade, profession or community standing or lower [her] in the estimation of the community." *Guilford Transp.*

*Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (cleaned up). A court may not hold a statement unactionable as a matter of law unless "it is beyond doubt that a reasonable juror could find no defamatory meaning in the published statement." *Stark*, 587 F. Supp. 2d at 175 (internal quotation marks omitted).

1.    **In their statements concerning Ms. Barrett's role in the inclusion of the masking detail, Defendants lied and concealed objective facts about Ms. Barrett's motive, materially overstated her role in the events to falsely portray her as a journalist who engineered a "fabrication"; falsely claimed that she lied or induced others to lie about aspects of the Article other than the masking detail, and then constructed a skewed, unprotected defamatory "opinion" based on all these fabrications.**

The first set of false and defamatory statements alleged in the Complaint (Claim 1) involve the statements about Ms. Barrett's role in the inclusion of a reference to a son in the Article. As outlined in the Complaint, Defendants' statements to this effect individually and collectively tell a story of Ms. Barrett—acting with a deceitful motive—orchestrating and implementing a corrupt scheme to write fiction and then pass it off as meticulous journalism to *The Atlantic* and its readers. Compl. ¶¶ 12-22, 125-31.

This description is not hyperbolic; it is "the substance, the gist, the sting" of Defendants' statements to *The Atlantic*'s staff and to a global audience of tens of millions. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (internal quotation marks omitted). Defendants stated, among other things, that Ms. Barrett *came up* with the idea of the fourth child and *induced* Sloane to falsely report him to *The Atlantic*'s fact-checking department, affirmatively "lied to" and "misled" fact checkers when asked about him, and did all this with the end goal of "deceiv[ing] *The Atlantic* and its readers about the makeup of Sloane's family." *Id.* ¶¶ 12, 98-105. Omitted from all these statements was the crucial backdrop of Sloane as a protected source operating under a confidentiality agreement approved by Defendants, along with the provable fact that it was Sloane and her husband who pressured Ms. Barrett into going along with the addition, not the other way

around, *id.* ¶¶ 24, 28, 75; and that this action did not arise out of anyone's impulse to "deceive"; but instead reflected Sloane's understandable effort to protect herself after she correctly surmised that *The Atlantic* was reneging on its agreement to render her unidentifiable, *id.* ¶ 130.a-d.

Taken in context and concert, these objectively false statements present a tale markedly different from the objective truth—a truth a reasonable juror could find at trial. Here's the truth: Ms. Barrett had an ethical and contractual duty to protect Sloane's identity. *Id.* ¶ 24. She proposed various, reasonable, and fully transparent ways to do so, in keeping with Atlantic Group's agreement with Sloane; *The Atlantic* refused, on the grounds that these shielding efforts either violated *The Atlantic*'s editorial policy against disclaimers or watered down the piece unacceptably. *Id.* ¶¶ 69-71, 74. As the Article advanced toward publication, Sloane grew increasingly fearful of exposure due to *The Atlantic*'s cavalier and half-hearted shielding efforts. *Id.* ¶ 72. So *Sloane* (not Ms. Barrett) proposed to insert a reference to an extra child, and *Sloane* (not Ms. Barrett) ultimately induced *The Atlantic*'s fact-checker to include it. *Id.* ¶¶ 73, 75. Ms. Barrett knew about and did not disclose this masking detail, but she considered it a benign and meaningless reference that had no bearing on the Article and served only to give her source a measure of plausible cover. *Id.* ¶ 75.

The Complaint alleges that Ms. Barrett *never* had any intent to deceive anyone. *Id.* ¶ 133.f. She went along with her source's self-protective action because *The Atlantic*'s disregard of its agreement with Sloane and Ms. Barrett's own ethical duty to uphold it presented her with a Hobson's choice: support Sloane and her husband's idea (at no cognizable cost to the Article's accuracy or credibility) or breach her duty to Sloane. *Id.* ¶¶ 8-9. She chose the first option.

A juror presented with the facts alleged in the Complaint would be faced with two pictures: one of an insidious scammer out to deceive the world for no good reason and who succeeded in

doing so by publishing an article rife with lies; and one of a meticulous writer forced to make an impossible choice between absolute accuracy and the journalistic imperative to honor promises of confidentiality made to sources.  No matter how much Defendants try to distort and reframe these diverging narratives, the differences between them hardly amount to "quibbles" over "specific words" or "preferences among synonyms." Mot. 17, 22. They are career-destroying distinctions. *See, e.g.*, *Psota v. New Hanover Twp.*, No. CV 20-5004, 2021 WL 6136930, at *33 (E.D. Pa. Dec. 29, 2021) (falsely accusing person employed in a career "linked with one's reputation for honesty and integrity" of fraudulent testimony is unquestionably defamatory because such conduct would make the person "unemployable" in the profession).

Defendants claim that the numerous, objectively false statements concerning Ms. Barrett's role in the inclusion of the son in the Article are in fact true because their "central charge" is that Ms. Barrett "knowingly participated in the inclusion of a falsity—Sloane's purported son—in her article and concealed that from editors." Mot. 16. Wrong: the "central charge" here is that Ms. Barrett acted in bad faith, fabricated lies that undermined the entire Article, corralled her sources to perpetuate her lies, and nefariously concealed them from Defendants and the public. This is far different from Defendants' spin on the facts, and Defendants don't get to re-write the Complaint to suit their self-serving narrative.

Next, Defendants claim that their repeated false statements and insinuations that Ms. Barrett acted with deceitful motives are "are protected opinion and, thus, not actionable," Mot. 18-19, but they argue for an absolute rule rejected long ago as a tool for injustice. For example, the Fourth Circuit "emphatically reject[ed]" the assertion that "statements of intention or motive are inherently unverifiable" and thus always protected, explaining that such a categorical rule would "ultimately threaten the entire concept of defamation." *Potomac Valve & Fitting Inc. v. Crawford*

13

*Fitting Co.*, 829 F.2d 1280, 1289 (4th Cir. 1987). Likewise, the Colorado Supreme Court warned that "plac[ing] all allegations of improper motive in a category of unconditionally privileged speech" would result in an "unconditional privilege for any attack on personal integrity or reputation." *Burns v. McGraw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351, 1358 (Colo. 1983) (en banc).

An opinion about someone's motive is protected only when it "is so imprecise or subjective that it is not capable of being proved true or false." *Farah*, 736 F.3d at 534-35. Here, a reasonable reader (or email recipient) of statements made by the masthead editors of an august publication such as *The Atlantic*—made in the context of a formal apology for a retracted article and in consonance with numerous factual claims about the purported lies that Ms. Barrett told or "induced"—could have reasonably believed that Defendants' claims as to Ms. Barrett's motive "to deceive *The Atlantic* and its readers," Compl. ¶¶ 98, 101-02, 128, implied "special knowledge of [her] actual motives," *Farah*, 736 F.3d at 540. Moreover, the manifold facts alleged in the Complaint concerning the moral dilemma forced upon Ms. Barrett, *id.* ¶ 8, are a far cry from the subjective, playful, and satirical statements about the plaintiffs' motives in *Farah*. Ms. Barrett's account of her motive is verifiable by examining the facts surrounding the inclusion of the masking detail.

*Vasquez v. Whole Foods Market, Inc.*, 302 F. Supp. 3d 36 (D.D.C 2018) presents an analogous situation. Plaintiffs worked as team leaders at their employer's grocery stores. at 42. The plaintiffs alleged the employer had a bonus program that paid team leaders whose team expenses came in under budget. The employer introduced a policy which required team leaders to falsify reports to create the impression that all departments were hitting their targets. at 43. The employer mounted a sham investigation, during which plaintiffs admitted that they had submitted

14

false reports but explained that this was done on the instruction of management. After the employer terminated them, the employer stated in a *Washington Post* article that the plaintiffs were fired for manipulating a store bonus program. *Id.* at 44. The court denied the defendant's motion to dismiss, holding that the employer's statements painted the plaintiffs as "cheats and thieves." at 67. The employer's statements were literally true—the employees did commit a "policy infraction" and did "manipulate[] a bonus program to their benefit"—but, the plaintiffs alleged that employer's omissions about *why* the plaintiffs engaged in such manipulation (following orders) allowed the employer to portray the employees as fraudsters. *Id.* at 67.

The similarities to this case are striking. Just as in *Vasquez*, the wrongful actions of Ms. Barrett's employer forced her to behave in a manner that exposed her to criticism, and her employer sought to use her as a scapegoat by publicly accusing her of egregious conduct and supporting its accusations with a narrative that painted her as a liar and omitted crucial context from its statements that would have explained her conduct. *Vasquez* counsels that context is king. Yet Defendants ignore it.

Defendants venture outside the record to quote an email Ms. Barrett sent to Defendant Peck in the heat of the multifrontal assault Defendants waged on Ms. Barrett in response to Wemple's badgering. They argue that because Ms. Barrett used the word "complicit" in that email, she somehow admitted that *all* of Defendants' repeated falsehoods are true. Mot. 18. This reliance on documents outside the Complaint is improper, but more importantly, even if the Court considers Ms. Barrett's email at this stage, the document doesn't do the work that Defendants depend on it to do.

First, this email is inadmissible extraneous evidence. At the motion to dismiss stage, the Court can only consider matters in the pleadings, documents attached to the complaint, and

documents on which the complaint relies. This email fits none of these categories—while Ms. Barrett references it in the Complaint to establish the timeline of events in question, *see* Compl. ¶¶ 44, 97, she did not attach it and does not rely on it in to form her claims, *see Moore v. Brouillette*, No. 20-1060 (CKK), 2020 WL 7318007, slip op. at 7 (D.D.C. Dec. 11, 2020) (emails appended to defendant's motion to dismiss could not be considered because they just offered "factual content meant to refute [p]laintiff's allegations at the pleading stage").

Second, even if Ms. Barrett's passing use of a word in an extraneous communication somehow contradicted something she pleaded in the Complaint (it doesn't), it could not establish, *on the pleadings and as a matter of law*, that Defendants' statements were true and non-defamatory. If Defendants believe that this email is relevant to Ms. Barrett's claims, they can seek to present it at trial to challenge her credibility. They'd be in trouble if they tried because Ms. Barrett will explain that the email shows only her steadfast, scrupulous advocacy for her source and her commitment to protecting her source even at her own expense. Her only aim in calling out her own "complicity" in the matter was to try to mitigate the harm of the Editor's Note and make it less injurious to Sloane and her shy, deeply private daughters, who were adolescents at the time of publication. But the bottom line is that it's not the Court's task to prematurely weigh the evidence Defendants seek to inject at the pleading stage. *Leftwich v. Gallaudet Univ.*, 878 F. Supp. 2d 81, 90 (D.D.C. 2012).

Defendants next try to write off their false claim that Ms. Barrett "induced at least one source to lie" to *The Atlantic*'s fact-checking department as "literally" true. Mot. 20. This is belied by Defendants' own conduct—they walked this lie back in the latest revision of its Editor's Note (Third Editor's Note) confining the allegation to just "a source" and thus eliminating the clear, unfounded, and proven false insinuation that she had induced multiple sources to lie. Compl. ¶

104.b. They also can't hide behind literal truth by claiming again that they were just repeating accusations by Sloane's attorney, Mot. 20, because repeating the lies of another doesn't immunize them, *White*, 909 F.2d at 527, and because they wove these false accusations into their broader narrative assailing Ms. Barrett's trustworthiness and character, *Zimmerman*, 246 F. Supp. 3d at 277.

Defendants also try to brush away the "at least one source" language they employed in the Second Editor's Note as mere "word choice," Mot. 20, but in the context of this case, any reasonable reader can tell the difference in implication (and resulting defamatory harm) between saying that one person accused Ms. Barrett of "inducing" one source to lie to fact-checkers and saying that she was accused of "inducing *at least* one source" to lie to them. This distinction is important because insinuating that Ms. Barrett was working behind the scenes to coordinate her sources to lie to fact-checkers feeds into the gist and sting of Defendants' broader narrative that Ms. Barrett was an untrustworthy author whose pervasive misconduct undermined any remaining confidence in the accuracy of the Article. *See* Compl. ¶¶ 110, 127.a, 128.a.

Nor is this statement simply "rais[ing] a question" about what "additional investigation" might show. Mot. 20. This false accusation that Ms. Barrett "induced" a source or sources to lie to fact-checkers is just that: an accusation. These statements simply parrot the false accusation made by Sloane's attorney; and, in the Second Editor's Note, fabricate additional false facts by insinuating that the allegations made by Sloane's attorney were just the tip of the iceberg and that further accusations would be forthcoming. *See* Compl. ¶¶ 47, 110.

Indeed, the same case Defendants rely on dispenses with this argument. In *Abbas v. Foreign Policy Group, LLC*, the D.C. Circuit observed that generally, "a question . . . is not accusation" for the purpose of defamation law, but also explained that "questions that contain

embedded factual assertions may sometimes form the basis for a successful defamation claim." 783 F.3d 1328, 1338 & n.7 (D.C. Cir. 2015). To the extent these statements can be characterized as "questions" at all, that's what we have here.

      **2.**    **Defendants' perpetuation of the false and defamatory claim by Sloane's attorney that Ms. Barrett "first proposed" to include the masking detail and "encouraged" Sloane to lie about it is actionable because Defendants wove this allegation into their broader false narrative about her conduct in order to make the statement appear true.**

Defendants' next line of attack is to argue that their lies that Ms. Barrett "first proposed the invention of a son" and "encouraged" Sloane to do so are unactionable because Defendants attributed them to Sloane's attorney in their communications. Mot. 19. The full extent of Defendants' argument here is simply that "Sloane's attorney, in fact, stated this to *The Atlantic*." Mot. 19.

To the contrary, "one who repeats or republishes a defamation uttered by another adopts it as his own." *Dameron v. Washington Mag., Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985) (internal quotation marks omitted). The only exception to this rule in DC is a narrow, inapposite one for "fair and accurate reporting concerning official government proceedings and acts" that are "judicial in character" and carried out before a court or "administrative, executive or legislative bodies." *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990) (cleaned up).

As Justice Brown Jackson explained while serving in this District, it is one thing to "report[] third-party allegations without otherwise taking any position on the statements," but it's another to "weave[]" a third party's false statements "into a broader narrative" about a person that gives "the impression that the [publishers] believe" what the third party says "is accurate."

*Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 277 (D.D.C. 2017) (Brown Jackson, J.) (cleaned up). That's exactly what Defendants did here.[5] *Id.* ¶¶ 43, 88-94.

Defendants argue that this falsehood is also immaterial, Mot. 19, but they again try to lead this Court astray by divorcing it from the overarching story they told about Ms. Barrett. Whether Ms. Barrett "first proposed the invention of the son" or "the idea originated with Sloane" is a critical component of their portrayal of her as a fraudulent actor driven by deceitful motives, instead of as a principled professional trying in good faith to balance reportorial accuracy with her duties to her confidential source. The difference could not be more pellucid: the first portrayal is sympathetic, while the second is career-annihilating.

### 3. Defendants' statements about the Article's retraction are not protected opinions because they contain embedded false factual assertions about Ms. Barrett's character and are constructed from many other false factual statements.

As for their false assertion that they "cannot attest" to Ms. Barrett's "trustworthiness and credibility" or "attest to the veracity of the article," Defendants again ask the Court to hold that any statement cast as an "opinion" is protected and unactionable. Mot. 20-22. More than three decades ago, the Supreme Court declined to "create a wholesale defamation exemption for anything that might be labeled 'opinion,'" because "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).

Accordingly, a defendant is not immunized from liability just by couching defamatory attacks as opinion. *Moldea v. New York Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994).

---

[5] For the same reason, Defendants' mention of Ms. Barrett's denial of this accusation is meaningless. To begin, Defendants don't disclose to the Court that they did *not* mention this denial in the Third Editor's Note (which Defendants published *after* the other three libel-laden communications). *See* Compl, Ex. 8, at 7. And in any event, after spending page after page of these editor's notes impugning Ms. Barrett's trustworthiness with *their own* false allegations, a reasonable reader would naturally find this denial dubious at best.

Defamatory opinions based on false facts stated by the speaker are unprotected. *Id.* And "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich*, 497 U.S. at 18-19. Thus, opinions are only protected if they are "based on true facts, accurately disclosed." *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 28 (D.C. Cir. 2010) ("*Jankovic I*"). And *all* the relevant facts must be disclosed: "the facts on which the purported opinion is based must be accurate and complete," and the opinion must not present "a skewed and incomplete picture of the facts a reader would need to come to his or her own conclusions on the matter" (emphasis added)). *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1247 (D.C. 2016).

Defendants' purported "opinion" that they could not "attest" to Ms. Barrett's honesty and credibility or the Article's "veracity" is a textbook attack on a person's character cloaked in the thinnest guise of an "opinion." First, this "opinion" was built on a throne of lies Defendants presented: false statements about Ms. Barrett's involvement in the inclusion of the masking detail, false reports of her "inducing" her sources to lie, dishonest aspersions cast on her motive for supporting the masking detail, false claims that Ms. Barrett tried to manipulate the Article's byline to hide her quarter century-old journalistic lapses, false insinuations about her 1999 departure from *The New Republic*, and lies about finding other errors in the Article. Compl. ¶¶ 129-30, 137-40.

Second, Defendants presented an incomplete picture of the facts. Among other things, they failed to disclose that Ms. Barrett assented to Sloane's inclusion of the masking detail because of her concern for Sloane and her ethical and contractual duty to protect Sloane's confidentiality, *id.* ¶¶ 53-54, that Ms. Barrett repeatedly requested that the *The Atlantic* consider taking other measures to fulfill its obligation to Sloane, *id.* ¶¶ 25, 70-71, 74, that *they* edited the Article to include a masking detail to protect a student, *id.* ¶¶ 31, 76, and that they refused to give Ms. Barrett a

meaningful opportunity to address and rebut the false allegations by Sloane's attorney and refused to make a genuine attempt to uncover the truth, *id.* ¶¶ 39-40, 43.

Third, this purported opinion implied additional false facts. Defendants' claim that they could not "attest to the veracity of the article" naturally implied that they had investigated the facts in the Article and found them untrustworthy. As the Complaint explains, the "only reasonable inference to be drawn" from this statement "is that the investigation referenced in the First Editor's Note had been completed and that the Article had been retracted because it had been found to contain multiple errors, which reflected very poorly on Ms. Barrett as the author of the Article." Compl. ¶ 47. In truth, Defendants' post-hoc investigation of the Article again affirmed the Article's accuracy, revealing only two trivial errors, one of which Defendant Peck himself dismissed as inconsequential: a "nothing correction." *Id.* ¶ 48.

Additionally, Ms. Barrett's mention in her original complaint that Defendants "could have" admonished Ms. Barrett for the inclusion of the masking detail or retracted the Article based on the masking detail does nothing to rehabilitate Defendants' unprotected defamatory "opinion." To begin, the current Complaint superseded the original complaint, so the Court shouldn't rely on it. *See Howard v. Gutierrez*, 474 F. Supp. 2d 41, 55 (D.D.C. 2007). But in any event, the fact that Defendants *could* have taken these actions has no bearing on the appropriateness or lawfulness of the actions they *did* take. Defendants could have taken these far more proportional actions without publishing defamatory falsehoods about Ms. Barrett or the Article, and these actions are a far cry from the character assassination they decided to engage in and which have destroyed Ms. Barrett's reputation and career. D.E. 1 ¶ 41. This statement is actionable.

4.   **Defendants' statements about Ms. Barrett's departure from** *The New Republic* **have only one reasonable meaning: that she was fired after, and because, new instances of plagiarism and inaccuracies were "discovered" in her work for that publication.**

In all four of their defamatory circulars, Defendants claimed that Ms. Barrett departed *The New Republic* ("*TNR*") in 1999 "after plagiarism and inaccurate reporting were discovered in her work." *Id.* ¶¶ 99, 101, 103, 136-38. On its face, this statement naturally implies (if not expressly asserts) that Ms. Barrett was forced out of her job at *TNR* in 1999 following the "discover[y]" of "plagiarism and inaccurate reporting" in her work *at TNR*. *Id.* ¶¶ 99. This is false, and paints a negative, harmful picture of Ms. Barrett's track record and career success after her 1994 and 1995 lapses, and portrays her as a habitually dishonest, error-prone and untrustworthy writer whose career has amounted to a continuous series of debacles. *See id.* ¶¶ 63-64, 139-41, 143. She has stated a claim as to these allegations.

Defendants circle back to the "literal truth" trope. Mot. 23. But it's beyond settled that a court analyzing falsity and defamatory meaning must examine the alleged statements "as a whole, and in the sense in which it would be understood by the readers to whom it was addressed." *Afro–American Pub. Co. v. Jaffe*, 366 F.2d 649, 659 (D.C. Cir. 1966). "[L]iteral truth" is not a defense when a statement "conveys to the public much more than" the technical or literal meaning. *Glass v. Ickes*, 117 F.2d 273, 276 n.1 (D.C. Cir. 1940). As Justice Brown Jackson counseled, "[c]ontext is critical because it is in part the settings of the speech in question that makes their nature apparent, and which helps determine the way in which the intended audience will receive them." *Zimmerman*, 246 F. Supp. 3d at 276 (cleaned up).

Taken in context (or even in isolation), the inescapable message conveyed by Defendants' statement about Ms. Barrett's *TNR* departure is that she was forced out following new revelations of plagiarism and inaccuracy in her work *in 1999* at *TNR*.  Defendants made this repeated statement

as part of and in support of four lengthy pronouncements that sought to thoroughly discredit Ms. Barrett and her work and eviscerate her suitability to write for *The Atlantic*. In that context, no reasonable reader would construe this deceptive remark according to the benign meaning Defendants now seek to retroactively ascribe to it.

Defendants also try to resurrect superseded allegations from Ms. Barrett's original complaint, which they try to contort into a supposed concession of the truth of Defendants' assertions about her departure. Mot. 23. A paragraph in the original complaint stated that Ms. Barrett chose to leave *TNR* after negative publicity that publication received over the misconduct of *another* editor resulted in a "renewed spotlight" on her and this spotlight in turn increased the negative publicity on the publication. D.E. 1 ¶¶ 63-65. This statement does not support Defendants' argument, first because it's outside the four corners of the *current* Complaint, and second because it doesn't "concede[]" anything Defendants claim it does.

To begin, "[i]t is well established that the amended pleading supersedes the original pleading," *Cureton v. U.S. Marshal Serv.*, 322 F. Supp. 2d 23, 25 n.6 (D.D.C. 2004) (internal quotation marks omitted), including "facts or claims stated in Plaintiff's Complaint," *Allen v. Mnuchin*, No. 18-1214 (RC), 2019 WL 2581323, at *1 n.3 (D.D.C. June 24, 2019). The Court may only look to the original pleading if its allegations "directly contradict" those in the amended complaint or have been "blatantly" changed "to respond to the defendant's motion to dismiss." *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 171–72 (D.D.C. 2013), *aff'd*, 796 F.3d 1 (D.C. Cir. 2015). "[R]econcilable small variations" between the facts pleaded in the original and amended complaints are not considered. *Id.*

Here, nothing in the Amended Complaint directly contradicts anything in the original, nor did Ms. Barrett "blatantly" allege directly contradictory facts in response to Defendants' first

23

motion to dismiss. Defendants don't even try to point to anything of the sort. Instead, she amended her complaint as of right under Rule 15. Regardless of the optics of evolving or sharpening her legal theories, she is fully entitled to do so as the case proceeds and the facts and legal theories are investigated and developed. Even this Court's Standing Order directs litigants to "carefully consider arguments raised in a motion to dismiss and correct defects through an amended complaint as allowed under Rule 15(a)." Accordingly, the Court should not consider allegations in her now-inoperative original pleading.

Further, even if the Court considers this prior statement, it doesn't establish the truth of *anything* Defendants said about her departure from *TNR*. The original complaint says that Ms. Barrett voluntary left *TNR* after transgressions by another *TNR* author and editor put the spotlight on TNR and resulted in renewed discussion of Ms. Barrett's lapses in 1994 and 1995. D.E. 1 ¶¶ 63-65. This is not a concession that she was forced from her job at *TNR* after new plagiarism and inaccuracies were "discovered in her work" in 1999. It's one thing for an upstanding author looking to move past an isolated series of lapses that occurred four and five years before to voluntarily leave a position as a favor to her under-fire employer; it's another for an author to be chased out in disgrace after being revealed as a serial malefactor and train wreck. Defendants can call this difference a "quibble" all they want, Mot. 22, but that doesn't change the fact that the true series of events said nothing negative about Ms. Barrett's credibility while the false one perpetuated by Defendants' was career-destroying.

### 5. Defendants' false statements about Ms. Barrett's byline are literally false, but even if they weren't, Defendants can't hide behind literal truth.

Defendants falsely accused Ms. Barrett of trying to hide her identity and conceal her past, chastising her in all three editor's notes and the Peck Memorandum for "request[ing]" a misleading byline that lacked "transparency" and differed from the byline she had used "recently." The truth

is that she proposed the byline "Ruth S. Barrett" (a byline she regularly used before) to increase transparency after *The Atlantic* recommended an opaque byline ("Ruth Barrett") that she had never used before, and she asked *The Atlantic* to put a link in the byline to her website (which displayed articles she wrote under the names "Ruth Shalit Barrett" and "Ruth S. Barrett"). Compl. ¶¶ 17-18. They refused to do so. *Id.* ¶ 18.

The true facts tell the story of a conscientious author who acted with no intent to deceive anyone and, to the contrary, acted to make sure that she didn't mislead readers by making sure that she published under a byline she had used previously. The false facts published by Defendants tell the story of a trickster looking for an opportunity to deceive at every turn and even conscripting Defendants into an identity fraud scheme until Defendants saw through her ruse, retracted her article, stripped her of her alias-byline and punitively restored the byline she'd used in the 1990s. The truth is benign; the published myth assailed her standing in her profession and in her community at large. *Wilner*, 760 A.2d at 594.

Defendants again cling to "literal truth," extracting individual words and phrases from their larger context and twisting them to claim that Ms. Barrett "concedes" their truth. Mot. 25. Yes, Ms. Barrett says she "recommended" the byline "Ruth S. Barrett," but of course she doesn't "concede[]" that she recommended it *to deceive readers*. The gist and sting of their statements are false and defamatory, and she concedes no aspect of the meaning Defendants intended to, and did, convey. *Jaffe*, 366 F.2d at 659; *Glass*, 117 F.2d at 276 n.1.

Defendants next claim these lies aren't actionable because the statements only criticized *The Atlantic*, not Ms. Barrett. Mot. 25. Wrong again. Again, these statements insinuated that Ms. Barrett proposed the byline to obscure her entity, and they concealed that she instead proposed it to *disclose* her identity and encouraged *The Atlantic* to increase transparency still further by linking

to her website, which it refused to do. Defendants' victimlike expression of regret for "defer[ring]" to Ms. Barrett is merely a tacked-on apology for going along with the tactics of the mythical charlatan they spent each of their proclamations falsely exposing.

The Complaint's allegations manifest that this discussion of the byline in Defendants' pronouncements implied that Ms. Barrett proposed it to hide her identity. A plaintiff establishes a defamatory implication where she pleads (1) a communication conveying facts "from which a defamatory inference can reasonably be drawn" and (2) "by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference." *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 427 (2021). Here, the affirmative evidence is abundant. Again, Defendants made these repeated statements about the byline within published accounts dedicated to smearing Ms. Barrett's credibility and trustworthiness. The statements are surrounded by all the false factual assertions and insinuations discussed above and in the Complaint. Individually and collectively, these false claims attacking Ms. Barrett's honesty provide ample indication that Defendants' "endorse[d] the defamatory inference" that she proposed the byline to deceive readers. *Tah*, 991 F.3d at 240.

6. **Defendants' self-serving comeuppance for assigning the Article to Ms. Barrett is actionable because it, too, is built on false facts, fails to disclose crucial refuting facts, and conveys ingrained defamatory factual assertions.**

The apotheosis of Defendants' four public statements on the Article is their repeated expression in each for exercising "poor judgment" in assigning the Article to Ms. Barrett. Compl. ¶¶ 156-57. Predictably, Defendants argue that this is a protected opinion. Mot. 27. But for all the reasons already discussed, this opinion is actionable. It rests on the full complement of false facts Defendants levied against Ms. Barrett. It skews those facts in favor of assaulting her character, rather than disclosing key facts disproving Defendants' various false claims and explaining Ms.

26

Barrett's motivation for assenting to inclusion of the reference to the son. And it contains embedded false factual assertions—namely, (1) Ms. Barrett did not "deserve[] a second chance to write feature stories" because she is an untrustworthy serial liar who "deceived *The Atlantic* and its readers" about the article, and (2) various inaccuracies in the Article fatally undermined its worthiness to be published. Accordingly, this repeated "opinion" is an actionable defamatory statement. *See Milkovich*, 497 U.S. at 18-19; *Mann*, 150 A.3d at 1247; *Jankovic I*, 593 F.3d at 28; *Moldea*, 15 F.3d at 1144.

Nor is the self-criticizing nature of these statements relevant. Again, it means nothing if a defendant is expressing feigned regret for publishing an author and a piece deemed deceitful and untrustworthy based solely on its own fabrications. The underlying false facts about *Ms. Barrett*'s credibility and the Article's veracity—not Defendants' stated regrets—make this repeated statement actionable. Defendants claimed to exhibit "poor judgment" for publishing the Article, but that was part and parcel of making Ms. Barrett the scapegoat for a situation they created themselves.

## B.   The actual malice standard does not apply, and even if it did, Ms. Barrett alleged it.

Defendants next try to impose an actual malice requirement on these claims by arguing that Ms. Barrett is a public figure. Mot. 28-31. That's wrong, but even if it were correct, Ms. Barrett's allegations amply support a finding of actual malice.

### 1.   The actual malice standard doesn't apply in this case.

The actual malice requirement applies only to plaintiffs who are public figures. *Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 309 (D.D.C. 2014) (hereinafter "*Jankovic II*"), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016). Whether a plaintiff is a public figure is a question of law. *Id.* at 300. There are two types of public figures: (1) general public figures and (2) limited-purpose public

figures. *Id.* Only a "well-known celebrity" whose "name is a household word" is a general public figure. *Id.* (cleaned up).

Ms. Barrett is presumed to be a private figure, and *Defendants* must show otherwise. *See, e.g.*, Law of Defamation, § 2:118 (2d ed. 2021); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994) ("We have proceeded upon the initial presumption that the defamation plaintiff is a private individual, subject to the defendant's burden of proving that the plaintiff is a public figure . . . ."); *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1346 (S.D.N.Y. 1977) ("Whether one is a public figure presents a mixed question of fact and law as to which defendants have the burden of persuasion."). Defendants point to nothing in the pleadings or elsewhere that overcomes this presumption at this stage.

Defendants don't even argue that Ms. Barrett is a household name, and she is not. They assert in passing that she is a "media celebrity," Mot. 28, but even assuming this ambiguous characterization is true, it's not enough. To be held a general public figure, a person must hold "persuasive power and influence." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). These "rare figure[s]" must possess "general fame" (not just fame within the media) or "notoriety in the community," engage in "pervasive involvement in the affairs of society," and must have "assumed a role of especial prominence in the affairs of society" such that the public recognizes and follows their "words and deeds." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980) (cleaned up). Defendants do not even attempt to make such a showing as to Ms. Barrett; their failure is fatal. *See id.* at 1292 ("[A]bsent clear evidence . . ., an individual should not be deemed a public personality for all aspects of his life." (cleaned up)).

Thus, the only question is whether she is a limited-purpose public figure. She is not. A person becomes a limited-purpose public figure if they "voluntarily inject themselves or are drawn

into a particular public controversy and therefore become public figures for a limited range of issues." *Id.* (cleaned up). To determine whether a plaintiff is a limited-purpose public figure, the Court "must identify the relevant controversy and determine whether it is a public controversy," then assess the plaintiff's role in the controversy, and then determine whether the alleged defamatory statement was "germane to the plaintiff's participation in the controversy." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016) ("*Jankovic III*"). Here, Defendants' defamatory statements were not germane to any public controversy. Defendants claim existence of two public controversies: one over the subject matter of the Article, and one over Ms. Barrett's "'talents, education, experience, and motives' as an author." Mot. 30 (quoting *Waldbaum*, 627 F.2d at 1298). Neither qualifies.

First, the Article drew *interest* from the general public, but Defendants fail to identify any *controversy*. *See Waldbaum*, 627 F.2d at 1296 (for a public controversy to exist, there "must be a real *dispute*" (emphasis added)); *Tatum v. The Dallas Morning News, Inc.*, 493 S.W.3d 646, 671 (Tex. Ct. App. 2015), *rev'd sub nom. on other grounds*, *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614 (Tex. 2018) ("[A] topic is not a public controversy merely because some people are talking about it . . . . there must first be a controversy before it can be a public one."). Defendants point to the Complaint's passing reference to Ms. Barrett's subjective hope that the Article would lead to a "broader" discussion about "equity in sports and college admissions or child and adolescent health," Mot. 29 (quoting Compl. ¶ 6), but they identify no such discussion or any actual "debate" about the topics covered in the Article. *See Wayment v. Clear Channel Broad., Inc.*, 116 P.3d 271, 285 (Utah 2005) (reporter was not a limited-purpose public figure because there was no sign of a "particular public *controversy*" over the topic of her story, and no evidence "the public was debating such issues," even if they found the issues interesting or important).

29

In cases where courts have found the existence of a public controversy, the record showed extensive debate. *See, e.g.*, *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668-69 (4th Cir. 1982) (court found public controversy because there was "abundant evidence" of public debate on the topic, including national press coverage of the topic, a *60 Minutes* segment on the issue, and differing views discussed and debated in books, magazines, and newspapers).

Further, Defendants have likewise failed to show that any unshown "controversy" the Article might have caused appreciably affected anyone other than the direct subjects of Ms. Barrett's reporting—affluent parents trying to use niche sports to get their children into elite colleges and universities. *See Waldbaum*, 627 F.2d at 1296 (no public controversy unless the matter in question affects "the general public or some segment of it in an appreciable way" or has ramifications extending beyond the matter's "direct participants").

Sure, the issues covered in the piece could hypothetically have some tangential impact on equity in sports and college admissions or child and adolescent health, but such attenuated effects are not "*appreciable*." *Id.* (emphasis added). For example, an internal dispute between a corporation's stockholders and management could have some effects on the local job market, the national economy, or the price of goods or services offered by the company, but those impacts do not rise to the level of a "substantial concern to the general public." *Denny v. Mertz*, 302 N.W.2d 503, 507 (Wis. Ct. App. 1981), *aff'd*, 318 N.W.2d 141 (Wis. 1982). And though a high school student's tragic suicide would certainly affect those who knew the student and might raise questions about student mental health, but this too is not the type of appreciable public impact that triggers the actual-malice requirement. *See Tatum*, 493 S.W.3d at 671. Like these participant-centered impacts, the appreciable impacts of the issues in the Article are limited to those affecting its subjects.

30

Still further, even if the Article prompted a public controversy that Defendants failed to identify, Defendants' defamatory statements were not germane to it. They had nothing to do with the subject matter of the Article but were instead totally consumed with destroying the reputation of its author. See *Waldbaum*, 627 F.2d at 1298 ("Misstatements wholly unrelated to the controversy . . . do not receive the *New York Times* protection.").

Defendants deceptively quote a treatise when they claim that courts "have 'generally accorded' public-figure status to journalists for purposes of debates regarding both their journalistic practices and the subject of their writings." Mot. 29 (quoting Defamation: A Lawyer's Guide 5:17). The treatise instead states only the more general proposition that writers are generally found to be public figures (almost always limited-purpose public figures) for *some* purpose, but it takes no position on the scope of the purpose or whether baseless attacks on a writer's personal honesty, career history, and fitness to write feature articles—all of which are totally divorced from the subject matter of their writings—are germane to it. *See* Defamation: A Lawyer's Guide § 5:17 (2021). Indeed, the many cases the treatise collects on the topic indicate that courts usually find the purpose limited to the subject matter of an author's works. *See id.*

Likewise, Defendants' reliance on *Waldbaum* on this point is misplaced. In *Waldaum*, the plaintiff served as president and CEO of the nation's second-largest supermarket cooperative. 627 F.2d at 1290. His controversial business strategies—which affected "consumers and retailers in the Washington area and, perhaps, elsewhere"—sparked debates within the industry and among the larger public. *Id.* at 1290, 1299. After the cooperative's board forced him out, a journal published an article claiming that the cooperative was "losing money" and "retrenching" during his tenure, a claim he alleged was false. *Id.* at 1290. Thus, the alleged defamatory statement fell

squarely within the controversy at issue—the plaintiff's management of the cooperative. *Id.* at 1300.

Defendants' second claimed public controversy—a purported "longstanding" debate over Ms. Barrett's credentials as an author, Mot. 30—falls right out of the gate. To establish this "controversy," Defendants rely solely on mid-1990s coverage over Ms. Barrett's early-career lapses, but again, the law is clear that coverage does not equal *controversy. Waldbaum*, 627 F.2d at 1296. They do not even try to identify any way in which discussion over Ms. Barrett's 27-year-old lapses could possibly affect anyone other than her in any "appreciable way." *Waldbaum*, 627 F.2d at 1296. And they can't manufacture a "debate" with defamatory statements and then use the controversy they created to impose an actual-malice requirement. *See, e.g.*, *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."); *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 14 (1st Cir. 2011) ("[T]o avoid improper 'bootstrapping' . . ., the controversy must predate the alleged defamation."). Nevertheless, aside from 27-year-old articles, Defendants rely solely on media coverage and debate that took place only *after* Defendants published their defamatory statements concerning "Barrett's conduct with respect to Sloane's son and *The Atlantic*'s challenged statements." Mot. 30.

The bottom line is that the only true controversy in this case is a workplace dispute between *The Atlantic* and its contractor. Just because this issue has "attract[ed] attention" does not transform it from an "essentially private concern[]" into a public controversy. *Waldbaum*, 627 F.2d at 1296. Ms. Barrett is not a public figure.

## 2.    In the alternative, Ms. Barrett sufficiently pleaded actual malice.

The Court has no need to apply the actual malice standard to Ms. Barrett's allegations, but she has sufficiently pleaded actual malice in any event. To establish actual malice, a plaintiff must

plead facts sufficient to show that the defendant published defamatory statements with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

Defendants devote many pages to their actual-malice arguments, Mot. 32-36, but most of their assertions can be boiled down to one central claim: actual malice can't be established without direct proof. In Defendants' view, none of the Complaint's exhaustive allegations concerning Defendants' egregious treatment of Ms. Barrett and their dozens of false assertions about her and the Article could possibly get the job done because actual malice is a subjective standard. So what? The law is filled with crimes and causes of action requiring proof of subjective state of mind as an element. But actual malice, like any of these subjective states of mind and most any element of a cause of action, may be established one brick at a time through circumstantial evidence. *See Jankovic II*, 72 F. Supp. 3d at 309 (a plaintiff is "entitled" to the benefit of the aggregate of the evidence concerning actual malice and therefore may prove actual malice using circumstantial evidence (cleaned up)).

Indeed, actual malice is a quintessential example of an element that could rarely, if ever, be proven if not through circumstantial evidence. *See Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1999). Courts have identified three types of circumstantial evidence capable of proving actual malice: (1) a story that was "fabricated or the product of [a] defendant's imagination," (2) a story "so inherently improbable that only a reckless man would have put it in circulation," or a story "based wholly on a source that the defendant had obvious reasons to doubt, such as an unverified anonymous telephone call." *Jankovic II*, 72 F. Supp. 3d at 309-10.

Moreover, in this case, Defendants had actual knowledge of all of the relevant facts because the statements concerned an internal dispute between them and one of their workers. It is therefore

more akin to a workplace defamation case such as *Vasquez*, *see supra* pp. 14-15, than a classic media defamation case where the media outlet's knowledge depends on what it learned from its investigation of an external matter.

The Complaint alleges facts that, if proven at trial, would clearly and convincingly show that Defendants acted with actual malice. In lieu of restating the dozens of allegations supporting a finding of actual malice discussed comprehensively in the Complaint, the allegations can be grouped into the following general categories:

***Actual knowledge***. The Complaint alleges that Defendants *knew* at the time they published their defamatory statements that many of their assertions had already been proven false. The Complaint provides many examples. Compl. ¶¶ 133, 142, 152, 163-66. If proven true, these allegations will establish clearly and convincingly that many of Defendants' false assertions were "fabricated" or "the product of [their] imagination," and "only a reckless man" (or worse) would have put and kept them in circulation. *Jankovic II*, 72 F. Supp. 3d at 309-10. And they knew this full well at the time of publication. By definition, this satisfies the actual-knowledge requirement articulated in *New York Times*. 376 U.S. at 279. And for other assertions that their subsequent post-publication investigation debunked, their failure to correct or retract those disproven assertions further supports a finding of actual malice. *See Kahl*, 856 F.3d at 118 (combined with other evidence, a failure to retract "may support actual malice" (internal quotation marks omitted)).

***Bad-faith investigation***. The Complaint also alleges that Defendants, pressured from Wemple's daily badgering, conducted a sham investigation into accusations made by Sloane's attorney that could have only produced one possible outcome: blaming Ms. Barrett. Compl. ¶ 93.

Defendants' bad-faith investigatory conduct is a classic example of a speaker "purposefully avoid[ing] the truth or deliberately decid[ing] not to acquire knowledge of facts that might confirm

the probable falsity of charges." *McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 114 (2007); *Arpaio v. Cottle*, No. 18-CV-02387 (APM), 2019 WL 11322515, at *1 (D.D.C. Dec. 3, 2019). If proven true, the rushed, haphazard, and intentionally one-sided nature of Defendants' "investigation" was so many worlds apart from *The Atlantic*'s standard commitment to accuracy that it too supports a strong inference of actual malice. *See Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992) (magazine's reputation for careful fact-checking could be supportive of an inference of actual malice when it failed to resolve discrepancies in the record before it).

*Self-preservation motive*. Finally, the facts alleged in the Complaint support the reasonable inference of at least one powerful motive to publish falsehoods about Ms. Barrett: by scapegoating her and concealing the facts about their disregard of their duty to protect Sloane's identity, they could try to avoid the inevitable criticism they would face if they presented the full picture to the public. Compl. ¶¶ 53-54, 71. These allegations of motive are corroborated by other facts in the Complaint. Defendants' departure from their prior conduct in similar situations and toward other authors is particularly suggestive of an ulterior motive. For example, the Complaint alleges that Defendants publicly castigated Ms. Barrett over inclusion of the masking detail to protect Sloane's identity, yet in the same article, they included another masking detail. *Id.* ¶¶ 31, 76.

Motive is yet another building block of a successful effort to prove actual malice. *See, e.g.*, *Sprouse v. Clay Communication*, 211 S.E.2d 674, 688 (W. Va. 1975); *Cochran v. Indianapolis Newspapers*, 372 N.E.2d 1211, 1220 (Ind. 1978); *Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992).

Taken together, all these facts (and many more in the Complaint) build a compelling case that would establish actual malice by clear and convincing evidence if proven at trial. They

systematically lay a brick-by-brick foundation for proving actual malice. Defendants again resort to trying to rewrite the Complaint's allegations to say something they don't or prematurely arguing about the facts based on inadmissible extraneous evidence or allegations in superseded pleadings. *See* Mot. 35 (fixating again on Ms. Barrett's use of the word "complicit" in an extraneous email); *id.* (categorizing variations in the Editor's Notes that show Defendants realized the falsity of prior statements as "minor wording changes"). This is impermissible. *See Rutledge v. City of Chicago*, No. 13 C 0870, 2013 WL 6645510, at *3 (N.D. Ill. Dec. 17, 2013) (motion to dismiss cannot "attempt to refute the complaint or to present a different set of allegations" (internal quotation marks omitted)).

## II.    The Complaint states a false light claim.

The Complaint also alleges facts that satisfy all the elements of a false light claim. To establish a false light claim, a plaintiff must plausibly plead "(1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be highly offensive to a reasonable person." *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 40 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003). The Complaint satisfied these elements for all the reasons laid out in the previous sections.

Defendants accuse Ms. Barrett of trying to use her false light claim to "avoid the constitutional requisites of a defamation claim," Mot. 37, but this is wrong because, as explained above, the constitutional requisite of actual malice to sustain a defamation claim against a public figure doesn't apply in this case, *see supra* pp. 27-32. Moreover, even if actual malice was required here, Ms. Barrett successfully pleaded it. *See supra* pp. 32-36.

Defendants' only other argument as to the false light claim is to assert a confusing argument that their lies are not highly offensive because they opted to characterize one of those lies as an

"opinion" (specifically, "*The Atlantic*'s decision to retract"). Mot. 37. Setting aside that this "opinion" is only one of 22 defamatory statements Defendants made, this assertion is just plain wrong because that purported opinion was based on numerous false facts and itself conveyed the false assertions that Ms. Barrett could not be trusted to write feature articles and that her Article could not be verified as accurate. *See supra* pp. 10-27. Thus, even this (and all Defendants' other false statements) constituted "major misrepresentation[s]" of her "character" and her "history." Restatement (Second) of Torts § 652E(c).

**III.    The Complaint states two contract claims.**

The Complaint pleads two claims against Atlantic Group for breaching its agreement with Ms. Barrett (the "Author's Agreement"). "To prevail on a breach of contract claim, plaintiff must demonstrate that a contract existed, that plaintiff performed his contractual obligations, that defendant breached the contract, and that plaintiff suffered damages due to the breach." *Dorsey v. Am. Express Co.*, 680 F. Supp. 2d 250, 254 (D.D.C. 2010), *aff'd sub nom. Dorsey v. Citibank*, N.A., No. 10-7023, 2010 WL 3068952 (D.C. Cir. Aug. 4, 2010).

> **A.    The contract claims plead distinct theories, and contain separate elements, from those underlying Ms. Barrett's defamation claims.**

Defendants assert a threshold argument that Ms. Barrett's contract claims fail because a plaintiff can't "evade the protections" afforded to defendants under defamation law "by dressing up" a defamation claim "in contract-law garb." Mot. 38-39. The stated premise does not dictate the stated conclusion because Ms. Barrett is not trying to hide her defamation claims behind her contract claims. In her contract claims, she is seeking distinct damages resulting from distinct conduct, which satisfies the distinct elements of contract law. In her two contract claims (Claims 6 and 7), she seeks loss of earning capacity proximately and directly caused by Atlantic Group's breach of Section 6(b) and 2(c) of the Author's Agreement, not reputational harm or injury to her

state of mind caused by defamatory statements. Compl. ¶¶ 191, 206. This difference in the relief sought takes her contract claims outside the confines of defamation law. *See Cohen*, 501 U.S. at 671 (non-defamation cause of action was not seeking to avoid the First Amendment standards for pleading libel or defamation where the plaintiff sought damages "for breach of a promise that caused him to lose his job and lowered his earning capacity").

The out-of-circuit case relied on by Defendants, *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520 (6th Cir. 2007), is inapposite. *Compuware* held that the actual-malice standard applied to a breach-of-contract claim by a company that hired a credit rating agency to assign and publish the company's credit rating. *Id.* at 531. The contracted-for service "without question involve[d] activities protected by the First Amendment," and the company—which was unhappy about the credit rating assigned to it—pleaded only a good-faith-and-fair-dealing claim and did not and could not plead that the rating agency violated any explicit provision of the governing contract. *Id.* Moreover, the allegations in support of the good-faith-and-fair-dealing claim sounded in negligence and not true bad faith. *Id.* Finally, the company claimed only "an injury to its reputation." *Id.* at 532. This combination of factors led the court to conclude that the contract claim was just "a backdoor attempt" to recover harm flowing from the credit rating agency's protected expression of its opinion concerning the company's financial condition. *Id.* at 531.

The allegations don't point in the same direction here: Ms. Barrett's good-faith-and-fair-dealing claim does not seek to challenge Atlantic Group's conscientiousness in expressing a protected subjective judgment (like a credit rating); she seeks to challenge its objective bad faith in performing its contractual obligations to Ms. Barrett, which is simply an internal workplace issue. *See* Compl. ¶¶ 179-91. She also alleges that Atlantic Group breached two express provisions of the Author's Agreement (Sections 6(b) and 2(c)). *Id.* ¶¶ 193, 204. And in Claims 6 and 7, she

seeks damages for lost earning capacity resulting from these contractual breaches, not reputational harm. *Id.* ¶¶ 191, 206.

Finally, even if the actual-malice standard applied to these claims, the claims nevertheless clear the bar because the Complaint also sufficiently pleads that element. *See supra* pp. 32-36.

### B.     Ms. Barrett performed all her obligations under the Author's Agreement.

Defendants try to get around Ms. Barrett's contract claims by asserting that Atlantic Group was excused from its duty to perform because Ms. Barrett supposedly breached her duty to 'cooperate fully' in the 'procedures' associated with *The Atlantic*'s right to 'edit, revise, [and] modify[]' the article, including by providing *The Atlantic* with any 'research material' and 'access to subjects.'" Mot. 39 (quoting Section 4 of the Author's Agreement, D.E. 20-8 at 3, ¶ 4). Let's count the ways why this is wrong.

First, this is yet another premature factual argument. While "a party may defend against a breach of contract claim on the ground that its performance was excused by the other party's prior breach of the contract," the Court does not need to "explore the availability or contours of this doctrine" at the pleading stage when the complaint does not allege facts establishing that the plaintiff "materially breached" the agreement at issue. *Donald Marshall Berlin v. Bank of Am., N.A.*, 101 F. Supp. 3d 1, 15 (D.D.C. 2015). Nothing in the Complaint establishes as a matter of law that Ms. Barrett breached Section 4 (see the next paragraph). Nor does anything in the Complaint establish beyond dispute that non-disclosure of a minor masking detail solely for the purpose of complying with another provision of the Author's Agreement constitutes a material breach of this provision. And "[w]hether a particular breach of a contract is 'material' is a classic issue of fact." *3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC*, 922 A.2d 439, 445 (D.C. 2007).

Second, Section 4 is ambiguous. It is unclear whether Ms. Barrett's conduct even falls within the scope of the "procedures" used by *The Atlantic* "to edit, revise, modify, abridge, adapt, translate, and arrange for the translation of" the Article. D.E. 20-8 at 3, ¶ 4. Those terms are undefined and are reasonably interpreted to include only refusal to disclose sources to the editors or provide supporting information when requested. Interpretation of these ambiguous terms is a "question of fact, to be answered by resort to extrinsic evidence" regarding the circumstances and understandings underlying the contract. *Simon v. Circle Assocs., Inc.*, 753 A.2d 1006, 1012-13 (D.C. 2000). The Court cannot resolve this question on the pleadings.[6]

Third, even if Ms. Barrett had breached Section 4, Atlantic Group can't rely on this defense because it was not entitled to violate the Author's Agreement in the manner it did. While the other party's nonperformance is a defense to a breach-of-contract claim, a defendant is "not in a position to rely on" this defense if its "alleged bad acts would not have been justified even had it known about" the plaintiff's breach. *Ashcraft & Gerel v. Coady*, 244 F.3d 948, 950 (D.C. Cir. 2001) (cleaned up). "Material breach entitles the injured party to an election of remedies, including rescission or termination of the contract, not a license to commit torts or otherwise breach the contract." *Id.* (internal quotation marks omitted).

Accepting for sake of argument that Ms. Barrett breached Section 4 and that the breach was material, Atlantic Group would perhaps have been justified in repudiating the contract or suspending performance, but it eschewed those remedies in favor of breaching multiple provisions

---

[6] Defendants also cherry pick and contort Ms. Barrett's passing use of the word "did not cooperate" to say she "admits" she violate the Author's Agreement, Mot. 39, but the original complaint has been superseded, *see supra* p. 21, and Ms. Barrett's word choice in describing her role in the post-publication fire drill in responses to Wemple's pressure cannot establish as a matter of law on the pleadings that she did not cooperate in The Atlantic's "process" of editing, revising, or modifying the piece.

of the Author's Agreement, including smearing Ms. Barrett and the Article in a manner designed to wipe out any possible benefits she could hope to obtain from the contract. One party's breach does not give the other party *carte blanche* to scapegoat and punish the other party. at 951.

Finally, Atlantic Group can't rely on this defense because, to the extent Ms. Barrett breached Section 4 (she didn't), Atlantic Group's own conduct caused her failure to perform. "The law is settled that where one party to a contract forbids or interferes with the performance by the other party to an extent which amounts to a refusal to perform, the party interfered with may recover as if the contract had been performed." *Gruhala v. Lacy*, 559 S.W.2d 286, 289 (Mo. Ct. App. 1977). Here, Defendants' disregard of Sloane's right to remain anonymous, and Ms. Barrett's ethical and contractual duty to protect that right, interfered with Ms. Barrett's ability to "cooperate fully" in *The Atlantic*'s "procedures" for editing, revising, or modifying the Article (again, assuming *arguendo* this provision covered Ms. Barrett's actions at all).

### C.   Claim 6 states a claim for breach of the duty of good faith and fair dealing.

The Complaint sufficiently pleads a claim for the breach of the duty of good faith and fair dealing. "A party breaches this duty by evading the spirit of the contract, willfully rendering imperfect performance, or interfering with performance by the other party." *Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 247-48 (D.D.C. 2012) (cleaned up).

Defendants argue that Ms. Barrett does not "identify a contractual 'fruit' to which she was deprived," Mot. 41, but to go along with this, the Court would have to ignore the central thrust of this controversy and the Complaint's allegations. The Complaint alleges that Atlantic Group evaded the spirit of the contract (publishing and promoting a piece of investigative journalism according to journalistic ethics) by undermining the public's faith in the Article (and Ms. Barrett)

through the publication of dishonest Editor's Notes that falsely suggested that the Article was unworthy of publication. Compl. ¶¶ 39-41, 181-84. That deprived Ms. Barrett of "the most valuable fruits of the agreement—the prestige of publishing with The Atlantic." *Id.* ¶ 186.

### D.   Claim 7 states a claim for breach of Sections 6(b) and 2(c) of the Author's Agreement.

The Complaint also sufficiently pleads a claim for breaches of Sections 6(b) and 2(c) of the Author's Agreement. The first provision, Section 6(b), required Ms. Barrett to represent and warrant that her work "does not infringe . . . any other right, of any person or entity," nor "invade the privacy … rights of anyone." D.E. 20-8 at 2, ¶ 6(b). This provision imposed reciprocal obligations on Atlantic Group not to infringe the confidentiality rights of Ms. Barrett's sources, or at very least barred Atlantic Group from thwarting Ms. Barrett's efforts to fulfill its requirements. The second provision, Section 2(c), obligated Atlantic Group to "make commercially reasonable efforts" to market the Article for dramatization and other commercial opportunities, such as hiring an agent for that purpose. D.E. 20-8 at 1, ¶ 2(c).

Defendants' interpretation of Section 6(b) as imposing no obligations on themselves but only on Ms. Barrett, Mot. 42-43, would create an absurd result. It would turn the spirit of the bargain on its head if a provision were to require an author to protect her sources (and make that requirement enforceable by the publisher), but at the same time allow the publisher to unilaterally violate the source's confidentiality and then leave the author holding the bag. This absurdity alone justifies rejection of Defendants' proffered construction, and it at minimum renders Section 6(b) ambiguous. *See Am. First Inv. Corp. v. Goland*, 925 F.2d 1518, 1521 (D.C. Cir. 1991) (contract held ambiguous when plain-meaning construction of two provisions would produce an absurd result). And because Atlantic Group drafted this contract and presented it to Ms. Barrett on a take-it-or-leave-it basis, it must be interpreted against Atlantic Group. See 11 Williston on Contracts §

32:12 (4th ed. 2021) ("[A]ny contract of adhesion . . . is particularly susceptible to the rule that ambiguities will be construed against the drafter."). In any event, dismissal is improper because further factual development is needed to inform Section 6(b)'s meaning. *Simon*, 753 A.2d at 1012-13.

Defendants' argument that compliance with Section 6(b) could only benefit Sloane, and breach of Section 6(b) could only harm Sloane, Mot. 43-44, takes an unreasonably restrictive view of the rights protected by Section 6(b). While Section 6(b) certainly was meant in part to protect Sloane, its prohibition on Atlantic Group interfering with that duty was meant to benefit Ms. Barrett as well by protecting her from the precise situation that Defendants' conduct put her in—an impossible choice between her contractual and ethical duty to protect Sloane and her duty to strive for complete accuracy in her work. Atlantic Group's breach of Section 6(b) stripped Ms. Barrett of this protection, and the direct harm flowing from this was the cascade of events that resulted in loss of her ability to earn as a writer.

For this same reason, Ms. Barrett sufficiently pleaded damages. At minimum, this breach was a "substantial factor in causing the loss." *United States Conf. of Mayors v. Great-W. Life & Annuity Ins. Co.*, 327 F. Supp. 3d 125, 129–30 (D.D.C. 2018), *aff'd*, 767 F. App'x 18 (D.C. Cir. 2019) (internal quotation marks omitted). And as to Atlantic Group's breach of Section 2(c), Defendants ignore the Complaint's allegation that Defendants, *inter alia*, rejected a potential television project based on the Article. Compl. ¶ 56.

Defendants next attempt to blame Ms. Barrett for all the personal details about Sloane in the Article because she drafted it and "approved" it for publication. Mot. 44. Here they go again—these are factual assertions outside the pleadings. The Complaint alleges that the version of the Article she drafted had protections for Sloane that Defendants rejected. *See* Compl. ¶ 25 And the

Complaint says nothing about whether Ms. Barrett "approved" the final version of the Article. This is a factual question not addressed in the Complaint. The Court can't just assume this is true because Defendants say it in a brief, because it must draw the inference in Ms. Barrett's favor.

Moreover, Ms. Barrett alleges that additional conduct by Defendants separate from their identity-revealing edits—pressuring Sloane to reveal identifying details, disclosing facts about Sloane to a third-party media organization, and disparaging Ms. Barrett for her efforts to protect Sloane—*id.* ¶¶ 82-87, also infringed Sloane's confidentiality and invaded her privacy or prevented Ms. Barrett from honoring her obligations under Section 6(b). *Id.* ¶ 202.

As to Atlantic Group's violation of Section 2(c), Defendants object that it would not be "commercially reasonable" to market an article that was "publicly criticized[] after the discovery of an intentional falsehood perpetrated by the article's author," Mot. 44, but, again, this argument only works if the Court improperly resolves the facts in Defendants' favor. They ask the Court to just take their word for it and assume that the media and entertainment industry would view a two-word reference about the number of children in an anonymous source's family as rendering the subject of the Article box-office poison. Indeed, Defendants don't even try to respond to Ms. Barrett's allegation that she got an inquiry from a Hollywood production company interested in developing the Article for television. Compl. ¶ 56.

## CONCLUSION

For all these reasons, the Court should deny the motion to dismiss in all respects.


Dated: April 27, 2022                                    Respectfully Submitted,

                                                         */s/ Hassan A. Zavareei*
                                                         Hassan A. Zavareei (DC Bar No. 456161)
                                                         Leora Friedman (DC Bar No. 1735514)
                                                         **TYCKO & ZAVAREEI LLP**
                                                         1828 L Street, NW Suite 1000

Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
lfriedman@tzlegal.com

Elliot C. Rothenberg (*pro hac vice*)
Attorney at Law
124 Groveland Avenue
Minneapolis, MN 55403-3607
Telephone: (612) 508-5373
ecrothenberg@gmail.com

Alexander Rufus-Isaacs (*pro hac vice*)
Rufus-Isaacs Acland & Grantham, LLP
9420 Wilshire Blvd., Suite B100
Beverly Hills, California 90212
Telephone: (310) 770-1307
Facsimile: (424) 258-7383
aisaacs@rufuslaw.com

45