**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RUTH SHALIT BARRETT, | |
| Plaintiff, | |
| v. | Civil Action No. |
| THE ATLANTIC MONTHLY GROUP LLC and DONALD CHRISTOPHER PECK, | 1:22-cv-00049-EGS |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

WILLIAMS & CONNOLLY LLP
Joseph M. Terry
Stephen J. Fuzesi
Whitney D. Hermandorfer
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jterry@wc.com
sfuzesi@wc.com
whermandorfer@wc.com

*Attorneys for Defendants The Atlantic
Monthly Group LLC and Donald
Christopher Peck*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

ARGUMENT ...........................................................................................................2

I.      BARRETT'S OWN PLEADING, THE CITED ARTICLES, AND THE
        EMAIL INCORPORATED BY REFERENCE ARE PROPERLY BEFORE
        THE COURT ..................................................................................................2

II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION ................4

        A.    The Statements at Issue Are Not Actionable .........................................4

              1.    Barrett's Participation in the Falsity and Deception (Claim 1)...................5

              2.    Barrett's Departure from The New Republic (Claim 2) ...........................11

              3.    Statements Relating to Barrett's Byline (Claim 3) ...................................12

              4.    The Decision to Assign Barrett the Article (Claim 4) ..............................13

        B.    The Complaint Fails to Plausibly Allege Actual Malice .......................................14

              1.    The Actual Malice Standard Applies ...........................................................14

              2.    The Complaint Does Not Plausibly Allege Actual Malice ......................17

III.    THE COMPLAINT'S ANCILLARY FALSE LIGHT CLAIM FAILS ....................20

IV.     THE COMPLAINT'S ANCILLARY CONTRACT CLAIMS FAIL .......................21

        A.    The Contract Claims Fail for the Same Reasons as the Defamation Claims.........21

        B.    The Contract Claims Fail Because of Barrett's Admitted Breach........................22

        C.    The Contract Claims Fail for Additional, Independent Reasons ..........................23

              1.    Good Faith and Fair Dealing (Claim 6) ......................................................23

              2.    Breach of Contract (Claim 7).......................................................................24

        CONCLUSION ...........................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### FEDERAL CASES

*Abbas v. Foreign Pol'y Grp.*, 783 F.3d 1328 (D.C. Cir. 2015) ............................................. *passim*

*Abbas v. Foreign Pol'y Grp.*, 975 F. Supp. 2d 1 (D.D.C. 2013) ....................................................8

*Adler v. Condé Nast Publ'g, Inc.*, 643 F. Supp. 1558 (S.D.N.Y. 1986) .......................................16

*Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649 (D.C. Cir. 1966) ........................................................12

*Am. First Inv. Corp. v. Goland*, 925 F.2d 1518 (D.C. Cir. 1991) ................................................24

*Arpaio v. Cottle*, 2019 WL 11322515 (D.D.C. Dec. 3, 2019) .......................................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................17, 18

*Berlin v. Bank of Am.*, 101 F. Supp. 3d 1 (D.D.C. 2015)..............................................................22

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081 (10th Cir. 2017) .................6

*Brown v. Petrolite Corp.*, 965 F.2d 38 (5th Cir. 1992).................................................................19

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991).......................................................................21

*Coles v. Wash. Free Wkly., Inc.*, 881 F. Supp. 26 (D.D.C. 1995)...................................................6

*Compuware Corp. v. Moody's Invs. Servs.*, 499 F.3d 520 (6th Cir. 2007)............................21, 22

*Deripaska v. Associated Press*, 282 F. Supp. 3d 133 (D.D.C. 2017) .....................................3, 6, 9

*Dorsey v. Am. Express Co.*, 680 F. Supp. 2d 250 (D.D.C. 2010) ..................................................22

*Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494 (S.D.N.Y. 2012)....................................................8

*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018)..............................................................19

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) .....................................................7, 10, 20

*Fonville v. District of Columbia*, 38 F. Supp. 3d 1 (D.D.C. 2014)...............................................10

*Glass v. Ickes*, 117 F.2d 273 (D.C. Cir. 1940).............................................................................12

*Harder v. Sunrise Senior Living, Inc.*, 2009 WL 5171843 (E.D. Mich. Dec. 22, 2009) ..............14

*Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657 (1989) .............................................17, 19

Page(s)

Federal Cases—continued:

*Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*,
238 F. Supp. 2d 174 (D.D.C. 2002) ...............................................................12, 13, 23

*Hourani v. Mirtchev*, 943 F. Supp. 2d 159 (D.D.C. 2013) ...............................................2

*Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir. 1986)...............................................9

*Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22 (D.C. Cir. 2010) .........................................10

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016) ...........................17, 18, 19

*Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106 (D.C. Cir. 2017) ...........14, 15, 17, 19

*Kaul v. Fed'n of State Med. Bds.*, 2021 WL 1209211 (D.D.C. Mar. 31, 2021) ...........13

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1998) ...................11

*Masson v. New Yorker Mag.*, 501 U.S. 496 (1991) ...........................................8, 11, 12

*McGarry v. Univ. of San Diego*, 64 Cal. Rptr. 3d 467 (2007) .....................................19

*Moldea v. N.Y. Times Co.*, 22 F.3d 310 (D.C. Cir. 1994)..............................................20

*Moore v. Brouillette*, 2020 WL 7318007 (D.D.C. Dec. 11, 2020) .................................4

*N.Y. Times v. Sullivan*, 376 U.S. 254 (1964) ...............................................................18

*Nunes v. WP Co. LLC*, 2022 WL 997826 (D.C. Cir. Apr. 1, 2022) .............................13

*O'Donnell v. CBS, Inc.*, 782 F.2d 1414 (7th Cir. 1986) ...............................................16

*Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724 (1st Cir. 1992) .................10

*Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280 (4th Cir. 1987) ...............7

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) .......................................................................14

*Shive-Ayala v. Pacelle*, 2022 WL 782412 (D.D.C. Mar. 15, 2022) ...............................3

*Tah v. Glob. Witness Publ'g*, 991 F.3d 231 (D.C. Cir. 2021)....................13, 17, 19, 20

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) .......................................2, 6, 13, 14

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ............................................................6

*Turner v. Wells*, 198 F. Supp. 3d 1355 (S.D. Fla. 2016) ...............................................7

Page(s)

Federal Cases—continued:

*Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018) ........................................................14

*Vasquez v. Whole Foods Market*, 302 F. Supp. 3d 36 (D.D.C. 2018) ...........................7

*W. Assocs. LP ex rel. Ave. Assocs. LP v. Mkt. Square Assocs.*,
    235 F.3d 629 (D.C. Cir. 2001) ..............................................................................3

*Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287 (D.C. Cir. 1980) ...............................16

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ...................5, 6, 11

*Zimmerman v. Al Jazeera Am.*, 246 F. Supp. 3d 257 (D.D.C. 2017)........................8, 12

## STATE CASES

*Armstrong v. Thompson*, 80 A.3d 177 (D.C. 2013)......................................................11

*Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351 (Colo. 1983) ...................................7

*Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132 (D.C. 2021) .................................20

*Cochran v. Indianapolis Newspapers*, 372 N.E.2d 1211 (Ind. Ct. App. 1978)............19

*Denny v. Mertz*, 302 N.W.2d 503 (Wis. Ct. App. 1981)..............................................15

*Gruhala v. Lacy*, 559 S.W.2d 286 (Mo. Ct. App. 1977)..............................................23

*Guilford Transp. Indus. v. Wilner*, 760 A.2d 580 (D.C. 2000) ...................................11

*Picard v. Brennan*, 307 A.2d 833 (Me. 1973) .............................................................11

*San Antonio Express News v. Dracos*, 922 S.W.2d 242 (Tex. Ct. App. 1996) ............16

*Sprouse v. Clay Commc'ns*, 211 S.E.2d 674 (W. Va. 1975) ........................................19

*Tatum v. Dall. Morning News, Inc.*, 493 S.W.3d 646 (Tex. Ct. App. 2015) ................15

*Wayment v. Clear Channel Broad.*, 116 P.3d 271 (Utah 2005)....................................15

## CONSTITUTION AND RULE

U.S. Const. amend. I ...........................................................................................9, 16, 22

Fed. R. Civ. P. 12(b)(6).............................................................................................2, 17

iv

Page(s)

## OTHER AUTHORITIES

Restatement (Second) of Torts § 652E cmt. c (1977)....................................................20

*Sack on Defamation* § 4:3.1 (5th ed. 2017) .................................................................10

v

## INTRODUCTION

Plaintiff Ruth Shalit Barrett participated in the deliberate inclusion of a falsehood in her article and concealed that fabrication from The Atlantic's editors.  Her opposition confirms as much, acknowledging from the outset that Barrett "could have spoken up" about the "fictional reference to a son," but intentionally "chose not to."  Opp. 2.  She "knew about and did not disclose" the falsification.  Opp. 12.  There is no dispute about *what* Barrett's misconduct was— and, indeed, that she even previously deemed it "egregious[]" and a "serious error."  Mot. 12.  Nor can Barrett evade her admission to The Atlantic—in an email the Amended Complaint expressly incorporates by reference—that she was "complicit" in the falsification, that it "would not be truthful or fair" for the editor's note to "blame [Sloane] for the invention of a son," and that she had "prevaricat[ed]" and been "evasive."  MTD Ex. 1, at 2.  The same goes for her prior allegation in this very case: that The Atlantic was within its rights to "retract[] the entire article" and to "admonish[]" her for her conduct.  Compl. ¶ 41.

Barrett's opposition, like her Amended Complaint, resorts to taking issue with The Atlantic's protected judgments about the significance of her conduct and how the magazine should best respond.  But Barrett's latest attempts to recharacterize what she did as a "form of *trivial* dishonesty" and "*benign* deception," Opp. 6 (emphases added), cannot alter the fact that she admittedly engaged in the very behavior described in the editor's note.  Indeed, effectively conceding the "literal" truth of what The Atlantic wrote in describing her conduct, *e.g.*, Opp. 6, 25, Barrett erects a strawman—a supposed "narrative" published by The Atlantic.  Opp. 1.  But this is a libel action.  What matters is what the Defendants said.  Barrett cannot base her claims on a "story" or a "picture" or a "tale," Opp. 11, 12, unmoored from the actual statements at issue.

In all events, Barrett's opposition centers on her assertion that The Atlantic's "picture" painted her as "[i]mpelled by no discernable motive other than a mischievous impulse," rather than

a desire to protect Sloane's anonymity.  Opp. 3.  But this is flatly refuted by what Defendants stated about Barrett's motive in each note at issue: she was acting "to protect [Sloane's] anonymity" and "this was a fabrication to make Sloane less identifiable, because she was concerned about maintaining anonymity."  Am. Compl. Exs. 2, 3; *accord* Exs. 4-5.  "The plain words" of the publications therefore "explicitly rebut" Barrett's core theory.  *Tavoulareas v. Piro*, 817 F.2d 762, 781 (D.C. Cir. 1987) (en banc).  Yet Barrett entirely fails to acknowledge this text.

Ultimately, Barrett's response rests on strident rhetoric and inaccurate assertions, such as that Defendants rely on "legal standards no court has ever accepted."  Opp. 6.  This bluster is baseless.  Defendants' motion rests on the elements of Barrett's claims.  It rests on well-settled doctrines of defamation law—which Barrett nowhere refutes.  And it rests specifically on grounds on which courts routinely have dismissed defamation claims at the Rule 12(b)(6) stage.  *See, e.g.*, Mot. 14 n.26, 26, 32 (collecting cases).  Like those, Barrett's claims should be dismissed now.

## ARGUMENT

## I.   BARRETT'S OWN PLEADING, THE CITED ARTICLES, AND THE EMAIL INCORPORATED BY REFERENCE ARE PROPERLY BEFORE THE COURT

As a threshold matter, this Court should reject Barrett's efforts to evade the allegations in her initial complaint, articles discussing her controversial career, and the email she sent to Atlantic editor (and named defendant) Don Peck that she expressly referenced in her Amended Complaint. They properly can be considered by the Court in resolving Defendants' motion to dismiss.

a.   This Court need not shut its eyes to the original allegations that Barrett chose to plead but has now jettisoned in an effort to respond to Defendants' initial motion to dismiss.  Opp. 21, 23-24.  Barrett herself acknowledges that courts may permissibly look to an original pleading "if its allegations directly contradict those in the amended complaint or have been blatantly changed to respond" to a motion to dismiss.  Opp. 23 (quoting *Hourani v. Mirtchev*, 943 F. Supp.

2d 159, 171-72 (D.D.C. 2013)).  That is exactly the case here.  Among the admissions that Barrett now seeks to abandon are those regarding her prior "journalistic malfeasance," Mot. 28; her departure from The New Republic, Mot. 23-24; and the seriousness of her misconduct with respect to The Atlantic article, Mot. 22.  All of those allegations served a significant role in Defendants' motion to dismiss and have been abandoned for no other reason than the apparent recognition that they supported dismissal.  What is more, the D.C. Circuit—in a case Barrett neglects to mention— has endorsed looking to original pleadings to assess the plausibility of plaintiffs' allegations more broadly.  *See W. Assocs. LP ex rel. Ave. Assocs. LP v. Mkt. Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001) (cited at Mot. 2, 23 n.30).  Defendants may properly point out the many ways in which allegations from the original Complaint undercut Barrett's claims.

        b.      Barrett's effort to suppress articles about her controversial past fails too.  In a rush to accuse Defendants of seeking to wage a "PR war" and "improperly influence" this Court, Opp. 7, Barrett ignores Defendants' cited cases holding that courts may take notice of publicly available articles in considering whether a plaintiff is a public figure, Mot. 4 n.2.  This rule does not apply only when facts are "not in dispute."  Opp. 8.  Rather, as public-figure status is a question of law, courts may permissibly assess whether the articles support the presence of a public controversy relevant to the challenged speech.  *See, e.g.*, *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140, 142 (D.D.C. 2017) (articles supported public-figure finding on motion to dismiss); *Shive-Ayala v. Pacelle*, 2022 WL 782412, at *2 n.1 (D.D.C. Mar. 15, 2022) (collecting cases).

        Barrett does not dispute that these articles are authentic and were in fact "published."  *See* Opp. 8-9.  To be sure, Barrett may (at least now[1]) disagree with the views many of the cited articles

---

[1] *Compare* Opp. 8 (accusing Defendants of "mischaracteriz[ing]" Barrett's October 1995 cover story by describing it "as a piece 'criticizing the Washington Post[]'"), *with* Compl. ¶ 56 (describing same article as "highly critical of *The Washington Post*").

expressed, preferring instead to tell the Court that she had a "track record of unimpeachable work." Opp. 1.  But that only proves the point:  There was a public controversy regarding Barrett's practices and career.  The articles thus demonstrate a public controversy for purposes of applying the actual malice standard—the purpose for which Defendants offer them.

c.     Barrett last asks this Court to ignore a document that she incorporated by reference into her Amended Complaint—the email, Opp. 15-16, in which Barrett admitted, among other things, to being "complicit" in the "invention of a son" and stated it would "not be truthful or fair" to "blame" Sloane alone, MTD Ex. 1, at 2.  It was Barrett who chose to rely on this email in her Amended Complaint.  *See* Am. Compl. ¶¶ 44 (recounting email), 97 (same).  Barrett's cited case confirms that, by "clearly referenc[ing] this specific correspondence," the Amended Complaint incorporated it by reference.  *Moore v. Brouillette*, 2020 WL 7318007, at *7 (D.D.C. Dec. 11, 2020).  Defendants thus may fairly provide it to the Court.

Barrett counters that she did not "rely" on the email "to form her claims," but instead only "reference[d] it in the Complaint to establish the timeline of events in question."  Opp. 16.  Not so:  Barrett specifically characterized and paraphrased the very text that Defendants now quote to the Court, seeking to proffer it as supporting her "motive . . . to protect Sloane."  Am. Compl. ¶ 44; *id.* ¶ 97.  There is no merit to Barrett's contention that she may rely on the email to support her version of events, yet shield from this Court's consideration what the email actually says.

## II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION

Barrett's opposition only highlights both why none of the statements at issue are actionable and that her Amended Complaint wholly fails to adequately plead actual malice, as required here.

### A.     The Statements at Issue Are Not Actionable

The path of Barrett's filings in this case is telling.  Barrett's original Complaint was predicated on supposed "implications" arising from The Atlantic's statements.  *See* Defs.' Mot. to

Dismiss Compl. 16-19, 23-24 (Mar. 9, 2022), ECF 15.  Defendants filed their initial motion to dismiss demonstrating that Barrett failed to make the "especially rigorous showing" required to state a claim of defamation by implication under *White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990), and *Abbas v. Foreign Pol'y Grp.*, 783 F.3d 1328, 1339 (D.C. Cir. 2015)—a showing that demands "affirmative evidence" on the face of the publication itself "suggesting that the defendant intend[ed] or endorse[ed] the defamatory inference," *Abbas*, 783 F.3d at 1339 (citation omitted).  Barrett then filed her Amended Complaint, which purported instead to challenge Defendants' specific statements.  Now, in response to Defendants' renewed motion to dismiss, Barrett reverts to challenging supposed "narratives," "stories," and "pictures" that are even further removed from the text.  Opp. 1, 12, 22.  What matters is what The Atlantic actually stated.  And for the reasons explained in Defendants' opening brief, none of the challenged statements are actionable.  *See* Mot. 14-28.

### 1.    Barrett's Participation in the Falsity and Deception (Claim 1)

Nothing in Barrett's opposition undermines any of the grounds for dismissal of Claim 1.

### a.    Statements Characterizing Barrett's Conduct

Significantly, Barrett does not appear to press her complaint that any of the specific words she challenges describing her conduct are actually false, let alone *materially* false.  *See* Opp. 11-18.  Nor could she, given the litany of affirmative admissions she has made.  Mot. 16-17.  This alone can and should end the analysis of those statements.

Barrett attempts to resuscitate her claim by ignoring what Defendants actually said, and instead recasting the editor's note as telling a "story" of an "insidious scammer out to deceive the world for no good reason."  Opp. 11-12.  To the extent Barrett is attempting to pursue an implication claim on this basis, no aspect of that exaggerated characterization of the editor's note comes close to satisfying the "especially rigorous showing" required to state a claim based on an

otherwise materially true statement.  *Abbas*, 783 F.3d at 1339; Mot. 16.  Not only is it not a

"reasonable" inference to draw from the actual text, but Barrett wholly fails to show that "the

communication, by the particular manner or language in which the true facts are conveyed,"

supplies "additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the

defamatory inference."  *White*, 909 F.2d at 520.  Indeed, Barrett barely even acknowledges this

standard, referencing it just once elsewhere.  *See* Opp. 26.

The centerpiece of Barrett's "story" appears to be the assertion that The Atlantic suggested

she was "acting with a deceitful motive" when in fact she was motivated to protect Sloane's

anonymity.  *See* Opp. 11-12.  But this assertion is foreclosed by the plain text.  Each of the

challenged publications explains that "this was a fabrication to make Sloane less identifiable,

*because she was concerned about maintaining anonymity*." Am. Compl. Ex. 3 (emphasis added);

*accord id*. Ex. 4, at 3 ("Sloane's attorney told The Atlantic that *she wanted to make herself less*

*readily identifiable*" and that, according to Sloane, Barrett "first proposed the invention of a son

. . . *as a way to protect [Sloane's] anonymity*" (emphases added)); *id.* Ex. 2, at 3 (same); *id.* Ex. 5

(similar); Mot. 18.  Barrett fails to acknowledge this at all, let alone offer a reason why it is not

dispositive.  Nor does she contest any of the cited authority (at Mot. 18) demonstrating that these

statements doom any implication claim, because "[t]he plain words of the" publications "explicitly

rebut" her contention.  *Tavoulareas*, 817 F.2d at 781; *see also, e.g.*, *Trudeau v. FTC*, 456 F.3d 178,

195-96 (D.C. Cir. 2006); *Deripaska*, 282 F. Supp. 3d at 148-49.[2]

---

[2] Likewise, Barrett's complaint that The Atlantic "omitted" certain "background" is foreclosed by
the well-established rule that "[t]he omission of additional favorable information from an
otherwise true publication does not render a statement materially false."  *Brokers' Choice of Am.,*
*Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 (10th Cir. 2017); *see also, e.g.*, *Coles v. Wash.*
*Free Wkly., Inc.*, 881 F. Supp. 26, 33 (D.D.C. 1995) ("Courts must be slow to intrude into the area
of editorial judgment," including "with respect to . . . omissions from news stories." (citation
omitted)), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996).

In any event, Barrett is wrong that any asserted implication as to her motive would be actionable.  As explained in Defendants' opening brief, statements assessing a person's state of mind are not actionable because they are not "capable of being proven true or false."  *Turner v. Wells*, 198 F. Supp. 3d 1355, 1370 (S.D. Fla. 2016); Mot. 19.  The cases Barrett cites are not to the contrary.  *Farah v. Esquire Mag.*, 736 F.3d 528, 534-35 (D.C. Cir. 2013), and *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1289 (4th Cir. 1987), confirm that assertions regarding motives that are based on "subjective values" are not actionable, 829 F.2d at 1289.  This rule forecloses Barrett's claim, which purports to be based on a subjective assessment of whether her conduct was "ethically correct" or instead "nefarious."  Opp. 1, 3.[3]  Nor can The Atlantic's statements be reasonably read to "impl[y] special knowledge of [her] actual motives," given The Atlantic's disclosure of the very motive (*i.e.*, protecting Sloane's anonymity) Barrett now relies upon.  Opp. 14 (quoting *Farah*, 736 F.3d at 540); *supra* p. 6.  Barrett's reliance on *Vasquez v. Whole Foods Market*, 302 F. Supp. 3d 36 (D.D.C. 2018), likewise fails.  That case involved express statements of fact whose truth was not disputed (or analyzed), *id.* at 63, and says nothing about the statements of motivation on which Barrett seeks to rest her claim.

### b.  Statement of Sloane's Attorney

Barrett's repeated admissions of her complicity likewise doom her claim based on The Atlantic's quotation of Sloane's attorney that, according to Sloane, Barrett "had first proposed the invention of a son."  *See* Mot. 19-20.  Barrett's opposition confirms that she does not dispute that the attorney, in fact, said this to The Atlantic.  Nor does she contest that The Atlantic made clear

---

[3] Both cases, as well as *Burns v. McGraw-Hill Broadcasting Co.*, 659 P.2d 1351, 1359 (Colo. 1983) (cited at Opp. 14), further instruct that the doctrine of opinion based on disclosed facts protects statements assessing motives when based on "circumstances set forth by the publisher," *see Farah*, 736 F.3d at 539-40; *Potomac Valve*, 829 F.2d at 1290.  That protection also would apply here, as any alleged assertions by Defendants stem from the facts the publications disclose.

that "Barrett denies that the invention of a son was her idea."[4]  Mot. 19.  The Atlantic's immediate

disclosure of Barrett's position on this specific "exchange" alone renders the passage incapable of

a false and defamatory meaning.  *See Abbas v. Foreign Pol'y Grp.*, 975 F. Supp. 2d 1, 19 (D.D.C.

2013); *see also Zimmerman v. Al Jazeera Am.*, 246 F. Supp. 3d 257, 279 (D.D.C. 2017) (reporting

plaintiffs' denial rendered reference to allegations nondefamatory in context).

    And that is only one ground on which to dismiss this claim.  Barrett has no meaningful

response to the dispositive point that there is no *material* falsity here whatsoever.  Mot. 19-20.

Whether the idea technically *originated* with her, it is undisputed that Barrett was a central

participant in the falsehood and proponent of it and that she deceived The Atlantic's editors.  She

pleaded she was part of conversations with Sloane and her husband during which the idea

originated; she "support[ed]" the inclusion of the falsehood; and she told The Atlantic that "it

would be unfair to scapegoat Sloane"—that the "Editor's Note shouldn't blame [Sloane] for the

invention of a son.  That would not be truthful or fair.  I was complicit."  *See* Mot. 19-20; MTD

Ex. 1, at 2.  This claim rests on hairsplitting, at best.  It fails as a matter of law because the

"substance, the gist" of the statement at issue is not materially different from the conceded truth.

*Masson v. New Yorker Mag.*, 501 U.S. 496, 517 (1991); *see Egiazaryan v. Zalmayev*, 880 F. Supp.

2d 494, 508 (S.D.N.Y. 2012) (denoting plaintiff a "member" of political party not materially false

where plaintiff was "associated with" and "backer of" party).

### c.    Statement Relating to Inducing a Source to Lie

    Barrett's argument as to The Atlantic's phrasing that she was accused of inducing "at least

one source to lie to our fact-checking department" fares no better.  *See* Mot. 20.  Her opposition

---

[4] Further, it is baseless for Barrett to maintain that "Defendants don't disclose to the Court that they did *not* mention this denial in the Third Editor's Note."  Opp. 19 n.5.  The denial is there, clear as day:  "Barrett denies that the invention of a son was her idea, and denies advising Sloane to mislead *The Atlantic*'s fact-checkers."  Am. Compl. Ex. 5.

here rests principally on a red herring—that when The Atlantic included an editor's note in a subsequent print edition, it used the phrase "a source" instead. *See* Opp. 16-17. But that minor change in phrasing does not render the earlier phrasing actionable. Both are true. If anything, it only highlights that this is a matter of word choice—the type of decision well within The Atlantic's editorial discretion. *See, e.g.*, *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986) (en banc) ("the First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words").

Further, the cases Defendants cite do not "dispense[] with [the] argument," Opp. 17, that the use of the phrase "at least" here at most raises a question as to what additional investigation would reveal. That wording indicates a "lack of definitive knowledge about the issue"—which is precisely why the D.C. Circuit held in *Abbas* that questions do not generally give rise to actionable libel claims. 783 F.3d at 1338; *see also, e.g.*, *Deripaska*, 282 F. Supp. 3d at 147 (stating business deals "*may* involve" improper conduct is "not a verifiable statement of fact" (emphasis added)).[5]

### d.    Statements Relating to The Atlantic's Decision to Retract

Lacking support for her claim regarding the magazine's explanation of its retraction decision, Barrett misstates the applicable law and misreports what The Atlantic said. As explained in Defendants' opening brief, the sentence at issue is quintessential protected opinion. *See* Mot. 20-22. Barrett does not cite any authority to the contrary.

Barrett confuses two separate doctrines, each independently supporting dismissal. First, a statement is not actionable if, as here, it reflects subjective opinion. *See* Mot. 14-15, 21-22. This does not depend on the disclosure of any facts, as Barrett appears to suggest. Rather, it is simply

---

[5] To the extent Barrett is also now claiming libel based on the statement that Barrett was accused of inducing any source to lie, it fails for same reason just discussed with respect to Sloane's attorney's statement that Barrett had first proposed the invention.

9

inherent in the assessment being made.  Barrett has no answer to the cases cited holding that conclusions as to plaintiffs' "honesty" or whether conduct was "acceptable" are protected statements of subjective opinion, *see Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 729 (1st Cir. 1992); *Fonville v. District of Columbia*, 38 F. Supp. 3d 1, 12 (D.D.C. 2014), let alone cases emphasizing the "particular[]" need to protect subjective "criticism" of authored work, *Sack on Defamation* § 4:3.1 (5th ed. 2017).  That is exactly the type of subjective assessment at issue here: The Atlantic's determination as to "trustworthiness and credibility."  Mot. 21.

Second, a statement is not actionable if—regardless of whether it is subjective or not—it represents a conclusion "that is based upon true facts that are revealed to readers or which are already known to readers."  *Farah*, 736 F.3d at 539 (citation and emphasis omitted).  Here, The Atlantic disclosed to its readers precisely what its conclusion was based upon.  Far from any "throne of lies," Opp. 20, the magazine's conclusion was based on the "accurately disclosed" conduct that Barrett has repeatedly admitted to be true, *id.* (quoting *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 28 (D.C. Cir. 2010)).  Regardless, Barrett principally relies again on her misleading assertion that The Atlantic failed to note that her motive was "to protect Sloane's confidentiality." Opp. 20.  But the editor's note and Peck's internal email did specifically disclose this.  *See supra* p. 6.  Barrett also ignores The Atlantic's express explanation for why it could not "attest to the veracity of the article."  It did not say it was because the article "had been found to contain multiple errors," Opp. 21, but rather because in The Atlantic's opinion, her admitted actions—to collude with a source regarding a falsehood and hide it from editors—"fatally undermined the effectiveness of the fact-checking process," Am. Compl. Ex. 4, at 5.  As a result, The Atlantic could not "vouch for the accuracy of th[e] article."  *Id*.

And far from "do[ing] nothing," Opp. 21, Barrett's concessions that it was The Atlantic's right to "retract[] the entire article," Compl. ¶ 41—and the magazine's "prerogative" to "view[] [her] inclusion of a nonexistent son as a cardinal lapse," Mot. 12—underscore exactly the point here:  The Atlantic was entitled to form its own opinion as to the significance of Barrett's misconduct and express that opinion as a matter of its editorial judgment.

## 2.   Barrett's Departure from The New Republic (Claim 2)

Barrett's opposition as to Claim 2 rests on the puzzling proposition that truth is a "trope" in a libel cause of action.  Opp. 22.  Barrett concedes the "literal truth" of what The Atlantic wrote about Barrett's departure from The New Republic.  *Id.*  That effectively forecloses her claim.

Having conceded the literal truth of the statement at issue, Barrett must at most be arguing defamation by *implication*.  But, as addressed above, this is a particularly demanding task when relying on an otherwise materially true statement.  It requires an "especially rigorous showing" of "*additional, affirmative* evidence" on the publication's face "suggesting that the defendant *intends* or *endorses* the defamatory inference."  *Abbas*, 783 F.3d at 1339 (emphasis added); *White*, 909 F.2d at 520.  Barrett cites no such evidence.  Her claim must, therefore, be dismissed.  Mot. 16.

The doctrine of substantial truth—or, stated differently, the requirement for a plaintiff to prove *material* falsity—is *additional protection* for the defendant above and beyond literal truth. The plaintiff cannot establish the element of falsity even if a statement is not literally or technically true, "so long as the substance, the gist, the sting, of the libelous charge [is] justified."  *Masson*, 501 U.S. at 517 (citation omitted); *see also, e.g.*, *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1998).  Accordingly, courts routinely dismiss lawsuits even if the plaintiff can argue that there is an "inaccuracy" in what the defendant stated.  *Armstrong v. Thompson*, 80 A.3d 177, 185-86 (D.C. 2013); *Guilford Transp. Indus. v. Wilner*, 760 A.2d 580, 601 (D.C. 2000); Mot. 14 n.26 (collecting cases); *see also Picard v. Brennan*, 307 A.2d 833 (Me. 1973) (statement

11

that a person was "fired" when he in fact had voluntarily resigned under less than favorable circumstances was not materially false).  Barrett's cited cases do not say anything to the contrary.[6]

Indeed, Barrett's claim seems to rest on an insistence that readers could perceive the sentence to state that her scandals occurred "in 1999" as opposed to a few years earlier.  But that is surely not *materially* false.  The precise timeline does not change the overall "gist" or "sting"— and Barrett does not contest Defendants' cited cases holding exactly that.  Mot. 24-25.  Moreover, despite seeking to avoid her prior pleading in this case, Barrett does not dispute that her departure from The New Republic related to her prior scandals—as she conceded in her original Complaint. Opp. 24.  It would have made no difference in the mind of the reader had The Atlantic stated that "after" first taking a leave of absence following scandals over plagiarism and inaccurate reporting, Barrett then left permanently in 1999 after another author's scandal "put a renewed spotlight" on her own admitted "transgressions."  Mot. 24 (quoting Compl. ¶ 64); *Masson*, 501 U.S. at 517.

### 3.  Statements Relating to Barrett's Byline (Claim 3)

Barrett once again misconstrues the actual statements at issue in search of a claim as to The Atlantic's discussion of her byline.  Here, too, Barrett acknowledges the "literal truth" that the magazine indeed "referred to Barrett as Ruth S. Barrett at her request."  Opp. 25.  And Barrett does not contest that what The Atlantic then expressed next was protected opinion: a subjective judgment that *the magazine* "should have included the name that [Barrett] used as her byline in the 1990s."  *See* Mot. 25.  She has waived any argument to the contrary.  *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002); *infra* n.7.

---

[6] The quotation Barrett cites from *Glass v. Ickes*, 117 F.2d 273, 276 n.1 (D.C. Cir. 1940), appears not in the court's analysis—which rested on a different ground—but instead is a recitation of a party's brief.  And neither *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 659 (D.C. Cir. 1966), nor *Zimmerman v. Al Jazeera America*, 246 F. Supp. 3d at 276, addresses the substantial truth doctrine at all; they simply reiterate the importance of assessing statements in context.

Barrett nonetheless maintains that the text is actionable because it *implied* that she proposed her byline "to hide her identity." Opp. 26. Barrett concedes that she must identify "affirmative evidence" from the face of the publication demonstrating that Defendants "intend[ed] or endors[ed]" that inference. *See id.* (quoting *Tah v. Glob. Witness Publ'g*, 991 F.3d 231, 240 (D.C. Cir. 2021)). But she identifies none, instead pressing an assertion that the entire publication was intended to "smear[]" her as a "mythical charlatan." *Id.* This is patently insufficient to fulfil the "especially rigorous showing" required. *Abbas*, 783 F.3d at 1339; *Nunes v. WP Co. LLC*, 2022 WL 997826, at *4 (D.C. Cir. Apr. 1, 2022) (allegations of "defamatory gist" insufficient to state implication claim where "[n]othing in the article suggests an intent on the part of [the publisher] to imply" asserted inference). Barrett fails to even acknowledge that The Atlantic explained that, when writing for other publications recently, Barrett's "full name" had been used. Mot. 25. This is "affirmative evidence" that "explicitly rebut[s]" any asserted implication that The Atlantic was accusing Barrett of hiding her name. Mot. 18 (quoting *Tavoulareas*, 817 F.2d at 781). It reinforces exactly what the text says: the magazine was critical of its own decision to not use her full name.[7]

### 4.     The Decision to Assign Barrett the Article (Claim 4)

Finally, Barrett devotes barely two paragraphs to opposing dismissal of Claim 4, and for good reason: The magazine's assessment that it exercised "poor judgment" in assigning Barrett the article is plainly a matter of protected opinion. Mot. 26-28. Barrett has no answer to the cases

---

[7] Barrett's Amended Complaint also passingly alleged defamation based on a January 2021 article in the Washington Post. Am. Compl. ¶ 52; *id.* Ex. 6. Defendants explained why this claim fails as a matter of law. Mot. 26 n.33. The opposition does not mention the Post article, let alone respond to the arguments. "It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins*, 238 F. Supp. 2d at 178; *Kaul v. Fed'n of State Med. Bds.*, 2021 WL 1209211, at *6 (D.D.C. Mar. 31, 2021) (collecting similar cases). Barrett has forfeited this claim.

13

cited finding expressions of "poor judgment" to be subjective opinion. *Turner v. Wells*, 879 F.3d 1254, 1266, 1271 (11th Cir. 2018); *see Harder v. Sunrise Senior Living, Inc.*, 2009 WL 5171843, at *5 (E.D. Mich. Dec. 22, 2009). And, as before, The Atlantic's conclusion is also an opinion based on the disclosed facts that Barrett has conceded to be, at the very least, materially true—and indeed, about which Barrett has stated "readers" may "draw their own conclusions."[8]

Further, the "self-criticizing nature of these statements" is plainly "relevant." Opp. 27. First, it reinforces that this is opinion—a self-critical assessment. Second, it independently dooms the claim, which requires any defamatory statement to be "specifically directed" at the plaintiff. *Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966). The statement here is directed at The Atlantic itself, for an act of "poor judgment *on our part*." Am. Compl. Ex. 4, at 5 (emphasis added). Barrett cites no basis to suggest that the statement was merely "feigned regret." Opp. 27. Her claim fails.

B. **The Complaint Fails to Plausibly Allege Actual Malice**

Barrett's opposition further underscores that she is, at a minimum, a limited-purpose public figure who must offer factual allegations capable of showing—by clear and convincing evidence— that Defendants acted with actual malice in publishing the challenged statements, and that she has failed to do so. This independently requires dismissal.

1. **The Actual Malice Standard Applies**

Barrett agrees that whether a plaintiff is a public figure subject to the actual malice standard "is 'a matter of law for the court to decide.'" *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 114 (D.C. Cir. 2017) (quoting *Tavoulareas*, 817 F.2d at 772); *see* Opp. 27. She is a public figure

---

[8] Michael Levenson, *The Atlantic Retracts Ruth Shalit Barrett Article on Niche Sports*, N.Y. Times (Nov. 1, 2020), https://tinyurl.com/2je9mynr (cited at Mot. 12 n.23).

for, at least, purposes of the speech that matters here—namely, Defendants' statements regarding Barrett's article and journalistic conduct.  Mot. 29-31.[9]

        a.      Barrett first qualifies as a public figure for purposes of speech about her article.  On the opposition's own account, Barrett's nationally published article plunged into a pre-existing "public controversy" disputed among "some segment of the public":  Barrett's piece linked her reporting to prior, "national press" relating to "the topics covered in the Article."  Opp. 29-30; *see* Am. Compl. Ex. 1, at 4-5, 13 (discussing related sociological work and newspaper stories); *cf. Kahl*, 856 F.3d at 114-15 (other coverage of dispute supported that case "involves a public controversy").  This factor readily distinguishes Barrett's cited cases (at Opp. 29), which lacked such prior "cover[age of] the debate."  *Tatum v. Dall. Morning News, Inc.*, 493 S.W.3d 646, 671 (Tex. Ct. App. 2015), *rev'd*, 554 S.W.3d 614 (Tex. 2018); *see Wayment v. Clear Channel Broad.*, 116 P.3d 271, 285 (Utah 2005) ("no evidence of any public controversy at all").

        Nor can Barrett credibly counter that her article would not have affected "anyone other than the direct subjects" of her reporting, Opp. 30, in light of her admission that she targeted a "global audience" in order to serve the "broader purpose" of spurring additional, "important conversations" regarding a debate over equity in college admissions and athletics, Am. Compl. ¶ 6; Compl. ¶¶ 111, 254.  Barrett's pleading confirms that she met her goal of prompting responses from a range of commentators, Am. Compl. ¶ 2; *see also* Compl. ¶¶ 81-83—a fact that also distinguishes her last case, *Denny v. Mertz*, 302 N.W.2d 503, 508 (Wis. Ct. App. 1981).  Indeed, Barrett acknowledged that she expected publishing on such a "topic of public importance" would draw public reaction and, indeed, "upset[] some."  Compl. ¶¶ 70, 124.  She nonetheless chose to

---

[9] As Barrett easily qualifies as a limited-purpose public figure, the Court need not address Barrett's arguments that she is not a general public figure "for all aspects of h[er] life."  Opp. 27-28.

enter the public conversation and broadcast her views nationally—with the hope of benefiting from the "prestige" of publishing in a "venerated" publication.  Am. Compl. ¶ 178.

Public-figure precedents bar Barrett from "hav[ing] it both ways—stepping into the limelight as a public commentator, yet avoiding it for purposes of defamation law and the First Amendment."  *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 255 (Tex. Ct. App. 1996) (cited at Mot. 31 n.37); *accord Adler v. Condé Nast Publ'g, Inc.*, 643 F. Supp. 1558, 1565 (S.D.N.Y. 1986).  Barrett does not respond to *any* of Defendants' mountain of cases supporting the commonsensical principle that authors are public figures for purposes of speech about their published works.  Rather, she concedes that a leading treatise supports "that writers are generally found to be public figures . . . for *some* purpose."  Opp. 31.  Barrett then shifts to arguing that the challenged speech, because it related to Barrett's journalistic *conduct* and not the article's specific *subject matter*, was not germane to the relevant public controversy.  *Id.*  But that distinction has no basis in the law.  It runs flat into *Waldbaum v. Fairchild Publications*' holding that speech "critical" of a commentator's "talents, education, experience, and motives" warrants protection because such factors could be "relevant to the public's decision whether to listen" to the commentator.  627 F.2d 1287, 1298 (D.C. Cir. 1980); *accord* Mot. 30 n.36 (citing, *inter alia*, *O'Donnell v. CBS, Inc.*, 782 F.2d 1414, 1417 (7th Cir. 1986)).

b.     For similar reasons, Barrett additionally qualifies as a public figure due to the longstanding controversy over her "conduct" and "career history."  Opp. 31-32.  Barrett insists that any discussion of these topics relates only to a "manufacture[d] . . . debate" of Defendants' own making that could not meaningfully "affect anyone other than her."  Opp. 32.  *But see Waldbaum*, 627 F.2d at 1298 (protecting speech regarding commentator's qualifications because it could be "relevant to the public's decision whether to listen" to the commentator).  Yet again,

Barrett's allegations show otherwise, pleading that her conduct prompted a "passionate debate" over "what does and does not constitute plagiarism" and related "ethics issue[s]." Am. Compl. ¶¶ 60-62; Compl. ¶¶ 29-30, 140. The many publicly available articles, whose existence Barrett does not dispute, *see supra* p. 3, likewise compel the conclusion that, by taking her case to the press and the public, Barrett "thrust" herself into the broader public controversy ("Ruthgate," as she called it) over her conduct at The New Republic. *Kahl*, 856 F.3d at 115; *see* Mot. 4-7. Public "discussion" of this controversy, moreover, "has continued" throughout Barrett's career, *Kahl*, 856 F.3d at 115, as shown by a series of articles Barrett does not address, Mot. 7 n.21. Defendants' speech on Barrett's conduct was thus the latest contribution to a long-running, public controversy.

## 2. The Complaint Does Not Plausibly Allege Actual Malice

Barrett concedes that, to survive dismissal for failure to plead actual malice, her complaint must allege specific facts showing that Defendants *knew* what they were stating was false or "actually had a 'high degree of awareness of . . . probable falsity'" and spoke anyway. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 688 (1989) (citation omitted). Rather than confront the "famously 'daunting'" nature of this subjective-knowledge standard, *Tah*, 991 F.3d at 240 (citation omitted), or courts' routine enforcement of it at the Rule 12(b)(6) stage, Mot. 32 (collecting cases), Barrett seeks to minimize the showing she must put forward, *see* Opp. 33 ("So what?"). That is no surprise, as Barrett's Amended Complaint contains *no* "well-pleaded allegations" supporting that Defendants subjectively disbelieved the statements they made, much less by a clear-and-convincing standard. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016). Indeed, as to Peck individually, her response on actual malice nowhere even mentions him by name.

17

The three grounds on which Barrett's opposition relies only prove the lack of sufficient allegations.[10]  While Barrett points to allegations purporting to support that Defendants "knew" their assertions were false, Opp. 34, in reality the Amended Complaint contains no non-conclusory allegations of actual knowledge.  The cited examples—which generally allege that Defendants "knew or should have known" a series of facts relating to the article's drafting and investigation, *e.g.*, Am. Compl. ¶¶ 133, 142(e), 152(e), or that The Atlantic "would have had to have buried its head in the sand to not" realize the falsity of its statements, *id.* ¶ 166—exemplify Barrett's failure to adequately plead facts, as opposed to just "labels and conclusions," *Iqbal*, 556 U.S. at 678, or to press allegations regarding "the state of mind of the specific 'persons having responsibility for the publication.'"  Mot. 32 (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 287 (1964)).

Barrett next cites her assertion of an allegedly "sham" investigation into "accusations made by Sloane's attorney."  Opp. 34-35.  Yet Barrett does not dispute that a failure to investigate does not suffice to show actual malice—nor could she, in light of the legion of cases so holding.  Mot. 34 (collecting cases).  Barrett cannot circumvent this rule by characterizing investigation as "bad-faith," a "sham," or "one-sided."  Opp. 34-35.  Again, "it is not enough to show that [a] defendant should have known better; instead, the plaintiff must offer evidence that the defendant *in fact harbored subjective doubt*."  *Jankovic*, 822 F.3d at 589 (emphasis added).

Nor do Barrett's allegations involve anything like the cases that have addressed speakers "'purposefully avoid[ing] the truth'" in the face of "highly improbable" accounts.  Opp. 34

---

[10] Barrett otherwise cites "three types of circumstantial evidence" probative of actual malice: evidence that a story was "fabricated" or the product of the defendant's "imagination"; "so inherently improbable that only a reckless man would have" published it; or "based wholly on a source that the defendant had obvious reasons to doubt, such as an unverified anonymous telephone call."  Opp. 33 (citation omitted).  It is clear that none apply here, nor does Barrett meaningfully argue otherwise.

18

(quoting *McGarry v. Univ. of San Diego*, 64 Cal. Rptr. 3d 467, 480 (2007)); *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 691.  Far from making a "deliberate decision not to acquire knowledge of facts" readily available to the journalist "that might confirm the probable falsity" of implausible accusations in the face of "obvious doubts," *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 691-92, Barrett acknowledges that The Atlantic questioned her—and then provided opportunity for email follow up, *see* Am. Compl. ¶¶ 38-40, 44—only to have Barrett *confirm* that she was "complicit" in the central falsehood regarding Sloane's son, Mot. 35.  And to the extent Barrett denied aspects of Sloane's account, The Atlantic informed the readers of this denial—a fact that further undercuts any allegation of actual malice, Mot. 34-35 (collecting cases), but that the opposition ignores.[11]

Finally, Barrett's assertion of an alleged "ulterior," "self-preservation motive" similarly fails.  Opp. 35.  Barrett ignores that it is well settled that neither alleged "animus towards Plaintiff" nor "'the mere presence of some ulterior motive'" is "enough to support actual malice."  *See, e.g.*, *Arpaio v. Cottle*, 2019 WL 11322515, at *2 (D.D.C. Dec. 3, 2019) (quoting *Jankovic*, 822 F.3d at 596)) (cited at Opp. 35); *accord Tah*, 991 F.3d at 243; *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 93 (D.D.C. 2018).[12]  Barrett's argument fails on her own allegations, too.  It rests on the asserted significance of an alleged "masking" change The Atlantic's staff made to a coach's quote during

---

[11] Nor can Barrett rest on The Atlantic's "failure to correct or retract" purported errors in the online editor's note.  Opp. 34.  Barrett cites no error in Defendants' initial statements, much less a material one, *supra* pp. 5-6, and in all events cannot overcome that what matters is the "state of knowledge at the time of initial publication," *Kahl*, 856 F.3d at 118 (citation omitted).

[12] Barrett's two state cases (at Opp. 35) were decided in the 1970s, prior to the Supreme Court's expounding on the requirements of proving actual malice in cases like *Harte-Hanks Commc'ns, Inc.*, 491 U.S. 657.  Unlike here, the cases further involved evidence that the defendants published "what [they] knew to be a false conclusion" and engaged in "prior attempts at intentional falsification" of statements about the plaintiffs.  *Sprouse v. Clay Commc'ns*, 211 S.E.2d 674, 690 (W. Va. 1975); *Cochran v. Indianapolis Newspapers*, 372 N.E.2d 1211, 1220 (Ind. Ct. App. 1978).  And while *Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992), cited the defendant's "motive to publish a false report" in assessing actual malice, "[m]ore important[]" was evidence demonstrating that the defendant "was aware of information directly contradicting its findings."

the editing process.  Opp. 35.  But neither the opposition nor the Amended Complaint alleges that the quote that appeared in the publication was false.  This purported "masking," from one truthful statement to another, is thus far afield from Barrett's "unilateral" choice intentionally to insert a false fact in the story and deceive editors about it.  Compl. ¶ 41; Mot. 22 n.29.

In sum, Barrett has not come close to plausibly alleging actual malice as to any Defendant.

## III.    THE COMPLAINT'S ANCILLARY FALSE LIGHT CLAIM FAILS

Barrett does not dispute that if her defamation claim fails, so must her false light claim (Claim 5).  Mot. 36-37; *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 140 (D.C. 2021) (false light claims based on "same allegations" as defamation claims will be "analyzed in same manner").  The false light claim should thus be dismissed for the same reasons as the libel claims.  *See, e.g.*, *Farah*, 736 F.3d at 539-40 (rejecting false light claim based on statements of opinion); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994) (same, substantial truth); *Close It! Title Servs.*, 248 A.3d at 139-40 (same, defamatory meaning); *Tah*, 991 F.3d at 243 (same, failure to adequately plead actual malice).

There is also nothing "confusing" about Defendants' argument that the claim additionally fails for independent reasons.  Opp. 36.  Barrett's response does not contend that the challenged statements placed her in a "highly offensive false light."  Mot. 37.  Nor does Barrett's opposition establish how the statements at issue amounted to such a "major misrepresentation" of her "character, history, [or] activities," Restatement (Second) of Torts § 652E cmt. c (1977), so as to be actionable for false light.  *See* Opp. 37.  Barrett herself has previously called her conduct "egregious[]," and even now recognizes that she "could not" introduce a known falsehood to the article.  Am. Compl. ¶ 28; *see* Mot. 6.  Barrett does not—and cannot—square her false light claim with her repeated public admissions as to both her conduct and its severity.

IV.     **THE COMPLAINT'S ANCILLARY CONTRACT CLAIMS FAIL**

Barrett's opposition also does not overcome the reasons for dismissing her contract claims.

A.     <u>**The Contract Claims Fail for the Same Reasons as the Defamation Claims**</u>

While Barrett accepts that she cannot use contract claims to evade the requirements of defamation law, she asserts her contract claims avoid this limit because they seek "distinct damages resulting from distinct conduct."  Opp. 37.  This contention ignores her own allegations.

Barrett's contract allegations are rife with statements that Defendants published "*defamatory*" editor's notes, "malign[ed]" and "disparage[d]" Barrett, published "scurrilous attacks and character assassination" that "cost" Barrett her "reputation," and "assaulted [her] in print"—confirming that Defendants' speech is at the core of her contract claims.   Mot. 38 (emphasis added; citations omitted).  Barrett's opposition underscores the point:  It states that The Atlantic "evaded the spirit of the contract . . . through the publication of dishonest Editor's Notes that falsely suggested that the Article was unworthy of publication."  Opp. 41-42.

Barrett insists that her damages allegations seek to remedy only "loss of earning capacity," not her "reputational harm."  But both claims state otherwise:  The only "loss of earning capacity" they cite is from Defendants' allegedly "making it more difficult or impossible for [Barrett] to practice her profession of writing."  Am. Compl. ¶¶ 191 (Claim 6), 206 (Claim 7); *accord id.* ¶ 203 ("unable to practice her profession as a writer").   These allegations plainly assert broad-based reputational harm, not economic loss flowing from a breach of the lone contract at issue.  *Cf. Compuware Corp. v. Moody's Invs. Servs.*, 499 F.3d 520, 531 (6th Cir. 2007) (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991)).

The analysis of *Compuware* squarely covers Barrett's claims.  She, like Compuware, pleaded a "good-faith-and-fair-dealing claim."  Opp. 38.  She, like Compuware, asserted an injury to her "reputation."  *Id.*  And Barrett's claim of breach, like Compuware's, challenges Defendants'

"conscientiousness" in "investigating" and "publishing" a statement "evaluating" the conduct at issue. *Compuware*, 499 F.3d at 531; Am. Compl. ¶¶ 182, 185, 189, 202. The claim likewise targets The Atlantic's "subjective judgment" that the article warranted a retraction. Opp. 38; *cf.* Am. Compl. ¶¶ 187-88 (challenging choice to retract, rather than publish "a simple correction"). Barrett's contract claims, in short, "involve[] activities protected by the First Amendment" and fall with her defamation claims. Opp. 38 (quoting *Compuware*, 499 F.3d at 531).

### B.    The Contract Claims Fail Because of Barrett's Admitted Breach

Barrett concedes that, as an element of her contract claims, she must establish that she "performed [her] contractual obligations." Opp. 37 (quoting *Dorsey v. Am. Express Co.*, 680 F. Supp. 2d 250, 254 (D.D.C. 2010), *aff'd* 2010 WL 3068952 (D.C. Cir. Oct. 26, 2010)). But her conceded conduct—and admissions—show that she cannot meet this requirement. Mot. 39-40.

Barrett's counterarguments lack merit. She asserts that her allegations lack facts showing that she "'materially breached' the agreement at issue." Opp. 39 (quoting *Berlin v. Bank of Am.*, 101 F. Supp. 3d 1, 15 (D.D.C. 2015) (rejecting defendant's breach defense where defendant did not "provide[] citations to any paragraphs in the Amended Complaint that it believes show" plaintiff breached the contracts)). But Barrett's original Complaint alleged that she "did not cooperate" with The Atlantic in its investigation of the article despite her contractual duty to "cooperate fully." Mot. 39 (quoting Compl. ¶ 18; Am. Compl. Ex. 7, at 3 ¶ 4). The Amended Complaint, for its part, changes the wording of this concession (from "did not cooperate" to made a "decision not to disclose," Am. Compl. ¶ 93), but not its effect. It also expressly acknowledges that "knowingly provid[ing] . . . false information" to the article's fact-checkers was something Barrett "could not" do. *Id.* ¶ 28. A clearer breach is difficult to imagine.

Barrett's own statements and allegations—acknowledging that her "egregious[]" conduct and "serious error" would support The Atlantic's "admonishing" her and "retract[ing] the entire

article," Mot. 12 (citations omitted)—further establish that her breach was "material," Opp. 39. As Barrett previously acknowledged, "lying" is *the most egregious offense in journalism*." Mot. 6. These allegations also foreclose Barrett's argument that The Atlantic's response to the breach was not "justified." Opp. 40. She cannot ignore her prior concessions now. *See* Mot. 23 n.30.

Barrett last argues that any breach should be excused because it stemmed from The Atlantic's "own conduct" in "disregard[ing]" Barrett's alleged duty to protect Sloane's anonymity. But even the lone out-of-Circuit case Barrett offers limits this rule to interference by a counterparty that "amounts to a refusal to perform." Opp. 41 (quoting *Gruhala v. Lacy*, 559 S.W.2d 286, 289 (Mo. Ct. App. 1977)). Barrett has not alleged, let alone pleaded facts to support, that The Atlantic's treatment of Sloane's confidentiality was a refusal to perform under the parties' contract—which, after all, gave The Atlantic "sole discretion" to "edit, revise, [and] modify" the piece. Am. Compl. Ex. 7, at 2. Moreover, Barrett has conceded that her "unilateral[]" action in including a falsehood in the article was an inappropriate response to Sloane's confidentiality concerns. Compl. ¶ 41. She cannot now plausibly blame this misconduct on any purported breach by The Atlantic.

### C.   <u>The Contract Claims Fail for Additional, Independent Reasons</u>

#### 1.   **Good Faith and Fair Dealing (Claim 6)**

Barrett barely defends her good faith and fair dealing claim. Opp. 41-42. She does not answer—and thus concedes, *e.g.*, *Hopkins*, 238 F. Supp. 2d at 178—two grounds on which Defendants urged dismissal: (1) that she failed to plead facts demonstrating that The Atlantic's editorial judgments constituted the type of misconduct necessary to breach the covenant, Mot. 42; and (2) that she failed to plausibly plead, as required, the deprivation of a particular contractual benefit that caused her asserted damages, Mot. 41-42. These bases alone require dismissal.

Nor does Barrett contest that, to sustain a good faith and fair dealing claim, she must identify a contractual "fruit" to which she was deprived. Opp. 41-42; *see* Mot. 40 (collecting

cases).  Yet the only supposed "fruit[] of the agreement" she identifies is "the prestige of publishing with The Atlantic."  Opp. 42.[13]  But this ignores that the contract nowhere promises Barrett a right to personal "prestige"—let alone binds The Atlantic to defend her "prestige" rather than exercise its editorial judgment to address Barrett's own conceded misconduct.  Barrett's response only confirms that her claim does not "comport with the terms of the parties' contract," as it "must" to advance.  Mot. 40 (citation omitted).  For all of these reasons, she fails to state a claim.

### 2.      Breach of Contract (Claim 7)

As to her express breach claim, Barrett's opposition not only confirms that she principally relies on Section 6(b) of the Author's Agreement, but that she does not contest that the section's plain text imposed requirements on "Ms. Barrett"—*not* The Atlantic.  Opp. 42.  Her claim thus impermissibly depends upon "rewrit[ing]" the contract.  Mot. 43 (citation omitted).  Barrett does not address, let alone refute, the cases Defendants cited that foreclose her claim.  *See* Mot. 43.

There is nothing "ambiguous" or requiring "further factual development" here.  Opp. 42-43.  The agreement simply does not impose a duty on The Atlantic.[14]  Barrett nonetheless insists that imposing a "reciprocal" confidentiality duty on The Atlantic is needed to avoid "absurd results."  Opp. 42.  But her only cited case involved an agreement with facially "unclear" terms. *Am. First Inv. Corp. v. Goland*, 925 F.2d 1518, 1520 (D.C. Cir. 1991).  This does nothing to displace the rule that courts are not "to impose by judicial *fiat* a provision which the parties did not include therein," nor "rewrite the plain terms of the contract."  Mot. 43 (citations omitted). And there is nothing "absurd" here.  The provision clearly protects *The Atlantic* by ensuring that

---

[13] Barrett abandons the litany of additional gripes—regarding, *e.g.*, The Atlantic's communications strategy and investigation—on which the Amended Complaint improperly relies.  *See* Mot. 41.

[14] Nor can Barrett's conclusory assertion that The Atlantic "prevented [her] from honoring her obligations under Section 6(b)" carry her express breach claim.  Opp. 44.  The Atlantic is not suing Barrett for breach of Section 6(b); she is suing The Atlantic.  The point is meritless.

pieces do not infringe the creative or legal rights of others in a way that would expose the magazine to liability.  In any event, any confidentiality interest would be *Sloane's* to assert, not Barrett's. Mot. 43-44.  The opposition's reliance on Sloane's "rights" of "confidentiality" and "privacy," Opp. 42, 44, ignores this fundamental point.

Barrett's defense of her second theory that The Atlantic breached the "commercially reasonable efforts" provision also falls far short.  If anything, her opposition underscores that the Amended Complaint lacks any plausible, well-pleaded factual allegations demonstrating that The Atlantic failed to act in a "commercially reasonable" manner by declining to market an article that it had to retract after its author admitted her complicity in deliberately including a falsehood, leading her to publicly apologize that she "had embarrassed The Atlantic and broken its trust with readers." *See supra* n.8; Mot. 12.  Barrett does not attempt to square her theory with her allegations that the article drew harsh, public criticism of The Atlantic.  Mot. 44 (collecting criticism).  Rather, Barrett posits that there still may have been interest from the "media and entertainment industry" and that she received an "inquiry from a Hollywood production company."  Opp. 44.  These allegations are vague and conclusory unto themselves, and in any event do not come close to pleading why it would have been commercially reasonable for *The Atlantic* to promote the article—when, after all, Barrett herself admits that The Atlantic was within its right to "admonish[]" her for "egregious[]" conduct.  Mot. 44; *supra* p. 22.  Barrett offers no response.

Finally, Barrett fails to meaningfully address the disconnect between the as-pleaded contract claims and the unbounded damages she seeks as to the "impossib[ility] for her to practice her profession."  This failure independently indicts the plausibility of her claims.  Mot. 45.

## **CONCLUSION**

For the foregoing reasons and those explained in Defendants' opening brief, the Amended Complaint should be dismissed with prejudice.

25

Dated: May 11, 2022

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ Stephen J. Fuzesi*
Joseph M. Terry (D.C. Bar No. 473095)
Stephen J. Fuzesi (D.C. Bar. No. 496723)
Whitney D. Hermandorfer
(D.C. Bar. No. 888314222)
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jterry@wc.com
sfuzesi@wc.com
whermandorfer@wc.com

*Attorneys for Defendants The Atlantic*
*Monthly Group LLC and Donald*
*Christopher Peck*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2022, a copy of this Reply Memorandum of Law in Support of Defendants' Motion To Dismiss Amended Complaint was filed via the Court's electronic filing system, and served via that system upon all parties required to be served.


Dated: May 11, 2022                    By:    */s/ Whitney D. Hermandorfer*
                                              Whitney D. Hermandorfer