**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RUTH SHALIT BARRETT,

        *Plaintiff*,

   v.

ATLANTIC MONTHLY GROUP LLC,
*et al.*,

        *Defendants*.

Civil Action No. 22-49 (LLA)

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Ruth Shalit Barrett brings this action against Defendants Atlantic Monthly Group LLC ("*The Atlantic*") and Donald Christopher Peck, Editor-at-Large for *The Atlantic* magazine. Ms. Barrett alleges that *The Atlantic* and Mr. Peck defamed her and portrayed her in a false light when they made statements regarding her professional background and an article she had written for the magazine (Counts One through Five). ECF No. 22-1 ¶¶ 124-72. She further alleges that Defendants breached their contract with her, both the implied covenant of good faith and fair dealing and two specific provisions of the agreement (Counts Six and Seven). *Id.* ¶¶ 173-207. Pending before the court is the Defendants' Motion to Dismiss. ECF No. 23. For the reasons explained below, the court will grant the motion in part and dismiss Counts One, Six, and Seven. The remaining claims survive.

**I.**       **Background**

**A.**      **Factual Background**

The following factual allegations from Ms. Barrett's amended complaint, ECF No. 22-1, and the attachments to her amended complaint, ECF No. 20-2 to 20-9, as modified by ECF

No. 22-2, are accepted as true for the purpose of evaluating the motion before the court. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

## 1.    Ms. Barrett's Professional History

Ms. Barrett began working as a reporter for *The New Republic* magazine in the early 1990s after graduating from Princeton University. ECF No. 22-1 ¶ 58. At that time, she used her maiden name, Ruth Shalit, as her byline. *Id.* Within her first few years on the job, she published many feature-length stories and was hired to write political stories for *The New York Times Magazine* and *GQ*. *Id.*

In 1994 and 1995, Ms. Barrett came under fire for plagiarism in two articles in *The New Republic*. *Id.* ¶¶ 59, 60. First, Ms. Barrett had written a story "in which three sentence of biographical information and a quote" had been taken, without attribution, from a *Legal Times* article. *Id.* ¶ 59. The second article, a profile of Steve Forbes, "contain[ed] 29 words from a *National Journal* article" that were also unattributed to the original author. *Id. The New Republic* published corrections to each article. *Id.* ¶ 60. Ms. Barrett's editors came to her defense, stating that "[t]he 'plagiarism' charges have been dealt with—and apologized for." *Id.* These incidents sparked debate within the media industry "about what does and does not constitute plagiarism." *Id.* ¶ 61. Also in 1995, a factual error was discovered in an article Ms. Barrett had written for *The New Republic* about *The Washington Post*. *Id.* ¶ 64. The error was addressed "using the standard practice of . . . a post-publication correction." *Id.*

Ms. Barrett worked at *The New Republic* for four more years until she departed in 1999. *Id.* ¶ 63. None of Ms. Barrett's articles from 1996-1999 were found to contain factual errors and *The New Republic* did not issue any corrections to her work in this time span. *Id.* ¶ 64.

For the next decade, Ms. Barrett worked in advertising, but also continued with journalism as a freelance writer for several national magazines and online publications. *Id.* ¶ 65. She

published work in outlets including *New York Magazine*, *The Wall Street Journal*, and *ELLE*. *Id.* Ms. Barrett describes herself at this time as "busy" and "thriving." *Id.* In 2004, Ms. Barrett married and took her husband's last name. *Id.* ¶ 66. She accordingly changed her standard byline from "Ruth Shalit" to "Ruth Shalit Barrett" or "Ruth S. Barrett." *Id.* Ms. Barrett maintains a personal website that includes links to articles she has written, some of which include her "Ruth Shalit" byline. *Id.* Ms. Barrett "has never tried to disguise or disassociate herself from the two journalistic lapses . . . from her early 20s." *Id.*

### 2. Writing and Editing of an Article Published in *The Atlantic*

In late 2019, *The Atlantic* hired Ms. Barrett to write a long-form investigative article detailing the "efforts of affluent parents to use niche sports to give their already-privileged children further advantages in the competitive admissions process at elite colleges and universities." ECF No. 22-1 ¶¶ 1-3. The eventual article, titled "The Mad, Mad World of Niche Sports Among Ivy League-Obsessed Parents" sparked the controversy that led to this lawsuit. *Id.* ¶ 1.

Ms. Barrett researched the story using a mix of empirical data and interviews with sources. *Id.* ¶ 3. She relied on one "important confidential source: a Fairfield County sports mom identified in the Article and herein as Sloane." *Id.* Sloane participated in Ms. Barrett's reporting on the condition that she remain anonymous and that *The Atlantic* mask her identity such that neither she nor her family could be identified. *Id.* Ms. Barrett agreed to these terms, which were memorialized in a contract. *Id.* ¶ 68. Ms. Barrett's editors at the magazine, including Mr. Peck, agreed to maintain Sloane's anonymity. *Id.* ¶ 6.

Ms. Barrett sent her first draft of the story to her editor at the beginning of July 2020. *Id.* ¶ 1 n.1, 69. Around that time, fact-checkers started reaching out to Sloane to verify the information in the article. *Id.* Sloane grew concerned that the article "was including too many specific details about her family" and would reveal her identity. *Id.* ¶¶ 7, 9, 26. Ms. Barrett relayed those concerns

to her editor and requested that the magazine "remove or blur certain details in order to protect Sloane." *Id.* ¶¶ 7, 69.  The editor agreed to some "minor changes" that did not alleviate Sloane's or Ms. Barrett's concerns, and the editor "push[ed] Ms. Barrett to persuade Sloane to go 'on the record' as a named source.'" *Id.* ¶ 71, *see id.* ¶¶ 7, 69.

Sloane "became increasingly concerned" about what she thought was an "excessive level of detail" in the article, including the article's description of her as a mother of three daughters. *Id.* ¶ 26.  In late August, Sloane texted Ms. Barrett asking her to remove the fact about her three children.  *Id.*  During phone calls around this same time, "Sloane and her husband told Ms. Barrett that they wanted the Article to say that they had a fourth child (a fictitious son) in order to give themselves some deniability." *Id.* ¶ 73, *see id.* ¶ 27.  Ms. Barrett "responded that she was not going to interrogate Sloane about the way that she chose to describe her own household; but that the Article was now getting perilously close to publication, and she had to decide how she was going to describe her family and stick to that description." *Id.* ¶ 27.  While Ms. Barrett shared Sloane's concern about the article including too many identifiable details, she wrote to Sloane that she (Ms. Barrett) "could not knowingly provide *The Atlantic*'s fact-checker with false information." *Id.* ¶¶ 28, 75.

In an effort to protect Sloane's identity, Ms. Barrett approached *The Atlantic* about including a brief disclaimer on the article "stating that minor identifying details about Sloane had been changed to preserve her confidentiality and protect her children's privacy," which would have allowed the magazine "to include a few masking details in the Article that would have assuaged Sloane's concerns while also preempting any accusation of misleading readers." *Id.* ¶ 74; *see id.* ¶ 29.  *The Atlantic* declined to adopt this approach.  *Id.* ¶¶ 29, 74.  At some point, Sloane told the fact-checker that she had a fourth child, a son, and reference to him was added to the

article.  *Id.* ¶ 29, 75.  Ms. Barrett "was aware of the inclusion of this masking detail" and believed that it "was fully justified" in light of Sloane's concerns about identification.  *Id.* ¶ 75.

At some point prior to publication, *The Atlantic* affixed a byline identifying the author as "Ruth Barrett."  *Id.* ¶ 118.  Ms. Barrett asked that her middle initial be included so that the byline read "Ruth S. Barrett."  *Id.*  She also asked her editor to include a link to her website on the online version of the article.  *Id.*

### 3.    Subsequent Controversy

*The Atlantic* published the article online on October 17, 2020 to much attention.  *Id.* ¶ 32, 77.[1]  A few days later, Erik Wemple, the media critic for *The Washington Post*, contacted Ms. Barrett seeking information related to the article.  *Id.* ¶ 78.  She declined on the advice of her editor.  *Id.*  Mr. Wemple separately reached out to *The Atlantic*'s Vice President of Communication to inquire why the magazine had chosen to work with Ms. Barrett on the project.  *Id.* ¶ 79.  *The Atlantic* initially defended the article and Ms. Barrett, *id.* ¶¶ 79-80, but an editor told Ms. Barrett that the magazine had been "caught off guard and deflated" by Mr. Wemple's inquiries, *id.* ¶ 82.

Mr. Wemple asked *The Atlantic* about facts in the article, specifically about a neck injury one of Sloane's daughters had sustained at a fencing tournament.  *Id.* ¶¶ 82.  *The Atlantic* "began to hound Sloane with phone and email requests" to corroborate the injury.  *Id.*  Ms. Barrett was "taken aback" by Mr. Wemple's actions seeking to uncover information about Sloane, and she was further surprised that *The Atlantic* had chosen to cooperate with his efforts.  *Id.* ¶ 83.  She repeatedly asked the magazine to confirm that it would not disclose Sloane's real name, but it would not give her this assurance.  *Id.* ¶ 84.

---

[1] The article also appeared in *The Atlantic*'s November 2020 edition.  ECF No. 22-2, at 7.

Mr. Wemple eventually discovered Sloane's identity and contacted her directly, "explaining that he believed that she was the anonymous mom featured in *The Atlantic* article." *Id.* ¶ 35.  He subsequently sent *The Atlantic* a list of disputed items from the story, most importantly a claim that he had "found the 'real' Sloane" and she only had "three children, not four." *Id.* ¶ 35, 85.  The magazine's editors contacted Sloane repeatedly by text, phone, and email seeking an answer about the exact composition of her family. *Id.* ¶ 86.  Mr. Wemple continued to reach out to Ms. Barrett about the article, but Ms. Barrett, again following the directive of *The Atlantic*, continually declined to speak with him. *Id.* ¶ 87.

On October 29, Mr. Peck emailed Ms. Barrett asking her to join a Zoom call later that day. *Id.* ¶ 88.  On the call, Mr. Peck and another editor told Ms. Barrett about a letter they had received from Sloane's attorney, which stated that Sloane "did not have a son, that the inclusion of the 'son' was Ms. Barrett's idea, that Ms. Barrett had pressured Sloane into going along with the idea of the 'son' and had coerced her into lying to the fact-checker, and that the Article was false in certain respects." *Id.*  The letter raised other alleged inaccuracies—for example, Sloane now denied a fact included in the article about how the family had "set up an indoor fencing strip in their basement." *Id.* ¶ 91.

Ms. Barrett denied the claims in the letter. *Id.* ¶ 89.  She told Mr. Peck that the idea for the fourth child had originated with Sloane due to her fear of being identified, and that she had "nothing to gain from such an invention, whereas Sloane clearly did." *Id.*  Ms. Barrett also refuted Sloane's denial about the basement fencing strip and shared "a voice recording in which Sloane described [it]." *Id.* ¶ 91.

## 4.        The Allegedly Defamatory Statements[2]

The day after the Zoom meeting, Mr. Peck informed Ms. Barrett that he intended to issue an Editor's Note related to the article.  *Id.* ¶ 97.  Ms. Barrett was worried that he was going to reveal Sloane's identity and claim that Sloane was an unreliable source.  *Id.*  She thus admitted to Mr. Peck that she had known that Sloane did not have a son in an effort to encourage Mr. Peck to "lessen the severity of [his] criticism of Sloane."  *Id.*  Later that evening, *The Atlantic* published the First Editor's Note to its website.  *Id.* ¶ 98.  The note began:

> [N]ew information emerged that has raised serious concerns about [the article's] accuracy, and about the credibility of the author, Ruth Shalit Barrett.
>
> **We have established that Barrett deceived The Atlantic and its readers about a section of the story that concerns a person referred to as "Sloane."**  We are sharing with our readers what we have learned so far.
>
> The original version of this article stated that Sloane has a son.  Before publication, Sloane confirmed this detail to be true to The Atlantic's fact-checking department.  After publication, when a Washington Post media critic asked us about the accuracy of portions of the article, our fact-checking department reached out to Sloane to recheck certain details.  Through her attorney, Sloane informed us that she does not, in fact, have a son.  We have independently corroborated that Sloane does not have a son, and we have corrected the story to remove the reference to her having a son.
>
> In explaining Sloane's reasoning for telling our fact-checker she had a son, Sloane's attorney told The Atlantic that she wanted to make herself less readily identifiable.  **Her attorney also said that according to Sloane, Barrett had first proposed the invention of a son, and encouraged Sloane to deceive The Atlantic as a way to protect her anonymity.**
>
> When we asked Barrett about these allegations, she initially denied them, saying that Sloane had told her she had a son, and that she had believed Sloane.  The next day, when we questioned her again, she admitted that she was "complicit" in "compounding the deception" and that "it would not be fair to Sloane" to blame her alone for

---

[2] The allegedly defamatory statements are indicated in bold typeface.

> deceiving The Atlantic.  Barrett denies that the invention of a son
> was her idea, and denies advising Sloane to mislead The Atlantic's
> factcheckers, but told us that "on some level I did know that it was
> BS" and "I do take responsibility."

ECF No. 22-2, at 2.  The note goes on to explain that the magazine was continuing to recheck the

facts in the article and provides clarification about several details: the severity of an injury suffered

by Sloane's daughter; the location of another family mentioned in the article; and the size of

hockey rinks mentioned in the story.  *Id.* at 2-3.

The First Editor's Note also addressed Ms. Barrett's byline.  In relevant part, it reads

> **Originally, we referred to [the writer] as Ruth S. Barrett.  When
> writing recently for other magazines, Barrett was identified by
> her full name, Ruth Shalit Barrett.** (Barrett is her married name.)
> **In 1999, when she was known by Ruth Shalit, she left The New
> Republic, where she was an associate editor, after plagiarism
> and inaccurate reporting were discovered in her work.  We
> typically defer to authors on how their byline appears**—some
> authors use middle initials, for example, or shorter versions of their
> given name.  **We referred to Barrett as Ruth S. Barrett at her
> request, but in the interest of transparency, we should have
> included the name that she used as her byline in the 1990s, when
> the plagiarism incidents occurred.  We have changed the byline
> on this article to Ruth Shalit Barrett.**
>
> **We decided to assign Barrett this freelance story in part because
> more than two decades separated her from her journalistic
> malpractice at The New Republic and because in recent years
> her work has appeared in reputable magazines.  We took into
> consideration the argument that Barrett deserved a second
> chance to write feature stories such as this one.  We were wrong
> to make this assignment, however.  It reflects poor judgment on
> our part, and we regret our decision.**

*Id.* at 3.  The note concludes by stating that the magazine was continuing to review the article and

would provide updates as needed.  *Id.*

Around the same time *The Atlantic* published the First Editor's Note, Mr. Peck distributed

an internal memorandum (the "Peck Memorandum") to the magazine's editorial staff.  In it,

Mr. Peck attached the Editor's Note and explained:

8

New information establishes that **Barrett was complicit with a source in the story, referred to as "Sloane," in an effort to deceive The Atlantic and its readers about the makeup of Sloane's family**.  The article originally included a reference to a son of Sloane's, but this was a fabrication to make Sloane less identifiable, because she was concerned about maintaining anonymity.  Both **Barrett and Sloane lied about this to the fact-checking department.**

We became concerned about certain details of the story last week and have been rechecking it; **we just confirmed Barrett's role in the fabrication of the son** this afternoon.

It is crucial for us to understand fully the scope of deceptions and errors in the article, and we are still working toward that goal.  In addition to the lie about the son, we have so far identified and corrected a number of smaller errors.  We ask for your patience and discretion as we continue our investigation.

I want to assure you that, in the coming days, we will examine all of the processes involved in the assignment and publication of the article, and work to reform them so that this doesn't happen again.

There is no doubt, however, that our choice of writer played the largest role.  **In 1999, when Barrett (her married name) was known by Ruth Shalit, she left The New Republic, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work.**

As we state in our editor's note, **we decided to assign Barrett this freelance story in part because more than two decades separated her from her journalistic malpractice, and because she had been published in recent years in reputable magazines.  But this was self-evidently an act of poor judgment on our part, and one we regret: The assignment was a mistake.**

**So was the initial byline under which the piece ran.  We typically defer to authors on how their byline appears, and originally we referred to Barrett as Ruth S. Barrett at her request.  In the interest of transparency to our readers, we should have included the name that she used in her byline in the 1990s.  We have changed the byline on this article to Ruth Shalit Barrett.**

*Id.* at 6-7.

*The Atlantic* issued two more versions of the Editor's Note.  *Id.* at 4-5, 7-8.  The Second Editor's Note, published online two days after the first, explained that the magazine was retracting the article because it could not "**attest to the trustworthiness and credibility of the author, and therefore [could not] attest to the veracity of the article**."  *Id.* at 4.  It repeated much of the information from the First Editor's Note and concluded by stating that "we now know that **[Ms. Barrett] misled our fact-checkers, lied to our editors, and is accused of inducing at least one source to lie to our fact-checking department**."  *Id.* at 5.

The Third Editor's Note was published in *The Atlantic*'s January/February 2021 print edition.  ECF No. 22-1 ¶ 104.  The note contains much of the same language as the previous two notes, including that the article was retracted due to concerns about "**the trustworthiness and credibility of**" Ms. Barrett, that Ms. Barrett proposed the addition of Sloane's fictitious son, the explanation of her byline, and that she "**misled . . . fact-checkers, lied to . . . editors, and is accused of inducing a source to lie to our fact-checking department**."  ECF No. 22-2, at 7-8.

## B.  Procedural Background

Ms. Barrett brought this action against *The Atlantic* and Mr. Peck in January 2022, alleging defamation, invasion of privacy, and breach of contract.  ECF No. 1.  Defendants filed a motion to dismiss the complaint, and Ms. Barrett subsequently amended her complaint.  ECF Nos. 15, 20.  Defendants filed a new motion to dismiss, which contains several references to news articles about Ms. Barrett and includes two exhibits: an email sent by Ms. Barrett to Mr. Peck around the time he was drafting the First Editor's Note and a 1996 article from the magazine *George* about Ms. Barrett, titled "The Truth About Ruth."  ECF Nos. 23, 23-2, 23-3.  Ms. Barrett objects to Defendants' references to news articles and inclusion of the *George* article as an exhibit.  ECF No. 24, at 7-9.  After the matter was fully briefed, ECF Nos. 23, 24, 27, it was reassigned to the

undersigned, who provided the parties an opportunity to supplement their briefs.  Jan. 10, 2024 Minute Order; ECF Nos. 34-36.

## II.   Legal Standards

To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that are more than "'merely consistent with' a defendant's liability" and that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 557); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires 'more than a sheer possibility that a defendant has acted unlawfully.'" (quoting *Iqbal*, 556 U.S. at 678)).  "A complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'"  *Banneker Ventures*, 798 F.3d at 1129 (alterations in original) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

When ruling on a motion to dismiss, the court may only consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (alteration in original) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).  "If the district court considers other facts, it must convert the motion to dismiss into a motion for summary judgment and 'provide the parties with notice and an opportunity to present evidence in support of their respective positions.'"  *Id.* (quoting *Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011)).  "The decision to convert a motion to dismiss

into a motion for summary [judgment] . . . is committed to the sound discretion of the trial court." *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 50 (D.D.C. 2006).

This court is exercising diversity jurisdiction and accordingly applies District of Columbia law. *See Metz v. BAE Sys. Tech. Sols. & Servs. Inc.*, 774 F.3d 18, 21-22 (D.C. Cir. 2014). The District of Columbia has not adopted a heightened pleading standard for defamation claims; instead, the court must determine whether "the factual allegations in the [plaintiff's] complaint are sufficient to permit the opposing party to form responsive pleadings." *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76-77 (D.C. 2005)).

## III.    Discussion

The court begins by addressing whether it may consider the materials referenced in and attached to Defendants' motion to dismiss. ECF Nos. 23-2, 23-3. It then addresses whether Ms. Barrett's claims for defamation, invasion of privacy, and breach of contract can survive Defendants' motion to dismiss.

### A.    References and Exhibits Attached to Defendants' Motion

The court will address the motion's references to news articles and the second exhibit, which is a specific news article, together. Ms. Barrett contends that the court should not take judicial notice of these materials because, while "Ms. Barrett does not dispute that the cited articles were published, . . . she *does* dispute the inflammatory claims about her character portrayed by Defendants' selective quotation of them." ECF No. 24, at 8. Defendants counter that the court may take notice of news articles in determining whether Ms. Barrett is a public figure—an important question that affects the defamation analysis. ECF No. 27, at 3; *see Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140-42 (D.D.C. 2017).

The court concludes that it can take judicial notice of news articles for the "existence or nature of the articles"—and may do so without converting the motion to one for summary

12

judgment—but it may not consider the articles for the truth of their assertions.  *Fridman v. Bean LLC*, No. 17-CV-2041, 2019 WL 231751, at *5 n.1 (D.D.C. Jan. 15, 2019); *see Shive-Ayala v. Pacelle*, No. 21-CV-704, 2022 WL 782412, at *2 n.1 (D.D.C. Mar. 15, 2022) (taking judicial notice of news articles without converting the motion to dismiss into a motion for summary judgment); *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 132 n.1 (D.D.C. 2016) ("The Court takes judicial notice of the articles not for their truth but merely for the fact that they were published.").  Neither party disputes that these articles were published, and news articles are a classic subject of judicial notice.  *Wash. Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991).  But, as with all judicially noticed materials, it would not be proper to accept the assertions in the articles for the truth of the matter asserted.  *See, e.g.*, *Hurd*, 864 F.3d at 687 ("[A] court cannot take judicial notice of the truth of a document simply because someone put it in the court's files." (alteration in original) (quoting 21B Charles Allen Wright, et al., *Federal Practice and Procedure* § 5106.4 (2d ed. 2017))); *Masek v. United States*, No. 22-3574, 2024 WL 1240093, at *7 (D.D.C. Mar. 22, 2024) (taking judicial notice of publicly filed pleadings but not "consider[ing] the factual matters within the pleadings as true").  Accordingly, the court will take judicial notice of the articles as demonstrating the existence of news coverage related to *The New Republic* controversy in the 1990s—a fact that Ms. Barrett openly alleges in the complaint, ECF No. 22-1 ¶¶ 58-64— but not for the truth of any statements contained in the articles.

The other exhibit is a series of emails between Ms. Barrett and Mr. Peck concerning Sloane and the article in the run-up to the First Editor's Note.  ECF No. 23-2.  Defendants argue that the email chain has been incorporated by reference into Ms. Barrett's amended complaint because she paraphrases the emails at various points in her complaint.  ECF No. 27, at 4 (citing ECF No. 22-1, ¶¶ 44, 97).  Ms. Barrett contends that she was only referring to the email to "establish the timeline

of events in question," such that incorporation by reference is not appropriate.  ECF No. 24, at 16.

The court concludes that it can consider the email chain.   "Incorporation by reference

can . . . amplify pleadings where the document is not attached by the plaintiff, but is 'referred to

in the complaint and [] integral to [the plaintiff's] claim.'"  *Banneker Ventures*, 798 F.3d at 1133

(alterations in original) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)).

Ms. Barrett paraphrased the email chain in her complaint, alleging that "[s]he informed Mr. Peck

that she had known that Sloane had only three children" and that "her sole motive [in doing so]

was to protect Sloane."  ECF No. 22-1 ¶ 44; *see id.* ¶ 97 (similar).  What Mr. Peck knew about

Ms. Barrett's involvement in the fabrication of Sloane's son is directly relevant to whether his

subsequent statements in the Editor's Notes gives rise to claims for defamation.  The emails are

thus "integral" to several of Ms. Barrett's claims and the court may consider them.

### B.      Defamation Claims

Ms. Barrett raises four claims of defamation per se based on the following groups of

statements: (1) accusations that she acted dishonestly with respect to the article; (2) accusations

that she was fired from *The New Republic* in 1999 for misconduct; (3) statements alleging that she

tried to disguise her identity by using "Ruth S. Barrett" in her byline; and (4) statements that she

is a dishonest journalist with a history of fabricating facts.  ECF No. 22-1 ¶¶ 124-67.  Under

District of Columbia law

> [T]o state a claim of defamation, 'plaintiff must allege and prove
> four elements: (1) that the defendant made a false and defamatory
> statement concerning the plaintiff; (2) that the defendant published
> the statement without privilege to a third party; (3) that the
> defendant's fault in publishing the statement amounted to at least
> negligence; and (4) either that the statement was actionable as a
> matter of law irrespective of special harm or that its publication
> caused the plaintiff special harm.

*Solers, Inc.*, 977 A.2d at 948 (quoting *Oparaugo*, 884 A.2d at 76).  The third element, fault, depends on whether the plaintiff is a public figure, subject to the heightened actual malice standard of proof, or is instead a private individual, subject to the lower negligence standard.  *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 n.33 (D.C. 2016).

For "a challenged statement to be actionable as defamation, 'it must at a minimum express or imply a verifiably false fact'" about the plaintiff.  *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 276 (D.D.C. 2017) (quoting *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001)).  That is because First Amendment protection attaches to statements "that cannot reasonably be interpreted as stating actual facts about an individual" in an effort to ensure "that public debate [does] not suffer."  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (quoting *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988)).  Truthful statements are not actionable, *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994), and "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (quoting *Heuer v. Kee*, 59 P.2d 1063, 1064 (Cal. Ct. App. 1936)).  In other words, a "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'"  *Id.* (quoting R. Sack, *Libel, Slander, and Related Problems* 138 (1980)).

A defamation claim can be sustained either by express words or by the implication of the defendant's statements.  *White v. Fraternal Ord. of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990).  A defamation-by-implication claim must demonstrate that, viewed in its entire context, the statement was capable of defamatory meaning, and that it implied provably false statements of fact.  *Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 586 (D.C. 2022).  "[I]t is not enough that a statement can 'be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the

author intends or endorses that that inference.'"  *Id.* (quoting *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000)).  The tort also requires that the statement have some negative effect, in that it "tends to injure the plaintiff in [her] trade, profession or community standing, or to lower him in the estimation of the community."  *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013).

Defendants argue that Ms. Barrett's complaint is defective because their statements are not "false and defamatory."  ECF No. 23, at 13.  They further argue that Ms. Barrett is a public figure—which would require her to meet the heightened "actual malice" standard—and that she failed to meet this bar.  ECF No. 23, at 13; *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  The court concludes that Ms. Barrett has failed to state a claim with respect to Count One, but that Counts Two through Four may proceed.  Additionally, based on the record currently before the court, the court concludes that Ms. Barrett is not a public figure subject to the actual malice pleading standard.

### 1.    Whether the Statements are "False and Defamatory"

#### a.    Count One: Accusations that Ms. Barrett acted dishonestly with respect to the article

Ms. Barrett's first claim alleges defamation per se with respect to the following statements made in the Editor's Notes and the Peck Memorandum, specifically, that

- Ms. Barrett "was complicit with a source in the story . . . in an effort to deceive *The Atlantic* and its readers about the makeup of Sloane's family;" that her "fabrication" had been "confirmed," and that it was "established" that Ms. Barrett "deceived *The Atlantic* and its readers," ECF No. 22-1 ¶¶ 125(a); 125(c), 126(a), 127(b), 128(b);

- Ms. Barrett "lied" to and "misled" the fact-checking department and editors and was "accused of inducing at least one source to lie to our fact-checking department," *id.* ¶¶ 125(b), 127(d), 128(d);

- Sloane's attorney said "[Ms.] Barrett had first proposed the invention of a son, and encouraged Sloane to deceive *The Atlantic* as a way to protect her anonymity," *id.* ¶¶ 126(b), 127(c), 128(c); and

- "We have decided to retract this article.  We cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the article," *id.* ¶¶ 127(a), 128(a).

Defendants argue that none of these statements are actionable because the first three are true based on the facts alleged in the complaint and the fourth is a protected statement of opinion.  ECF No. 23, at 16-22.  The court agrees and addresses each group of statements in turn.

Ms. Barrett makes clear in her complaint that she knew before the article's publication that Sloane did not have a son.  ECF No. 22-1 ¶ 8.  Ms. Barrett further alleges that she had pitched magazine editors about including such a masking detail, but they declined, *id.* ¶¶ 73-75; that she knew that Sloane planned to tell fact-checkers this fictitious detail and supported it, *id.* ¶ 8; and that, after the fabrication about Sloane's son was added, she was "aware of the inclusion" and believed it to be "fully justified," *id.* ¶ 75.  This course of events is fully consistent with Defendants' description of Ms. Barrett as "complicit with a source in the story . . . in an effort to deceive *The Atlantic* and its readers about the makeup of Sloane's family" and related statements. *Id.* ¶ 125(a); *see* 125(c), 126(a), 127(b), 128(b).  The "gist" of the statement is that Ms. Barrett allowed incorrect information about Sloane's family into the article—and that is substantially true. *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296 (D.C. Cir. 1988) (explaining that "slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance").  To be "complicit" is to be "involved knowingly or with passive compliance," and to "deceive" is to "cause to believe what is false; to mislead as to a matter of fact."  *Complicit*, *Deceive*, Oxford English Dictionary (2024).  Thus, the substance of Defendants' statements is that Ms. Barrett allowed a false fact to enter the story, seeking to cause the magazine and its readers to

believe a falsity about the composition of Sloane's family.   That is entirely consistent with Ms. Barrett's own allegations in the complaint.

The same is true for Defendants' statements that Ms. Barrett "lied" to and "misled" the fact-checking department and editors and had been "accused of inducing at least one source to lie to our fact-checking department."  ECF No. 22-1 ¶¶ 125(b), 127(d), 128(d).  The "gist" of this statement is materially true—Ms. Barrett alleges in her complaint that she "knew that this trivial detail about the 'son' was erroneous" but "fail[ed] to disclose it to The Atlantic."  *Id.* ¶ 75; *see id.* ¶ 29 ("In her heart, [Ms. Barrett] knew that Sloane did not have a son but she considered the addition of this trivial masking detail to be justified.").  As to the accusation of "inducing at least one source to lie to [the] fact-checking department," *id.* ¶ 127, that was true as well: Ms. Barrett alleges in her complaint that Sloane's attorney *had* accused her of "pressur[ing] Sloane into going along with the idea of the 'son' and . . . coerc[ing] her into lying to the fact-checker," *id.* ¶ 88.  Defendants' statements "would [not] have [produced] a different effect on the mind of the reader [than] that which the pleaded truth would have produced."  *Masson*, 501 U.S. at 517 (quoting R. Sack, *Libel, Slander, and Related Problems* 138 (1980)).

Ms. Barrett takes issue with the fact that *The Atlantic* did not qualify its statements with her motive to protect Sloane's identity, arguing that this omission suggests that she was acting in "bad faith."  ECF No. 24, at 11-13.  She suggests that a juror presented with these facts could choose between "two pictures: one of an insidious scammer out to deceive the world for no good reason . . . and one of a meticulous writer forced to make an impossible choice between absolute accuracy and . . . confidentiality . . . to sources."  *Id.* at 12-13.  But, as Defendants note, the alleged defamatory statements do not omit this information.  ECF No. 27, at 6.  In his Memorandum, Mr. Peck states that the reference to a son was added "to make Sloane less identifiable, because

she was concerned about maintaining anonymity." ECF No. 22-2, at 6. The same is true of the Editor's Notes. *Id.* at 2 (stating that the son was included "as a way to protect [Sloane's anonymity]"), 4 (same), 7 (same). No matter how noble Ms. Barrett's motives may have been, it does not change that fact that Defendants' description accurately states the events that transpired.

Ms. Barrett also argues that the phrase "at least one" suggests the existence of multiple accusers and that the Third Editor's Note change of language from "at least one source" to "one source" suggests that Defendants were aware of the falsity and walked it back. ECF No. 24, at 16-17. But this is the type of "slight inaccurac[y] of expression" that is not actionable because the substance as a whole is accurate. *Liberty Lobby, Inc.*, 838 F.2d at 1296. At most, the phrase "at least one" suggests a "lack of definitive knowledge about the issue," comparable to a question, which is rarely a successful basis for a defamation claim. *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015) (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995)).

Regarding Sloane's attorney's statements to *The Atlantic*, Ms. Barrett establishes in her complaint that Sloane's attorney did in fact send a letter to Defendants "contend[ing] that [Sloane] did not have a son, that the 'son' had been forced on her by Ms. Barrett" and that Ms. Barrett "bullied" Sloane "into lying to the fact-checker." ECF No. 22-1 ¶ 39. Thus, *The Atlantic*'s statement that the attorney said these things is factually true, but that does not end the inquiry. That is because "[c]ontext is critical" to a defamation claim. *Farah*, 736 F.3d at 535. Repetition of a third-party's false statement can be defamatory when, considered in context, the repetition suggests an endorsement or adoption of the statement. *Zimmerman*, 246 F. Supp. 3d at 277-78. Such was the case in *Zimmerman*, when a documentary film detailing the use of steroids in professional sports "weave[d] [a source's] statements into a broader narrative about doping in

sports." *Id.* at 277.  The film went beyond "merely reporting that [the source] made certain allegations; rather, it provide[d] contextual clues"—like statements assuring viewers that reporters had fact-checked the source's claims—"that could lead a reasonable viewer to believe that [the source] is credentialed and trustworthy, and that his statements . . . are true." *Id.* at 277.  On the other end of the spectrum, in *Abbas*, the court held that a journalist's repetition of what "several Palestinians" had told him was not defamatory because it alleged no facts—the context made clear that the statement was "merely the latest in an ongoing exchange of charge and countercharge" and did not take any position on the truth or falsity of the assertions.  975 F. Supp. 2d 1, 18-19 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015).

The circumstances here are closer to those in *Abbas* than in *Zimmerman*.  Every time Defendants repeated Sloane's attorney's statement, they also stated that Ms. Barrett had denied the allegations.  ECF No. 22-2, at 2, 4, 7.  This makes clear to any reader that there was an "exchange of charge and countercharge" between Sloane's attorney's statement to *The Atlantic* and Ms. Barrett's response.  *Abbas*, 975 F. Supp. 2d at 19.  To be sure, the context of the statement within the Editor's Notes suggests that Defendants were taking the allegation seriously.  But that is not enough to rise to the level of endorsement.  *See Zimmerman*, 246 F. Supp. 3d at 279.

Finally, Defendants argue that their statement in the Second and Third Editor's Notes that "[w]e have decided to retract this article [because w]e cannot attest to the trustworthiness and credibility of the author, and therefore we cannot attest to the veracity of the article" is not actionable because it is protected opinion.  ECF No. 23, at 20-22; ECF No. 27, at 9-11.  The court agrees.  The D.C. Circuit has explained that

> when a writer gives a statement of opinion that is based upon true facts that are revealed to readers or which are already known to readers, such opinions generally are not actionable so long as the opinion does not otherwise imply unstated defamatory facts.

> Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.  Thus, the statement "In my opinion Jones is a liar because he cheats on his taxes" would not be actionable if Jones had in fact recently been convicted of tax evasion, so long as the statement did not imply additional, unstated bases for calling Jones a liar.  While it might be wholly unreasonable to attack Jones' veracity on the basis of his tax returns, a reader would be free to make his or her own assessment of the facts presented.

*Farah*, 736 F.3d at 539 (quoting *Moldea*, 15 F.3d at 1144-45).

The statements here are protected opinions.  *The Atlantic* provided its opinion that the article was "based upon true facts" to readers throughout the Editor's Notes.  *Id.* (emphasis omitted).  The notes explained the fact-checking process, clarified minor errors in the piece, and provided the sequence of events related to the fabrication of the son and its discovery.  ECF No. 22-2.  Ms. Barrett may disagree with the conclusion that *The Atlantic* could not "attest" to her "trustworthiness and credibility," but it was a reasonable inference for Defendants to have drawn from the facts as established in the Editor's Notes.  *Farah*, 736 F.3d at 539.  Additionally, there are no implied defamatory facts in the statement, because all the supporting facts related to the retraction of the article are both substantially true and explicitly stated in the Editor's Notes.  "A reasonable reader would understand [Defendants'] statements to be expressions of [their] own opinion" because they do not contain factual assertions.  *Id.* at 540.  Because Defendants' subjective opinion cannot be proven true or false, it is not contextually defamatory.  *Id.*  The statement is comparable to "it is my opinion that Jones is a liar because he cheats on his taxes"— essentially, Defendants state "it is our opinion that Ms. Barrett is not credible because she allowed a falsehood to enter the article and she is accused of further wrongdoing by Sloane's attorney."  The statements are thus protected opinion and not actionable as defamation.

21

For these reasons, there is no defamatory meaning in the statements related to Ms. Barrett's conduct with respect to the article.  Count One will be dismissed.

**b.      Count Two: Accusations that Ms. Barrett was fired from *The New Republic* in 1999 for misconduct**

Ms. Barrett's second count alleges defamation per se with respect to the following statement made in each Editor's Note and the Peck Memorandum:

> In 1999, when Barrett (her married name) was known by Ruth Shalit, she left *The New Republic*, where she was an associate editor, after plagiarism and inaccurate reporting were discovered in her work.

ECF No. 22-1  ¶¶ 136-38.   Defendants again argue that these statements are technically and substantially true.  ECF No. 23, at 22-24.  This time, however, the argument fails because it ignores the most likely interpretation of the statement by readers and the context of the speech overall.  *See Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (explaining that a defamatory statement "must be taken as a whole, and in the sense in which it would be understood by readers to whom it was addressed").

Defendants are correct that it is literally true as a matter of timing that Ms. Barrett left *The New Republic* after the controversy surrounding her work (several years after, in fact)—but that literal truth is a strained reading of the statement in its full context.  A defamation-by-implication claim lies where a statement, viewed in context, is capable of defamatory meaning and implies provably false statements of fact.  *Fells*, 281 A.3d at 586.  The court considers "both the words themselves and the entire context in which the statement occurs."  *Zimmerman*, 246 F. Supp. 3d at 276 (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987)).  In *Fells*, the D.C. Court of Appeals recognized a defamation-by-implication claim based on a statement that the plaintiff had been terminated after an investigation into sexual misconduct "triggered by allegations that another recently ousted executive . . . was having inappropriate sexual relationships with

22

subordinates." 281 A.3d at 586. While the plaintiff had not been terminated for sexual misconduct, the defendant stated that the investigation had "brought to light the serious problems related to [the plaintiff's] abusive behavior towards staff, predominantly female staff." 281 A.3d at 586 (emphasis omitted). The court held that, although the defendant had not explicitly stated that the plaintiff was terminated for sexual misconduct, the defendant's reference to the other executive's departure and the plaintiff's abuse "towards . . . predominantly female staff" heavily implied that the plaintiff's termination was related to sexual misconduct. *Id.* (emphasis omitted).

The statement that Ms. Barrett left *The New Republic* "after plagiarism and inaccurate reporting were discovered in her work" similarly implies a causal relationship between her departure and the alleged infractions. That meaning is further underscored by the statement's placement alongside allegations that Ms. Barrett had been an inappropriate choice to write the story and that her assignment to the story was "a second chance." ECF No. 22-2, at 3, 5-6, 8. Like the mention of the sexual misconduct investigation and abuse toward women in *Fells*, use of the phrase "second chance" strongly suggests that Ms. Barrett had been driven out of the industry due to her past failings and had yet to receive another chance. This is especially the case considering the court's obligation to draw all inferences in Ms. Barrett's favor at this stage in the proceedings. *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023).

Defendants point to Ms. Barrett's concessions that she had been accused of plagiarism and other journalistic malfeasance during her tenure at *The New Republic*. ECF No. 23, at 22-23. But that is beside the point—the defamation claim rests on the implication that she was pushed out of

her job *because of* these incidents, not that they did not occur.[3]  Because the "gist" and "sting" of the statements addressed in Count Two are capable of defamatory meaning, they survive the motion to dismiss.  *Liberty Lobby, Inc.*, 838 F.2d at 1296.

      **c.**    **Count Three: Statements related to Ms. Barrett's byline**

Ms. Barrett's third claim alleges defamation per se with respect to the following statement, made with slight variation in all three Editor's Notes and the Peck Memorandum:

> The assignment [to Ms. Barrett] was a mistake.  So was the initial byline under which the piece ran.  We typically defer to authors on how their byline appears, and originally we referred to Barrett as Ruth S. Barrett at her request.  In the interest of transparency to our readers, we should have included the name that she used in her byline in the 1990s.  We have changed the byline on this article to Ruth Shalit Barrett.

ECF No. 22-1 ¶¶ 145-4 (alteration in original).  Ms. Barrett further points to an additional statement by an editor at *The Atlantic*—later included in a *Washington Post* article—that Ms. Barrett "was hoping to disguise her name in her byline to prevent people from realizing that she had once written articles under her maiden name of Ruth Shalit." *Id.* ¶ 148.  Defendants argue that these statements are truthful and that the assertion "we should have included the name that she

---

[3] Defendants point to statements in Ms. Barrett's initial complaint, ECF No. 1, detailing her departure from the magazine, ECF No. 23, at 23.  Ms. Barrett initially clarified that in 1998, another writer for *The New Republic* was embroiled in a high-profile scandal that revealed he had fabricated a large number of articles for the outlet.  ECF No. 1 ¶ 63.  When this scandal received media attention, Ms. Barrett was referenced in the coverage. *Id.* ¶ 64.  Ms. Barrett decided to leave *The New Republic* after learning that "her continued employment at the magazine was exacerbating the negative publicity" related to Mr. Glass. *Id.* ¶ 65.  Defendants reference these statements from her earlier complaint in an effort to establish, as a matter of fact, why Ms. Barrett left *The New Republic*.  The court will not consider these details from the original complaint because once amendment occurred, "the original pleading no longer performs any function in the case."  6 Charles Allen Wright et al., *Federal Practice and Procedure* § 1476 (3d ed. 2024).  Further, even if the court accepted this set of facts as true, they do not contradict the amended complaint or the analysis in this opinion.  To the extent that Defendants wish to establish as a matter of fact why exactly Ms. Barrett left *The New Republic*, a motion to dismiss is not the appropriate vehicle.

used in her byline in the 1990s" is an inactionable subjective judgment and statement of opinion. ECF No. 23, at 25. The court disagrees and concludes that these statements are capable of defamatory meaning.

A defamation-by-implication claim survives here because the statements, viewed in context, are capable of defamatory meaning and imply provably false statements of fact. *Fells*, 281 A.3d at 586. As Defendants note, it is literally true that Ms. Barrett requested the "Ruth S. Barrett" byline. ECF No. 23, at 25. But the context of the statement suggests that Ms. Barrett chose this variation to distance herself from her journalism in the 1990s and to mislead readers. However, Ms. Barrett alleges that this is false—she never intended to conceal her identity, and in fact, she affirmatively chose to use the *more* identifying "Ruth S. Barrett" as opposed to "Ruth Barrett." ECF No. 22-1 ¶ 118. She even requested that the magazine link to her personal website, which included articles she had penned under her unmarried "Ruth Shalit" byline. *Id.* ¶ 66, 118. The "gist" of the statements is that Ms. Barrett sought to conceal her identity and distance herself from some nefarious past; that is capable of defamatory meaning. *Liberty Lobby, Inc.*, 838 F.2d at 1296.

Defendants argue that these statements are inactionable opinion because they "reflect[] a subjective judgment about what The Atlantic 'should' have done to better promote 'transparency' to its readers." ECF No. 23, at 25. To be sure, that is what the text literally says. But a reasonable reader could infer two negative narratives, both of which "imply unstated defamatory facts": first, that Ms. Barrett sought to conceal her identity and distance herself from her work in the 1990s; second, that her history was sufficiently unsavory to warrant her doing this. *Farah*, 736 F.3d at 539 (quoting *Moldea*, 15 F.3d at 1144-45). Here, a reader cannot understand that *The Atlantic*'s opinion represents its interpretation of the facts presented because no truthful facts in relation to

the byline or Ms. Barrett's professional past are presented.  Accordingly, the reader cannot "draw his or her own conclusions" and is instead led to believe the negative implications of the statements.  *Id.*  The key question is whether this statement of opinion has an "implicit factual foundation" that would be "objectively verifiable."  *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 625 (D.C. Cir. 2023) (quoting *Guilford Transp. Indus., Inc.*, 760 A.2d at 589).  In this instance, the implicit factual foundation is that Ms. Barrett tried to use an opaque byline to mislead readers because her maiden name evoked a nefarious history from the 1990s.  Those facts can be proven true or false.  Accordingly, Count Three survives.

### d.    Count Four: Statements suggesting that Ms. Barrett is a dishonest journalist with a history of fabricating facts

As her final defamation claim, Ms. Barrett argues that each of the previously addressed allegedly defamatory statements, taken together and with two additional statements, constitute defamation.  ECF No. 22-1 ¶¶ 155-57.  The two additional statements are substantially similar to each other.  In his Memorandum to *The Atlantic* staff, Mr. Peck stated

> We decided to assign Barrett this freelance story in part because more than two decades separated her from her journalistic malpractice at The New Republic and because in recent years her work has appeared in reputable magazines.  We took into consideration the argument that Barrett deserved a second chance to write feature stories such as this one.  We were wrong to make this assignment, however.  It reflects poor judgment on our part, and we regret our decision.

ECF No. 22-2, at 3.  In each version of the Editor's Note, there were slight variations on the statement that

> [*The Atlantic*] decided to assign Barrett this freelance story in part because more than two decades separated her from her journalistic malpractice at The New Republic and because in recent years her work has appeared in reputable magazines.  We took into consideration the argument that Barrett deserved a second chance to write feature stories such as this one.  We were wrong to make this

> assignment, however.  It reflects poor judgment on our part, and we
> regret our decision.

ECF No. 22-1 ¶ 157.  Defendants contend that the newly added statements are inactionable as

subjective opinion.  ECF No. 23, at 26-29.  As explained in relation to the statements regarding

Ms. Barrett's professional past and the byline, Defendants failed to provide the reader with

adequate truthful facts from which to infer their own conclusions.  *Farah*, 736 F.3d at 539.

Defendants' opinions have "implicit factual foundation[s]" that would be "objectively

verifiable"—namely, that Ms. Barrett had committed journalistic malpractice, that she needed a

"second chance" as a result of that malpractice, and that her conduct was sufficiently severe that

she should not have been afforded the opportunity to write the article.  *Wright*, 68 F.4th at 625

(quoting *Guilford Transp. Indus., Inc.*, 760 A.2d at 589).  The question is close with respect to the

statements that "[*The Atlantic*] [was] wrong to make this assignment, however.  It reflects poor

judgment on our part, and we regret our decision."  ECF No. 22-1 ¶ 157.  These two sentences,

standing alone, could be classic statements of opinion.  But "[c]ontext is critical . . . '[to]

determin[ing] the way in which the intended audience [would] receive'" these statements.  *Farah*,

736 F.3d at 535 (quoting *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 314 (D.C. Cir. 1994)).  These

sentences cannot be separated from the preceding statements.  A reader would consider them part

of a whole in conveying a defamatory narrative.

     In keeping with the prior analysis, the court allows this count to proceed but will exclude

the statements related to the article associated with Count One because, as explained, those are

materially true or protected statements of opinion.  ECF No. 22-1 ¶¶ 125-28 (defamatory

statements 1-13).  The remaining statements survive for the reasons described above, and this

claim encompasses the group of them.  *Id.* ¶ 155 (explaining that this cause of action "is based on

the totality of all the specific defamatory statements," which would now include statements 14-22).

Removing some of the statements does not doom this claim because the rest are actionable.  *See US Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 32 (D.D.C. 2022) (allowing a defamation claim to proceed without parsing specific statements because "not . . . each and every statement mentioned" need assert a falsehood on its own); *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 67-68 (D.D.C. 2018) (allowing a defamation suit to proceed past the motion-to-dismiss stage where "Plaintiffs [had] pleaded at least some actionable statements").

Further, this count draws in all the defamatory statements together—the scope now captures the larger narrative.  Here, the court concludes that a reasonable juror could infer that the full cadre of statements paints a picture of a serial liar who maliciously set out to deceive editors and readers.  There is enough in the complaint to survive this initial stage.  *See Solers, Inc.*, 977 A.2d at 948.

### 2.    Actual Malice

Defendants argue that Ms. Barrett is subject to the heightened fault standard of actual malice.  ECF No. 23, at 13.  In the defamation context, "[t]he applicable fault standard 'turns upon whether the plaintiff is a public or a private figure.'"  *Salem Media Grp., Inc. v. Awan*, 301 A.3d 633, 645 (D.C. 2023) (quoting *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 504 (D.C. 2020)).  Private figures may recover if the defendant is negligent.  *Id.*  But public figures must meet the more demanding "actual malice" standard of liability—meaning the defendant acted "with knowledge that [the relevant statement] was false or with reckless disregard of whether it was false or not."  *Hustler Mag., Inc.*, 485 U.S. at 52 (1988) (quoting *Sullivan*, 376 U.S. at 279-80).  The actual malice standard recognizes the tension between the long-established tort of defamation and the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *Sullivan*, 376 U.S. at 270.  Public figures "have voluntarily exposed themselves to increased risk of injury from defamatory falsehood" and boast increased

access to media to "counteract false statements."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).  In contrast, "[p]rivate individuals are 'more vulnerable to injury,' so the 'state interest in protecting them is correspondingly greater.'"  *Salem Media Grp., Inc.*, 301 A.3d at 646-47 (quoting *id.*).  These different standards accommodate the need to balance free public discourse and the reputational interests of plaintiffs.

There are three types of defamation plaintiffs who must establish actual malice: "(1) a public official; (2) an individual who 'achieve[s] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts,' referred to as a general-purpose public figure; and (3) '[m]ore commonly, an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues,' i.e., a limited-purpose public figure."  *Id.* at 647 (quoting *Gertz*, 418 U.S. at 351).  Whether a plaintiff falls into one of these categories is a question of law that a court must determine. *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1293 n.12 (D.C. Cir. 1980).

The court concludes that Ms. Barrett is not a general-purpose public figure.  Such figures are rare, *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 114 (D.C. Cir. 2017), having reached a level of "well-known celebrity" such that their names are "household word[s]," *Tavoulareas*, 817 F.2d at 772 (internal quotation marks omitted).  Members of the media sometimes achieve celebrity to the level of a general-purpose public figure.  *See Buckley v. Littell*, 539 F.2d 882, 885 (2d Cir. 1976) (holding that news commentator William Buckley was a public figure where, among other things, he was the founder of a national magazine with a circulation of about 100,000 copies per issue, published a syndicated newspaper column for several years, and appeared on a weekly national television show); *Braden v. News World Commc'ns, Inc.*, No. CA-10689-89, 1991 WL 161497 at *8-9 (D.C. Super. Ct. Mar. 1, 1991) (finding that political commentator Thomas

Braden was a public figure where he had published multiple books, appeared on national television, and hosted a daily radio show). But in each instance of defamation, the specific context controls. *See Salem Media Grp., Inc.*, 301 A.3d at 647; *Waldbaum*, 627 F.2d at 1299-1300. Nothing in the record currently before the court suggests that Ms. Barrett is a "well-known celebrity," whose name is "household word" comparable to the preceding examples. *Tavoulareas*, 817 F.2d at 772 (internal quotation marks omitted). There is a material difference between an individual like William Buckley, who may rise to the status of general-purpose public figure as a result of his celebrity, and a freelance writer like Ms. Barrett who occasionally writes features for various outlets.

Nor is Ms. Barrett a limited-purpose public figure on the record currently before the court. As explained, such a figure takes on a central role of a particular public controversy, "either by virtue of their own voluntary actions or involuntarily" through their involvement in the controversy at hand. *Salem Media Grp., Inc.*, 301 A.3d at 647; *Fells*, 281 A.3d at 583. While Defendants suggest that journalists typically fall within this category "for purposes of debates regarding both their journalistic practices and the subject of their writings," ECF No. 23, at 29, there is no generalized rule because the question whether a person is a limited-purpose public figure "is a difficult one, requiring a highly fact-intensive inquiry." *Fridman*, 229 A.3d at 505 (quoting *Doe No. 1 v. Burke*, 91 A.3d 1031, 1041 (D.C. 2014)). To conduct this analysis, the court first identifies whether a public controversy exists and defines its scope. *Salem Media Grp., Inc.*, 301 A.3d at 647. Then, "[i]f there was a preexisting public controversy, [the court] must determine whether the plaintiff is a private or public figure and whether the defamatory statements were 'germane to the plaintiff's participation in the controversy.'" *Id.* (quoting *Moss v. Stockard*, 580 A.2d 1011,

1031 (D.C. 1990)).  The public controversy must predate the defamation.[4]  *Id.*  And not every matter of interest is a public controversy; there must be some "real dispute, the outcome of which affects the general public or some segment of it in an appreciable way."  *Id.* at 648 (quoting *Moss*, 580 A.2d at 1030-31).

Defendants claim that there are two public controversies, one related to the subject matter of the article and the other related to Ms. Barrett's background and performance as a journalist. ECF No. 23, at 29-30.  Neither establishes that Ms. Barrett is subject to the actual malice standard at this stage.

### a.     Subject matter of the article

Defendants argue that the subject of the article—"equity in sports and college admissions or child and adolescent health"—qualifies as a public controversy.  Accepting without deciding that this subject qualifies as a public controversy, this cannot make Ms. Barrett a limited-purpose public figure because the allegedly defamatory statements do not relate to this topic.  The Editor's Notes and Peck Memorandum have nothing to do with "equity in sports and college admissions or child and adolescent health"—their topic is Ms. Barrett's professional actions, journalistic ethics, and the magazine's response.  *See* ECF No. 22-2.  The defamatory statements are divorced from this topic, and for that reason, cannot be the basis for limited-public figure status.  *See Elliott v. Donegan*, 469 F. Supp. 3d 40, 54 (E.D.N.Y. 2020) (finding that a widely published author was not a limited-purpose public figure because his professional work was only tangentially related to his defamation claim).  *Waldbaum* provides a useful illustration of the need for some kind of nexus between the public controversy, the defamatory statements, and the plaintiff's level of

---

[4] For this reason, Defendants' statements that "the filing of this lawsuit alone generated coverage" from the press is irrelevant.  ECF No. 23, at 28.

participation.  There, a CEO of a supermarket company was deemed a limited-purpose public figure in a defamation suit based on an article covering his ouster from the company that stated the company had been losing money.  627 F.2d at 1290, 1300.  The CEO had "inject[ed]" himself into a topic of public debate—the supermarket industry generally—by hosting forum discussions, overseeing the company's marketing, and making public statements on the company's behalf.  *Id.* at 1292, 1300.  Based on this, the court found that he had become a limited-purpose public figure on the topic of the company's policies and approach to the industry.  *Id.* The defamatory statements fell squarely within this topic and were thus subject to the actual malice standard.  *Id.*

In contrast to *Waldbaum*, the alleged defamatory statements here have nothing to do with the subject matter of the article.  The Editor's Notes and Peck Memorandum relate to the article insofar as they detail allegations related to how the article was written.  But they do not engage with the substance—equity in sports, college admissions, or child and adolescent health—in any real way.  For those reasons, the subject matter of the article is not a viable basis for public controversy in the context of Ms. Barrett's defamation claims.

### b.  Ms. Barrett's background and performance as a journalist

Defendants also pitch Ms. Barrett's "talents, education, experience, and motives" as an alternative public controversy.  ECF No. 23, at 30.  The problem here is sequencing.  Considering the facts as alleged in the complaint, there was no *ongoing* public controversy related to Ms. Barrett's credentials when the alleged defamatory statements were made.  Defendants contend, and the complaint admits, that there had been a public controversy on the topic in the 1990s, around the time plagiarism was discovered in Ms. Barrett's work.  ECF No. 22-1 ¶¶ 61-62; ECF No. 23, at 30; ECF No. 27, at 16-17.  But this controversy died down, and Ms. Barrett continued to work as a freelance writer through the 2000s, publishing work in outlets including *New York Magazine*, *The Wall Street Journal*, and *ELLE*.  *Id.* ¶ 65.  The court is not convinced on

the record before it that the purported public controversy from the 1990s was sufficiently close in time to the alleged defamation to render Ms. Barrett a limited-purpose public figure.  *See Addison v. City of Baker City*, 258 F. Supp. 3d 1207, 1241 (D. Or. 2017) (holding that a journalist was not a limited-purpose public figure when six years had elapsed between a public controversy and the alleged defamation and the controversies differed in subject matter).

In sum, Ms. Barrett is not subject to the heightened pleading standard on the record currently before the court.  To the extent that Defendants wish to challenge the factual basis for this conclusion based on facts outside the complaint, they may do so at summary judgment.  *See Fridman*, 2019 WL 231751 at *5.

## C.    False Light Invasion of Privacy Claim (Count Five)

To state a claim for false light invasion of privacy, a plaintiff must show "(1) publicity; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; . . . (4) which places the plaintiff in a false light that would be offensive to a reasonable person."  *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1267 (D.C. 2015).  These elements are typically met "if a plaintiff 'is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position.'"  *Zimmerman*, 246 F. Supp. 3d at 275 (quoting Restatement (Second) of Torts § 652E cmt. b (2016)).  Although some elements overlap with defamation, they are distinct torts.  *Id.* at 273-75.  While defamation captures damage to reputation, false light "redresses *mental distress* from having been exposed to public view."  *Id.* at 274-75.  When "the plaintiff rests both [her] defamation and false light claims on the same allegations," analysis overlaps and the claims rise or fall together.  *Id.* at 273 (quoting *Blodgett v. Univ. Club*, 930 A.2d 210, 223 (D.C. 2007)).  Further, "the same First Amendment protections" from the defamation context apply.  *Weyrich*, 235 F.3d at 627.

Ms. Barrett's false light claims rest on each defamatory statement, mapping directly onto the court's analysis of Count Four.[5]  ECF No. 22-1 ¶ 169.  For the reasons described above, the claims are sufficient to support an actionable false light claim.  *See Zimmerman*, 246 F. Supp. 3d at 278.  First, Ms. Barrett pleads "publicity"—all the statements identified in her false light claim were communicated either to *The Atlantic*'s audience broadly in the Editor's Notes, or to the staff of the magazine in the Peck Memorandum.  ECF No. 22-1 ¶ 169.  Ms. Barrett has identified false statements or imputations that are "of and concerning" herself—that she left *The New Republic* as a result of a plagiarism scandal, that she used a misleading byline to conceal her identity, and that she sought to mislead readers.  *Id.* ¶ 170.  Finally, these statements would be offensive to a reasonable person.  Ms. Barrett makes clear that Defendants' statements have "pulveriz[ed] [her] reputation" and "had a catastrophic effect on [her] life" "caus[ing] . . . severe humiliation, anger, embarrassment[,] and emotional distress."  *Id.* ¶¶ 22, 55.  Publicity from the statements has also had "an equally catastrophic effect on her career."  *Id.* ¶ 55.  Such allegations, accepted as true, sufficiently paint Ms. Barrett in a false light that could be offensive to a reasonable person.[6]  Accordingly, Ms. Barrett has stated a claim for false light sufficient to survive a motion to dismiss.

### D.    Contract Claims (Counts Six and Seven)

"To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach."  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187

---

[5] For the reasons set forth in the analysis of Count Four, the statements related to the article associated with Count One are excluded from the false light claim because they are materially true or protected statements of opinion.  *See supra*, III.B.1.d; ECF No. 22-1 ¶¶ 125-28 (defamatory statements 1-13).

[6] Defendants are correct that if the actual malice standard applies to the defamation claims, it also attaches to the false light claim.  ECF No. 23, at 36-37; *Weyrich*, 235 F.3d at 627.  However, as explained above, Ms. Barrett is not subject to it on the record currently before the court.

(D.C. 2009).  "Under D.C. law, 'the written language of a contract governs the parties' rights unless it is not susceptible of clear meaning.'"  *Red Sage Ltd. P'ship v. DESPA Deutsche Sparkassen Immobilien-Anlage-Gasellschaft mbH*, 254 F.3d 1120, 1125 (D.C. Cir. 2001) (quoting *Adler v. Abramson*, 728 A.2d 86, 88 (D.C. 1999)).

Ms. Barrett brings two contract claims based on the Author's Agreement she entered into with *The Atlantic* to write the article: one asserting breach of the duty of good faith and fair dealing; the other alleging breach of privacy provisions in the contract.  ECF No. 22-1 ¶¶ 173-207.  She has failed to plead adequate facts to support either claim.

### 1.     Breach of the Duty of Good Faith and Fair Dealing

"[I]n every contract there exists an implied covenant of good faith and fair dealing," consisting of a duty that "neither party shall do anything which will have the effect of destroying or injuring the right of the party to receive the fruits of the contract."  *Weatherly v. Second Nw. Coop. Homes Ass'n*, 304 A.3d 590, 596 (D.C. 2023) (quoting *Abdelrhman v. Ackerman*, 76 A.3d 883, 891-92 (D.C. 2013)).  "If the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing."  *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000)).   To state such a claim, "a plaintiff must allege either bad faith or conduct that is arbitrary and capricious."  *Weatherly*, 304 A.3d at 596.

Ms. Barrett alleges that *The Atlantic* breached the agreement by failing to protect Sloane as a confidential source, discussing her article with Mr. Wemple (*The Washington Post*'s media critic), issuing three Editor's Notes that "went out of their way to malign [her]," and failing to conduct a fair and thorough investigation into the events surrounding the "mishap" with the article. ECF No. 22-1 ¶¶ 179-81, 186, 189.  Defendants argue that these actions do not violate the covenant

because they are disconnected from the terms of the Author's Agreement or any of the rights contained therein.  ECF No. 23, at 40-41; ECF No. 27, at 23-24.  The court agrees.  Good-faith obligations are tied to the conditions of the contract.  *See Sundberg v. TTR Realty, Inc.*, 109 A.3d 1123, 1134 (D.C. 2015).  A plaintiff cannot base this type of claim on rights she was never entitled to, or on rights she wished she had acquired.  *Ihebereme v. Capital One, N.A.*, 933 F. Supp. 2d 86, 102-05 (D.D.C. 2013).  With the exception of *The Atlantic*'s failure to maintain Sloane's confidentiality, none of the other purported breaches relate to a tangible provision in the contract.  Indeed, Ms. Barrett does not identify any bases in the contract for these rights.  *See* ECF No. 22-1 ¶¶ 181-91.

Ms. Barrett's claim that *The Atlantic* interfered with her obligation to protect Sloane as a confidential source could serve as a basis for the breach, because she alleges efforts by *The Atlantic* to "interfere[] with [her] performance" of this provision of the contract.  *Allworth*, 890 A.2d at 201.  For example, *The Atlantic* repeatedly pressed Ms. Barrett to provide increasingly detailed information in the story about Sloane and her family, which ultimately led to Mr. Wemple identifying Sloane.  ECF No. 22-1 ¶¶ 7, 9, 26, 69, 71, 180.  Allegations of this type of interference are sufficiently connected with Ms. Barrett's efforts to comply with the contract.

Nevertheless, this claim fails because Ms. Barrett does not allege specific facts to support the necessary element of damages for the claim.  *Tsintolas Realty Co.*, 984 A.2d at 187 (explaining that damages are required in a breach of contract claim).  "[W]hile damages are not required to be proven with mathematical certainty, there must be some reasonable basis on which to estimate damages," and here there is none.  *Wood v. Day*, 859 F.2d 1490, 1493 (D.C. Cir. 1988) (quoting *Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C. 1982)).  Ms. Barrett states that she "suffer[ed] economic harm" because the breach "ma[de] it more difficult or impossible for her to

practice her profession of writing."  ECF No. 22-1 ¶ 206.  But such an allegation of generalized harm is insufficient.  She does not, for example, suggest that she lost a specific paid writing opportunity or has been unable to obtain future sources as a result of her failure to maintain Sloane's anonymity (which was itself caused by *The Atlantic*'s breach).  Her allegations are insufficiently speculative.  Accordingly, she fails to state a claim on Count Six.

### 2.      Breach of the Author's Agreement

Ms. Barrett asserts breach of two sections of the contract: Section 6(b) and Section 2(c). ECF No. 22-1 ¶¶ 193, 204; ECF No. 20-8, at 1-2.  The court addresses each in turn.

Section 6(b) of the Author's Agreement required Ms. Barrett to ensure that her work "does not infringe . . . any other right, of any person or entity" or "invade the privacy . . . rights of anyone."  ECF No. 22-1 ¶ 193 (alterations in original); ECF No. 20-8, at 2.  She purports that this language "should be interpreted as imposing reciprocal obligations on *The Atlantic* not to infringe any rights of any person, including rights under an agreement of confidentiality."  *Id.* ¶ 200.  The court interprets the meaning of the contract by its plain terms unless it is ambiguous.  *Red Sage Ltd. P'ship*, 254 F.3d at 1125.  The plain meaning of the Author's Agreement is clear: its terms apply solely to Ms. Barrett, not to *The Atlantic*, so her allegations of a breach fail as a matter of law.  Ms. Barrett cites no authority or legal basis to the contrary, other than to argue that it would produce an "absurd result" in which *The Atlantic* could violate the source's confidentiality, thereby opening up the author to liability under the Author's Agreement.  ECF No. 24, at 42.  But in such a circumstance, the plaintiff would have a claim for violation of the covenant of good faith and fair dealing.  There is thus no reason to depart from Section 6(b)'s plain text.

Section 2(c) granted "exclusive worldwide rights" to the story to *The Atlantic* in exchange for its promise "to make commercially reasonable efforts, including through a contractual relationship with an agent selected by [*The Atlantic*], to make such intellectual property rights

available to interested parties and to market such rights."  ECF No. 22-1 ¶ 204; ECF No. 20-8, at

1.  Ms. Barrett alleges that *The Atlantic* violated this term by not marketing the article and by

"preventing" her from pursing commercial opportunities related to the article.  ECF No. 22-1

¶ 204-05.  However, Ms. Barrett does not allege any facts to support such a claim—there is no

basis from which the court can determine whether *The Atlantic* undertook "commercially

reasonable" efforts to market her work.  If anything, as Defendants point out, the facts in the

complaint suggest that in the face of controversy surrounding the article and its ultimate retraction,

*The Atlantic* could have done little to promote the story.  ECF No. 23, 44-45; ECF No. 27, at 25.

As a result, the court will dismiss Count Seven.

## IV.    Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss, ECF No. 23, is **GRANTED** in

part and **DENIED** in part.  Counts One, Six, and Seven are **DISMISSED**.  Counts Two through

Five will proceed.  Defendants shall file an answer on or before September 23, 2024.  Fed. R. Civ.

P. 12(a)(4)(A).

**SO ORDERED.**

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date: September 9, 2024